Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:   (818) 532-6449
E-mail:        jpafiti@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:   (212) 661-1100
Facsimile:    (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:   (312) 377-1181
Facsimile:    (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN GOLDEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BOFI HOLDING, INC., GREGORY GARRABRANTS, and ANDREW J. MICHELETTI,<br><br>Defendants. | No. '15 CV 2324 GPC KSC<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Steven Golden ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding BofI Holding, Inc. ("BofI" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased the securities of BofI from September 4, 2013 to October 13, 2015, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against BofI and certain of its officers and directors for violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     BofI operates as the holding company for BofI Federal Bank, a provider of consumer and business banking products through the Internet in the United States.   BofI Federal Bank's deposits products include consumer and business checking, demand, savings, and time deposit accounts. Its loan portfolio

comprises residential single family and multifamily mortgage loans; commercial real estate secured and commercial lending products; specialty finance factoring products; and consumer lending products consisting of prime loans to purchase new and used recreational vehicles and automobiles, as well as deposit-related overdraft lines of credit.

3.     BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet USA ("Bank of Internet") brand.

4.     The Company was incorporated in 1999. BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ under the ticker symbol "BOFI."

5.     Throughout the Class Period, defendants made false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, prospects and performance.  Specifically, during the Class Period, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's internal controls were frequently disregarded; (ii) Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (iii) many Bank of Internet accounts lacked required tax identification numbers; (iv) Bank of Internet fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (v)  as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

6.     On October 13, 2015, post-market, *The New York Times* reported that Matt Erhart ("Erhart"), a former internal auditor at Bank of Internet, had filed a lawsuit against the Company for violating federal laws designed to protect whistle-blowers (the "Erhart Complaint"). The Erhart Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the Office of the Comptroller of the Currency ("OCC"), its primary regulator;

- Bank of Internet at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

7.     On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

8.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

13.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased the securities of BofI at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

14.     Defendant BofI is a Delaware company headquartered and operating at 4350 La Jolla Village Drive, Suite 140, San Diego, California 92122.  BofI's shares trade on the NASDAQ under the ticker symbol "BOFI."

15.     Defendant Gregory Garrabrants ("Garrabrants") has served at all relevant times as the Company's President, Director, and Chief Executive Officer ("CEO").

16.     Defendant Andrew J. Micheletti ("Micheletti") has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO").

17.     The Defendants referenced in ¶¶ 15-16 are sometimes referred to herein, collectively, as the "Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

18.     Defendant BofI operates as the holding company for Bofi Federal Bank, a provider of consumer and business banking products through the Internet in the United States.  BofI Federal Bank's deposits products include consumer and business checking, demand, savings, and time deposit accounts. Its loan portfolio comprises residential single family and multifamily mortgage loans; commercial real estate secured and commercial lending products; specialty finance factoring products; and consumer lending products consisting of prime loans to purchase new and used recreational vehicles and automobiles, as well as deposit-related overdraft lines of credit.

19.     BofI Federal Bank's most significant business is making mortgages to high-net-worth individuals for the purchase of expensive properties through BofI Federal Bank's Bank of Internet brand.

20.     The Company was incorporated in 1999.  BofI is headquartered in San Diego, California, and its shares trade on the NASDAQ under the ticker symbol "BOFI."

### Materially False and Misleading
### Statements Issued During the Period

21.     The Class Period begins on September 4, 2013, when BofI filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 10-K"). For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million, compared to net income of $8.57 million, or $0.64 per diluted share, on net revenue of $26.55 million for the same period in the prior year. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million, compared to net income of $29.48 million, or $2.33 per diluted share, on net revenue of $95.56 million for fiscal year 2012.

22.     In the 2013 10-K, the Company stated, in part:

**REGULATION OF BOFI FEDERAL BANK**

*General*. As a federally-chartered savings and loan association whose deposit accounts are insured by the Federal Deposit Insurance Corporation ("FDIC"), BofI Federal Bank is subject to extensive regulation by the FDIC and . . . the [Office of the Comptroller of the Currency]. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

. . .

*Anti-Money Laundering and Customer Identification*. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct

Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.'

23.     The 2013 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual Defendants, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On November 5, 2013, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q1 2014 10-Q").  For the quarter, the Company reported net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million, compared to net income of $8.99 million, or $0.67 per diluted share, on net revenue of $29.25 million for the same period in the prior year.

25.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On December 4, 2013, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q1 2014 financial and operating results (the "Q1 2014 Investor Presentation").  The Q1 2014 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

27.   On February 5, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2013 (the "Q2 2014 10-Q").  For the quarter, the Company reported net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million, compared to net income of $9.77 million, or $0.70 per diluted share, on net revenue of $31.19 million for the same period in the prior year.

28.   The Q2 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

29.   On February 6, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q2 2014 financial and operating results (the "Q2 2014 Investor Presentation").  The Q2 2014 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

30.    On May 6, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q3 2014 10-Q").  For the quarter, the Company reported net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million, compared to net income of $10.40 million, or $0.74 per diluted share, on net revenue of $33.04 million for the same period in the prior year.

31.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

32.    On May 7, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q3 2014 financial and operating results (the "Q3 2014 Investor Presentation").  The Q3 2014 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

33.    On August 7, 2014, BofI issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2014 (the "2014 8-K").  For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million, compared to net income of $11.13 million, or $0.78 per diluted share, on net revenue of $35.87 million for the same period in the prior year.  For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million, compared to net income of $40.29 million, or $2.89 per diluted share, on net revenue of $129.34 million for fiscal year 2013.

34.    On August 28, 2014, BofI filed an annual report on Form 10-K with the SEC (the "2014 10-K").  The 2014 10-K reiterated the financial and operating results previously announced in the 2014 8-K.

35.    In the 2014 10-K, the Company stated, in part:

**REGULATION OF BOFI FEDERAL BANK**

***General***. As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

. . .

***Anti-Money Laundering and Customer Identification***. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA Patriot Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA Patriot Act.

36.    The 2014 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.    On September 3, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q4 2014 financial and operating results (the "Q4 2014 Investor Presentation"). The Q4 2014 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

38.     On November 4, 2014, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q1 2015 10-Q").  For the quarter, the Company reported net income of $17.84 million, or $1.20 per diluted share, on net revenue of $50.12 million, compared to net income of $12.18 million, or $0.85 per diluted share, on net revenue of $35.09 million for the same period in the prior year.

39.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On November 17, 2014, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q1 2015 financial and operating results (the "Q1 2015 Investor Presentation").  The Q1 2015 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

41.    On January 29, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended December 31, 2014 (the "Q2 2015 10-Q").  For the quarter, the Company reported net income of $19.37 million, or $1.27 per diluted share, on net revenue of $54.81 million, compared to net income of $13.15 million, or $0.91 per diluted share, on net revenue of $38.37 million for the same period in the prior year.

42.    The Q2 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43.    On March 2, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q2 2015 financial and operating results (the "Q2 2015 Investor Presentation").  The Q2 2015 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

44.    On April 30, 2015, BofI filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q3 2015 10-Q").  For the quarter, the Company reported net income of $21.07 million, or $1.35 per diluted share, on net revenue of $59.03 million, compared to net income of $14.61 million, or $1.00 per diluted share, on net revenue of $40.88 million for the same period in the prior year.

45.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

46.    On May 6, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q3 2015 financial and operating results (the "Q3 2015 Investor Presentation").  The Q3 2015 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

47.    On July 30, 2015, BofI issued a press release and filed a Form 8-K with the SEC announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2015 (the "2015 8-K").  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, on net revenue of $65.57 million, compared to net income of $16.01 million, or $1.09 per diluted share, on net revenue of $45.22 million for the same period in the prior year. For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, on net revenue of $229.54 million, compared to net income of $55.96 million, or $3.85 per diluted share, on net revenue of $159.55 million for fiscal year 2014.

48.    On August 10, 2015, BofI filed Form 8-K with the SEC containing an Investor Presentation concerning the Company's Q4 2015 financial and operating results (the "Q4 2015 Investor Presentation").  The Q4 2015 Investor Presentation contained, in part, the following statements:

- BofI is Consistently Ranked among the Best of the Biggest Thrifts by SNL Financial…;

- …and is also a Top Performer among the Broader Universe of All Public Banks and Thrifts;

- BofI is a Top Quartile Performer Versus Bank Peer Group;

- Our Business Model is More Profitable Because Our Costs are Lower; and

- Our Asset Growth has been Driven by Strong and Profitable Organic Loan Production

49.   On August 22, 2015, *The New York Times* published an article, titled "An Internet Mortgage Provider Reaps the Rewards of Lending Boldly," concerning BofI's robust growth during defendant Garrabrants' tenure as CEO. The article stated, in relevant part:

> As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms. But because its financial performance has, in many ways, been spectacular, ***Bank of Internet has been turning heads — and setting off alarm bells as well. The bank has made loans to people who were later found to have run afoul of the law, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.***

> Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

> "I am passionate about what we do here, and I believe in it," Mr. Garrabrants said in one of several telephone interviews in recent weeks. "We are proud of what we are doing here. ***We try to really run a good, ethical shop, and I want people to know that.***"

> . . .

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky. ***Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering. The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices.*** They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

. . .

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, says the critics are spreading disinformation — and losing money — as they bet against his firm's soaring stock.

"Here's the problem for them: They are going into an earnings juggernaut that has none of the things that they're talking about," Mr. Garrabrants said. And ***he says the bank is as judicious as any other lender in picking its borrowers.*** "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

. . .

Still, ***Bank of Internet has lent money to some unsavory characters.*** For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaidfraud. In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a

"Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

Mr. Garrabrants defended his practices in an email. ***"It is unfair to characterize our borrowers' profiles as different than other banks that serve high-net-worth customers,"*** he said. "You would easily be able to find lawsuits and an occasional legal issue if you scanned First Republic or another bank with high-net-worth borrowers as well."

. . .

***Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners.*** When asked, Mr. Garrabrants said it was "nowhere near the majority." Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. ***Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details.***

Regulators have not publicly warned or penalized the bank for its lending to foreign nationals, and Mr. Garrabrants often sounds exasperated when defending that business. In his view, short-sellers had sought to stir up concerns about those loans to try to persuade regulators

to stop Bank of Internet from acquiring parts of H&R Block's banking unit. The deal was concluded this month.

And, ***according to Mr. Garrabrants, regulators have inspected Bank of Internet's processes for vetting loans to foreigners — and given the bank positive feedback. "We've had full regulatory review of that process and specific compliments on it,"*** he said, noting that the review took place after the two internal auditors left. ***"It is beyond a nonissue."*** The Office of the Comptroller of the Currency declined to comment on Bank of Internet or any interactions with the bank.

50.     On August 26, 2015, BofI filed an annual report on Form 10-K with the SEC (the "2015 10-K"). The 2015 10-K reiterated the financial and operating results previously announced in the 2015 8-K.

51.     In the 2015 10-K, the Company stated, in part:

**REGULATION OF BOFI FEDERAL BANK**

*General*. As a federally-chartered savings and loan association whose deposit accounts are insured by FDIC, BofI Federal Bank is subject to extensive regulation by the FDIC and, as of the Transfer Date, the OCC. Under the Dodd-Frank Act, the examination, regulation and supervision of savings associations, such as BofI Federal Bank, were transferred from the OTS to the OCC, the federal regulator of national banks under the National Bank Act. The following discussion summarizes some of the principal areas of regulation applicable to the Bank and its operations.

. . .

***Anti-Money Laundering and Customer Identification***. The U.S. government enacted the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act") on October 26, 2001 in response to the terrorist events of September 11, 2001. The USA PATRIOT Act gives the federal government broad powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and

broadened anti-money laundering requirements. In February 2010, Congress re-enacted certain expiring provisions of the USA PATRIOT Act.

52.    The 2015 10-K contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.    The statements referenced in ¶¶ 21-52 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, prospects and performance.  Specifically, during the Class Period, defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's internal controls were frequently disregarded; (ii) Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws; (iii) many Bank of Internet accounts lacked required tax identification numbers; (iv) Bank of Internet fired an internal auditor who raised the foregoing issues to management and to federal regulators; and (v)  as a result of the above, the Company's statements regarding its internal controls and other financial statements were materially false and misleading at all relevant times.

### The Truth Emerges

54.    On October 13, 2015, post-market, *The New York Times* reported that Erhart, a former internal auditor at Bank of Internet, had filed a lawsuit against the Company for violating federal laws designed to protect whistle-blowers.  The Erhart Complaint alleged, *inter alia*, that:

- Bank of Internet's borrowers included foreign nationals who should have been off-limits under federal anti-money-laundering laws;

- Erhart had seen a spreadsheet that contained as many as 200 accounts without tax identification numbers, contrary to Bank of Internet's representations to the OCC, its primary regulator;

- Bank of Internet at times failed to provide full and timely information to regulators; and

- Erhart was fired after he revealed wrongdoing at Bank of Internet to management and federal regulators.

55.   On this news, shares of BofI fell $42.87, or 30.2%, to close at $99.13 on October 14, 2015.

56.   As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired BofI securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the BofI Class Period, securities of BofI were actively traded on the NASDAQ Global Select Market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BofI or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BofI;

- whether the Individual Defendants caused BofI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BofI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- BofI securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold BofI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were

disclosed, without knowledge of the omitted or misrepresented facts.

64.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

66.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.   This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud

in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BofI securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BofI securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

69. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for BofI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BofI's internal controls and compliance with federal law.

70. By virtue of their positions at BofI, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were

committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of BofI securities from their personal portfolios.

72.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of BofI, the Individual Defendants had knowledge of the details of BofI's internal affairs.

73.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of BofI.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to BofI's business, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of BofI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning BofI's operations and quality control processes which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired BofI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the

securities and/or upon statements disseminated by defendants, and were damaged thereby.

74.     During the Class Period, BofI securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of BofI securities at prices artificially inflated by defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of BofI securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market price of BofI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

75.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

77.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78.    During the Class Period, the Individual Defendants participated in the operation and management of BofI, and conducted and participated, directly and indirectly, in the conduct of BofI's business affairs.   Because of their senior positions, they knew the adverse non-public information about BofI's business and quality control.

79.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to BofI's internal controls and to correct promptly any public statements issued by BofI which had become materially false or misleading.

80.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which BofI disseminated in the marketplace during the Class Period concerning BofI's results of operations and internal controls.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause BofI to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of BofI within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they

1  participated in the unlawful conduct alleged which artificially inflated the market

2  price of BofI securities.

3      81.    Each of the Individual Defendants, therefore, acted as a controlling

4  person of BofI.  By reason of their senior management positions and/or being

5  directors of BofI, each of the Individual Defendants had the power to direct the

6  actions of, and exercised the same to cause, BofI to engage in the unlawful acts and

7  conduct complained of herein.  Each of the Individual Defendants exercised control

8  over the general operations of BofI and possessed the power to control the specific

9  activities which comprise the primary violations about which Plaintiff and the other

10  members of the Class complain.

11      82.    By reason of the above conduct, the Individual Defendants are liable

12  pursuant to Section 20(a) of the Exchange Act for the violations committed by BofI.

13                          **PRAYER FOR RELIEF**

14      **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

15      A.     Determining that the instant action may be maintained as a class action

16  under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as

17  the Class representative;

18      B.     Requiring Defendants to pay damages sustained by Plaintiff and the

19  Class by reason of the acts and transactions alleged herein;

20      C.     Awarding Plaintiff and the other members of the Class prejudgment

21  and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

22  and other costs; and

23

1       D.    Awarding such other and further relief as this Court may deem just and

2   proper.

3   <u>**DEMAND FOR TRIAL BY JURY**</u>

4       Plaintiff hereby demands a trial by jury.

5   Dated: October 15, 2015

    Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6449
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile: (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com
        mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***