1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: | Case No. 3:15-CV-02324-GPC-KSC |
| BofI HOLDING, INC. SECURITIES LITIGATION. | CLASS ACTION |
| | **ORDER:** |
| | **DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS** |
| | [ECF No. 37] |
| | **GRANTING DEFENDANTS' MOTION TO SEAL** |
| | [ECF No. 42] |
| | **DENYING PLAINTIFFS' MOTION TO STRIKE** |
| | [ECF No. 45] |
| | **GRANTING PLAINTIFFS' MOTION TO SEAL** |
| | [ECF No. 46] |

Plaintiffs, purchasers of BofI's common stock, have sued BofI and a number of its corporate officers for misrepresenting the risk involved in investing in its internet bank. On February 1, 2016, the Court consolidated two related securities class actions, *Golden*

1

*v. BofI Holding Inc., et al*, Case No. 15-cv-02324-GPC-KSC (S.D. Cal.) and *Hazan v. BofI Holding, Inc. et al*, Case No. 15-cv-02486-GPC-KSC (S.D. Cal).  ECF No. 23.  At that time, the Court appointed Houston Municipal Employees Pension System (HMEPS) as lead plaintiff of the class action suit pursuant to 15 U.S.C. § 78u–4(a)(3).  *Id.*  HMEPS then filed a Consolidated Amended Class Action Complaint on April 11, 2016.  ECF No. 26.  The Consolidated Amended Class Action Complaint ("CAC" or "the Complaint") asserts 1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and 2) violations of Section 20(a) of the Exchange Act.  ECF No. 26. Presently before the Court is a motion to dismiss filed by Defendants BofI Holding Inc., Gregory Garrabrants, Andrew J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas (collectively "Defendants").  ECF No. 26.  Defendants seek to dismiss both of Plaintiffs' claims on the theory that Plaintiffs have failed to meet the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), which requires that Section 10(b) claims plead both fraudulent misrepresentation and scienter with particularity.  ECF No. 37-1 at 8.[1]

## **BACKGROUND**

Founded in 1999, BofI[2] is a federally-chartered internet bank that operates from its headquarters in San Diego, California.  *See* CAC ¶ 3.  BofI is not your run-of-the-mill bank.  Instead of relying on brick-and-mortar branches to generate business, BofI offers its products through retail distribution channels, such as websites, online advertising, a call center of salespeople, referrals from financial advisory firms, and referrals from affinity groups.  *Id.*  BofI is in the business of providing consumer and business products, including checking, savings, and time-deposit accounts, and services, such as financing for residential and commercial real estate, business, and vehicles.  *Id.* ¶¶ 2-3.  BofI is also in the business of consumer and business lending.  *Id.* ¶ 30.  BofI engages in Single

---

[1] All page numbers cited herein follow CM/ECF's internal pagination.
[2] "BofI" will refer to both the holding company and its subsidiary, BofI Federal Bank.  *Id.* ¶ 2.

Family Mortgage Secured Lending, MultiFamily Mortgage Secured Lending, Commercial Real Estate Secured and Commercial Lending, Specialty Financial Factoring, Prepaid Cards, and Auto, RV, and other consumer-related lending.  *Id.* ¶ 30.

BofI has grown tremendously in recent years.  *Id.* ¶ 5.  Over the last five years, total deposits increased to $5.2 billion, signaling 235% growth, and net income increased from $20.6 million in fiscal year 2011 to $82.7 million in fiscal year 2015.  *Id.* Development of the bank's loan portfolio propelled BofI's growth during these years. *Id.* ¶ 42.  From 2011 to 2015, BofI's loan portfolio grew from $1.33 billion to $5 billion, representing 274% in growth.  *Id.*  By the end of calendar year 2015, BofI had a loan portfolio worth $5.715 billion.  *Id.* ¶ 30.  From September 4, 2013 to February 3, 2016 (the putative "Class Period"), Plaintiff HMEPS and other class members similarly situated purchased BofI's common stock.  *Id.* ¶ 1.  During the Class Period BofI's stock reached a high of $142.54 per share, representing a 1,100% increase over its initial public offering of $11.50 per share in 2005.  *Id.* ¶ 6.  As of January 22, 2016, HMEPS had 63,032,258 in common stock shares outstanding.  *Id.* ¶ 32.

On October 13, 2015, *The New York Times* reported that a formal internal auditor at BofI had filed a federal whistleblower lawsuit ("the *Erhart* Case")[3]  alleging that BofI was engaged in widespread misconduct.  *Id.* ¶ 20.  After the *Erhart* Case was filed, the price of BofI's stock fell by $10.72 per share (or $42.87 per share on a pre-split adjusted basis), or 30.2%, and closed at $24.78 on October 14, 2016.  *Id.* ¶ 21.  The total capital loss amounted to $675 million.  *Id.*  The price of Defendants' stock then continued to decrease through February 3, 2016 (i.e., the last day of the Class Period).  *Id.* ¶ 22. Plaintiffs now allege that the decline in the market value of BofI's securities caused Plaintiffs to suffer significant damages.  *Id.*

---

[3] *Erhart v. BofI Holding, Inc.*, Case No. 15-cv-2287-BAS-NLS (S.D. Cal).

In addition to BofI, Plaintiffs have named five individuals as defendants in this action, all of whom served as BofI executives throughout the Class Period.  Gregory Garrabrants is the CEO, President, and Director of BofI.  *Id.* ¶ 33.  He has held the CEO position since 2007 and been President and Director since 2008.  *Id.*  Andrew J. Micheletti is BofI's Executive Vice President and Chief Financial Officer, and has held those positions throughout the Class Period.  *Id.* ¶ 34.  Paul J. Grinberg is a member of BofI's Board of Directors and has been the Chairman of the Board Audit Committee, the Board Compensation Committee, and a member of the Board Nominating Committee for the Class Period.  *Id.* ¶ 35.  Nicholas A. Mosich has served as the Vice Chairman of BofI's Board of Directors and as a member of the Board Audit Committee throughout the Class Period.  *Id.* ¶ 36.  James S. Argalas served as a member of the Board of Directors and a member of the Board Audit Committee throughout the Class Period.  *Id.* ¶ 37.

## 1. Defendants' Alleged Fraudulent Scheme

The tenor of Plaintiffs' claims is that Defendants materially misrepresented the risk of investing in BofI by engaging in knowing and reckless conduct that rendered the bank a "materially-less safe investment than investors were led to believe."  *Id.* ¶ 23.  The Defendants, Plaintiffs allege, sold themselves as offering "significant cost savings and operation efficiencies derived from its purported branchless business model, as well as low loan losses."  *Id.* ¶ 7.  Yet while Defendants touted themselves as a "careful, prudent institution" and emphasized their "conservative loan-underwriting standards," Plaintiffs allege that the bank actually had a "troubled identity that resorted to lax lending practices and other unlawful conduct to fraudulently boost its loan volume and earnings."  *Id.* ¶¶ 1 & 8.  By way of numerous false and misleading representations, BofI allegedly concealed the actual risk of loss present on its ledger and deceived investors as to its true financial condition.  In their more than 140-page complaint, Plaintiffs point to copious facts as evidence that BofI statements, and their omissions, were false and misleading when made.  The gravamen of the allegations concerns Defendants' deviations from BofI's

loan underwriting standards, inadequate internal control and audit measures, undisclosed related-party transactions, and other violations of the federal securities laws.

### 2. Defendants' False and Misleading Statements

Plaintiffs have identified four types of misleading statements made by BofI: 1) earnings calls; 2) SEC filings; 3) conference calls about the results in SEC filings; and 4) press releases about the results in SEC filings. *Id.* ¶¶ 45, 244-362. With regard to the SEC filings, Plaintiffs have specifically identified Defendants' 2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K as misleading, *id.* ¶¶ 253, 306, & 359, as well as Defendants' 10-Q forms for Quarters 1 through 3 of 2014, Quarters 1 through 3 of 2015, and Quarter 1 of 2016, *id.* ¶¶ 259, 272, 286, 312, 325, 337, 384. Most of the press releases and conference calls that Plaintiffs have identified refer specifically to BofI's financial earnings as published in the respective SEC filings. The statements made in response to the *Erhart* allegations are denials of the allegations made by the plaintiff in the *Erhart* case.[4]

### a. Earnings Calls

CEO Garrabrants described Defendants' lending practices in a series of earnings calls held on August 7, 2014, April 30, 2015, and October 29, 2015, respectively, as follows:

1) "we continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products," "we believe that we can continue to grow our [C & I loan] portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines," and "[w]e are pleased with the increase in the credit quality at the bank."

2) "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes," and "[r]isk is not hidden in the tail of the portfolio."

---

[4] The Court will not recount these statements in any depth because Defendants' other statements were sufficient for the Court to reach a decision.

3) BofI's "portfolio credit quality is very strong," "[o]ur strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs."

*Id.* ¶ 45.

### b. 10-K Filings

The three 10-Ks that Defendants filed with the SEC during the Class Period made many of the same representations about credit quality and loan underwriting as indicated in the earnings calls above. They also address risk in BofI's loan portfolio and in its off-balance sheets. Because the representations made in Defendants' 2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K are essentially identical, the Court will treat the 2013 Form 10-K as illustrative. *Compare id.* ¶¶ 244-53 *with id.* ¶¶ 299-306 *and id.* ¶¶ 352-59. The annual report included in Defendants' 2013 Form 10-K detailed BofI's loan underwriting standards as follows:

> We individually underwrite the loans that we originate and all loans that we purchase. Our loan underwriting policies and procedures are written and adopted by our board of directors and our loan committee. Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators.
>
> In the underwriting process we consider the borrower's credit score, credit history, documented income, existing and new debt obligations, the value of the collateral, and other internal and external factors. For all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment, but we also endeavor to obtain personal guarantees from all borrowers or substantial principals of the borrower. In evaluating multifamily and commercial loans, we review the value and condition of the underlying property, as well as the financial condition, credit history and qualifications of the borrower. In evaluating the borrower's qualifications, we consider primarily the borrower's other financial resources, experience in owning or managing similar properties and payment history with us or other financial institutions. In evaluating the underlying property, we consider primarily the net operating income of the property before debt service and depreciation, the ratio of net operating income to debt service and the ratio of the

loan amount to the appraised value.

*Id.* ¶ 248.  The 2013 Form 10-K also indicated that its "allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio"; that BofI was committed to "maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio"; and that "management performs an ongoing assessment of the risks inherent in the portfolio."  *Id.* ¶ 245.  The report went on to address BofI's off-balance sheet activities.

> Credit-Related Financial Instruments. The Company is a party to credit-related financial instruments with off-balance- sheet risk in the normal course of business to meet the financing needs of its customers. . . .
>
> The Company's exposure to credit loss is represented by the contractual amount of these commitments. The Company follows the same credit policies in making commitments as it does for onbalance-sheet instruments.

*Id.* ¶ 249.  Elaborating on the company's off-balance sheet commitments, the filing also stated that "[t]he fair value of off-balance sheet items is not considered material" and that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  *Id.* ¶ 250.  Defendants Garrabrants and Micheletti certified BofI's 2013, 2014 and 2015 Form 10-Ks pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX").  *Id.* ¶¶ 251, 305, 358

### c. 10-Q Filings

As stated previously, Plaintiffs identified seven of Defendants' Form 10-Qs submitted during the Class Period as false and misleading.  *Id.* ¶¶ 259, 272, 286, 312, 325, 337, 384.  The representations made in those documents are substantially similar in kind to those made in the Form 10-Ks.

Defendants' 2014 Form 10-Q explained that "[t]he Company's goal is to maintain the allowance for loan losses (sometimes referred to as the allowance) at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that "the Company believes that the allowance for loan losses is adequate . . . ." *Id.* ¶ 255.  The form also described Defendants' off-balance commitments and explained that it had "no commitments to purchase loans, investment securities or any other unused lines of credit" and that "[t]he fair value of off-balance sheet items is not considered material."  *Id.* ¶ 257.  Nearly identical statements were made in the remaining 10-Qs.  *See id.* ¶¶ 254-59, 267-72, 281-86, 307-12, 320-25, 333-37.

BoFI's Q1 2016 filing, unlike the other quarter filings, also made reference to ongoing "Legal Proceedings."  *Id.* ¶ 381.

> . . . from time to time we may be a party to other claims or litigation that arise in the ordinary course of business, such as claims to enforce liens, claims involving the origination and servicing of loans, and other issues related to the business of the Bank. None of such matters are expected to have a material adverse effect on the Company's financial condition, results of operations or business.  *Id.* ¶ 381.

Defendants Garrabrants and Micheletti certified BofI's 10-Q forms for Quarters 1 through 3 of 2014, Quarters 1 through 3 of 2015, and Quarter 1 of 2016 pursuant to SOX. *Id.* ¶¶ 258, 271, 285, 311, 324, 336, 383.

### d. Conference Calls

During the Class Period, BofI held regular conference calls with analysts and investors to discuss the outcomes reported in the most recent Form 10-Q.  *See, e.g.*, *id.* ¶ 262.  Each time, Defendant Micheletti "reiterated the financial results" and Defendant Garrabrants made statements concerning one or more of the following topics: BofI's credit quality, underwriting standards, risk management, as well as internal and external compliance.

In an earnings call for Q1 2014 held on November 5, 2013, Garrabrants stated that "[w]e are pleased with the increase in the credit quality at the bank," a refrain also uttered

in the earnings call identified above.  *Id.* ¶ 263.  He made similar remarks during subsequent conference calls.  *See id.* ¶¶ 276, 290, 296, 317.  In the same November 5 call, Garrabrants also remarked, with respect to BofI's operations and risk management, that "[w]e continue to make investments in our people, systems, and processes to ensure that we will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for the future."  *Id.* ¶ 264.  He continued by discussing BofI's loan underwriting standards:

> . . . We've always done full documentation loans. I don't believe in low documentation, and no documentation loans. From my perspective, I want to see everything. If we're making a judgment and a trade off [sic] about a particular aspect of something, that's fine. But we can do that with the holistic picture, and have that picture documented.

*Id.* ¶ 265.

On an earnings call held on February 5, 2014 for Q2 2014, Garrabrants commented as follows on the growth in BofI's Commercial & Industrial (C&I) loans, "the vast majority of those loans are loans that have been self originated by the bank, sourced by our team and they are a significant portion of those [sic] are lender financed loans that are backed by hard collateral, receivables, real estate or other loans."  *Id.* ¶ 277.  He went on to reiterate his comments from November 5 about fully documenting loans, "in our case, we never did no documentation loans. We always collected every piece of documentation that we possibly could including tax returns from the IRS and everything else, so that really didn't change anything that we did."  *Id.* ¶ 278.

On May 6, 2014 BofI held a Q3 2014 conference call.  *Id.* ¶ 289.  At that time Garrabrants remarked that "[w]e remain highly focused on credit quality at the Bank and have not sacrificed credit quality to increase originations nor loosen our underwriting standards[.]"  *Id.* ¶ 290.  He added that "[o]ur current level of loan loss reserve reflects the low-risk and low loan-to-value ratio in the current portfolio."  *Id.* ¶ 291.

On August 7, 2014, Garrabrants made the following statements during a Q4 and fiscal year conference call.  *Id.* ¶ 295.  "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages

and have not reduced our loan rates for these products." *Id.* ¶ 296.  He added, "we believe that we can continue to grow our portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines." *Id.* Garrabrants also addressed BofI's compliance programs, and specifically, its Bank Secrecy Act (BSA) and Anti-Money Laundering (AML) programs.  *Id.* ¶ 297.

> We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance. We believe that we are on the same page with our regulators about their expectations.
>
> * * *
>
> We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams.
>
> * * *
>
> But we want to make sure we stay ahead of our risk management needs and make sure that certainly we stay out of BSA trouble and things like that.

*Id.*

On November 4, 2014 during a Q1 2015 conference call, Garrabrants made the similar refrain of: "[w]e continue to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination." *Id.* ¶ 318.  He went on to add, "[o]ur strong credit discipline and low loan to value ratio of portfolio has resulted in consistently low credit losses and servicing costs." *Id.*

During a Q2 2015 conference call on January 29, 2015, Garrabrants made the following remark about BofI's compliance infrastructure.

> We have invested significantly in our regulatory and compliance infrastructure, management and personnel to meet heightened regulatory demands and prepare ourselves for our relationship with H&R Block.
> . . . "[w]e're investing in a new BSA system, which we think is going to be a lot more – better at detecting suspicious activity and those sorts of things.

*Id.* ¶ 330.

On April 30, 2015, during a conference call for Q3 2015, Garrabrants emphasized the qualities of BofI's loan underwriting standards: "We continue to maintain our

conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes. . . Risk is not hidden in the tail for the portfolio. Only 8% of the single-family has a loan-to-value ratio greater than 70%, less than 1% greater than 80% and no loans with a loan-to-value ratio of greater than 90%. . . ." *Id.* ¶ 341.

During the conference calls on July 30, 2015 for Q4 2015 and October 29, 2015 for Q1 2016, Garrabrants made similar remarks to ones he made previously about credit quality and loan origination: "portfolio credit quality is very strong. Our strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs," *id.* ¶ 388; "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to increase loan volume," *id.*; "[c]urrently, the vast majority of our C&I loan book is sole sourced, originated and agented by us," *id.* ¶ 347.

### e. Press Releases

Plaintiffs' allegations also rely on press releases elaborating on BofI's financial condition as detailed in Defendants' SEC filings. *See, e.g.*, *id.* ¶ 260. The press releases identified by Plaintiffs mostly reiterated issues previously addressed by Defendants' earnings calls, SEC filings, and conference calls. Plaintiffs highlight that all of the press releases emphasized that BofI had had "record" financial results for the respective calendar filing. *See, e.g.*, *id.* ¶ 273. The press releases quoted Garrabrants as making comments such as "[w]e achieved our loan growth without reducing our credit standards while improving our net interest margin," *id.* ¶ 293, and "[s]trong loan growth was achieved while maintaining high quality credit standards," *id.* ¶ 314.

## DISCUSSION

### LEGAL STANDARD

#### 1. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or

sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citations omitted).

Any complaint alleging fraud must also comply with Rule 9(b), which requires the complaint to state with particularity the circumstances constituting fraud.  Fed. R. Civ. P. 9(b).  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. *Id.*  To satisfy the heightened pleading requirements, the plaintiff must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (internal citations omitted).  In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba –Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

In the event that the Court does grant a motion to dismiss, Rule 15 provides that leave to amend should be freely granted when justice so requires.  Accordingly, when a court dismisses a complaint for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (internal citations omitted).  Amendment, therefore, may be denied if it would be futile.  *See id.*

### 2. Falsity and Scienter

To survive the motion to dismiss, Plaintiffs' claims must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").  In 1995, Congress enacted the PSLRA to curb abuses of securities fraud litigation.  *Amgen, Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1200 (2013).  These include "nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and manipulation by class action lawyers." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007).  In response to these abuses, the PSLRA imposed a heightened pleading requirement for securities fraud actions brought under § 10(b) and Rule 10b-5, requiring that falsity and scienter be plead with particularity.  *Amgen*, 133 S. Ct. at 1200; *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

Under the PSLRA's heightened pleading instructions, a complaint alleging that the defendant made a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs, Inc.*, 551 U.S. at 321.  "It does not suffice that a reasonable fact finder plausibly could infer . . . the requisite state of mind." *Id.* at 313.  Rather, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 313.

**Alleged Violations**

**1. Section 10(b) of the 1934 Securities Act and Rule 10b–5**

Section 10(b) of the Securities Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b–5(b). Rule 10b-5 also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c).

To state a securities fraud claim under 10(b) of the Act and Rule 10b-5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). A complaint alleging claims under section 10(b) and Rule 10b-5 must satisfy the pleading requirements of both the PSLRA and Rule 9(b). *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). In order for an omission to be actionable under the securities laws, that omission must affirmatively create an impression that the state of affairs differs materially from the actual state of the matter. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

**A. Materially False and Misleading Statements**

Plaintiffs' complaint alleges that BofI's public statements about its financial results, lending practices, off-balance sheet activities, and internal controls were false and misleading when made because Defendants were engaged in a course of conduct that

14

deviated from its loan underwriting standards, relied upon inadequate internal and audit controls, and failed to disclose related-party loans, among other misconduct.  They have identified material statements made by Defendants in 10-K and 10-Q filings, earnings calls, press releases, and quarterly conference calls as misleading or false, CAC ¶¶ 244-362, and they have stated with tremendous care why those statements are misleading and false, *id.* ¶¶ 41-243.  Notwithstanding the Complaint's length and detail, there are those misrepresentations that fall short of the PSLRA's heightened standards.  Yet because Plaintiffs need only plead a single materially false misrepresentation to survive a motion to dismiss, the Court need not dwell on those aspects of the Complaint here.  *See Feyko v. Yuhe Intern., Inc.*, 2013 WL 816409 *4 n.2 (C.D. Cal. Mar. 5, 2013) (noting that, in order to survive the motion to dismiss, the plaintiff need only allege a single material misrepresentation); *Cunha v. Hansen Natural Corp.*, 2011 WL 8993148 *4 (C.D. Cal. May 12, 2011) (stating that there it "no reason that it [the court] must address parts of the CAC that *do not* work" (emphasis in original)).  Defendants argue that Plaintiffs have failed to identify a single affirmative statement by Defendants that was actually rendered false or misleading by Plaintiffs' allegations. ECF No. 41 at 4.  The Court disagrees. Plaintiffs have plead that a material misrepresentation has occurred.  Indeed, they have plead more than just one.

Examples of Plaintiffs' particularized pleadings include Defendants' representations that:

1) "We continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes," *id.* ¶ 45;
2) "Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators," *id.* ¶ 248;
3) "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products," *id.* ¶ 296;

4) "[W]e will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for the future," *id.* ¶ 264;

5) "We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance. We believe that we are on the same page with our regulators about their expectations," *id.* ¶ 297;

6) "We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams," *id.*

Defendants do not persuasively dispute the alleged falsity of these, and other, statements identified in Plaintiffs' Complaint. One of Defendants' arguments is that statements discussing BofI's "conservative credit guidelines" or applauding the "increase in credit quality at the bank" are not actionable under 10(b) because they are "corporate puffery." *See* ECF No. 37-1 at 20 n. 6; *see also* ECF No. 40 at 41 (citing to *Lloyd v. CVB Fin. Corp.,* 811 F.3d 1200, 1206-07 (9th Cir. 2016)). As the Ninth Circuit explained in *Newcal Indus., Inc. v. Ikon Office Solution*, a statement is merely puffery when it is "extremely unlikely to induce consumer reliance." 513 F.3d 1038, 1053 (9th Cir. 2008). The Court finds, however, that taking a few of Plaintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine Plaintiffs' detailed allegations that BofI's actual lending practices fell short of the standards BofI represented to investors. In *In re New Century*, the court found that statements describing the defendant as having "higher credit quality," "strict underwriting and risk management disciplines," and "improved underwriting controls and appraisal review process" were not mere puffery and were sufficient to plead falsity with particularity. 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008). Moreover, Plaintiffs' allegations are unlike those that were dismissed as puffery in *Lloyd v. CVB Fin. Corp.*, 811 F.3d at 1206-07. There, the court characterized the plaintiff's allegations that its credit metrics were "superior" to those of its peers, that it had "strong credit culture," and that the company had "limited its exposure to problem credits" as puffery because the statements were vague and optimistic. *See id.* By contrast, Plaintiffs' allegations are neither aspirational nor general. They allege that

3:15-CV-02324-GPC-KSC

Defendants repeatedly represented, in a variety of forums, that it continued to adhere to conservative loan underwriting practices and that it had not loosened credit guidelines in order to increase loan volume, when the defendants had, in fact, resorted to lax lending practices.  *Cf. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("[A]s a mortgage lender . . . underwriting practices would be among the most important information looked to by investors.").  Thus, because Plaintiffs' claims ring of those in *In re New Century* as opposed to those in *Lloyd*, Defendants' argument that Plaintiffs' claims are mere puffery is unavailing.

Defendants' other strategy is to dismiss Plaintiffs' allegations as the unreliable speculation of confidential witnesses, all former BofI employees, ex-employee Charles Matthew Erhart, and anonymous bloggers.  ECF No. 37-1 at 16-17.  As an initial matter, the Court need not address the reliability of Erhart or the articles posted on *Seeking Alpha*, *see e.g.,* CAC ¶¶ 70, 77, 89, as Plaintiffs have adequately plead misrepresentations that rely on neither source.  What's more, the Court is satisfied that Plaintiffs have described the confidential witnesses with sufficient detail to provide an adequate basis for attributing facts reported by the witness to the witness' personal knowledge.  *See Zucco*, 552 F.3d at 995.  In *Zucco*, the Ninth Circuit summed up the confidential witness inquiry as a two-pronged test requiring plaintiffs to establish the reliability and personal knowledge of confidential witnesses cited in the allegations.  *See Zucco*, 552 F.3d at 991. In *Daou*, the plaintiffs met this requirement by describing each of the confidential witnesses' job descriptions and responsibilities, and in some instances, their job title and the title of the person to whom they reported.  *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005).  Here, Plaintiffs have done exactly that.  They have identified each confidential witness by title and job description, and in quite a few instances included the name of the individual to whom they reported.  *See* CAC ¶¶ 52, 60, 66, 123, 133, 134, 146, 163, 164, 234.  Accordingly, the Court finds no reliability issue with the confidential witness' allegations.

The Complaint sets forth numerous allegations made by confidential witnesses that corroborate Plaintiffs' claims that BofI was engaging in "lax lending practices" and failing to enforce adequate compliance measures. Accordingly, Plaintiffs have stated the "reason or reasons" why at least some of Defendants' representations, including those illustrated above, were false and misleading. *See* 15 U.S.C. § 78u–4(b)(1). Confidential Witness ("CW") 1, a former BofI senior underwriter, described being pressured by senior management to underwrite loans that CW 1 felt uncomfortable approving, refusing to recommend highly-leveraged loans that senior management ultimately approved, and noting that it "started to become very rare that we would deny a loan." CAC ¶¶ 52-59. Other confidential witnesses corroborated these allegations. CW 2, another former senior underwriter, described how BofI approved a multi-million dollar mortgage with suspicious repayment terms for a property that, in CW 2's estimation, had been grossly over-appraised in order to inflate the loan-to-value ratio. *Id.* ¶¶ 61-64. CW 10, a former senior underwriter[5], gave further credence to these allegations by stating that BofI's executive management funded many loans that CW 10 had declined to sign off on. *Id.* ¶ 66.

The Complaint also sets forth detailed allegations concerning Defendants' inadequate internal procedures and audit programs. Plaintiffs allege that BofI failed to operate an effective audit program as required by federal law and regulation. *Id.* ¶ 165.

---

[5] According to Plaintiffs, CW 10 worked at BofI just before the start of the Class Period. CAC ¶ 66. Defendants point to the Ninth Circuit's decision *In re NVIDIA* as support for the argument that the Court should dismiss the allegations of employees who worked at BofI before the Class Period. *See* ECF No. 37-1 at 17. The Court is unpersuaded by this argument. In *In re NVIDIA*, the Ninth Circuit dismissed plaintiffs' 10(b) allegations that NVIDIA, a technology company specializing in graphic processing units, had strategically delayed disclosing a product defect to the detriment of the company's investors. *See In re NVIDIA*, 768 F.3d at 1056-57. One of the many reasons the court gave for dismissing plaintiffs' allegations was that some of the confidential witnesses had stopped working at NVIDIA "long before" the product defect arose. *Id.* at 1061. Here, unlike in *In re NVIDIA*, Plaintiffs allege that defendants engaged in a pattern of misrepresenting and misleading investors over a number of years. They do not point to one, isolated event as the source of misrepresentation, as did the plaintiffs in *In re NVIDIA*, but to a course of conduct. Thus, insofar as CW 10 corroborates other allegations that BofI was engaged in a pattern of misconduct during the Class Period, the Court finds that testimony relevant.

Plaintiffs described what laws and regulations require of BofI's audit procedures and then explained how many of BofI's observed practices fell short of those standards. For example, in the Complaint, Plaintiffs explained how guidance issued by the Office of the Comptroller of Currency (OCC) underscores the importance of maintaining independent auditors whose internal audit activities are not overseen by chief financial officers or the like. *Id.* ¶ 169. To demonstrate that BofI violated such guidance, Plaintiffs pointed to the allegations of CW 7, a former BofI lending compliance officer. CW 7 explained that Garrabrants had interfered with the audit committee's duties by "cleaning up" loan documents given to OCC examiners after CW 7 had identified them as problematic. *Id.* ¶ 174. CW 9, who stopped working at BofI just prior to the Class Period, made similar allegations of BofI's less-than-independent audit committee. *Id.* ¶¶ 173 & 175. As for staffing needs, CW 3 noted that BofI's Third Party Risk Department was understaffed with only three persons, *id.* ¶ 161, and CW 7 described BofI's internal controls as "nonexistent." *Id.* ¶ 162.

Standing alone, these allegations demonstrate why at least some of Defendants' statements were misleading or false at the time they were made. For example, Defendants represented that they had "not loosened credit quality to enhance yields or increase loan volumes." Yet that statement was made false or misleading by allegations that senior management was pressuring underwriters to approve loans they were uncomfortable with, that senior management frequently approved loans against the recommendation of underwriters, and that at least one loan-to-value ratio had been fabricated. Defendants also represented that "[w]e have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance." And that statement was made false or misleading by the allegation that Garrabrants was interfering with auditor duties in contravention of OCC guidance, that internal controls were "nonexistent," and that the Third Party Risk Department was understaffed.

1       The Court's conclusion that Plaintiffs have plead a material representation is,

2 moreover, consistent with other cases that have found similar allegations as sufficient to

3 withstand scrutiny under the PSLRA.  *See Atlas*, 556 F. Supp. 2d at 1142, 1149-53,1154-

4 55 (S.D. Cal. 2008) (concluding that plaintiffs allegations regarding defendants' loan

5 underwriting standards, alleged manipulation of reserve amounts, and improper

6 accounting were sufficient to meet the 10(b) particularity standard); *In re New Century*,

7 588 F. Supp. at 1225-27 (C.D. Cal. 2008) (holding that defendants' false and misleading

8 public statements about the strong credit quality and strict underwriting practices of the

9 issuer were actionable under 10(b)); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F.

10 Supp. 2d 1044, 1057 (C.D. Cal. 2008) (concluding that plaintiffs had sufficiently plead

11 defendants' misrepresentation of the rigor of their loan origination process, the quality of

12 its loans, and the company's financial situation).  Here, Plaintiffs have made analogous

13 allegations against BofI concerning their lax lending practices, inadequate internal

14 controls, and general failure to disclose the actual financial condition of the bank.

15 Accordingly, Plaintiffs have plead a materially false representation with sufficient

16 particularity to survive the PSLRA's heightened standard.

    **B. Materiality**

18       The Court further concludes that BofI's mispresentations were material.  The

19 materiality of Defendants' statements is underscored by the very fact that Defendants

20 repeatedly highlighted BofI's conservative loan underwriting standards, and to some

21 extent its sophisticated controls, in myriad conference calls and press releases throughout

22 the Class Period.  *See Atlas*, 556 F. Supp. 2d at 1155 (S.D. Cal. 2008) (finding that

23 materiality was demonstrated through Defendants' emphasis on underwriting policies and

24 press releases and other public statements).

    **C. Scienter**

26       Plaintiffs must plead scienter with particularity to survive a motion to dismiss a

27 10(b) claim.  Scienter encompasses the intent to deceive, manipulate, and defraud.  *In re*

28 *NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053 (quoting *Ernst & Ernst v. Hochfelder*, 425

U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)).  To satisfy the requisite state of mind in the Ninth Circuit, "a complaint must 'allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco*, 552 F.3d at 991 (citation omitted).  Recklessness involves "a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re NVIDIA*, 768 F.3d at 1053 (internal citations omitted).  Facts showing mere recklessness or a motive to commit fraud and opportunity to do so, provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness.  *In re VeriFone*, 704 F.3d at 701.  Thus, to establish a strong inference of deliberate recklessness, plaintiffs must "state facts that come closer to demonstrating intent, as opposed to mere motive or opportunity." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (abrogated on other grounds by *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

### i. Holistic Review

As stated above, a complaint brought under the PSLRA is well-plead if the facts give rise to a "strong inference" that the defendants acted with the requisite state of mind. In assessing the sufficiency of allegations under 10(b)(5) a district court must view the allegations holistically, not in isolation.  *In re VeriFone*, 704 F.3d at 702-03 (discussing in-depth holistic review as required by the Supreme Court in *Matrixx Initiatives, Inc. v. Siracusano,* 131 S. Ct. 1309, 1324 (2011)).  That is not to say that the court cannot, if it chooses, "engage in an individualized discussion of the complaint's allegations," but rather that it should not "unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *Id.*  At this stage, the court must test for allegations of scienter sufficient to justify the case to proceed against the defendant.  *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011).

/ / / /

21

### ii. Defendants' Scienter

In order for a 10(b) claim to lie against BofI, the Court must find a strong inference of scienter for the corporate defendant. Generally speaking, such an inference must be made by pleading scienter as to the individual executive or director who made the misstatement.[6] *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008). In assessing the scienter of corporate officers, the Ninth Circuit has often spoken in terms of what is not enough to create a strong inference that a corporate officer acted with scienter. In *South Ferry* the Ninth Circuit tackled the question of whether and when the "core operations inference" – that is, the inference that key company officers have knowledge of facts critical to a business' core operations or important transactions – is sufficient to meet the strict pleading standards of the PSLRA. 542 F.3d at 781. There, the court concluded that an officers' position within a company was not sufficient, on its own, to create a strong inference of scienter, but that a kind of "core inference plus" would be sufficient. *Id.* at 784-85. By way of example, the *South Ferry* court noted that Plaintiffs might be able to meet the PSLRA requirement by relying on the core operations inference and by alleging that specific information had been conveyed to management relating to the fraud. *Id.* at 785. In *Zucco*, the Ninth Circuit made clear that SOX certifications are not sufficient "without more" to satisfy the PSLRA requirements. *Zucco*, 552 F.3d at 1004. Finally, in *In re Rigel Pharm., Inc. Sec. Regulation*, the Ninth Circuit concluded that allegations of "routine corporate objectives" or executive compensation based upon corporate goals, were not sufficient by themselves to create a strong inference of scienter, despite the element of motive involved. *See* 697 F.3d 869, 884 (9th Cir. 2012).

---

[6] The Ninth Circuit has left open the possibility that a plaintiff, given certain circumstances, might be able to establish corporate scienter by pleading collective scienter on the part of the company's employees. *See Glazer*, 549 F.3d at 744. However, because Plaintiffs have not raised the issue of whether the Court should consider finding collective scienter, it will not address the question here.

To undermine Plaintiffs' allegations of scienter, Defendants attack their opponents' allegations one-by-one.  *See* ECF No. 37-1 at 28-31.  Defendants argue that based on the Ninth Circuit precedent expounded in *South Ferry*, *Zucco*, and *In re Rigel*, Plaintiffs cannot properly infer scienter from the Defendants' positions within BofI; from the fact that Defendants Garrabrants and Micheletti signed SOX certifications; or from the fact that defendants were eligible for cash bonuses during the Class Period.  *Id.*  Yet in light of the Supreme Court's mandate in *Matrixx* to view allegations of scienter holistically, Defendants' piecemeal argument fails to persuasively make the case that Plaintiffs have not satisfied the PSLRA's heightened standard.  Given the holistic nature of the Court's inquiry, the Court concludes that Plaintiffs' allegations of false and misleading statements do give rise to a strong inference of scienter.  As the Ninth Circuit stated in *In re Read-Rite Corp. Sec. Litig.*, falsity and scienter are "a single inquiry, because falsity and scienter are generally inferred from the same set of facts."  335 F.3d 843, 846 (9th Cir. 2003).  Thus, just as the Court is persuaded that Plaintiffs have alleged falsity with particularity, the Court is also satisfied that Plaintiffs have alleged scienter with particularity.  Specifically, the Court finds that Plaintiffs have sufficiently alleged scienter as to Defendant Garrabrants and, thus, they have successfully alleged it as to BofI as well.

### iii. Garrabrants

The complaint sets forth a number of facts from which the Court can infer that CEO Gregory Garrabrants knew that BofI was deviating from its stated lending practices and failing to maintain adequate internal and audit controls.  For one, Plaintiffs' allegations indicate that Garrabrants was actually complicit in misconduct.  Confidential Witness 7, who had once attended a meeting with Garrabrants to discuss negative audit findings, stated that Garrabrants not only brushed his findings "under the rug," CAC

¶ 147, but "cleaned up" audit reports that he disagreed with.[7]  *Id.* ¶ 174.  Then, according to a former BofI Assistant Vice President/Senior Processor of Income Property Lending Operations, Garrabrants had instructed employees to do no further background checks on foreign nationals if their name did not appear on the Office of Foreign Asset Control (OFAC) list.  *Id.* ¶ 134.  Confidential witnesses who worked at BofI before the Class Period made similar allegations of Garrabrants' complicity.  *See id.* ¶ 133 (stating that Garrabrants had instructed BofI's Executive Vice President and Chief Credit Officer to underwrite loans even though they were missing TINs); *id.* ¶ 173 (stating that Garrabrants interfered with the audit committee's duties).  Plaintiffs' allegations also set forth facts indicating that Defendant was aware – or should have been aware – of misconduct occurring at the bank.  The Complaint contains allegations of a third party risk officer who stated that Garrabrants had said the officer's tombstone would read "died understaffed," in response to the officer's assertion that they needed more people in the Bank Secrecy Act department.  *Id.* ¶ 124.  Plaintiffs also alleged that a senior underwriter even went so far as to leave concerns about a multi-million dollar loan directly with Garrabrants' assistant, in order to explain why her boss should not have recommended that Garrabrants approve a specific loan over her objection.  *Id.* ¶¶ 61-64.

Viewing these allegations holistically, and in light of the fact that Garrabrants was the CEO of BofI throughout the Class Period, had signed the SOX certifications on the company's quarterly and yearly earnings throughout the Class Period, and made repeated representations that BofI had sound underwriting and audit procedures during the Class Period, the Court finds that Plaintiffs have alleged a strong inference of scienter as to Garrabrants.  The opposing inference that Defendants would have the Court adopt – that

---

[7] Defendants' argument that this allegation actually "contradicts the notion that BofI's lending practices were lax" because the OCC did not take action after the reports were filed, is unconvincing.  ECF No. 37-1 at 12 (internal citations omitted).  For one, it is no surprise that a regulatory body would take no action as to a report that was intentionally altered so as to not raise suspicion.  More importantly, Defendants' argument fails to address Plaintiffs' argument that Garrabrants should not have been interfering in the auditor's duties in the first place.

1    is, that the confidential witnesses are nothing more than "disgruntled" and "low-level"

2    employees making unsubstantiated statements, *see* ECF No. 41 at 4-5 & ECF No. 37 at

3    17 – is not as strong as the inference that Garrabrants knowingly misrepresented BofI as

4    having conservative credit guidelines, adequate internal controls, and as being in

5    compliance with regulatory obligations.  Accordingly, Plaintiffs have sufficiently plead

6    scienter so as to survive Defendants' motion to dismiss.

### iv. Micheletti, Grinberg, Mosich, and Argalas

8           As stated previously, a complaint must allege as to each defendant that he or she

9    made a false or misleading statement either intentionally or with deliberate recklessness

10   in order to plead a 10(b) claim.  *See Zucco*, 552 F.3d at 991.  Accordingly, Defendants

11   are right to point out that Plaintiffs' Complaint "is all but silent with respect to Mr.

12   Micheletti and the Audit Committee Defendants."  ECF No. 41 at 13.  Indeed, neither

13   Plaintiffs' Complaint, *see generally* CAC ¶¶ 407-17, nor response brief, ECF No. 40 at

14   25-31, identify specific statements or omissions made by the remaining individual

15   defendants, or set forth facts demonstrating that the defendants were nonetheless aware of

16   the falsity of representations being made by BofI.  Instead, Plaintiffs ask the Court to

17   infer scienter from the audit committee members' positions, from allegations of motive,

18   and from the factual allegations pleaded as a whole.

19          The Court, however, is not persuaded by Plaintiffs' argument that it can draw a

20   strong inference of scienter from the audit committee members' failure to recognize

21   BofI's accounting errors, as was the conclusion in *Thomas v. Megaship Semiconductor*

22   *Corp.*, No. 14-CV-01160-JST, 2016 WL 845288 (N.D. Cal. Mar. 4, 2016).  The facts of

23   that case indicate that the magnitude of the error missed by the audit committee members

24   was so large that net income was inflated by 500% and total revenue by $121.7 million.

25   *Id.* at *6.  By contrast, here, Defendants' misconduct concealed, rather than revealed, the

26   presence of illicit goings-on, thus belying any inference that audit committee members

27   would have necessarily been aware of significant reporting errors.

28

The Court is also not persuaded by Plaintiffs' argument that the individual defendants had motive to commit fraud because they had benefitted from related-party loans. *See* ECF No. 40 at 29 n. 26. In *Neborsky v. Valley Forge Composite Techs., Inc.*, the case Plaintiffs cite, the court found that the defendant's motive and opportunity to commit fraud was persuasive because the defendant had an unusually high monetary stake in the alleged misrepresentations. *See* No. 13-CV-2307-MMA BGS, 2014 WL 3767011 *8 (S.D. Cal. July 29, 2014) (noting that the defendant had advanced $491,257 to the defendant company, held over 31% of the company's stock, and controlled the SEC filings, press releases, and other corporate documents of the company). Here, Plaintiffs ask us to infer that the remaining individual defendants knew that BofI was engaged in widespread misconduct simply because they benefitted from a single loan that was allegedly made on more favorable terms than those offered to the public. CAC ¶¶ 414-15. The Court declines to make that leap with Plaintiffs.

Even viewing Plaintiffs' scienter allegations holistically, the Court finds that Plaintiffs have not adequately plead that the remaining individual defendants had the requisite scienter. There simply are too few facts from which to infer that the remaining defendants were aware of the falsity of BofI's many misrepresentations. Plaintiffs also fail to proffer any theory of scienter that might, nonetheless, give rise to an inference that the remaining defendants acted with the appropriate state of mind. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-88 (9th Cir. 2008) (finding a strong inference that the company's CEO and CFO were aware of stop-work orders because they were heavily involved in the day-to-day operations of the company); *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (finding that plaintiffs' specific allegations that the defendant CEO had access to and frequently monitored a database detailing the company's financial condition was sufficient to infer scienter). Because Plaintiffs have not set forth sufficient allegations from which the Court can infer a strong inference of scienter on the parts of Defendants Micheletti,

Grinberg, Mosich, and Argalas, the Court GRANTS Defendants' motion to dismiss as to those defendants.

### 2. Section 20(a) of the Securities Act

To plead a violation of Section 20(a) of the Securities Act Plaintiff must prove a 1) primary violation of the securities laws and 2) demonstrate that the defendant exercised actual power over the primary violator. *See In re NVIDIA*, 768 F. 3d at 1052. In other words, Section 20(a) imposes liability on a "controlling person." *Id.*; 15 U.S.C. § 78t(a). The question of whether a defendant is a controlling person is an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

Defendant asks the Court to dismiss the 20(a) claim as to all defendants because Plaintiff's have failed to plead a primary violation of the securities laws. ECF No. 37-1 at 25. Plaintiffs counter by making the conclusory assertion that its 10(b) allegations are sufficient to demonstrate that there was a primary securities violation and, therefore, those allegations are also sufficient to establish that the individual defendants are controlling persons. *See* ECF No. 40 at 31. Because the Court has determined that the allegations against Defendants Micheletti, Grinberg, Mosich, and Argalas should be dismissed, the Court need only address whether Garrabrants is rightly deemed a "controlling person." Given Garrabrants ability to control and influence BofI by virtue of his position as CEO, President, and Director of BofI, his involvement with the false statements at the center of this dispute, and his alleged oversight over much of the company's daily operations, the Court finds Garrabrants to be a "controlling person" for purposes of Section 20(a). *See Howard*, 228 F.3d at 1065-66 (finding that allegations that the company's CEO and Chairman's day-to-day management of the company and the fact that he reviewed and signed the company's financial statements was sufficient to plead "control person" liability). Accordingly, Plaintiffs have sufficiently plead a violation of Section 20(a) so as to survive the motion to dismiss.

**Defendants' Request for Judicial Notice**

Generally, a court cannot consider matters outside of the complaint on a Rule 12(b)(6) motion to dismiss, unless those matters are: 1) authenticated documents that have been incorporated by the complaint or 2) facts subject to judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Documents may be incorporated into a complaint when the plaintiff "refers extensively" to the document or when the document forms the basis of the plaintiff's claims. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Courts may take judicial notice of adjudicative facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Indisputable facts are those that are "generally known" or that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Id.*

Here, Defendants have requested that the Court take judicial notice of eight exhibits in connection with Defendants' motion to dismiss. The first is a declaration of Jonathan Ball, the former Vice President of Internal Audit at BofI. ECF No. 37-2 at 2. Five are filings made with the SEC. ECF No. 37-2 at 2. The remaining two are requests to take judicial notice of a *Seeking Alpha* article and a BofI press release, respectively. Plaintiffs have opposed judicial notice of the Ball declaration and oppose judicially noticing the SEC filings for the truth of the matter asserted. ECF No. 40-1 at 4-5. Plaintiffs have not opposed the two remaining requests as Defendants made those requests in a supplemental memorandum attached to its reply to Plaintiffs opposition to the motion to dismiss. *See* ECF No. 41-2.

SEC filings are the proper subjects of judicial notice as they are not subject to reasonable dispute. *See Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *see also In re New Century*, 588 F. Supp. 2d at 1219-20 (taking judicial notice of the SEC filings submitted by Defendants). Accordingly, the Court will GRANT defendants' request to take judicial notice of the SEC filings, but the Court will not, as Plaintiffs request, consider these documents for the truth of the matters asserted therein. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010)

(granting defendants' request to take judicial notice of SEC filings, but specifying that they will not "where inappropriate" be considered for the truth of the matter asserted."); *see also Curry v. Hansen Medical, Inc.*, 2012 WL 3242447 *3 (N.D. Cal. Aug. 10, 2012) (taking judicial notice of SEC filings, "but not for the truth of the matters asserted therein.")

Because the Court did not rely on the other documents included in Defendants' request, the Court will DENY Defendants' request to take judicial notice of the Ball Declaration, the *Seeking Alpha* article, and the BofI press release.[8]  *See In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 996 (S.D. Cal. 2005) (denying defendants' request for judicial notice in part because the court did not rely on the document and found them irrelevant in deciding the motion to dismiss).

## Plaintiffs' and Defendants' Motions to Seal

Courts have recognized a "general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.,* 435 U.S. 589, 597 & n. 7 (1978).  Nonetheless, access to judicial records is not absolute. A narrow range of documents is not subject to the right of public access at all because the records have "traditionally been kept secret for important policy reasons."  *Times Mirror Co. v. United States,* 873 F.2d 1210, 1219 (9th Cir.1989).  Unless a particular court record is one "traditionally kept secret," a "strong presumption in favor of access" is the starting point.  *Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1135 (9th Cir. 2003) (citing *Hagestad v. Tragesser,* 49 F.3d 1430, 1434 (9th Cir.1995)).  A party

---

[8] For similar reasons, the Court also DENIES Plaintiffs' Motion to Strike, ECF No. 51.  The Court did not rely on the declarations of Confidential Witnesses 6 and 8, as offered by Defendants in ECF No. 42 or otherwise, in reaching its decision. Accordingly, the Court finds it proper to deny Plaintiffs' motion to strike.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 2003 WL 23208956 *1 n.1 (N.D. Cal. Mar. 24, 2003),  *rev'd on other grounds*, 380 F.3d 1226 (9th Cir. 2004) (dismissing as moot plaintiffs' motion to strike defendants' appendix of confidential witness allegations because the court did not rely on the appendix in reaching its motion to dismiss).

seeking to seal a judicial record then bears the burden of overcoming this strong presumption by meeting the "compelling reasons" standard.  *Id.* at 1135.  That is, the party must "articulate[ ] compelling reasons supported by specific factual findings," *id.* (citing *San Jose Mercury News, Inc. v. U.S. Dist. Ct.,* 187 F.3d 1096, 1102-03 (9th Cir.1999)), that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process," *id.* (quoting *Hagestad,* 49 F.3d at 1434).  In turn, the court must "conscientiously balance[ ] the competing interests" of the public and the party who seeks to keep certain judicial records secret.  *Foltz,* 331 F.3d at 1135.  After considering these interests, if the court decides to seal certain judicial records, it must "base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad,* 49 F.3d at 1434 (citing *Valley Broadcasting Co. v. U.S. Dist. Ct.,* 798 F.2d 1289, 1295 (9th Cir.1986)).

In general, "compelling reasons" sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when "court files might have become a vehicle for improper purposes," such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets.  *Nixon,* 435 U.S. at 598.  Yet the mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records.  *Foltz,* 331 F.3d at 1136.

In the instant case, the motions to seal seek to protect the identities of two confidential witnesses referenced in the Complaint and in Defendants' reply to Plaintiffs' opposition to the motion to dismiss.  *See* ECF Nos. 26 & 41.  The Court is aware that confidential witnesses have become a staple of securities litigation.  *See* Justin Scheck, *Securities Lawyers Spar Over Use of Confidential Witnesses*, THE RECORDER (Apr. 11, 2005), http://www.therecorder.com/id=900005426901/Securities-Lawyers-Spar-Over-Use-of-Confidential-Witnesses?slreturn=20160826203048.  The combination of the PSLRA's strict pleading requirements and discovery stay, *see* 15 U.S.C. § 78u–4(3)(B)

1   ("all discovery and other proceedings shall be stayed during the pendency of any motion

2   to dismiss"), explains why the use of confidential witnesses has become so common.  *See*

3   Gideon Mark, <u>Confidential Witnesses in Securities Litigation</u>, 36 J. Corp. L. 551, 554-55

4   (2011).  Confidential witnesses are typically current or former employees, customers, or

5   suppliers, who are fearful of retaliation if their identities are disclosed.  *Id.*

6        Here, the confidential witnesses identified in Plaintiffs' and Defendants' motions

7   to seal are former BofI employees who reportedly fear such retaliation and potential

8   harassment.  *See, e.g.*, ECF No. 39 at 19-20; *see also Plumbers & Pipefitters Local Union*

9   *No. 630 Pension-Annuity Trust Fund v. Arbitron, Inc.*, 278 F.R.D. 335, 344 (S.D.N.Y.

10  2011) (noting that a confidential witness "may have a legitimate interest in non-

11  disclosure, where revealing his or her name may lead to retaliation in a current or future

12  job.").  Plaintiffs have alleged that the confidential witnesses in this case complained of a

13  "fear-based" culture at BofI "where dissent was not tolerated and fears of retaliation were

14  fueled by constant reminders from upper management, primarily Garrabrants, that

15  employees would be 'destroyed' for not following management directives."  ECF No. 40

16  at 8.  Plaintiffs have further claimed that such fears have begun to play out through

17  Defendants' alleged efforts to "deceive and intimidate CWs in this action into self-

18  identifying themselves and divulging attorney work-product," through Defendants'

19  "recent initiation of criminal proceedings" against a CW who left the company three

20  years ago, and through Defendants' counterclaims against the whistleblower in the *Erhart*

21  Case.  *Id.*  Accordingly, because the Court finds the above-mentioned grounds to be

22  compelling reasons that outweigh the public's interest in disclosure, the Court GRANTS

23  the Plaintiffs' and Defendants' motions to seal.

## **CONCLUSION**

25       For the foregoing reasons, **IT IS HEREBY ORDERED** that:

26  1.  Defendants' Motion to Dismiss, ECF No. 37, be **DENIED** as to Defendant BofI

27      and Defendant Gregory Garrabrants, and be **GRANTED** as to Defendants Andrew

3:15-CV-02324-GPC-KSC

J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas **with leave to amend.**

2.  Defendants' Motion to Seal, ECF No. 42, and Plaintiffs' Motion to Seal, ECF. No. 46, be **GRANTED**.

3.  Plaintiffs' Motion to Strike, ECF No. 45, be **DENIED**.

**IT IS SO ORDERED.**

Dated:  September 27, 2016

Hon. Gonzalo P. Curiel
United States District Judge

3:15-CV-02324-GPC-KSC