1   Richard M. Heimann (Cal. Bar No. 063607)
    rheimann@lchb.com
2   Joy A. Kruse (Cal. Bar No. 142799)
    jakruse@lchb.com
3   Katherine C. Lubin (Cal. Bar No. 259826)
    kbenson@lchb.com
4   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
6   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
7
    Daniel P. Chiplock (admitted *pro hac vice*)
8   dchiplock@lchb.com
    LIEFF CABRASER HEIMANN &
9   BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
10  New York, NY  10013-1413
    Telephone:  (212) 355-9500
11  Facsimile:  (212) 355-9592

12  [Additional Counsel Appear on Signature Page]

13  *Counsel for Lead Plaintiff Houston Municipal*
    *Employees Pension System and Lead Counsel for*
14  *the Proposed Class*

15              **UNITED STATES DISTRICT COURT**
                **SOUTHERN DISTRICT OF CALIFORNIA**
16

17  HOUSTON MUNICIPAL EMPLOYEES          Case No. 3:15-cv-02324-GPC-KSC
    PENSION SYSTEM, Individually and On
18  Behalf Of All Others Similarly Situated,
                                          **CLASS ACTION**
19                  Plaintiff,
                                          **SECOND AMENDED CLASS**
20           vs.                          **ACTION COMPLAINT FOR**
                                          **VIOLATIONS OF THE**
21  BOFI HOLDING, INC., GREGORY          **FEDERAL SECURITIES LAWS**
    GARRABRANTS, ANDREW J.
22  MICHELETTI, PAUL J. GRINBERG,
    NICHOLAS A. MOSICH, AND JAMES
23  S. ARGALAS,                          **DEMAND FOR JURY TRIAL**

24                  Defendants.

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

4

NATURE OF THE ACTION .................................................................. 1

5

JURISDICTION AND VENUE ........................................................... 10

6

PARTIES ............................................................................................. 10

7

SUBSTANTIVE ALLEGATIONS ...................................................... 15

8

I.      BofI Engaged in Unlawful Lending Practices .................................... 15

9

        A.      BofI Violated the "Ability to Repay" Rule ............................. 17

10

        B.      BofI Engaged in, and Concealed, Illicit Lending
                Partnerships ............................................................................ 24

11

                1.      OnDeck ...................................................................... 24

12

                2.      Quick Bridge .............................................................. 28

13

                3.      RCN ........................................................................... 32

14

                4.      Center Street .............................................................. 33

15

                5.      Propel Tax .................................................................. 35

16

                6.      BofI Properties .......................................................... 36

17

        C.      BofI Failed to Disclose Its Use of Affiliated Off-Balance
                Sheet SPEs To Purchase Third-Party Originated Lottery
18
                Receivables ............................................................................. 39

19

        D.      BofI Maintained a Deficient Customer-Identification
                Program and Violated Federal Laws and Regulations ............. 40
20

                1.      BofI's Deficient Customer Identification Program ........ 40
21

                2.      BofI's Deficient BSA/AML Compliance Program ........ 43
22

                3.      Missing or Unverifiable Customer TINs ...................... 44
23

                4.      Loans to Foreign Nationals ......................................... 46
24

        E.      BofI's Violations of the Flood Disaster Protection Act .......... 49
25

        F.      BofI Misrepresented Its Allowance for Loan Losses .............. 51
26

II.     BofI's Ineffective Internal Controls ................................................... 54
27

III.    BofI's Audit Committee and Internal Audit Program Were
        Materially Inadequate ....................................................................... 57
28

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

# TABLE OF CONTENTS
## (continued)

Page

IV.   BofI Failed to Adequately Disclose Related-Party Transactions ....... 61

    A.   Related-Party Loans................................................................. 61

    B.   BofI Violated Applicable SEC Rules by Failing to Adequately Disclose A Related-Party Loan to Propel Tax. ...... 66

    C.   BofI Violated U.S. Generally Accepted Accounting Principles ("GAAP") by Failing to Disclose A Material Related-Party Transaction with Encore Capital Group / Propel Tax. ................................................................................ 68

V.   BofI Failed To Disclose The Criminal Background Of A Senior Officer and Violations of the FDIA ..................................... 70

VI.   Other Unlawful Misconduct By Defendants ................................. 73

VII.   BofI Failed To Disclose Material Information About Pending Government and Regulatory Investigations ........................ 74

VIII.   Garrabrants Intimidated And Threatened BofI Personnel, And Abused His Position For Personal Gain .............................. 76

MATERIALLY FALSE AND MISLEADING STATEMENTS  ISSUED DURING THE CLASS PERIOD.................................................. 81

THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISREPRESENT AND OMIT MATERIAL FACTS ........................ 116

ADDITIONAL SCIENTER ALLEGATIONS ..................................... 132

LOSS CAUSATION ................................................................... 136

PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................... 137

FRAUD-ON-THE-MARKET PRESUMPTION ................................... 139

ADDITIONAL CONTROL-PERSON ALLEGATIONS.......................... 140

COUNT I  (AGAINST ALL DEFENDANTS FOR VIOLATIONS OF SECTION 10(B)  OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER)................................................ 143

COUNT II  (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT  AGAINST THE INDIVIDUAL DEFENDANTS) ......................... 146

PRAYER FOR RELIEF ............................................................... 148

DEMAND FOR TRIAL BY JURY................................................... 149

Lead Plaintiff Houston Municipal Employees Pension System ("Plaintiff" or "HMEPS"), individually and on behalf of all other entities and individuals similarly situated, by its undersigned attorneys, alleges the following against BofI Holding, Inc. ("BofI" or the "Company") and the other defendants identified below (collectively "Defendants") based on personal knowledge as to itself and its own acts, and information and belief as to all other matters. Plaintiff's allegations are premised on, *inter alia*, the investigation conducted by and through its attorneys, which includes a review of:

- public filings with the United States Securities and Exchange Commission ("SEC") by BofI, as well as other regulatory and government filings by and concerning BofI and/or related entities further described below;

- wire and press releases published by and regarding BofI, as well as public conference calls, media and news reports concerning BofI;

- securities analysts' reports and advisories about BofI; and

- pleadings and other documents filed in lawsuits involving BofI, including in *Charles Matthew Erhart v. BofI Holding Inc., et al.*, No. 3:15-cv-2287-BAS-NLS (S.D. Cal.), *BofI Federal Bank v. Charles Matthew Erhart, et al.*, No. 3:15-cv-2353-BAS-NLS (S.D. Cal.), and *In re BofI Holding, Inc. Derivative Litigation*, No. 3:15-cv-2722-GPC-KSC (S.D. Cal.), as well as related information readily obtainable on the Internet.

Plaintiff's counsel also conducted and/or caused to be conducted interviews with former BofI employees, who are identified in this Complaint as confidential witnesses ("CWs"). Plaintiff believes further substantial evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as SEC Rule 10b-5 promulgated thereunder, on behalf of all individuals and entities who purchased or otherwise acquired the publicly traded common stock of BofI between

September 4, 2013 and February 3, 2016, inclusive (the "Class Period"), as well as purchasers of BofI call options and sellers of BofI put options during the Class Period. As detailed in this Complaint, BofI and those who ran it—particularly its CEO and President, Gregory Garrabrants—touted BofI's purportedly conservative loan-underwriting standards and compliance with legal and regulatory obligations while, in fact, secretly manipulating the Company's financials through numerous mechanisms (including significantly understating the Company's allowance for loan losses ("ALL")), engineering lucrative related-party transactions between the Company and senior executives, and flouting banking laws and other directives. In short, Defendants misrepresented the risks of investing in BofI. When investors ultimately became aware that Defendants were allowing BofI to engage in far riskier practices than Defendants represented in numerous Class Period statements, the price of BofI shares fell significantly, and Plaintiff and other Class members suffered damages.

2.      BofI is the holding company for BofI Federal Bank (the "Bank"),[1] a federal savings association that provides consumer and business banking products through various distribution channels and affinity group partners. BofI offers various types of consumer and business checking, savings and time-deposit accounts, as well as financing for single-family and multi-family residential properties, small-to-medium size businesses in certain sectors, state lottery prize and structured-settlement annuity payments, and consumer auto and recreational vehicles.

3.      Founded in 1999 during the dot-com boom, BofI is not the typical thrift bank with multiple brick-and-mortar branch locations. Rather, BofI operates primarily from its headquarters in San Diego, California and relies on various distribution channels such as banking websites promoting the Company's "Bank of

---

[1] References herein to "BofI" include BofI Federal Bank, unless otherwise indicated.

Internet," "NetBank," "Bank X," and other brands, partnerships with affinity groups, relationships with mortgage brokers, and salespeople, to generate business.

4.     BofI generates fee income from consumer and business products, including fees from loans it originates for sale and transaction fees from processing payments on loans it retains.  BofI's loan portfolio also generates interest income.

5.     In recent years, BofI has consistently reported extraordinary growth and record profitability while other banks faced small and shrinking net interest margins (the difference between what a bank pays depositors and its loan rates) amid low interest rates and a flattening yield curve.[2]  In the last five years, BofI's total deposits have increased nearly 235% to $5.2 billion and its total loan portfolio has increased more than 270% to $5.715 billion (as of December 31, 2015).  BofI earnings have also increased year-over-year, from $20.6 million for its fiscal year ending June 30, 2011 to $82.7 million for fiscal year ending June 30, 2015, driven primarily by growth in the Company's interest-earning loan portfolio.  As of December 30, 2015, approximately 59% of BofI's loan portfolio consisted of single-family residential secured mortgages and approximately 21% consisted of multi-family real estate secured loans.

6.     BofI's stock price has also skyrocketed on the Company's purportedly strong performance.  During the Class Period, it reached a high of $142.54 per share, or more than 1,100% above its initial public offering price of $11.50 per share in 2005.[3]

7.     BofI's success has been attributed to its ability to attract money by offering relatively high deposit rates and then using the money to make mortgage loans, often to wealthy borrowers with blemished or no credit history, at high

---

[2] *See* John Carney, *Fed Stance Squeezes Bank Profits*, Wall St. J., Sept. 21, 2015.

[3] On or around November 18, 2015, BofI completed a forward 4:1 stock split and the stock began trading on a split-adjusted basis.  BofI's stock price in ¶ 6 is reported on a pre-split basis.  Unless otherwise indicated, all other BofI references in this Complaint to BofI share prices are adjusted for the stock split.

1    interest rates.  The Company also prides itself on significant cost savings and

2    operational efficiencies derived from its purported branchless business model, as

3    well as low loan losses, which the Company attributes to its adherence to

4    conservative loan-underwriting standards and its remarkably low 60% effective

5    weighted average loan-to-value ("LTV") percentage—the ratio of the loan amount

6    to the value of the property securing the loan—across its entire loan portfolio.

7         8.     As detailed in this Complaint, however, Defendants' representations of

8    BofI as a careful, prudent institution masked a troubled entity that resorted to lax

9    lending practices and other unlawful conduct to fraudulently boost its loan volume

10   and earnings.  In doing so, BofI was subject to enormous undisclosed risk of loss

11   that it concealed during the Class Period through the use of undisclosed special

12   purpose entities ("SPEs") and accounting manipulations, including failing to

13   maintain an adequate ALL, to embellish the Company's financial statements and to

14   conceal from investors the actual level of risk of investing in the Company.

15        9.     BofI's fraudulent scheme included undisclosed lending partnerships

16   with a number of entities such as On Deck Capital, Inc. ("OnDeck"), Quick Bridge

17   Funding LLC ("Quick Bridge"), RCN Capital, LLC ("RCN"), Center Street

18   Lending ("Center Street"), and Propel Tax, each of which engaged in predatory

19   lending or other high risk practices, including offering "liar loan" products.  Those

20   lending arrangements involved, among other things, (i) BofI originating high-risk

21   loans recommended and immediately purchased by OnDeck as a part of a "Rent a

22   Charter" scheme designed to circumvent state banking laws; (ii) BofI originating

23   high-risk loans recommended and eventually serviced by Quick Bridge, then

24   assigning the loans off BofI's balance sheet to a secret SPE financed by BofI; and

25   (iii) BofI originating high-risk loans to Center Street and disguising them on BofI's

26   financial statements as non-descript "single family lender finance loans."

27        10.    BofI reaped significant benefits from these lending partnerships,

28   including millions of dollars in loan-origination fees and the ability to report growth

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1   in its loan originations and overall improved efficiency, without accounting for or
2   reporting the attendant risks.

3        11.    BofI also used undisclosed off-balance-sheet SPEs managed by BofI
4   executives to purchase lottery receivables originated by third parties, contrary to
5   Defendants' express representations that BofI originates contracts for the retail
6   purchase of such payments in-house.

7        12.    BofI's improper lending and other practices flouted numerous federal
8   banking regulations and consumer protection laws and subjected the Company to
9   significant risk of regulatory and government action.

10        13.    Specifically, several former BofI employees knowledgeable about
11   BofI's loan-origination and underwriting activities and operations confirmed that
12   BofI (i) failed to implement and enforce adequate internal controls, as required by
13   the U.S. Department of the Treasury's Office of the Comptroller of the Currency
14   ("OCC"), BofI's principal regulator; (ii) issued loans to foreign nationals with
15   criminal or suspicious backgrounds and/or who lacked sufficient identifying
16   information, in violation of the Bank Secrecy Act of 1970 ("BSA"); (iii) employed
17   a convicted felon as a senior officer without obtaining a waiver required by the
18   Federal Deposit Insurance Act ("FDIA"); (iv) issued loans for properties that failed
19   to comply with the Flood Disaster Protection Act of 1973 ("FDPA"); and (v) issued
20   loans to borrowers whose ability to repay was demonstrably doubtful, in violation
21   of the Truth-In-Lending Act ("TILA").

22        14.    BofI recently admitted to the existence of nonpublic government
23   investigations of the Company, including investigations by the OCC, and that the
24   Company had received government-issued subpoenas.

25        15.    Investors also recently learned that BofI is no longer "branchless" even
26   though it continues to prominently advertise otherwise.  Rather, in August 2015,
27   BofI opened a phantom "full service" branch location in Reno, Nevada, apparently
28   to issue and book hundreds of millions of dollars of financial products of H&R

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1   Block Bank ("H&R Block"), which BofI agreed to provide as part of a program-

2   management agreement with H&R Block, and to take advantage of Nevada usury

3   laws, which do not limit interest rates in express written contracts.  This is yet

4   another example of how BofI's actual lending practices differed materially from

5   Defendants' Class Period representations to investors regarding the Company's

6   purportedly prudent and conservative business model.

7       16.    BofI's senior management, led by CEO and President Gregory

8   Garrabrants, perpetrated the fraudulent scheme at BofI.  Having worked as a Senior

9   Vice President at IndyMac Bank, which experienced one of the largest U.S. bank

10  failures in history, Garrabrants was no stranger to practices that could, and have,

11  caused banks to collapse and their investors to suffer significant losses.

12  Throughout the Class Period, while publicly touting BofI as an "earnings

13  juggernaut," Garrabrants suppressed concerns voiced by those below him regarding

14  the practices detailed in this Complaint and conspired with other senior BofI

15  officers and certain BofI directors, many of whom had also worked at failed banks,

16  to misrepresent or conceal the Company's risky, and in some cases illegal, business

17  practices.

18      17.    Garrabrants fostered a corporate environment in which compliance

19  with his directives was demanded and dissenting views were silenced.  As detailed

20  below, former BofI employees recall meetings in which Garrabrants repeatedly

21  threatened retaliatory action against any employee who challenged him, and that

22  Garrabrants interfered with employees' ability to perform their jobs properly.

23      18.    Garrabrants also abused his powerful position at BofI and reaped

24  personal gains as a result of the Company's deficient internal controls and the

25  unethical environment he cultivated.  On multiple occasions, Garrabrants directed

26  employees to deposit third-party checks into his personal account at BofI and, in at

27  least one instance, he forged a third party's signature.  Garrabrants also obtained a

28

sizeable personal construction loan from BofI on far better terms than would have been available to him had he not been affiliated with BofI.

19.     Other members of BofI's senior management and BofI's Audit Committee who were complicit in the wrongful conduct similarly obtained personal loans with uniquely favorable terms.  BofI neither adequately disclosed these related-party loans nor properly accounted for them as additional compensation in the Company's financial statements.  The loans also compromised the independence of the Audit Committee members who received them, thereby undermining the Committee's effectiveness.

20.     On October 13, 2015, *The New York Times* reported that a former internal auditor at BofI, Charles Matthew Erhart, had filed an action against BofI for violating federal laws designed to protect whistleblowers (the "Erhart Action"), which alleged widespread misconduct at the Company.  Erhart's complaint (the "Erhart Complaint")[4] alleges, *inter alia*, that:

- BofI's management may be falsifying the Company's financial statements;

- BofI falsely responded to an SEC subpoena requesting customer account information;

- BofI falsely responded to the OCC's request for information about accounts with missing customer Tax Identification Numbers ("TINs"), claiming no such accounts existed even though Erhart saw a spreadsheet containing 150-200 such accounts;

- BofI made substantial loans to foreign nationals and politically exposed persons in violation of the BSA;

- BofI compliance personnel found FDPA issues with 49 out of 51 sample loans reviewed, and BofI "buried" a compliance review identifying many FDPA issues;

- BofI "sanitized" a list of high-risk Global Cash Card customers and presented it to the OCC, instead of the original list noting customer-identification issues;

---

[4] *See Erhart v. BofI Holding Inc., an entity, d/b/a BofI Federal Bank and Bank of the Internet*, No. 3:15-cv-2287-BAS-NLS (S.D. Cal. filed Oct. 13, 2015), Dkt. No. 1.

- Garrabrants deposited third-party checks into his personal account and was the signatory of his brother's account with a $4 million balance—Erhart could not verify the source of those funds;

- Jonathan Ball, BofI's Vice President of Internal Audit and Erhart's supervisor, resigned abruptly on March 5, 2015 after refusing Garrabrants's order "to engage in what Ball reasonably viewed to be unlawful conduct to cover up the Bank's wrongdoing"; and

- Erhart was fired after he revealed wrongdoing at BofI to management and to the SEC, the OCC, and the U.S. Department of Labor, Occupational Safety and Health Administration.

Erhart Compl. ¶¶ 9-75.

21. Following the revelation of those allegations, BofI common stock fell $10.72 per share (or $42.87 per share on a pre-split adjusted basis), or 30.2%, to close at $24.78 on October 14, 2015, on extremely high trading volume, for a one-day market capitalization loss of more than $675 million.

22. BofI's stock price continued to plummet through February 3, 2016, the last day of the Class Period, as the market learned additional details about Defendants' fraudulent scheme. As a result of Defendants' misstatements and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members suffered significant damages.

23. As described above and further detailed below, Plaintiff's claims arise primarily from Defendants' knowing and deliberate actions that rendered BofI a materially less-safe investment than investors were led to believe. While each of the incidents and schemes detailed below was improper, their collective undermining of the Defendants' portrayal of BofI as a prudent, safe investment is the thrust of Plaintiff's claims.

24. Plaintiff asserts two types of claims under the federal securities laws: (i) Section 10(b) claims against Defendants BofI, Garrabrants, Micheletti, Grinberg, Mosich, and Argalas, arising from Defendants' knowing or deliberately reckless making of false or misleading statements of material fact, as detailed in this

Complaint; and (ii) Section 20(a) claims for "control person liability" against Defendants Garrabrants, Micheletti, Grinberg, Mosich, and Argalas (collectively, the "Individual Defendants"), arising from those Defendants' positions as "controlling persons" of BofI as contemplated by Section 20(a).

25.   To establish a *prima facie* claim under Section 20(a), Plaintiff must demonstrate (i) a primary violation of the securities laws and (ii) that the defendant exercised actual power over the primary violator.  Further, establishing a controlling person's liability under Section 20(a) does *not* require establishing that person's scienter distinct from the controlled corporation's scienter.[5]  As demonstrated in this Complaint, each Individual Defendant is a "controlling person" of BofI under Section 20(a).  *See, e.g.*, ¶¶ 443-54, *infra*.  Accordingly, because BofI is liable under Section 10(b), each Individual Defendant is liable as a "controlling person" of BofI under Section 20(a) regardless of whether he is also liable under Section 10(b).[6]

---

[5] *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000); *see also In re NorthPoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1106 (N.D. Cal. 2002) (Alsup, J.) (upholding Section 20(a) claims against defendant company's Chairman and Chief Development Officer notwithstanding the dismissal of Section 10(b) claims against them; court observed that "'[t]o establish the liability of a controlling person, the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter'") (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993)).

[6] In its September 27, 2016 Order on Defendants' motion to dismiss (Dkt. No. 64), the Court (i) upheld Plaintiff's Section 10(b) claims against BofI and Garrabrants; (ii) upheld Plaintiff's Section 20(a) claim against Garrabrants; and (iii) dismissed Plaintiff's Section 10(b) and Section 20(a) claims against Micheletti, Grinberg, Mosich, and Argalas.  While Plaintiff respectfully disagrees with the Court's determinations as to Plaintiff's Section 10(b) claims against Micheletti, Grinberg, Mosich, and Argalas, Plaintiff files this Second Amended Complaint primarily to make clear that it asserts Section 20(a) claims against those Defendants notwithstanding the Court's dismissal of the Section 10(b) claims against them. Plaintiff also, however, retains Section 10(b) claims against those Defendants in this Complaint to preserve them for appeal or in the event discovery reveals additional information supporting those claims.

1

## JURISDICTION AND VENUE

2    26.    HMEPS asserts claims under Sections 10(b) and 20(a) of the Exchange

3    Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and SEC Rule 10b-5 promulgated

4    thereunder, 17 C.F.R. § 240.10b-5.

5    27.    This Court has jurisdiction over the subject matter of this action

6    pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act,

7    15 U.S.C. § 78aa.

8    28.    Venue is proper in this District pursuant to Section 27 of the Exchange

9    Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), as the Company is headquartered

10   in this District and many of the acts and practices complained of in this Complaint

11   occurred in substantial part in this District.

12   29.    In connection with the misconduct alleged in this Complaint,

13   Defendants, directly or indirectly, used the means and instrumentalities of interstate

14   commerce, including the United States mails, interstate telephone communications,

15   and the facilities of the national securities markets.

16

## PARTIES

17   30.    By an order entered on February 1, 2016, this Court appointed HMEPS

18   as Lead Plaintiff (Dkt. No. 23).  As set forth in its certification filed in connection

19   with its motion for appointment as Lead Plaintiff (Dkt. No. 12-3 (Ex. B)), HMEPS

20   purchased BofI common stock during the Class Period and, as a result of

21   Defendants' misconduct alleged herein, suffered damages in connection with those

22   purchases.

23   31.    Defendant BofI is a Delaware company that maintains its corporate

24   headquarters at 4350 La Jolla Village Drive, Suite 140, San Diego, California

25   92122.  Founded in 1999, BofI is the holding company for BofI Federal Bank, a

26   federally chartered savings association that purportedly operates from its single

27   location in San Diego.  BofI provides consumer and business banking products,

28   including deposit accounts and financing, through distribution channels and affinity

groups.  BofI, which purports to be "branchless," offers various types of consumer

and business checking, savings, certificates of deposit, and other deposit accounts

through retail distribution channels, including websites and online advertising

promoting BofI's brands, such as "Bank of Internet" and "Bank X," a call center of

salespeople, financial advisory firms that introduce their clients, and affinity groups

that provide access to their members.  As of December 31, 2015, BofI held $5.2

billion in deposits.

32.    BofI also offers various types of consumer and business loans, which it

categorizes as: (i) Single Family Mortgage Secured Lending—mortgages secured

by first liens on single-family residential properties for consumers and for

businesses (i.e., lender-finance loans), as well as consumer home equity loans

secured by second liens on single-family mortgages; (ii) Multifamily Mortgage

Secured Lending—multi-family residential mortgage loans; (iii) Commercial Real

Estate Secured and Commercial Lending—loans secured by first liens on

commercial real estate and commercial and industrial ("C&I") loans based on

business cash flow and asset-backed financing; (iv) Specialty Finance Factoring—

whereby the Bank originates contracts for the retail purchase of state lottery

winnings and structured-settlement annuity payments and, since 2013, originates

pools of structured-settlement receivables for sale; (v) Prepaid Cards—whereby the

Bank provides card-issuing and bank identification number ("BIN") sponsorship

services to companies who use prepaid cards for payroll, incentive, and gift cards

for consumers, among other purposes; and (vi) Auto and RV and Other Consumer

Lending—loans to purchase recreational vehicles, automobiles, and deposit-related

overdraft lines of credit.  As of December 31, 2015, BofI's loan portfolio totaled

$5.715 billion, consisting of $3.37 billion in single-family secured mortgages,

$1.20 billion in multi-family secured mortgages, and $281.1 million in C&I loans.

33.    On or around August 31, 2015, BofI closed a purchase-and-assumption

transaction with H&R Block, a federal savings bank, and its parent company,

1   pursuant to which BofI purchased certain assets and assumed certain liabilities,

2   including all of H&R Block's deposit liabilities.  It also received $419 million of

3   cash and assumed an equal amount of deposit liabilities and acquired a small

4   amount of non-cash assets.  Additionally, BofI entered into a program-management

5   agreement with H&R Block under which BofI would provide H&R Block-branded

6   financial services products through H&R Block's retail and digital channels.

7          34.    As of January 22, 2016, the aggregate number of shares of BofI

8   common stock outstanding was 63,032,258.  During the Class Period, BofI's

9   common stock was listed on NASDAQ Global Select Market under the ticker

10  "BOFI" and is a component of the Russell 2000® Index and the S&P SmallCap

11  600® Index.

12         35.    Defendant Gregory Garrabrants has served at all relevant times as

13  President, CEO, and a Director of BofI.  He has served as CEO since October 2007

14  and as President and a Director since March 2008.  Garrabrants has also served as

15  President, CEO, and a Director of BofI Federal Bank, and a member of its Board's

16  Credit Committee, Asset and Liability Committee ("ALCO"), and Operations and

17  Technology Committee.  Between March 2006 and September 2007, Garrabrants

18  was a Senior Vice President at IndyMac Bancorp. Inc. ("IndyMac"), where he led

19  the corporate business development group responsible for merger and acquisitions,

20  joint ventures, and strategic alliances.  IndyMac failed in 2008, amid the housing

21  crisis, and was seized by the Federal Deposit Insurance Corporation ("FDIC").  On

22  February 11, 2011, the SEC charged three former senior IndyMac executives with

23  securities fraud for misleading investors in 2007 and 2008 about the bank's

24  deteriorating financial condition.  Garrabrants also previously worked as an

25  investment banker at Goldman & Sachs & Co. and as a management consultant at

26  McKinsey & Company.  Garrabrants is an attorney and member of the State Bar of

27  California; he also has a Master's of Business Administration ("MBA") degree and

28  is a Chartered Financial Analyst.

36.     Defendant Andrew J. Micheletti has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer ("CFO"). Micheletti joined BofI in 2001.  Between 1997 and 2001 he served as Vice President – Finance for TeleSpectrum Worldwide Inc. ("TeleSpectrum"), an international provider of outsourced telephone and Internet services to large companies.  Micheletti also previously worked as Vice President, Controller and Vice President, Financial Reporting, for Imperial Savings Association ("Imperial Savings"), a former California state-chartered savings and loan association that was seized by the federal government in February 1990 and placed into conservatorship due to bank's massive losses in its junk bond portfolio and problem loans and other investments that depleted the bank's capital.  Micheletti joined Imperial Savings in 1985 as an internal auditor and worked in various positions before being promoted to Controller in 1990.  He also held several positions with Deloitte & Touche LLP as an auditor from 1980 to 1985.  Micheletti is licensed as a Certified Public Accountant ("CPA") (inactive) in the State of California and has held various NASD securities licenses.

37.     Defendant Paul J. Grinberg has served at all relevant times as a member of BofI's Board of Directors and as Chairman of the Board's Audit Committee, Chairman of the Board's Compensation Committee, and a member of the Board's Nominating Committee.  Grinberg became a Director of BofI in April 2004.  Grinberg also serves as Chairman of the Audit Committee of the Board of Directors of BofI Federal Bank.  Grinberg has also served as Group Executive, International and Corporate Development of Encore Capital Group (Nasdaq: ECPG), a publicly-traded international specialty finance company, since February 2015, and formerly as Executive Vice President and CFO of Encore Capital. Between 1997 and 2000, Grinberg was an Executive Vice President and CFO of TeleSpectrum.  Grinberg is a former partner of Deloitte & Touche LLP and has an

1   MBA degree and a bachelor's degree in accounting.  He is licensed as a CPA in the

2   state of New York.

3        38.    Nicholas A. Mosich has at all relevant times served as Vice Chairman

4   of BofI's Board of Directors and as member of the Board's Audit Committee.

5   Mosich also serves as a member of the Audit Committee, the ALCO, the Credit,

6   and the Operations and Technology Committees of the Board of Directors of BofI

7   Federal Bank.  Since 2005, Mosich has been a Managing Member of Arroyo Vista

8   Partners, LLC, a discretionary investment fund that acquires land for residential

9   development projects in California.  Mosich previously worked as an Executive

10  Vice President and Board Member of The Seidler Companies Incorporated and had

11  an active role as a co-manager of the BofI's initial public offering in March 2005.

12  Mosich has an MBA degree.

13       39.    James S. Argalas has at all relevant times served as a member of

14  BofI's Board of Directors and as a member of the Board's Audit Committee.

15  Argalas also serves as a member of the Audit Committee and the Internal Assets

16  Review Committee of the Board of Directors of BofI Federal Bank.  Argalas is the

17  founder and lead principal of Presidio Union Management, LLC, a San Francisco-

18  based investment management company that manages a series of investment

19  partnerships on behalf of institutional and individual investors. He was previously

20  an Associate Principal with McKinsey & Company and an Associate at Goldman

21  Sachs & Co., and has an MBA degree.

22       40.    As noted above, the individuals referenced in ¶¶ 35-39 above are

23  sometimes referred to collectively in this Complaint as the "Individual Defendants."

24       41.    Defendants Garrabrants and Micheletti signed Sarbanes-Oxley Act of

25  2002 ("SOX") certifications accompanying Forms 10-Q and 10-K that BofI filed

26  with the SEC during the Class Period, and made untrue statements of material fact

27  and failed to disclose material facts necessary to make statements made by

28

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1    Defendants not misleading, including in press releases issued by BofI and during

2    BofI conference calls with analysts and investors during the Class Period.

3         42.    Defendants Grinberg, Mosich, and Argalas each signed the false and

4    misleading Report of the Audit Committee included in BofI's definitive proxy

5    statement, filed with the SEC on September 4, 2015 on Schedule 14A (the "2015

6    Proxy Statement").

7                           **SUBSTANTIVE ALLEGATIONS**

8    **I.    BofI Engaged in Unlawful Lending Practices**

9         43.    BofI Federal Bank began as small consumer-focused, nationwide

10   savings bank operating primarily through the Internet.  After Garrabrants joined

11   BofI in 2007, it rapidly grew into a diversified financial-services company offering

12   diverse loan-origination and fee-income businesses that have yielded remarkable

13   financial returns through the Company's purportedly branchless distribution

14   channels.

15        44.    Between fiscal 2011 and 2015, BofI's total deposits grew 232% (from

16   $1.34 billion to $4.45 billion) and its total loan portfolio grew 274% (from $1.33

17   billion to $5.0 billion), while net income increased consecutively each year, from

18   $23.2 million as of the fiscal year ending June 30, 2011 to $82.7 million as of the

19   fiscal year ending June 30, 2015.  The primary driver of BofI's increased earnings

20   during that time was growth of its loan portfolio and increasing net interest margin.

21        45.    BofI is subject to extensive regulation by its principal regulator, the

22   OCC, as well as the FDIC, the Federal Reserve, the SEC, the Consumer Financial

23   Protection Bureau ("CFPB"), and the Financial Industry Regulatory Authority

24   ("FINRA").  Two major focuses of banking supervision and regulation are the

25   safety and soundness of a bank and its compliance with consumer protection laws.

26   Bank examiners perform on-site examinations to review the bank's performance

27   based on its management and financial condition, as well as its compliance with

28   regulations.

46.     During the Class Period, BofI deceived its regulators (and investors) by engaging in undisclosed, widespread misconduct that, as detailed below, subjected the Company to enormous risks of regulatory action, legal liability, and significant penalties and fines and caused BofI investors to suffer significant damages.

47.     During the Class Period, BofI engaged in deliberately lax lending practices and issued loans to borrowers with poor credit history whose ability to repay the high-interest loans issued to them was, as Defendants knew, doubtful. These lending practices were inconsistent with BofI's claims that its lending standards were "conservative" and "disciplined," including (as further detailed in ¶¶ 50-142 below):

- Garrabrants's representations during an August 7, 2014 earnings conference call that "we continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products," "we believe that we can continue to grow our [C&I loan] portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines," and "[w]e are pleased with the increase in the credit quality at the bank";

- Garrabrants's representations during an April 30, 2015 earnings conference call that "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes" and "[r]isk is not hidden in the tail for the portfolio"; and

- Garrabrants's representations during an October 29, 2015 earnings conference call that BofI's "portfolio credit quality is very strong," "[o]ur strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs," and "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to increase loan volume"

48.     Through those and other statements, Defendants knowingly misled investors as to the extent of the true risks entailed in investing in BofI.

49.     Further, as detailed in ¶¶ 143-150, 158-217 below, Defendants violated various federal banking and lending regulations and failed to implement effective internal controls.

### A.     BofI Violated the "Ability to Repay" Rule

50.    In January 2013, the CFPB adopted a rule (effective on January 10, 2014) amending 12 C.F.R. § 1026, or "Regulation Z" (which implements TILA), to implement sections of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act") requiring, among other things, that creditors make a reasonable, good faith determination of a consumer's ability to repay, with limited exclusions, any consumer credit transaction secured by a dwelling. 12 C.F.R. § 1026.43(c).  The rule also establishes certain protections from liability under this requirement for "qualified mortgages" or "QMs."  12 C.F.R. § 1026.43(e).

51.    The ability-to-repay/QM rule requires lenders to make a reasonable, good-faith determination before or when a mortgage loan is issued that the borrower has a reasonable ability to repay the loan, considering such factors as the borrower's  income or assets and employment status (if relied on) against: (i) the mortgage loan payment; (ii) ongoing expenses related to the mortgage loan or the property that secures it, such as property taxes and hazard insurance; (iii) payments on other loans secured by the same property; and (iv) the borrower's other debt obligations.  12 C.F.R. § 1026.43(c)(2).  The rule also requires the lender to verify the borrower's credit history.  12 C.F.R. § 1026.43(c)(3).

52.    The rule contains a presumption that the lender has complied with the rule if it originates a QM.  QMs generally cannot contain certain risky features, such as interest-only payments or balloon payments.[7]  Additionally, points and fees on QMs are limited.

53.    As described below, Defendants routinely disregarded borrowers' ability to repay in making mortgage loans.  According to a copy of a 2014 presentation by BofI's National Sales Executive entitled "Comprehensive Overview

---

[7] *See* CFPB's *Basic guide for lenders What is a Qualified Mortgage?*, http://files. consumerfinance.gov/f/201310_cfpb_qm-guide-for-lenders.pdf.

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1    of Our Wholesale Business," BofI offered non-QM loans and other loans to

2    consumers, including foreign nationals, with LTVs that were higher than the

3    average LTV for single-family mortgages BofI reported in its SEC filings.[8]

---

[8] Maurice Totry, BofI National Sales Executive, *Comprehensive Overview of our Wholesale Business, 2014* (the "2014 Presentation"), *available at* https://www.dropbox.com/s/wpxip6e91rfhqaj/BofIFederal_Presentation-%20MT%20Version%2003%2011%202014.pdf?dl=0.  The presentation was apparently intended for BofI's wholesale distribution channel partners.



# Wholesale- Portfolio Arm Matrix

## ELIGIBILITY MATRIX- FULL DOC ONLY

### Primary Residence - Purchase

| Property | ≤$1m **LTV/CLTV | >$1m≤$2m **LTV/CLTV | >$2m≤$3m **LTV/CLTV | >$3m≤$5m **LTV/CLTV | >$5m **LTV/CLTV |
|---|---|---|---|---|---|
| 1 unit | 70%/75% | 70%/75% | 65%/70% | 60%/65% | By Exception |
| 2-4 unit | 70%/75% | 70%/75% | 65%/70% | 60%/60% | By Exception |
| Condo* | 65%/65% | 65%/65% | 65%/65% | 60%/60% | By Exception |
| Co-op | 65%/65% | 65%/65% | 65%/65% | 60%/60% | By Exception |

### Second Home - Purchase

| Property | ≤$1m **LTV/CLTV | >$1m≤$2m **LTV/CLTV | >$2m≤$3m **LTV/CLTV | >$3m≤$5m **LTV/CLTV | >$5m **LTV/CLTV |
|---|---|---|---|---|---|
| 1 unit | 65%/70% | 60%/65% | 55%/60% | 50%/55% | By Exception |
| 2-4 unit | 65%/70% | 60%/65% | 55%/60% | 50%/55% | By Exception |
| Condo* | 65%/70% | 60%/65% | 55%/60% | 50%/55% | By Exception |
| Co-op | 65%/70% | 60%/65% | 55%/60% | 50%/55% | By Exception |

### Primary Residence - Refinance

| Property | ≤$1m **LTV/CLTV | >$1m≤$2m **LTV/CLTV | >$2m≤$3m **LTV/CLTV | >$3m≤$5m **LTV/CLTV | >$5m **LTV/CLTV |
|---|---|---|---|---|---|
| 1 unit | 70%/75% | 65%/70% | 60%/65% | 60%/65% | By Exception |
| 2-4 unit | 70%/75% | 65%/70% | 60%/65% | 60%/60% | By Exception |
| Condo* | 65%/65% | 65%/65% | 60%/60% | 55%/60% | By Exception |
| Co-op | 65%/65% | 65%/65% | 60%/60% | 55%/60% | By Exception |

### Second Home - Refinance

| Property | ≤$1m **LTV/CLTV | >$1m≤$2m **LTV/CLTV | >$2m≤$3m **LTV/CLTV | >$3m≤$5m **LTV/CLTV | >$5m **LTV/CLTV |
|---|---|---|---|---|---|
| 1 unit | 60%/65% | 55%/60% | 50%/55% | 50%/50% | By Exception |
| 2-4 unit | 60%/65% | 55%/60% | 50%/55% | 50%/50% | By Exception |
| Condo* | 60%/65% | 55%/60% | 50%/55% | 50%/50% | By Exception |
| Co-op | 60%/65% | 55%/60% | 50%/55% | 50%/50% | By Exception |

### Investment - Purch & Refi

| Property | ≤$1m **LTV/CLTV | >$1m≤$5m **LTV/CLTV | >$5m **LTV/CLTV |
|---|---|---|---|
| 1 unit | 55%/55% | 55%/55% | By Exception |
| 2-4 unit | 55%/55% | 55%/55% | By Exception |
| Condo* | 55%/55% | 55%/55% | By Exception |
| Co-op | 55%/55% | 55%/55% | By Exception |

### MATRIX NOTES

*Condos N/A in AZ and NV.  Condotels max LTV 50%.

**5% Reduction in LTV/CLTV for ANY AZ and NV properties.

***Interest Only optional on the 5-year ARM only and LTV/CLTV is the lesser of the matrix or 60%.

****NO CEMA on 6 mo. ARMS****



Refinance LTV's includes cash out loans
All Cash out Loans okay on an exception basis



**Foreign Nationals**
60 LTV to $2mil
55 LTV to $3mil
50 LTV to $5mil

54.   Former BofI employees, including loan underwriters, provided detailed accounts of the Company's deliberately lax lending practices.  According to a former BofI Senior Underwriter ("CW 1") who worked at BofI's San Diego headquarters during part of the Class Period primarily on financings for apartment buildings and mixed-use buildings, as well as some commercial properties, beginning in early 2014 CW 1 and CW 1's group were being pressured by BofI's Executive Vice President and Chief Credit Officer Thomas Constantine, as well as Leigh Porter, who was in charge of BofI's Multifamily – Income Property Lending group, to underwrite loans that CW 1 was not comfortable signing off on and that did not make economic sense for BofI to issue.

55.   One such loan on which CW 1 worked in mid-2014 involved a multi-family property located in Laguna Beach, California that was highly leveraged, at approximately 70% to 75% LTV.  According to CW 1, the borrower sought a cash-out refinancing loan of several million dollars but had bad credit and no cash. CW 1 reviewed bank statements provided by the borrower that showed less than a $100 balance in some accounts, including one account that had a negative balance. According to CW 1, it was clear that the borrower "was using the property basically to support a lifestyle the borrower no longer had the money to support." CW 1's review of the operating standards of the property showed barely any cash flow.  Despite CW 1's recommendation against financing the property, BofI issued the loan.

56.   Further, BofI already had issued a highly leveraged refinancing loan for a mixed-use property to the same borrower, and soon after BofI made the second loan to that borrower, CW 1 was told by co-workers in BofI's loan-servicing department that the borrower had not yet made the first payment owed on the first loan.

57.   CW 1 worked on the second refinancing loan and noticed on an updated credit report concerning the borrower that since the first cash-out

1  refinancing loan from BofI, the borrower had taken on an additional $80,000 in

2  debt from Mercedes-Benz, which CW 1 believed indicated the borrower had

3  recently purchased a new luxury vehicle.  CW 1 was concerned, regarding those

4  two loans, that the borrower's spending habits outstripped her income.  According

5  to CW 1, the debt-service coverage ratio was not good with respect to both

6  properties.[9]

7      58.    CW 1 expressed concerns about the two loans to Constantine.

8  According to CW 1, Constantine's response was that the transaction was a good

9  deal for BofI, even if it had to foreclose on the underlying properties.  Constantine

10  noted to CW 1 that it did not matter to BofI if the first loan defaulted because the

11  underlying property was located in Laguna Beach (one of the most expensive real

12  estate markets in California).

13      59.    Constantine's comment was at odds with the ability-to-repay/QM

14  rule, which does not include a property's foreclosure value among the factors that

15  should be considered in determining a borrower's ability to repay a loan.

16      60.    CW 1 described other improper lending practices at BofI, including

17  its use of the same appraiser, Brendan Flynn and his appraisal company, The Flynn

18  Group, to perform appraisals for the vast majority of loans BofI made.  CW 1

19  noted that Flynn was a friend of Constantine and that even though The Flynn

20  Group was located in Southern California, it performed appraisals for BofI for

21  properties located elsewhere, including in Oregon and Las Vegas.  CW 1 recalled

22  instances in which CW 1 saw an initial appraisal by The Flynn Group that

23  appraised a property for a certain value, and later saw an "updated appraisal" by

24  The Flynn Group with a higher appraisal value of the same property.

25      61.    CW 1 worked on an average of 10 to 15 loans per month at BofI and,

26  beginning in February 2014, CW 1 was uncomfortable with approximately 10% to

27

28  _____
[9] The debt-service coverage ratio is the ratio of cash available for debt servicing to
interest, principal, and lease payments.

1   20% of those loans because of the process BofI used to approve loans.  "It started

2   to become very rare that we would deny a loan," according to CW 1.

3        62.    Another Senior Underwriter who worked in BofI's San Diego

4   headquarters prior to and during part of the Class Period ("CW 2") provided

5   similar accounts of BofI's lending practices.  CW 2 worked in the same lending

6   group as CW 1 for part of the Class Period, and then, also during the Class Period,

7   transferred to BofI's C&I Lending Group, where CW 2 reported to Constantine.

8   According to CW 2, Constantine and Garrabrants approved deals that CW 2 and

9   other underwriters recommended against doing, including loans CW 2 and other

10  BofI underwriters believed were unlikely to be repaid.

11       63.    In mid-2014, CW 2 worked on a multimillion dollar C&I loan for a

12  large property located in the 700 block of Broadway Street in downtown San

13  Diego, California.  The property had been listed for sale for three years at

14  approximately $13 million, which, according to CW 2, indicated that the property

15  was not worth $13 million.  The property was owned by an individual who had

16  planned to work with Starwood Hotels to build a hotel on the property, but having

17  not done so, the individual was forced by Starwood to sell the property.

18       64.    The borrower was a limited liability company ("LLC").  CW 2 noted

19  that the appraiser whom BofI hired for the deal was Brendan Flynn of The Flynn

20  Group, the same appraiser identified by CW 1 as performing the vast majority of

21  appraisals for BofI loans.  CW 2 similarly noted that Flynn was a friend of

22  Constantine and was the only appraiser BofI used for all multifamily property

23  appraisals.  According to CW 2, Flynn called CW 2 stating that the property

24  needed to be appraised for $18 million to satisfy the LTV required for BofI to

25  proceed with the loan.  CW 2 refused to recommend the loan with a property

26  valuation of $18 million, particularly after reviewing the borrower's LLC

27  agreement, which contained a suspicious clause indicating that the property owner

28  was also making a loan to the borrower above the purchase price, that the

1    difference between the loan amount and purchase price would be paid to the owner

2    by the borrower within 24 months, and if the borrower failed to do so, the owner

3    would assume ownership of the property.  CW 2 voiced concerns about the clause,

4    which CW 2 thought was part of a scam designed for the owner to regain

5    ownership of the property, to BofI's Chief Legal Officer, Eshel Bar-Adon.

6       65.    After CW 2 informed Constantine and the BofI loan originator

7    working on the same loan that CW 2 would not approve the loan, CW 2 received a

8    call from the loan originator at approximately 3:00 a.m. the following day asking if

9    CW 2 would approve the loan, to which CW 2 responded "Absolutely not."  CW 2

10   then received a call from Constantine pressuring CW 2 to approve the loan.

11   Again, CW 2 refused.

12      66.    A review of the June 2014 Brendan Flynn appraisal report revealed

13   that the Broadway property was ultimately appraised at $18 million.  According to

14   CW 2, the loan was approved by Garrabrants upon recommendation by

15   Constantine and the loan was funded for between $11 million and $13 million.

16   CW 2 subsequently expressed concerns about the transaction to Constantine,

17   BofI's Executive Vice President and Chief Lending Officer Brian Swanson, and

18   other BofI managers.  CW 2 also left a copy of the loan documents and a list of

19   CW 2's concerns with Garrabrants's assistant, as Garrabrants was in Italy at the

20   time.

21      67.    CW 2 also described another loan BofI issued to a borrower whom

22   CW 2 knew had poor credit and a FICO score in the 400 range.[10]  The interest rate

23   on the $24,000 loan was approximately 20%.  According to CW 2, the loan was

24   signed by an underwriter whom CW 2 knew and who, when confronted about the

25   loan, denied any knowledge that his name was on the loan documents.

26

27   _____

[10] A FICO score is a type of credit score between 300 and 850 that lenders use to
28   assess an applicant's credit risk.  The higher the score, the lower the applicant's
     credit risk.

68.     Another Senior Underwriter who worked in BofI's Multifamily lending group in the Company's San Diego headquarters just prior to the Class Period ("CW 10") confirmed that BofI executive management funded loans that CW 10 and other BofI underwriters declined to sign off on.

### B.     BofI Engaged in, and Concealed, Illicit Lending Partnerships

69.     BofI also worked with undisclosed SPEs and lending partners such as OnDeck, Quick Bridge, RCN, Center Street, Propel Tax, and BofI Properties, LLC-Series 1 ("BofI Properties") in making high-risk loans that were inconsistent with BofI's purported "conservative" and "disciplined" lending standards.  Certain of those lending partnerships included the deceptive transfer of high-risk loans off BofI's balance sheet to artificially improve the Company's performance.

### 1.     OnDeck

70.     BofI worked with OnDeck to expand BofI's C&I Lending business, one of the Company's fastest-growing segments during the Class Period.  OnDeck is a publicly traded company whose common stock is listed on the New York Stock Exchange under the ticker "ONDK."  OnDeck was profiled in a Bloomberg article entitled "*Is OnDeck Capital the Next Generation of Lender or Boiler Room?*" that described OnDeck's business as "essentially payday lending for businesses[]" at a high cost – the average interest rate on OnDeck's business loans was 54%.[11]  OnDeck worked with independent mortgage brokerage firms that recommended loans to BofI in exchange for lucrative fees.  According to Bloomberg, "OnDeck has teamed up with brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy, according to interviews with the brokers and court records."[12]

---

[11] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*," Bloomberg, Nov. 13, 2014.
[12] *Id.*

71.     In December 2014, in connection with its initial public offering, OnDeck filed a prospectus with the SEC in which it described its partnership with BofI.  OnDeck revealed that pursuant to the lending partnership, BofI issued commercial loans in states and jurisdictions in which OnDeck is not licensed to do so:

> [N]ine states and jurisdictions, namely Alaska, California, Maryland, Nevada, North Dakota, Rhode Island, South Dakota, Vermont, and Washington, D.C., require a license to make certain commercial loans and may not honor a Virginia choice of law. . . . In such states and jurisdictions and in some other circumstances, term loans are made by an issuing bank partner that is not subject to state licensing, primarily BofI Federal Bank (a federally chartered bank), or BofI, and may be sold to us.
>
> * * *
>
> BofI establishes its underwriting criteria for the issuing bank partner program in consultation with us.  We recommend term loans to BofI that meet BofI's underwriting criteria, at which point BofI may elect to fund the loan. If BofI decides to fund the loan, BofI retains the economics on the loan for the period that it owns the loan.  BofI earns origination fees from the customers who borrow from it and in addition retains the interest paid during the period BofI holds the loan before sale.  In exchange for recommending loans to BofI, we earn a marketing referral fee based on the loans recommended to, and funded by, BofI.  BofI has the right to hold the loans or sell the loans to us or other purchasers, though it generally sells the loans to us on the business day following its origination of the loan. . . .[13]

72.     BofI's partnership with OnDeck is tantamount to a "Rent-a-Charter" scheme, which the OCC has publicly condemned and sought to eliminate at other banks through enforcement actions.[14]  The OCC has found "a number of abuses in these relationships.  Of primary concern was the inability of small banks to properly oversee the third parties who were making loans in their names.  Among the abuses: deceptive marketing practices, failure to secure confidential customer files, and unsafe and unsound lending."[15]

---

[13] OnDeck Form 424B4 filed with the SEC on December 17, 2014.

[14] Aurelius, *BofI:  Boiler Rooms, Bad Loans, And Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks*, *Seeking Alpha*, Nov. 10, 2015.

[15] OCC website, *Payday Lending*, http://www.occ.treas.gov/topics/consumer-protection/payday-lending/index-payday-lending.html.

73.     The OCC has issued advisory letters that warned against Rent-A-Charter schemes, which applied to BofI.  In OCC Advisory Letter AL 2000-10, for example, the OCC noted that "[s]uch third-party arrangements significantly increase risks to the bank and the OCC's supervisory concerns. . . . Payday lenders entering into such [Rent-a-Charter] arrangements with national banks should not assume that the benefits of a bank charter, particularly with respect to the application of the state and local law, would be available to them."[16]  Further, the OCC Advisory Letter provided guidelines for such arrangements, including:

- If payday lending is done indirectly through a third party, the agreement between the bank and a third party must establish adequate controls over the loan transactions, and should clearly delineate the services to be provided by the third party, including compliance with the bank's underwriting and servicing standards, funding procedures, reporting requirements, compensation, and other terms.[17]

74.     Additionally, in advisory letter AL 2003-3, which is also applicable to BofI, the OCC cautioned against "mak[ing] loans through brokers or obtain[ing] loans through purchase transactions that contain terms or reflect practices that may be characterized as abusive or 'predatory.'"[18]  The OCC's concerns included, among other things, that such loans "present significant legal, reputation, and other risks, in addition to the heightened credit risk assumed in cases where the borrower lacks the ability to repay the loan without resorting to liquidation of the collateral."[19]

75.     As mentioned above in ¶ 70 and reported by Bloomberg, the average interest rate on OnDeck's business loans was 54%.  OnDeck acknowledged in its

---

[16] *OCC Advisory Letter, AL-2000-10*, Nov. 27, 2000, *available at* http://www.occ.gov/static/news-issuances/memos-advisory-letters/2000/advisory-letter-2000-10.pdf.

[17] *Id.*

[18] *OCC Advisory Letter, AL 2003-3*, Feb. 21, 2003, *available at* http://www.occ.gov/static/news-issuances/memos-advisory-letters/2003/advisory-letter-2003-3.pdf.

[19] *Id.*

2015 10-K that a May 22, 2015 Second Circuit Court decision, *Madden v. Midland Funding*,[20] poses an additional threat to its "Rent-a-Charter" business model.  In *Madden*, the court held that the federal pre-emption of state usury laws does not apply in a case where consumer debt originated by a federally chartered bank is subsequently acquired by a non-bank debt collector.  Although the case is about credit card debt, the holding is broad, and according to legal experts it could also apply to commercial loans.[21]  OnDeck's risk disclosure in pertinent part states:

> Any extension of Second Circuit's decision, either within or without the states in the Second Circuit, could challenge the preemption of state laws setting interest rate limitations for those loans made by our issuing bank partners.

76.     BofI did not disclose its partnership with OnDeck or its active role in facilitating the Rent-a-Charter scheme pursuant to which BofI made millions of dollars in high-risk loans.  As OnDeck disclosed in its Form 10-K for the year ending December 31, 2014, loans made in states in which OnDeck was not licensed were "primarily" made by BofI, and, further, such loans by issuing bank partners totaled approximately ***$184.08 million***, or 15.9% of OnDeck's $1.157 billion in total originations in 2014.[22]

77.     Contrary to Garrabrants's assertions about BofI's C&I lending business that, among other things, "[w]e are the sole agent for the vast majority of our C&I loans," "the vast majority of our C&I loan books is sole sourced, originated and agented by us," and "[w]e believe there will be opportunities to work more closely with other institutions to growing our C&I loan portfolio either through club deals on a shared national credit basis," a significant portion of BofI's

---

[20] 786 F.3d 246 (2d Cir. 2015).

[21] *See* http://www.paulhastings.com/publications-items/details/?id=e695e469-2334-6428-811c-ff00004cbded: "However, the broad language of the Appeals Court's holding in the Madden case is not limited to the specific facts of the case and, thus, has potential applicability to commercial as well as consumer loans originated by national banks and federal thrifts relying on federal preemption from state usury laws, (…)"

[22] OnDeck IPO Prospectus, at p. 20.

C&I loan originations during the Class Period were actually pursuant to BofI's partnership with OnDeck as part of a Rent-a-Charter scheme.[23]

## 2. __Quick Bridge__

78.     BofI also originated C&I loans recommended by Quick Bridge, an Irvine, California-based "alternative lending company" that provides short-term loans to small and medium-sized business that are unable to obtain traditional loans.  Quick Bridge's website advertises, "Poor Credit? No problem.  We base our financing off of a business's cash flow, rather than a business's credit, because we understand the obstacles that modern business owners face."[24]

79.     According to an article published on *Seeking Alpha* on November 10, 2015, entitled *BofI:  Boiler Rooms, Bad Loans, And Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks* (the "November 10, 2015 Article"), Quick Bridge previously did business as "BlackRock Lending Group" ("BLG"),[25] which "the State of Washington has publicly accused of perpetrating 'an advance fee loan scam' whereby 'consumers are told to wire the funds and the consumers never receive their loans.'"[26]

80.     The relationship between Quick Bridge and BLG is confirmed by (i) Plaintiff's review of more than 200 loan foreclosure lawsuits filed by "BlackRock Lending Group, LLC d/b/a Quick Bridge Funding"; and (ii) an amendment to a UCC Financing Statement initially listing BLG as the debtor and BofI Federal Bank as the secured party, but later amended to change the debtor to Quick Bridge Funding, LLC.[27]

---

[23] *See* BofI Holding's (BOFI) CEO Greg Garrabrants on Q4 2015 Results - Earnings Call Transcript, *Seeking Alpha*, July 30, 2015.

[24] *See* Quick Bridge website at http://quickbridgefunding.com/

[25] BlackRock Lending Group is not related to asset-management firm BlackRock, Inc.

[26] *See supra* footnote 14.

[27] See UCC Financing Statement, Filing No. 14-7399509037, Document No. 4162438002, filed with the California Secretary of State on February 14, 2014 (showing BlackRock Lending Group as debtor, and BofI Federal Bank as secured

81.     Quick Bridge relied on a network of brokers to recommend loans that "come with ridiculously high interest rates, must be paid daily, and have significant fees and penalties."[28]  Quick Bridge then reportedly passed the loans to BofI for origination, which immediately assigned the loans off-balance sheet to WCL Holdings I, LLC ("WCL"), a wholly-owned subsidiary of BLG and an apparent SPE managed by Quick Bridge, that was financed by BofI.  The loans were then reportedly serviced by Quick Bridge, which also managed collections.

82.     According to the November 10, 2015 Article, "[c]ourt documents reveal that many borrowers appear to have never been capable of meeting the onerous terms of the loans and, in some cases, have defaulted within days of the loans being issued.  As a result, the courts have been flooded with collections actions and/or bankruptcies of small business owners related to loans originated by BOFI."[29]

83.     Plaintiff's review of court filings in 420 foreclosure actions filed by Quick Bridge, BLG, and/or WCL concerning defaulted loans reveals that 229 out of 420 of the loans at issue, or 55%, were originated by BofI, and the total remaining balance owed and demanded on the BofI-originated loans was approximately $11.78 million.  A nearly identical form loan agreement was used in each of the 420 BofI-originated loans Plaintiff reviewed.  In one case involving a loan originated by BofI, the "Business Loan Agreement," dated May 12, 2014, showed BofI Federal Bank as the  "Lender," Quick Bridge Funding as the "Servicer," and System Solding (USA) Inc. as the "Borrower," and listed a "Loan Amount" of $150,000, a "Total Repayment Amount" of $198,000, an "Origination Fee" of $3,000, and a payment schedule requiring "$2,357.14 Daily Payment

party), amended by UCC Financing Statement, Filing No. 14-74267595, Document No. 44681230002, filed with the California Secretary of State on September 3, 2014 (changing BlackRock Lending Group to Quick Bridge Funding LLC as debtor).

[28] *See supra* footnote 14.

[29] *Id.*

Amount (Weekday)" and "84 Daily Payments."[30]  The loan was modified 10 months later with a "Restructure Agreement," dated March 27, 2015, in which the borrower agreed to make 12 remaining monthly payments of $8,652.39.  Less than two months later, however, on May 15, 2015, the borrower allegedly defaulted on the loan with a remaining unpaid loan balance of $78,723.38.[31]  Many of the borrowers of the aforementioned BofI-originated loans defaulted within weeks of obtaining their loan — the average term of those loans was 167 calendar days and the amount of time before the borrowers defaulted was, on average, 52 days.  Significantly, some of the borrowers of the loans BofI originated did not even make their first loan payment due. A review of all 229 loans revealed that the average annual effective interest rate on these BofI originated loans is 248%, which is a marked contrast to the average interest rate which appears to apply on the face of the loan agreement (29%).[32]

84.    As demonstrated by the "Loan Assignment Schedule" (with redactions) attached to a filing in a collections action and included in the November 10, 2015 Article, many loans originated by BofI are non-performing and have been assigned to WCL:

---

[30] *See* Complaint filed in *Quick Bridge Funding, LLC v. System Solding (USA) Inc., et al.*, Case No. 30-2015-00795980-CU-BC-CJC (Cal. Super. Ct. filed June 29, 2015).

[31] *Id.*

[32] The average borrower will assume that the difference between "Total Repayment Amount" and "Loan Amount" represents interest, but the average borrower will not realize the excessively high effective annual interest rate, since it is not disclosed.

Loan Assignment Schedule

| Assignor | Assignee | Business Loan Agreement Date | Promissory Note Date | Promissory Note Number | Business Loan Agreement Number | Customer Name | Original Loan Amount | Funding Date | UCC - Financing Statement Filing No | UCC-1 Financing Statement Filing Date | Secretary of State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BOFI Federal Bank | WCL Holdings I, LLC | 12/3/2014 | 12/15/2014 | 8-8259-7 | 8-8259-7 | [redacted] | $30,000.00 | 12/15/2014 | [redacted] | 5/22/2014 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/9/2015 | 210-48481-1 | 210-48481-1 | [redacted] | $50,000.00 | 1/9/2015 | [redacted] | 1/9/2015 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/30/2014 | 1/5/2015 | 111-46703-1 | 111-46703-1 | [redacted] | $27,000.00 | 1/5/2015 | [redacted] | 1/6/2015 | NY |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/31/2014 | 1/5/2015 | 7-48205-1 | 7-48205-1 | [redacted] | $40,000.00 | 1/5/2015 | [redacted] | 1/5/2015 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/8/2015 | 160-42792-3 | 160-42792-3 | [redacted] | $50,000.00 | 1/8/2015 | [redacted] | 1/9/2015 | KS |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/9/2015 | 139-31015-2 | 139-31015-2 | [redacted] | $50,000.00 | 1/9/2015 | [redacted] | 9/4/2014 | IL |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/30/2014 | 12/30/2014 | 7-28229-2 | 7-28229-2 | [redacted] | $30,000.00 | 12/30/2014 | [redacted] | 7/21/2014 | CO |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/7/2015 | 20-29345-3 | 20-29345-3 | [redacted] | $31,000.00 | 1/7/2015 | [redacted] | 7/31/2014 | FL |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/30/2014 | 12/31/2014 | 20-48018-1 | 20-48018-1 | [redacted] | $28,000.00 | 12/31/2014 | [redacted] | 1/5/2015 | TN |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/12/2015 | 1/13/2015 | 6-49038-1 | 6-49038-1 | [redacted] | $35,000.00 | 1/13/2015 | [redacted] | 1/12/2015 | OR |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/8/2015 | 3-19720-5 | 3-19720-5 | [redacted] | $100,000.00 | 1/8/2015 | [redacted] | 4/30/2014 | WA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/31/2014 | 12/31/2014 | 50-22469-2 | 50-22469-2 | [redacted] | $45,000.00 | 12/31/2014 | [redacted] | 4/4/2014 | CO |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/24/2014 | 1/7/2015 | 3-5976-5 | 3-5976-5 | [redacted] | $50,000.00 | 1/7/2015 | [redacted] | 7/31/2014 | MO |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/22/2014 | 12/29/2014 | 210-47353-1 | 210-47353-1 | [redacted] | $30,000.00 | 12/29/2014 | [redacted] | 12/30/2014 | MA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/15/2014 | 1/8/2015 | 42-11639-4 | 42-11639-4 | [redacted] | $50,000.00 | 1/8/2015 | [redacted] | | |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/15/2014 | 12/16/2014 | 22-1272-5 | 22-1272-5 | [redacted] | $26,000.00 | 12/16/2014 | [redacted] | 12/16/2014 | NC |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/10/2014 | 12/17/2014 | 3-24771-4 | 3-24771-4 | [redacted] | $25,000.00 | 12/17/2014 | [redacted] | 6/30/2014 | WV |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/5/2015 | 1/6/2015 | 266-48238-1 | 266-48238-1 | [redacted] | $33,000.00 | 1/6/2015 | [redacted] | 1/6/2015 | PA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/29/2014 | 12/29/2014 | 5-18651-4 | 5-18651-4 | [redacted] | $30,000.00 | 12/29/2014 | [redacted] | 4/17/2014 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/6/2015 | 181-35466-2 | 181-35466-2 | [redacted] | $40,000.00 | 1/6/2015 | [redacted] | 10/29/2014 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/19/2014 | 12/23/2014 | 7-45959-1 | 7-45959-1 | [redacted] | $30,000.00 | 12/23/2014 | [redacted] | 12/29/2014 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/12/2014 | 12/12/2014 | 50-12717-3 | 50-12717-3 | [redacted] | $25,000.00 | 12/12/2014 | [redacted] | 2/3/2014 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/18/2014 | 12/29/2014 | 228-46382-1 | 228-46382-1 | [redacted] | $30,000.00 | 12/29/2014 | [redacted] | 12/30/2014 | MA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/19/2014 | 12/23/2014 | 28-27188-3 | 28-27188-3 | [redacted] | $30,000.00 | 12/23/2014 | [redacted] | 8/26/2014 | FL |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/18/2014 | 12/22/2014 | 50-18072-3 | 50-18072-3 | [redacted] | $25,000.00 | 12/22/2014 | [redacted] | 6/26/2014 | MA |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/5/2015 | 1/6/2015 | 5-32721-2 | 5-32721-2 | [redacted] | $40,000.00 | 1/6/2015 | [redacted] | 10/3/2014 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/11/2014 | 12/18/2014 | 270-45558-1 | 270-45558-1 | [redacted] | $30,000.00 | 12/18/2014 | [redacted] | 12/19/2014 | FL |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/30/2014 | 1/5/2015 | 5-1161-5 | 5-1161-5 | [redacted] | $30,000.00 | 1/5/2015 | [redacted] | 1/5/2015 | NY |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/11/2014 | 12/15/2014 | 64-43216-1 | 64-43216-1 | [redacted] | $30,000.00 | 12/15/2014 | [redacted] | 12/16/2014 | MI |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/10/2014 | 12/11/2014 | 3-45068-1 | 3-45068-1 | [redacted] | $25,000.00 | 12/11/2014 | [redacted] | 12/12/2014 | PA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/23/2014 | 12/29/2014 | 112-47303-1 | 112-47303-1 | [redacted] | $25,000.00 | 12/29/2014 | [redacted] | 12/30/2014 | GA |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/13/2015 | 1/14/2015 | 183-3704-5 | 183-3704-5 | [redacted] | $50,000.00 | 1/14/2015 | [redacted] | 1/14/2014 | OH |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/8/2015 | 50-47049-1 | 50-47049-1 | [redacted] | $100,000.00 | 1/8/2015 | [redacted] | 1/9/2015 | MI |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/9/2014 | 12/12/2014 | 5-9752-4 | 5-9752-4 | [redacted] | $25,000.00 | 12/12/2014 | [redacted] | 7/7/2014 | NC |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/13/2015 | 5-47790-1 | 5-47790-1 | [redacted] | $50,000.00 | 1/13/2015 | [redacted] | 1/14/2015 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/8/2015 | 1/8/2015 | 2-15581-4 | 2-15581-4 | [redacted] | $25,000.00 | 1/8/2015 | [redacted] | 6/2/2014 | MO |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/12/2015 | 1/13/2015 | 3-14541-4 | 3-14541-4 | [redacted] | $40,000.00 | 1/13/2015 | [redacted] | 1/15/2015 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/8/2015 | 3-6257-7 | 3-6257-7 | [redacted] | $36,000.00 | 1/8/2015 | [redacted] | 6/5/2014 | MI |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/9/2015 | 1/12/2015 | 144-19575-2 | 144-19575-2 | [redacted] | $50,000.00 | 1/12/2015 | [redacted] | 1/14/2015 | RI |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/5/2015 | 1/6/2015 | 5-27090-2 | 5-27090-2 | [redacted] | $40,000.00 | 1/6/2015 | [redacted] | 6/23/2014 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/29/2014 | 12/31/2014 | 63-28036-2 | 63-28036-2 | [redacted] | $30,000.00 | 12/31/2014 | [redacted] | 7/11/2014 | SC |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/5/2015 | 1/7/2015 | 3-10106-4 | 3-10106-4 | [redacted] | $60,000.00 | 1/7/2015 | [redacted] | 6/12/2014 | MD |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/22/2014 | 12/23/2014 | 160-23560-2 | 160-23560-2 | [redacted] | $30,000.00 | 12/23/2014 | [redacted] | | |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/12/2015 | 1/13/2015 | 3-3100-6 | 3-3100-6 | [redacted] | $50,000.00 | 1/13/2015 | [redacted] | 6/27/2014 | AZ |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/7/2015 | 255-46201-1 | 255-46201-1 | [redacted] | $30,000.00 | 1/7/2015 | [redacted] | 1/8/2015 | GA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/12/2014 | 12/15/2014 | 7-27121-3 | 7-27121-3 | [redacted] | $27,000.00 | 12/15/2014 | [redacted] | 6/25/2014 | DE |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/30/2014 | 1/5/2015 | 50-8123-6 | 50-8123-6 | [redacted] | $50,000.00 | 1/5/2015 | [redacted] | 4/28/2014 | NY |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/9/2015 | 1/13/2015 | 6-29001-3 | 6-29001-3 | [redacted] | $46,000.00 | 1/13/2015 | [redacted] | 7/28/2014 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/12/2014 | 12/15/2014 | 35-45865-1 | 35-45865-1 | [redacted] | $26,000.00 | 12/15/2014 | [redacted] | 12/16/2014 | NY |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/15/2014 | 12/22/2014 | 50-14996-3 | 50-14996-3 | [redacted] | $25,000.00 | 12/22/2014 | [redacted] | 5/22/2014 | NJ |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/15/2014 | 12/16/2014 | 185-45601-1 | 185-45601-1 | [redacted] | $25,000.00 | 12/16/2014 | [redacted] | 12/18/2014 | VA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/29/2014 | 12/31/2014 | 3-627-4 | 3-627-4 | [redacted] | $25,000.00 | 12/31/2014 | [redacted] | 12/30/2014 | OR |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/12/2015 | 1/13/2015 | 171-49090-1 | 171-49090-1 | [redacted] | $30,000.00 | 1/13/2015 | [redacted] | 1/13/2015 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/6/2015 | 1/7/2015 | 50-16818-4 | 50-16818-4 | [redacted] | $30,000.00 | 1/7/2015 | [redacted] | 5/5/2014 | MD |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/18/2014 | 12/19/2014 | 175-23855-2 | 175-23855-2 | [redacted] | $30,000.00 | 12/19/2014 | [redacted] | 5/2/2014 | FL |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/29/2014 | 1/5/2015 | 10-46228-1 | 10-46228-1 | [redacted] | $50,000.00 | 1/5/2015 | [redacted] | 1/6/2015 | MI |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/15/2014 | 12/16/2014 | 93-46233-1 | 93-46233-1 | [redacted] | $30,000.00 | 12/16/2014 | [redacted] | 12/17/2014 | IN |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/17/2014 | 12/18/2014 | 108-46283-1 | 108-46283-1 | [redacted] | $30,000.00 | 12/18/2014 | [redacted] | 12/19/2014 | CA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/31/2014 | 1/7/2015 | 156-48109-1 | 156-48109-1 | [redacted] | $25,500.00 | 1/7/2015 | [redacted] | 1/7/2015 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/7/2015 | 1/8/2015 | 42-21005-4 | 42-21005-4 | [redacted] | $70,000.00 | 1/8/2015 | [redacted] | 1/8/2015 | NY |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/8/2015 | 1/12/2015 | 50-19132-5 | 50-19132-5 | [redacted] | $90,000.00 | 1/12/2015 | [redacted] | 8/11/2014 | TX |
| BOFI Federal Bank | WCL Holdings I, LLC | 1/8/2015 | 1/9/2015 | 100-48912-1 | 100-48912-1 | [redacted] | $25,000.00 | 1/9/2015 | [redacted] | | |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/11/2014 | 12/15/2014 | 268-45679-1 | 268-45679-1 | [redacted] | $26,000.00 | 12/15/2014 | [redacted] | 12/18/2014 | VA |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/17/2014 | 12/19/2014 | 3-36363-2 | 3-36363-2 | [redacted] | $30,000.00 | 12/19/2014 | [redacted] | 12/19/2014 | MO |
| BOFI Federal Bank | WCL Holdings I, LLC | 12/11/2014 | 12/12/2014 | 3-26188-2 | 3-26188-2 | [redacted] | $26,000.00 | 12/12/2014 | [redacted] | 6/27/2014 | NY |

1/22/2015

85. Constantine and BofI's Assistant General Counsel Seth Bayles approved the assignments of BofI loans to WCL, as demonstrated in a document entitled "Bulk Assignment" signed by Bayles and Constantine on behalf of BofI referenced in the November 10, 2015 Article.

86. A review of Uniform Commercial Code Financing Statements ("UCC Financing Statements") filed by BofI with various states' Secretaries of State shows that BofI has provided secured financing to WCL and BLG.[33]

[33] *See, e.g.*, UCC Financing Statement, Document No. 41624380002, Filing No. 14-7399509037 with California Secretary of State (Feb. 14, 2014) (showing BLG as debtor and BofI Federal Bank as secured party), amended by Document No. 44681230002, Filing No. 14-74267595 (Sept. 3, 2014), and UCC Financing Statement, Initial Filing No. 2014 0603993, filed with Delaware Secretary of State

87.   By lending to WCL, whose primary purpose is apparently to purchase BofI loans, BofI was effectively financing its own loan originations.  This arrangement allowed BofI to falsely report its C&I loans to WCL as fully performing, even though WCL was apparently loaded with troubled loans originated and assigned by BofI.  The November 10, 2015 Article summed up the benefits of such an arrangement to BofI as follows:

> 1.  By originating the loans, BOFI is able to earn origination fees which results in high non-interest income growth.  It is also able to report growth in originations which has become a key metric watched by many of the bank's devoted followers.
>
> 2.  Assigning the loan to an SPE removes the loans from BOFI's balance sheet which means BOFI doesn't have to report the corresponding delinquency statistics to investors.
>
> 3.  Since all of the loans are brokered, BOFI doesn't incur the expenses necessary to actually source the loans.  This is essential because it improves BOFI's efficiency ratio that it reports to investors.  Standing in the mid to low 30% range (far better than most banks), BOFI's efficiency ratio has been used by promoters to validate the company's "transformational" internet banking model.

### 3.   RCN

88.   BofI also maintained an undisclosed lending relationship with RCN which, according to its website, is based in South Windsor, Connecticut and "provides time-sensitive, interim/bridge financing to real estate investors for the purchase of non-owner occupied residential and small-balance commercial properties."[34]  RCN's "Rehab Cash Now" program specializes in residential "fix and flip" loans, or short-term, real estate backed loans ranging from $50,000 to $2.5 million for borrowers with "no set minimum [FICO score]" to acquire and/or fix non-owner occupied residential properties.[35]

89.   A review of Westlaw Uniform Commercial Code Reports concerning UCC Financing Statements filed by BofI with the Connecticut Secretary of State

---

(Feb. 14, 2014) (showing WCL Holdings I, LLC as debtor, BofI Federal Bank as secured party).

[34] *See* RCN website at http://www.rcncapital.com/about-rcn-capital/.

[35] *Id.*

1   confirm that BofI has provided secured financing to RCN and related entities.[36]

2   BofI has not disclosed the existence of those RCN-related financings or their

3   impact on the Company's financials.

### 4.   Center Street

5   90.   BofI made single-family lender finance loans to Center Street, a

6   private lender that provides "first lien short-term financing within 24 hours for

7   residential real estate investors purchasing properties at discounted prices through

8   trustee sales, pre-foreclosures, short sales, bank REO's, or just about any other

9   kind of discounted sale."[37]

10   91.   According to an article published by *Seeking Alpha* on November 19,

11   2015 (the "November 19, 2015 Article"), Center Street and several of its SPEs

12   were recently sued by the receiver of a California "flip and fix" real estate fund

13   named Capital Cove Bancorp which the SEC alleged was a Ponzi scheme and shut

14   down in June 2015.[38]  The receiver's action reportedly alleges that for several

15   years, "Center Street was 'enabling and assisting' the perpetuation of the Ponzi

16   scheme" by, among other things, lending money to Capital Cove on at least 86

17   occasions when Center Street knew, or should have known, Capital Cove could not

18   have profited from the properties it purchased given "all of the liens placed against

19   the properties, the cost of refurbishment, the carrying costs for the properties" and

20   other costs.  The action reportedly also alleged that despite defaults on most loans

---

[36] *See* Uniform Commercial Code Reports by Westlaw concerning:  (1) Filing No. 2965185 (Nov. 4, 2013) (showing RCN Capital, LLC as debtor, BofI Federal Bank as secured party; (2) Filing No. 2965184 (Nov. 4, 2013) (showing RCN Capital Funding LLC as debtor, BofI Federal Bank as secured party); Filing 2966234 (Nov. 12, 2013) (showing RCN Capital, LLC as debtor, BofI Federal Bank as secured party); Filing No. 2966240 (Nov. 13, 2013) (showing RCN Capital Funding LLC as debtor, BofI Federal Bank as secured party); Filing No. 2966239 (Nov. 13, 2013) (showing RCN Capital, LLC as debtor, BofI Federal Bank as secured party); and Filing No. 2966435 (Nov. 13, 2013) (showing RCN Capital, LLC as debtor, BofI Federal Bank as secured party).

[37] *See* Center Street website at http://www.centerstreetlending.com/about-us.html.

[38] Aurelius, *BofI: Risky Loan To Undisclosed, Off-Balance Sheet SPEs Found Disguised Within Mortgage Warehouse Portfolio¸* Seeking Alpha, Nov. 19, 2015.

1   Center Street had already issued to Capital Cove, Center Street continued to issue

2   new fix and flip loans to Capital Cove's operator, Rashid Khalfani, whom Center

3   Street knew had a criminal record, to assist Khalfani in perpetuating a scheme to

4   attract capital from unsuspecting investors and using proceeds to pay Center Street.

5        92.    BofI nevertheless issued single-family lender finance loans to Center

6   Street.  A review of UCC Financing Statements filed by BofI confirms that BofI

7   provided financing to Center Street through its SPEs.[39]

8        93.    Those loans appear to be included in BofI's "Warehouse and Other"

9   loans on its financial statements without any attribution to Center Street.  Rather,

10   BofI reports its total loan portfolio composition in amounts and percentages by

11   type of loan at the end of each fiscal year-end.  Under the loan type "Single Family

12   Real Estate Secured," there is a subtype of loans called "Warehouse and Other,"

13   which BofI explains in a footnote is comprised of warehouse loans (short terms

14   loans to mortgage bankers to fund loans) and single-family lender finance loans

15   ("loans to businesses secured by first liens on single family mortgage loans from

16   cross selling, retail direct and through third-parties.")  (2015 Form 10-K at 1, 4).

17

---

18   [39] *See* UCC Financing Statement, Document No. 42609120002, Filing No. 14-
7508068361, filed with the California Secretary of State on April 17, 2014,
19   (showing Center Street Lending Fund IV, LLC as debtor, BofI Federal Bank as
secured party); UCC Financing Statement, Document No. 3896360002, Filing No.
20   13-7370912629, filed with the California Secretary of State on July 22, 2013
(showing Center Street Lending RE I, LLC as debtor, BofI Federal Bank as
21   secured party); UCC Financing Statement, Filing No. 20141513506, filed with the
Delaware Secretary of State on April 17, 2014 (showing Center Street Lending
22   Fund IV SPE, LLC as debtor, BofI Federal Bank as secured party); UCC
Financing Statement, Filing No. 20133378503, filed with the Delaware Secretary
23   of State on August 29, 2013 (showing Center Street Lending MP III SPE, LLC as
debtor, BofI Federal Bank as secured party); UCC Financing Statement, Filing No.
24   20133378677, filed with the Delaware Secretary of State on August 29, 2013
(showing Center Street Lending MP III, LLC as debtor, BofI Federal Bank as
25   secured party); UCC Financing Statement, Filing No. 20141191949, filed with the
Delaware Secretary of State on March 26, 2014 (showing Center Street Lending
26   MP IV SPE, LLC as debtor, and BofI as secured party); UCC Financing
Statement, Filing No. 20141191923, filed with the Delaware Secretary of State on
27   March 26, 2014 (showing Center Street Lending MP IV, LLC as debtor, and BofI
as secured party); and UCC Financing Statement, Filing No. 20132822568, filed
28   with the Delaware Secretary of State on July 22, 2013 (showing Center Street
Lending RE I SPE, LLC as debtor, and BofI as secured party).

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

94.     In its Form 10-Q for the quarter ending December 31, 2015, BofI reported that its loan portfolio includes $343.23 million in single-family lender finance loans.  It omitted any mention of loans made to Center Street or its affiliates.

## 5.     Propel Tax

95.     BofI also failed to disclose its lending relationship with Propel Tax, a lender based in San Antonio, Texas that also does business as "Rio Tax."  On May 12, 2012, Propel Tax was acquired by Encore Capital Group, Inc. ("Encore Capital"), a publicly traded company.  Defendant Paul Grinberg, who is Chairman of the BofI Board's Audit Committee and Compensation Committee, and a member of the Nominating Committee, is also currently Group Executive, International and Corporate Development of Encore Capital.  BofI secretly issued a $31.9 million term loan facility to Propel Tax in May 2014 that BofI was required to disclose because, as described further in ¶¶ 196-206 below, it constituted a related-party transaction under applicable SEC regulations.

96.     Propel Tax's business reportedly consists of acquiring delinquent tax liens and then issuing complex, high-interest loans to unsuspecting borrowers to pay down their debt.[40]  Propel Tax's controversial business has recently caught the attention of regulators.  In January 2015, Encore Capital reached a settlement with New York Attorney General Eric Schneiderman over concerns that the company filed thousands of flawed debt collection lawsuits against state residents.[41]  In September 2015, the CFPB brought an enforcement action against Encore Capital for using deceptive tactics to collect delinquent accounts.  The CFPB required

---

[40] *See* Aurelius, *Bofi: Undisclosed Related Party Dealings Found to Infect Audit Committee*, *Seeking Alpha*, Jan. 6, 2016.

[41] *See* Jessica Silver-Greenberg, *Debt Buyer Faces Fine and Loss of Thousands of Court Judgments*, N.Y. Times, Jan. 8, 2015.

1   Encore Capital to pay $42 million in consumer refunds and a $10 million penalty

2   and to stop collections on debts totaling more than $125 million.[42]

3       97.    BofI's relationship with Propel Tax and Encore Capital is evidenced

4   by several UCC Financing Statements and a Term Loan Facility of the same date,

5   May 2, 2014, showing "Propel Financial 1, LLC" or "Propel Funding Holdings 1,

6   LLC" (both of which are subsidiaries of Encore Capital) as the debtor, and "BofI

7   Federal Bank" as the secured party.[43]

8       98.    The relationship is further evidenced in Encore Capital's Form 10-K

9   for the fiscal year ending December 31, 2014 in which Encore Capital reported

10  that on the same day that the UCC Financing Statements were dated, May 2, 2014,

11  Encore Capital, through affiliates of Propel, entered into a $31.9 million term loan

12  facility to fund the acquisition of a portfolio of tax liens. The term loan facility

13  reportedly had a fixed 5.5% interest rate and matures in October 2016.  Encore

14  Capital further disclosed that at December 31, 2014, the outstanding balance on the

15  term loan facility was $19.2 million.

16      99.    The term-loan facility constituted a related-party transaction and

17  should have been disclosed by BofI in its financial statements pursuant to

18  Accounting Standards Codification ("ASC") 850 by the Financial Accounting

19  Standards Board ("FASB"), as well as SEC Staff Accounting Bulletin No. 99, but

20  was not (*see* ¶¶ 194, 196-206 below).

21          **6.    BofI Properties**

22      100.   BofI established an affiliated, undisclosed entity named BofI

23  Properties that was managed by BofI executives and played a central role in an

24  illicit scheme to conceal BofI's losses from non-performing loans.  Pursuant to the

---

[42] *See* Ann Carrns, *Debt Collectors to Pay $61 Million in Consumer Refunds and Amend Their Practices*, N.Y. Times, Sept. 9, 2015.

[43] *See* UCC Financing Statement, Filing No. 20141730068, May 2, 2014 (filed with Delaware Secretary of State) (Propel Financial 1, LLC), and UCC Financing Statement, Filing No. 20141730241, May 2, 2014 (filed with Delaware Secretary of State) (Propel Funding Holdings I, LLC).

scheme, BofI transferred non-performing multi-family property loans to BofI Properties, which, in turn, acquired deeds in lieu of foreclosure on the underlying properties and found new buyers whose purchases were financed by BofI.

101. BofI Properties is managed by BofI's Executive Vice President, Specialty Finance and Chief Legal Officer, Bar-Adon, and Constantine.[44]  BofI Properties was formed on February 10, 2015, as evidenced by a "Certificate of Formation of BofI Properties, LLC" filed with the Delaware Secretary of State, Division of Corporations on the same day by an "authorized person" named Jennifer R. Fitzgerald.  There is no mention of BofI Properties in any of BofI's filings with the SEC.

102. In its Form 10-Q for the second fiscal quarter ending December 31, 2015, BofI reported multi-family real estate secured loans totaling $1.20 billion, or approximately 21.0% of its total portfolio.

103. An article published by *Seeking Alpha* on January 21, 2016 described a suspicious transaction with BofI Properties involving an apartment building in Lawton, Oklahoma.[45]  In February 2012, BofI issued a $1,000,040 mortgage to two individuals for the purchase of the apartment building.  The purchasers, however, stopped making payments on the loan by early 2015.  Rather than foreclose on the apartment building or accept a deed in lieu, BofI assigned the $1,000,040 note and mortgage securing the note and all rights related thereto to "BofI Properties, LLC –Series 1" on April 8, 2015 at 10:59 a.m., as indicated by the date stamp on an "Assignment of Loan Documents" filed with the Comanche

---

[44] *See* Aurelius, *SPEs Managed by BOFI Executives Directly Contradict Financial Reporting*, *Seeking Alpha*, Jan. 21, 2016 (the "January 21, 2016 Article") (which includes an excerpt of an "Application by Foreign Limited Liability Company for Authorization to Transact Business," filed with the Florida Secretary of State on Sept. 8, 2015, and listing "BOFI PROPERTIES, LLC" as the foreign limited liability company and Bar-Adon and Constantine as "Managers" with the same San Diego address as BofI's headquarters).

[45] *Id.*

1   County Clerk's Office in Oklahoma.  The document was signed by Constantine on
2   behalf of both BofI and BofI Properties.

3       104.   Three minutes after the filing of the Assignment of Loan Documents,
4   a General Warranty Deed was recorded with the same County Clerk's Office in
5   connection with the sale of the apartment building to BofI Properties.

6       105.   According to the January 21, 2016 Article, BofI Properties
7   subsequently marketed the property for sale and eventually sold it on November 6,
8   2015 for $900,000 to buyers James Stevens and Mary Elizabeth Stevens.

9       106.   The buyers' purchase was financed with a $625,000 mortgage from
10  BofI Federal Bank, as indicated in a "Mortgage, Assignment of Rents, Security
11  Agreement and Fixture Filing," filed with the Comanche County Clerk's Office on
12  November 6, 2015 at 11:27 a.m.  While it owned the property, BofI failed to report
13  its value in its Form 10-Q for the quarter ending September 30, 2015 ("1Q 2016
14  Form 10-Q").  *See* 1Q 2016 Form 10-Q (reporting $762,000 of  "[o]ther real estate
15  owned and foreclosed assets:  Multifamily real estate secured" as of June 30, 2015,
16  but zero such assets as of September 30, 2015, while BofI still owned the
17  Oklahoma property).

18      107.   The January 21, 2016 Article describes another similar transaction in
19  which BofI began foreclosure proceedings on a distressed New York mortgage.
20  BofI Properties purchased the underlying property from BofI via a public referee
21  in December 2015 and still holds the property.

22      108.   According to the January 21, 2016 Article, the suspicious transactions
23  described above were part of BofI's illicit scheme to avoid accounting for and
24  reporting the negative impact of non-performing loans on BofI's financial
25  performance, including its reported credit-quality statistics.

26
27
28

C.      **BofI Failed to Disclose Its Use of Affiliated Off-Balance Sheet SPEs To Purchase Third-Party Originated Lottery Receivables**

109.    BofI's loan portfolio included contracts for the retail purchase of state lottery prize and structured-settlement annuity payments, which BofI described as "high credit quality deferred payment receivables." (2015 Form 10-K at 39). The purchases are governed by specific state statutes requiring judicial approval of each transaction. According to BofI, its commission-based sales force originated contracts in-house for the retail purchase of such payments based on leads generated by BofI's "dedicated research department" and using "proprietary research techniques." (*Id.* at 3). The contracts are classified under "Factoring" in BofI's loan portfolio.

110.    BofI also indicated that Factoring contracts were lucrative and provided a steady stream of income because the yields were typically higher than mortgage loan rates, and the gain received upon sale of the payment stream was greater than the gain received from an equivalent amount of mortgage loan sales. (*Id.*) In its Form 10-Q for the second fiscal quarter ending December 31, 2015, BofI reported Factoring contracts totaling $143.896 million, or approximately 2.5% of its total portfolio, and that all of those contracts were "in-house originated."

111.    BofI failed to disclose, however, that its Factoring business included the use of undisclosed, off-balance sheet SPEs to purchase lottery receivables from and originated by third parties. The January 21, 2016 Article included images of Certificates of Formation for three Delaware limited liability companies with similar names: "B of I Lottery Receivables LLC I," "B of I Lottery Receivables LLC II," and "B of I Casino Winnings LLC." The sole signatory on each of the Certificates is Bar-Adon. BofI has not publicly disclosed the existence of any of these related entities.

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

112.    The SPEs frequently purchased lottery receivables from and originated by Stone Street Capital, LLC ("Stone Street"), the same firm at which Bar-Adon worked for eight years before he joined BofI.  For example, a review of the images of UCC Financing Statements included in the January 21, 2016 Article shows Stone Street secured a lottery receivable from an individual on September 14, 2015 with respect to his $2.0 million Ohio Lottery prize winning and then assigned the receivable to B of I Lottery Receivables LLC I.

113.    BofI's SEC filings do not mention the use of any SPEs in connection with its Factoring business and these purchases of third-party originated lottery receivables by the undisclosed SPEs are inconsistent with BofI's statements in its SEC filings that contracts for the retail purchase of such receivables are "in-house originated."

**D.    BofI Maintained a Deficient Customer-Identification Program and Violated Federal Laws and Regulations**

**1.    BofI's Deficient Customer Identification Program**

114.    BofI routinely opened customer deposit and loan accounts for individuals and entities with suspicious or criminal backgrounds and who failed to provide sufficient identifying information.  Those banking practices violated various federal regulations and laws, including (i) the BSA; (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (also known as the USA Patriot Act) (Pub. L. No. 107-56, 115 Stat. 272) ("Patriot Act"); (iii) regulations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("U.S. Treasury"); and (iv) FDIC rules and regulations concerning BSA/Anti-Money Laundering ("AML") compliance programs.

115.    The BSA requires banks to maintain appropriate records and file certain reports involving currency transactions and its customer relationships.  According to the FDIC's Risk Management Manual of Examination Policies (the

"FDIC Manual"), the BSA requires banks to maintain sufficient records to reconstruct customer account transactions and activity, if necessary.[46] Banks must also file Currency Transaction Reports ("CTRs") concerning currency transactions over $10,000, and Suspicious Activity Reports concerning suspected criminal activity. The reports and records prescribed by the BSA assist authorities in investigating individuals suspected of criminal activity, including tax evasion, money laundering, and illegal drug and terrorist financing activities.

116.   The scope and enforcement of the BSA and AML measures have been expanded by several acts and regulations, including Section 326 of the Patriot Act. The Patriot Act requires banks to implement a written and board-approved Customer Identification Program ("CIP") into the bank's BSA/AML compliance program, which must also be board-approved. The purpose of the CIP Program is to allow a bank to form a reasonable belief that it knows the true identity of each customer.[47]

117.   The CIP rule applies to all individuals and entities that open an "account," namely, a formal, ongoing banking relationship to provide or engage in services, dealings or other financial transactions, including deposit accounts and accounts opened when a bank enters into an enforceable agreement to provide a loan to a person, who then becomes a customer. (FDIC Manual at 8.1-9).

---

[46] *See* Section 8.1 of the FDIC Manual, *available at* https://www.fdic.gov/regulations/safety/manual/.

[47] *See* FDIC Manual; *see also* Federal Financial Institutions Examination Council (the "FFIEC"), *Bank Secrecy Act/Anti-Money Laundering Examination Manual*, Feb. 27, 2015 (the "FFIEC Manual"), *available at* https://www.fdic.gov/regulations/examinations/bsa/FFIEC_CIP.pdf. According to the FFIEC's website, it "is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), the Office of the Comptroller of the Currency (OCC), and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions."

118.   The CIP must contain account-opening procedures that specify the following identifying information obtained from each customer before opening an account:  (i) name; (ii) date of birth for individuals; (iii) physical address; and (iv) identification number, including a Social Security Number ("SSN"), Tax Identification Number ("TIN"), Individual Tax Identification Number ("ITIN"), or Employer Identification Number ("EIN").  (*Id.* at 8.1-10).

119.   For non-U.S. persons, a bank must obtain one or more of the following identification numbers:

- Customer's TIN,

- Passport number and country of issuance,

- Alien identification card number, and

- Number and country of issuance of any other (foreign) government-issued document evidencing nationality or residence and bearing a photograph or similar safeguard.

(*Id.* at 8.1-10).

120.   Further, the CIP requires banks to develop procedures to verify the identity of each customer.  Those procedures must include the use of documentary methods for verification, such as an unexpired driver's license or passport for individuals, or, in the case of an entity, documents showing its existence, such as a government-issued business license, partnership agreement, or certificate of good standing.  (*Id.* at 8.1-10).  Banks may also use non-documentary methods to verify a customer's identity.  (*Id.*)

121.   Significantly, the CIP "must include procedures for determining whether the customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency and designated as such by the Treasury in consultation with the other Federal functional regulators." (*Id.* at 8.1-12).  Banks are contacted by the U.S. Treasury when such a list is issued and are required to compare customer names against the list and follow any accompanying directives.  (FFIEC Manual at 51).

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

122.   Part 326.8 of the FDIC's Rules and Regulations also requires banks to maintain a system of internal controls that is designed to, among other things, "[e]stablish procedures for screening accounts and transactions for OFAC compliance that include guidelines for responding to identified matches and reporting those to OFAC."

123.   OFAC is a division of the U.S. Treasury that administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals.[48]   OFAC is also responsible for issuing regulations that restrict transactions by U.S. persons and entities, including banks, with certain foreign countries, their nationals, or specially designated nationals ("SDNs").   *See* U.S. Treasury website. Violations of these sanctions can expose banks to enforcement actions and/or substantial penalties.   (*Id.*)

124.   OFAC maintains and publishes a number of sanctions lists, including a list of SDNs that consists of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.   (*Id.*)   SDN assets are blocked and U.S. persons are generally prohibited from dealing with them.   (*Id.*)

## 2.   BofI's Deficient BSA/AML Compliance Program

125.   BofI did not allocate sufficient resources to maintain a robust and effective BSA/AML compliance program.   A former BSA and Third Party Risk Officer who worked at BofI's San Diego headquarters prior to and during part of the Class Period ("CW 3") described the BSA and Third Party Risk Department Team CW 3 oversaw as consisting of only three people during CW 3's tenure at BofI.   CW 3 was also responsible for development of bank staff and remediation of regulatory issues of BSA examinations and internal audits.   CW 3 reported to John

---

[48] *See* U.S. Treasury website at https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx ("U.S. Treasury website").

1    Tolla (BofI's Chief Governance Risk and Compliance Officer and Senior Vice
2    President, Compliance and Audit) during CW 3's last four to five months working
3    at BofI.

4    126.   CW 3 related that CW 3 attended a meeting a couple of weeks after
5    CW 3 joined BofI at which 10 to 12 other people were present, including
6    Garrabrants and other BofI executives.  CW 3 related that during the meeting,
7    Garrabrants introduced CW 3 and said that CW 3's tombstone is going to read
8    "[CW 3] died understaffed."  According to CW 3, Garrabrants's comment was in
9    response to CW 3's assertion that CW 3 needed a lot more people in the BSA
10   department because of the risk Garrabrants was causing BofI to take on.

11   127.   BofI's former Internal Auditor, Erhart, discovered in early 2015 that
12   John Tolla "had repeatedly changed the findings on numerous reports required
13   under the Bank Secrecy Act's Quality Control ('QC') requirements."  (Erhart
14   Compl. ¶ 35).

15               **3.    Missing or Unverifiable Customer TINs**

16   128.   Erhart also discovered that BofI opened and maintained hundreds of
17   accounts without TINs.  According to Erhart, on or about January 15, 2015, the
18   OCC requested that BofI provide information about bank accounts without TINs.
19   "The Bank responded to the OCC that there were no accounts without TIN's."
20   (Erhart Compl. ¶ 32).  BofI's response was knowingly false, Erhart alleged, as he
21   "saw a spreadsheet in the BSA [Bank Secrecy Act] folder disclosing
22   approximately 150-200 accounts where the borrower does not have a TIN."  (*Id.*)

23   129.   Erhart showed his supervisor, Jonathan Ball, on Erhart's work
24   computer the OCC's request as well as the loan spreadsheet Erhart found that
25   contained a column titled "account number."[49]  According to Erhart's allegations,

26

27   [49] Declaration of Charles Matthew Erhart In Support of His Opposition to Motion
     for Preliminary Injunction, at ¶ 32 ("Erhart Declaration") (Dkt. No. 27-4 (Ex. 5),
28   filed in *BofI Federal Bank v. Charles Matthew Erhart,* No. 15-cv-2353-BAS-NLS
     (S.D. Cal.).

1   Erhart counted the number of loans lacking TINs for Ball and Ball appeared

2   surprised.  (Erhart Decl. ¶ 32).

3       130.   Erhart also reviewed BofI's CIP with respect to Global Cash Card

4   ("GCC"), which, Erhart alleges, was a vendor that provides cash cards that

5   companies can use for various purposes, including paying employees in lieu of

6   traditional paychecks.  (Erhart Compl. ¶ 40).  BofI's business indeed includes a

7   Prepaid Card division that provides card issuing and bank identification number

8   ("BIN") sponsorship services to companies who have developed payroll, general

9   purpose reloadable, incentive and gift card programs serving consumers.  (2015

10  Form 10-K at 3).  For 2015, BofI reported $6.85 million in "Banking service fees

11  and other income," which includes fee income from prepaid card sponsors.  (2015

12  Form 10-K at 39).

13      131.   During the week of January 26, 2015, Erhart and a co-worker met

14  with BofI's Deputy BSA Officer, Third Parties to discuss GCC CIP reviews for

15  high-risk customers.  (Erhart Compl. ¶ 40).  Erhart and his co-worker then

16  prepared an internal audit memorandum of their findings on or about February 12,

17  2015, during which time the OCC was conducting an on-site examination of BofI

18  and had asked that third party vendors, such as GCC, to rate their customers.  (*Id.* ¶

19  41).  GCC provided BofI with a list of high-risk customers, 30% of whom BofI

20  found presented verification problems.  (*Id.*)  According to Erhart:

21      The list included at least one social security number ("SSN")
        belonging to a deceased person, 30 SSN's that could not be found in
22      public records, scores of SSN's that did not match the customer's
        name or were issued before the customer's date of birth was born,
23      many had suspiciously high cash balances, even exceeding $70,000.

24  (*Id.*)

25      132.   The GCC list was presented to John Tolla, who "demanded that a new

26  list be produced" that did not feature any "bad" CIP data.  (*Id.* ¶ 42).  BofI also did

27  not submit the original list to the OCC and, instead, a "new, sanitized list was."

28  (*Id.*).  BofI proceeded to terminate its relationship with GCC and, according to

1   Erhart, "Tolla repeatedly instructed staff not to inform the OCC about why the

2   relationship was terminated." (*Id.*)  Erhart alleged on information and belief that

3   Garrabrants was party to the discussion when the "bad" CIP data was discovered.

4   (*Id.*)

5       133.   Erhart and a coworker attached the original GCC list as an exhibit to

6   their February 12, 2015 internal audit memorandum that was intended to be

7   presented to BofI's Audit Committee.  (*Id.* ¶ 43).

8               **4.   Loans to Foreign Nationals**

9       134.   BofI also made loans to foreign nations with suspicious or

10  unverifiable backgrounds, including criminals and politically exposed persons and

11  persons who failed to provide sufficient identifying information.  According to

12  Erhart, in or around January 2015, he discovered in his audit of BofI's loan

13  originations that "the Bank was making substantial loans to foreign nationals

14  including Politically Exposed Persons ('PEP's') in potential violation of

15  BSA/Know Your Customer rules." (*Id.* ¶ 34).  Erhart found information showing

16  that "many of the borrowers were criminals, even notorious criminals, and other

17  suspicious persons" and also included "very high level foreign officials from major

18  oil-producing countries and war zones." (*Id.*)

19      135.   A former BofI officer who worked in the Company's San Diego

20  headquarters and left shortly before the Class Period ("CW 5"), and who reported

21  directly to Garrabrants, confirmed that BofI did not have sufficient internal

22  controls to comply with anti-money laundering laws and regulations.  CW 5 noted

23  that there were a lot of foreign national loans at BofI, some of which lacked TINs.

24  According to CW 5, foreign national loans required the borrower to open a bank

25  account at BofI and payments on the loan were processed through a BofI business

26  account.  CW 5 related that CW 5 attended meetings with Garrabrants and other

27  BofI banking personnel where the issue of missing TINs on foreign national loans

28  was discussed.  According to CW 5, Garrabrants issued instructions at the

1  meetings "to do it anyway" and that "it's got to be done."  CW 5 stated that

2  Constantine pressured CW 5's department to push loans through at Garrabrants's

3  instruction.

4      136.   A former BofI Assistant Vice President: Senior Processor of Income

5  Property Lending Operations who worked at the Company's San Diego

6  headquarters prior to and during part of the Class Period ("CW 6") related that

7  Garrabrants issued instructions that if a foreign national's name did not appear on

8  OFAC's list, those individuals were deemed to be "waived" and there was no need

9  to do any further background checks on the borrower.

10     137.   CW 1 described a refinancing loan that BofI made in mid-2015 to a

11  borrower that participated in a gambling ring operated by a Salvadoran gang.  The

12  borrower had accumulated gambling debt, which the Salvadoran gang permitted

13  the borrower to pay back by recruiting new gamblers for the gambling ring.  CW 1

14  recalled conducting a background search on the borrower using online search

15  engines and discovering that the borrower had been convicted of a crime and

16  entered into a plea deal a couple years before applying for a BofI loan.  BofI

17  nevertheless issued the loan to the borrower.

18     138.   CW 2 recalled underwriting a loan for the purchase of a vacant lot in

19  Pasadena that was partially funded by a Venezuelan family trust.  According to

20  CW 2, the property previously housed a plastics factory that left the property

21  contaminated.  CW 2 indicated that a phase I environmental report about the

22  property recommended obtaining a phase II report to further assess the safety of

23  the property.  Constantine searched for and found an environmental inspection

24  company that concluded no further assessment was necessary, and therefore, a

25  phase II report was not ordered, CW 2 recalled.

26     139.   According to CW 2, the Venezuelan family trust provided equity to

27  the borrower for the purchase.  CW 2, however, did not receive any documents

28  about the trust other than a financial statement.  CW 2 was not provided with the

1   names of the persons behind the trust or any TIN and, therefore, CW 2 was not

2   able to run an OFAC report to check for matching names on the OFAC list.  CW 2

3   notified Constantine of those issues and refused to approve the loan.  CW 2 stated

4   that Constantine approved the loan anyway, apparently in violation of OFAC.

5        140.   A slide presentation by BofI's National Sales Executive in 2014

6   confirms that BofI issued many loans to foreign nationals and was "flexible" in the

7   types of identifying and credit information it accepted from foreign borrowers.[50]

8   Specifically, the BofI Presentation included the following question and answer

9   about loans to Chinese nationals without TINs:

10                    **True Foreign National Loan Q and A**

11       QUESTION:  I have a lot of people asking for foreign nationals.  One
         of the clients is asking about foreign nationals from China.  Have you
12       done any of these transactions? I talked to a lot of clients and China is
         a little different.  They are not required to file tax returns unless they
13       make over a certain dollar amount.  It's also hard to get other
         alternative trade lines.  Thoughts?
14
         ANSWER: We have lent to a lot of Chinese foreign nationals – we
15       know they don't have to file tax returns and we accept letters of
         employment translated into English by certified translators.  As for alt
16       credit they have been able to provide letters from banks or companies
         they rent from but we can certainly be flexible on this as well.
17
         141.   The 2014 Presentation also outlined the alternate forms of credit,
18
     income, and assets that BofI was willing to accept on foreign national loans:
19
         Credit:  In Lieu of Fico or Credit Report; please provide 4 credit
20       references for 12 months alternate credit references (they can be either
         foreign or US.  If they are foreign they need to be translated into
21       English if applicable). Letters are sufficient - we don't need them on a
         credit report.
22
         Income:
23       We require 2-years income verification history. Tax documents from
         country of origin is okay. If the country of origin does not require the
24       borrower to file the equivalent of tax returns, then we need paystubs,
         bank statements, an employment letter on company letter head
25       explaining compensation, etc. (if in foreign language we need these
         translated).
26
     _____
27   [50] *See* Maurice Totry, National Sales Executive, *BofI's Comprehensive Overview
     of Our Wholesale Business*, 2014, *available at*
28   https://www.dropbox.com/s/wpxip6e91rfhqaj/BofIFederal_Presentation-
     %20MT%20Version%2003%2011%202014.pdf?dl=0.

Assets:
2 months bank statements or equivalent
Must be source seasoned assets in a known verifiable worldwide
financial institution (i.e., Credit Suisse, HSBC, UBS, Bank of
Tokyo)...the funds cannot be in an institution which cannot be
verified.
If not in US Dollars...your processor must Google conversion rate and
provide that with submission....[51]

142.   As described in an article published by *Seeking Alpha* on August 28,
2015 (the "August 28, 2015 Article"), BofI's willingness to make loans to foreign
nationals in violation of OFAC regulations is further demonstrated by doing
business with a South Florida mortgage broker, A&D Mortgage LLC, whose
website includes the images of the flag of Russia, among other national flags, on a
page advertising "Foreign National Loans."[52]  A review of the U.S. Treasury's
website reveals that OFAC issued directives in 2014 imposing sanctions on
specified persons operating in sectors of the Russian economy and prohibiting U.S.
persons from engaging in certain financing transactions in the U.S. with those
persons.[53]  The August 28, 2015 Article also noted that BofI's issuance of loans to
foreign nationals from Russia is inconsistent with Garrabrants's claim that BofI's
foreign national loans consist primarily of loans made to Western Europeans and
Canadians.

### E.   BofI's Violations of the Flood Disaster Protection Act

143.   BofI failed to comply with the Flood Disaster Protection Act of 1973
(as defined above, the FDPA) in issuing loans.  The National Flood Insurance Act
of 1968 and the FDPA, as amended, govern the National Flood Insurance Program
("NFIP").[54]  These statutes require the purchase of flood insurance on certain

---

[51] *Id.*

[52] The Friendly Bear, *The New York Times Has Only Scratched The Surface On BofI Holding...*, *Seeking Alpha*, Aug. 28, 2015.

[53] *See Ukraine-/Russia-related Sanctions,* U.S. Treasury website, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx.

[54] *See* Flood Disaster Protection, Comptroller's Handbook, May 1999 (the "Flood Handbook"), *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/flood.pdf.

properties and make available federally subsidized flood insurance to owners of improved real estate or mobile homes located in special flood hazard areas in communities that participate in the NFIP.

144.   Under the FDPA, flood insurance is required for the term of a loan when all of the following factors are present:

- The financial institution makes, increases, extends, or renews any loan (commercial or consumer) secured by improved real estate or a mobile home that is or will be affixed to a permanent foundation; and

- The improved property securing the loan is located or will be located in an SFHA [special flood hazard area] as identified by FEMA; and

- The community in which the improved property is located or to be located participates in the NFIP.

(Flood Handbook at 4).

145.   A lender or loan servicer must force place flood insurance if a property is not adequately insured.  (*Id.* at 8).

146.   Erhart discovered in performing an FDPA audit at BofI that a "previous Compliance employee had found issues with 49 of the 51 samples she pulled" and that "another employee previously produced a Compliance Review identifying many issues."  (Erhart Compl. ¶ 37).  Erhart discovered that BofI "had buried and never issued the reviews."  (*Id.*)

147.   After investigating and verifying the negative findings, Erhart presented them to BofI management "who caused most of the negative findings to be excluded from the Audit Report, leaving in only a small fraction of the findings."  (*Id.* ¶ 38).

148.   A former BofI Lending Compliance Officer who worked in the Company's San Diego headquarters prior to and during part of the Class Period ("CW 7"), and who previously worked as an FDIC auditor and compliance examiner, related that CW 7 conducted a complete FDPA audit because, according to CW 7, there had been a lot of issues with FDPA compliance at BofI.  CW 7

1  related that CW 7 found that almost every loan CW 7 reviewed had a potential

2  non-compliance issue.

3    149.   CW 7 related that CW 7 wrote a report of the audit but that CW 7's

4  superior, who was BofI's Compliance Manager and First Vice President, refused to

5  release the report to management because of the negative findings.  CW 7 related

6  that CW 7 and CW 7's superior met with Garrabrants, Bar-Adon, Swanson, and a

7  couple of other BofI employees about the audit findings.  According to CW 7,

8  Garrabrants brushed the findings under the rug and indicated that other examiners

9  had conducted audits and did not find the issues CW 7 had found.  CW 7 related

10 that in response, CW 7 and CW 7's superior indicated to Garrabrants that a real

11 examiner would have found the same issues.

12   150.   CW 7 also estimated the potential fines BofI faced for the FDPA

13 compliance issues to be a couple of hundred thousand dollars, based on $2,000 per

14 fine.  CW 7 indicated that Garrabrants dismissed the audit findings and CW 7 did

15 not hear anything further about them.

16   **F.    BofI Misrepresented Its Allowance for Loan Losses**

17   151.   BofI made untrue statements and omitted material information in its

18 financial statements about its allowance for loan losses (ALL), a key measure of

19 BofI's financial health.

20   152.   According to the OCC's Comptroller's Handbook on Allowance for

21 Loan and Lease Losses (the "ALLL Handbook"), an allowance for loan losses is a

22 valuation reserve that banks maintain to cover losses that are probable and

23 estimable on the date of evaluation.[55]  The allowance is established and maintained

24 through charges against a bank's operating income, and is used to reduce the book

25

---

26 [55] *See* Allowance for Loan and Lease Losses, Comptroller's Handbook, *available*

27 *at* http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/alll.pdf.  The term "Allowance for Loan and Lease Losses" (or "ALLL")

28 includes "ALL" and applies to banks that, in addition to loans, offer leases, which BofI does not.

value of loans (and leases) to the amount that is expected to be collected.  (*Id.* at 1).

153.   The OCC instructs that a bank "must have a program to establish and regularly review the adequacy of its allowance" which "must cover inherent losses in all outstanding loans, leases, and, to the extent that they are expected to be funded, any binding commitments to advance additional funds." (*Id.* at 3).  The OCC warns that "[a] bank that fails to maintain an adequate allowance is operating in an unsafe and unsound manner." (*Id.*).

154.   In its 2015 Form 10-K, BofI described its ALL as follows:

> ***Allowance for Loan Losses.*** The allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio. Management determines the adequacy of the allowance based on reviews of individual loans and pools of loans, recent loss experience, current economic conditions, the risk characteristics of the various categories of loans and other pertinent factors. This evaluation is inherently subjective and requires estimates that are susceptible to significant revision as more information becomes available. The allowance is increased by the provision for loan losses, which is reduced by charge-offs and recoveries of loans previously charged-off. Allocations of the allowance may be made for specific loans but the entire allowance is available for any loan that, in management's judgment, may be uncollectible or impaired.
>
> The allowance for loan loss includes specific and general reserves. Specific reserves are provided for impaired loans. All other impaired loans are written down through charge-offs to their realizable value and no specific or general reserve is provided. A loan is measured for impairment generally two different ways. If the loan is primarily dependent upon the borrower's ability to make payments, then impairment is calculated by comparing the present value of the expected future payments discounted at the effective loan rate to the carrying value of the loan. If the loan is collateral dependent, the net proceeds from the sale of the collateral is compared to the carrying value of the loan. If the calculated amount is less than the carrying value of the loan, the loan has impairment.
>
> A general reserve is included in the allowance for loan loss and is determined by adding the results of a quantitative and a qualitative analysis to all other loans not measured for impairment at the reporting date. The quantitative analysis determines the Bank's actual annual historic charge-off rates and applies the average historic rates to the outstanding loan balances in each loan class. The qualitative analysis considers one or more of the following factors: changes in lending policies and procedures, changes in economic conditions, changes in the content of the portfolio, changes in lending management, changes in the volume of delinquency rates, changes to

- 52 -

1
2
3
4
5

the scope of the loan review system, changes in the underlying collateral of the loans, changes in credit concentrations and any changes in the requirements to the credit loss calculations. A loss rate is estimated and applied to those loans affected by the qualitative factors. The following portfolio segments have been identified: single family secured mortgage, home equity secured mortgage, single family warehouse and other, multifamily secured mortgage, commercial real estate mortgage, recreational vehicles and auto secured, factoring, C&I and other.

6
7
8
9
10

155.   BofI has consistently maintained a low ALL, which it represented was attributable to, among other things, its purportedly "strong credit discipline" and low LTV.  In its 2015 Form 10-K, BofI's ALL was $28.327 million, or only 0.566% of its total loan portfolio.  In its 2014 Form 10-K, BofI's ALL was $18.373 million, or only 0.511% of its total loan portfolio.

11
12
13
14
15
16

156.   A review of the FFIEC's Uniform Bank Performance Reports shows that BofI's ALL for 2014 was significantly lower than the average ALL or ALLL of 1.09% (as a percentage of total loans) of comparable banks nationwide (that is, insured savings associations with more than $1 billion in assets), and the average ALL or ALLL of 1.53% (as a percentage of total loans) of all insured savings banks in California for the same period.[56]

17
18
19
20
21
22
23
24

157.   BofI's ALL failed to account for likely losses on the high-risk loans BofI underwrote and originated, including loans BofI made pursuant to lending partnerships with Quick Bridge, BofI Properties, and others.  A review of available documents in connection with alternative business loans BofI originated for Quick Bridge, for example, shows that $11.631 million of those loans are currently the subject of foreclosure proceedings.  If BofI consolidated those loans on its financial statements (which it currently does not), it would likely need to increase its ALL to account for probable losses.

25
26
27
28

---

[56] *See* Uniform Bank Performance Reports on FFIEC's website at https://cdr.ffiec.gov/public/managefacsimiles.aspx.

## II.     BofI's Ineffective Internal Controls

158.   BofI's shoddy lending practices, fraudulent accounting, and other wrongful conduct alleged in this Complaint were made possible by the Company's systemic failure to implement and enforce adequate internal controls.  In doing so, BofI violated the following banking laws and regulations requiring banks to establish and maintain effective internal controls: 12 C.F.R. § 30, Safety and Soundness Standards; 12 C.F.R. § 363, Annual Independent Audits and Reporting Requirements; and Section 13 of the Exchange Act.  Further, Defendants' failure to maintain proper internal controls—as with the other misconduct alleged in this Complaint—undermined their portrayal to investors of BofI as an institution committed to sound business practices that minimized risk.

159.   12 C.F.R. § 30.2 provides that Section 39 of the FDIA requires the OCC to establish safety and soundness standards.  Those standards are set forth in Appendix A to Part 30, and establish certain managerial and operational standards for all insured national banks, including standards for internal controls.  Specifically, Appendix A provides, in relevant part, that a bank should have internal controls that are appropriate to the bank's size and the nature, scope, and risk of its activities, and that provide for

- An organizational structure that establishes clear lines of authority and responsibility for monitoring adherence to prescribed policies.

- Effective risk assessment.

- Timely and accurate financial, operational, and regulatory reports.

- Adequate procedures to safeguard and manage assets.

- Compliance with applicable laws and regulations.[57]

---

[57] *See* Internal Control, Comptroller's Handbook at 3, January 2001 (the "Internal Control Handbook"), *available at* http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/intcntrl.pdf.

160.    12 C.F.R. § 363, Annual Independent Audits and Reporting Requirements, mandates that banks with more than $500 million in total assets must submit an annual report to the OCC and the FDIC that includes:

- A report containing

  – Annual audited financial statements.

  – A statement of management's responsibilities for preparing financial statements, establishing and maintaining internal control and procedures for financial reporting, and complying with safety and soundness laws concerning loans to insiders and dividend restrictions.

  – Management's assessment of the effectiveness of the bank's internal control and procedures for financial reporting as of the end of the fiscal year, and management's assessment of the bank's compliance with designated laws and regulations during the most recent fiscal year.

- A report by the independent public accountant attesting to management's assertions regarding internal control and procedures for financial reporting.

(Internal Control Handbook at 4).

161.    Section 13 of the Exchange Act concerning "Periodical and Other Reports, 15 U.S.C. § 78m, requires companies with registered securities develop and maintain a system of internal accounting controls that ensure that:

- Transactions are executed in accordance with management's general or specific authorization.

- Transactions are recorded to permit preparation of financial statements in conformance with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets.

- Access to assets is permitted only in accordance with management's general or specific authorization.

- Accounting records on assets are compared with the assets at reasonable intervals and appropriate action is taken to reconcile any differences.

(Internal Control Handbook at 4-5); 15 U.S.C. § 78m(b)(2).

162.    Several BofI former employees related that BofI's internal controls were woefully deficient or non-existent.  According to CW 5, "internal controls

- 55 -

were whatever Greg [Garrabrants] wanted them to be. . . We have internal controls on paper, but were they ever followed?  No."  CW 5 indicated that Garrabrants disregarded internal control protocols and was more concerned about BofI reaching performance targets and that some numbers were changed to reach performance targets.  CW 5 described BofI's internal controls as the worst CW 5 had ever seen.  CW 5 also indicated that BofI's Compliance department was staffed with only one person.

163.   CW 3 also noted that BofI's BSA and Third Party Risk Department Team was understaffed, consisting of only three members.

164.   CW 7 described BofI's internal controls as "non-existent."

165.   A former BofI Chief Information Security Officer and Bank Security Officer who worked at BofI's San Diego headquarters prior to and during part of the Class Period ("CW 8"), and reported to BofI's Chief Operating Officer/Head of Technology and Information Systems Adrian Van Zyl until early 2014 and then to Jan Durrans, stated that BofI's internal controls "weren't as important as making the money."  CW 8 related that CW 8 attended senior staff meetings with Garrabrants and other BofI employees at the Senior Vice President level or higher and that BofI's executive management made it very clear that their purpose in life was to make money and ensured that all of BofI's numbers "created the right numbers."  According to CW 8, BofI's management was constantly concerned with how BofI's Form 10-K or Form 10-Q appeared and made decisions based on those concerns.

166.   A former BofI senior accounting officer who worked in the Company's San Diego headquarters just prior to the Class Period and who reported to Garrabrants ("CW 9") described Garrabrants as "very heavy handed" in managing certain aspects of CW 9's department, including restructuring the department and reassigning personnel without explanation to CW 9.  CW 9

indicated that CW 9's department was short-staffed and Garrabrants did not allow CW 9 to hire additional personnel.

### III. BofI's Audit Committee and Internal Audit Program Were Materially Inadequate

167.   Defendants failed to establish, maintain, and operate an effective Audit Committee and audit programs at BofI as required by numerous federal laws and regulations.[58]  Additionally, as described in ¶¶ 179-87, 190 below, BofI's Audit Committee members suffered from undisclosed, debilitating conflicts of interest by having benefitted from undisclosed related-party loans from BofI on terms far more favorable than the terms available to borrowers unaffiliated with BofI.

168.   The Comptroller's Handbook on Internal and External Audits (the "Audit Handbook"), issued by the OCC, provides important guidance on effective audit functions based on those laws and regulations.[59]

169.   The Audit Handbook (at 5) provides that a bank's board of directors has non-delegable responsibilities for establishing, overseeing, and maintaining audit functions that:

- Effectively test and monitor internal controls,

- Ensure the reliability of the bank's financial statements and reporting, and

- Satisfy statutory, regulatory, and supervisory requirements.

---

[58] The following are the relevant establish minimum requirements for internal and external audit programs:  12 C.F.R. § 9, Fiduciary Activities of National Banks (requiring annual audit for national banks acting as fiduciaries); 12 C.F.R. § 21.21, BSA Compliance (requiring a BSA compliance program); 12 C.F.R. § 30, Safety and Soundness Standards (establishing operational and managerial standards for internal audit systems for insured national banks); 12 C.F.R. § 363 (establishing requirements for independent financial statement audits; board of directors' audit committee structure and responsibilities); 12 C.F.R. §§ 210, 228, 229, and 240 (S.E.C. regulations establishing requirements for, among other things, independent financial statement audits, qualifications, responsibilities, and disclosures of audit committees); and SOX (addressing auditor independence).

[59] *See* Internal and External Audits, Comptroller's Handbook, Apr. 2003, *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/2003AuditHB.pdf.

Further, the directors must ensure that the bank's audit programs test internal controls to identify:

- Inaccurate, incomplete, or unauthorized transactions;

- Deficiencies in the safeguarding of assets;

- Unreliable financial and regulatory reporting;

- Violations of laws or regulations; and

- Deviations from the institution's policies and procedures.

170.   With respect to a bank's audit committee, the Audit Handbook notes that 12 C.F.R. § 363 requires national banks with more than $500 million in assets (such as BofI) to have an audit committee consisting entirely of outside directors that are independent of bank management, and that SOX and the Exchange Act impose specific requirements on audit committees aimed at strengthening their independence, effectiveness, and accountability.  The OCC expects that an audit committee's principal responsibilities include:

- Supervising the audit function directly to ensure that internal and external auditors are independent and objective in their findings.

- Working with internal and external auditors to ensure that the bank has comprehensive audit coverage to meet the risks and demands posed by its current and planned activities.

* * *

- Monitoring, tracking, and, where necessary, providing discipline to ensure effective and timely response by management to correct control weaknesses and violations of law or regulation noted in internal or external audit reports or in examination reports.

(Audit Handbook at 5-6).

171.   With respect to internal auditors, the OCC explains that their primary role is "to independently and objectively review and evaluate bank activities to maintain or improve the efficiency and effectiveness of a bank's risk management, internal controls, and corporate governance."  The OCC emphasizes that internal

auditors "must be independent of the activities they audit so that they can carry out their work freely and objectively" and "render impartial and unbiased judgments." (*Id.* at 23).  Accordingly, the bank's "chief financial officer, controller, or other similar positions should generally be excluded from overseeing the internal audit activities[.]"  (*Id.* at 14).

172.   The OCC's guidance is consistent with the "Interagency Policy Statement On External Auditing Programs of Banks and Savings Associations" on the FDIC's website which provides, in relevant part, that "[b]oth the staff performing an internal audit function and the independent public accountant or other external auditor should have unrestricted access to the board or audit committee without the need for any prior management knowledge or approval."[60]

173.   BofI's Audit Committee, which consists of three members— Defendants Paul J. Grinberg (Audit Committee Chair), James S. Argalas, and Nicholas A. Mosich—failed to oversee and maintain audit functions at BofI because, as alleged *infra* at ¶¶ 179-87, 190, each member suffered conflicts of interest by having benefitted from undisclosed BofI loans issued to them on terms far more favorable than the terms available to borrowers unaffiliated with BofI. Further, as described in ¶¶ 174-78, BofI's internal audit function was ineffective because Garrabrants and other senior executives interfered with the Company's internal audit function and BofI's internal audit department was significantly understaffed.

174.   Erhart revealed in a declaration that in a discussion with Jonathan Ball during his employment at BofI, Ball said to Erhart that the "real problem is that the Audit Committee is not independent."  (Erhart Decl. ¶ 6).  According to Erhart, Ball told him that he would no longer address key issues over the phone during

---

[60] *See* FDIC's "Interagency Policy Statement On External Auditing Programs of Banks and Savings Associations," *available at* https://www.fdic.gov/regulations/laws/rules/5000-2400.html#fdicfoot3_3_link.

1   Audit Committee meetings because on at least one occasion, unbeknownst to Ball,
2   Garrabrants listened in on the call and chimed in.  (*Id.*).

3      175.   CW 5 similarly recalled that Garrabrants often interfered with the
4   audit committee's duties.  Garrabrants also ignored internal audit personnel's
5   findings and warnings about BofI's policies concerning depositing third party
6   checks, as described in ¶¶ 237-39, 241-44.

7      176.   CW 7 recounted another instance in which Garrabrants and other
8   senior managers falsified audit reports provided to OCC examiners.  CW 7 related
9   that CW 7 and another auditor worked on an audit of BofI's Fair Lending Program
10   in the fall of 2013 in anticipation of an expected OCC examination, and that in
11   September/October 2013, when OCC examiners were on-site at BofI's San Diego
12   headquarters, CW 7 and the other auditor gathered loan documents, some of which
13   had problem items, placed them in a folder and then presented them to the
14   examiners.  CW 7 related that CW 7 and the other auditor were immediately
15   "called on the carpet" by BofI executive management members who yelled at them
16   both for providing the loan documents to the OCC without management review.
17   CW 7 indicated that Garrabrants, Brian Swanson, and a mortgage department head
18   "cleaned up" the loan documents and they were then given to the OCC examiners.
19   CW 7 related that CW 7 noticed that the documents had been altered.

20      177.   CW 9 related that CW 9 had read the Erhart Complaint.  In the Erhart
21   Complaint, the whistleblower related (among other things) being instructed to
22   change audit findings or reports at BofI, including his findings concerning BofI's
23   apparent violations of Cal. Penal Code § 632 (for having recorded cold-call
24   telephonic conversations with persons who had received lottery winnings or
25   litigation awards, without advising those individuals) and the identification of
26   "high-risk" Global Cash Card Customers who had Social Security numbers that
27   could not be found in public records, belonged to dead persons, or did not match
28   the customer's name.  *See, e.g.*, Erhart Compl. ¶¶ 13-16, 40-42.  CW 9 related that

it was common, in CW 9's experience, to be asked to "fix" items in audit reports. CW 9 related that Micheletti would "walk in and say 'Here are these four things on the whatever, get it fixed before it goes to, get it fixed' or do whatever. That was very common. . . ." CW 9 "fixed" what CW 9 felt comfortable doing but left the other items alone.

178. The deliberate efforts by Garrabrants, Micheletti, and others to manipulate internal reports and other documents, as well as the Audit Committee's inability or unwillingness to prevent or rectify that misconduct, belied Defendants' repeated representations to investors regarding BofI's purportedly conservative business practices, in addition to Garrabrants's and Micheletti's certifications (in numerous SEC filings) regarding the soundness of the Company's internal controls. *See infra* ¶¶ 253-54, 260, 273, 287, 308, 317, 331, 343, 366, 392.

## IV.   BofI Failed to Adequately Disclose Related-Party Transactions

### A.   Related-Party Loans

179. Defendants Garrabrants, Micheletti, Grinberg, Argalas, and Mosich, as well as other BofI senior executives, obtained related-party loans, including apparent non-QM loans and loans with LTVs higher than BofI's reported average LTV for single family mortgages, from BofI on far better terms than available to persons unaffiliated with BofI, in direct contravention of BofI's express statements otherwise, and in violation of 12 C.F.R. § 215, or "Regulation O."

180. Regulation O governs any extension of credit by a Federal Reserve member bank to an executive officer, director, or principal shareholder of that bank, of a bank holding company of the member bank, and of any other subsidiary of that bank holding company. It provides, in relevant part, as follows:

> (a) Terms and creditworthiness—(1) In general. No member bank may extend credit to any insider of the bank or insider of its affiliates unless the extension of credit:
>
> (i) Is made on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at

the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank; and

(ii) Does not involve more than the normal risk of repayment or present other unfavorable features.

12 C.F.R. § 215.4.  The preceding paragraph (a), however, does not apply to any extension or credit made pursuant to a benefit or compensation program

(i) That is widely available to employees of the member bank and, in the case of extensions of credit to an insider of its affiliates, is widely available to employees of the affiliates at which that person is an insider; and

(ii) That does not give preference to any insider of the member bank over other employees of the member bank and, in the case of extensions of credit to an insider of its affiliates, does not give preference to any insider of its affiliates over other employees of the affiliates at which that person is an insider.

*Id.*

181.    In its 2015 Proxy Statement filed with the SEC on September 4, 2015, BofI revealed that, as of June 30, 2015, it made $29.1 million in loans, at below market interest rates, to directors, executive officers and employees who elected to participate in the Company's employee loan program, and that $12.5 million of those loans were made to directors, principal officers, and their affiliates.  Total principal payments on related-party loans were $0.3 million, which reflects an average interest rate of approximately only 1% across all loans in loan program.

182.    The 2015 Proxy Statement described the terms of those related-party loans as follows, in relevant part:

> ***Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank***.[61]  Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the

_____

[61] Unless otherwise noted, all emphases appearing in quoted text throughout this Complaint are supplied.

normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features.

183.   In its 2015 Form 10-K, BofI reported its LTV for different types of mortgages.  The Company defined "LTV" as "[t]he ratio of the loan amount to the value of the property securing the loan" and explained that the ratio was calculated "by dividing (a) the loan principal balance less principal repayments by (b) the appraisal value of the property securing the loan."  As of June 30, 2015, BofI reported that the weighted average LTV for BofI's single-family mortgages was only 57.76% and that the median LTV for the same loans was 58.87%.

184.   An article published on *Seeking Alpha* on November 4, 2015 entitled "Buyer Beware:  BOFI Related Party Loans" (the "November 4 Article") makes clear that BofI's loans to BofI executives and directors involved far greater risk of collectibility and more favorable terms than available to unaffiliated borrowers at the time.[62]

185.   Some of BofI's related-party loans included a "Balloon Rider."  The CFPB's website describes "Balloon Loans" as "a mortgage that requires a larger-than-usual one-time payment at the end of the term," which can make the borrower's payments lower in the years before the balloon payment, but require large payments, possibly in the tens of thousands of dollars, at the end of the loan term.  According to the CPFB website, a "balloon payment isn't allowed in a type of loan called a Qualified Mortgage, with some limited exceptions."

186.   During the Class Period, BofI's website advertised "Conventional, FHA, VA and Jumbo loan products" available for consumers wishing to purchase or refinance a home, but there was no mention of "Balloon Loan" or "Balloon Rider" as an available product or loan feature.  There was also no mention of

---

[62] Real Talk Investments, *Buyer Beware:  BOFI Related Party Loans*, Seeking Alpha, Nov. 4, 2015.

1   "Balloon Loan" or "Balloon Rider" in BofI's 2014 Presentation or in any of its

2   SEC filings.

3      187.   One such related-party loan BofI issued was to BofI's Audit

4   Committee Chair, Defendant Grinberg. According to the November 4, 2015

5   Article, Grinberg obtained a $2.192 million loan from BofI for the purchase of a

6   single-family home in Orinda, California in November 2012 for $2.74 million,

7   which implies 80% LTV. The loan note indicates that there is a "Balloon Rider."

8      188.   Rama Bar-Adon, the sister of BofI's Chief Legal Officer Eshel Bar-

9   Adon, also obtained a loan from BofI in the amount of $936,000 for the purchase

10   of a house in San Diego, where Bar-Adon apparently resides, in December 2012

11   for $1.17 million, which implies 80% LTV. The loan note indicated there is a

12   "Balloon Rider." Curiously, according to the November 4, 2015 Article, which

13   contained images of certain pages of the loan documents, Eshel Bar-Adon is listed

14   as "Borrower" on the Balloon Rider to the loan and apparently signed it; however,

15   on other pages, his name is crossed out and his sister, Rama Bar-Adon, who

16   reportedly is a practicing attorney in Texas and apparently does not live in San

17   Diego, appeared to have signed as the borrower. The November 4, 2015 Article

18   also included an image of a "Notice of Federal Tax Lien" listing Eshel Bar-Adon

19   as the Taxpayer, which likely had a negative impact on his credit history and may

20   be a reason why the loan was not taken out in his name.

21      189.   BofI also issued a $648,000 loan with a balloon rider to Thomas

22   Constantine in February 2012 for the purchase of a home in Poway, California by

23   his family trust for $775,000, which implies 84% LTV. At the time BofI made the

24   loan to Constantine, he reportedly owned another home in Oceanside, California,

25   which was worth less than what Constantine owed on loans on the home. He

26   eventually sold the Oceanside home through a short sale in August 2012 for

27   $450,000, having taken out $720,000 in loans on the home.

28

190.   The following summarizes other related-party loans BofI issued to its executive officers and directors as reported in the November 4, 2015 Article:

| BofI Insider | Loan Amount (Year) | Implied LTV | Balloon Rider |
|---|---|---|---|
| Nicholas A. Mosich<br><br>Vice Chairman of Board of Directors and Audit Committee Member | $985,000<br><br>(July 11, 2013) | 78% | No |
| Brian Swanson<br><br>Executive Vice President, Chief Lending Officer | $568,000 (January 25, 2011) | 79.8% | Yes |
| Gregory Garrabrants<br><br>President and CEO (as trustee of Apollo Trust-Two) | $1,853,000<br><br>(2009); Refinanced for $1,870,000 (September 2010) | (Construction loan; LTV not indicated) | Yes |
| Andrew J. Micheletti<br><br>Chief Financial Officer | $1,547,000 (June 2011) (Cash-out refinance) | (Not applicable) | Yes |
| James S. Argalas<br><br>Director and Audit Committee Member | $1,510,000 (February 22, 2013) | (Not indicated) | Yes |
| Theodore Allrich<br><br>Chairman of Board of Directors | $600,000 (June 18, 2014) | (Construction loan; LTV not indicated) | No |

191.   BofI also reportedly made a loan to Jonathan Ball in March 2012 during which time he was Vice President of Internal Audit.[63]

---

[63] Aurelius, *BofI:  Undisclosed Related Party Dealings Found to Infect Audit Committee*, Seeking Alpha, Jan. 6, 2016.

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

## B. **BofI Violated Applicable SEC Rules by Failing to Adequately Disclose A Related-Party Loan to Propel Tax.**

192. Item 404 of Regulation S-K, entitled "Transactions with Related Persons, Promoters and Certain Control Persons," 17 C.F.R. § 229.404, requires public disclosure of the following information concerning "any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest":

> (1) The name of the related person and the basis on which the person is a related person.

> (2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.

> (3) The approximate dollar value of the amount involved in the transaction.

> (4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.

> (5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

> (6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

17 C.F.R. § 229.404(a).  Item 404(a)(i) defines "related person" to include "[a]ny director or executive officer of the registrant" and "[a]ny immediate family

member of a director or executive officer of the registrant[.]"  17 C.F.R. §
229.404(a)(i) and (iii).

193.   Under Item 404(c), the disclosure requirements in Item 404(a) do not
apply "[i]f the lender is a bank, savings and loan association, or broker-dealer
extending credit under Federal Reserve Regulation T (12 C.F.R. § 220) and the
loans are not disclosed as nonaccrual, past due, restructured or potential
problems," so long as the registrant includes a statement that the related party
loans

> i. Were made in the ordinary course of business;
>
> ii. Were made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable loans with persons not related to the lender; and
>
> iii. Did not involve more than the normal risk of collectibility or present other unfavorable features.

17 C.F.R. § 229.404(a)(i).

194.   ASC 850-10-50-2 further provides that "[n]otes or accounts
receivable from officers, employees, or affiliated entities must be shown separately
and not included under a general heading such as notes receivable or accounts
receivable."

195.   BofI was required to disclose the required details about the term credit
facility to Propel Tax because: (i) the loan was for an amount in excess of
$120,000; (ii) as a BofI director, Grinberg was a "related person"; (iii) Grinberg
had a direct or indirect "material interest" in the related-party loan, as described
immediately below; and (iv) as described above, the loan did not contain the
features in Item 404(c) that would have exempted BofI from detailed disclosures
about it.

196.   As discussed in ¶¶ 95-99 above, one of BofI's lender partners is
Propel Tax, owned by Encore Capital, where Grinberg is Group Executive,

1  Internal and Corporate Development, and, formerly Encore Capital's Chief

2  Financial Officer.  According to a recent Proxy Statement filed with the SEC by

3  Encore Capital, Grinberg, as a "Named Executive Officer," is entitled to short-

4  term as well as long-term incentive plans, including an annual cash incentive

5  bonus, payable pursuant to Encore Capital's Key Contributor Plan ("KCP") based

6  on Encore Capital's achievement of performance targets.[64]  The performance

7  targets are based largely on Encore Capital's adjusted earnings before income, tax,

8  depreciation and amortization ("Adjusted EBITDA").  (Encore Proxy Statement at

9  22).

10  197.  In 2014, Grinberg received a KCP cash bonus of $975,385 based on

11  Encore Capital's achievement of the performance target established for that year.

12  (*Id.* at 22).  Propel Tax, Encore Capital's tax lien business, contributed positively

13  to those results.

14  198.  Grinberg therefore had a direct interest in Propel Tax's $31.9 million

15  term loan facility with BofI.  Accordingly, the term loan facility should have been

16  disclosed.

17  **C.  BofI Violated U.S. Generally Accepted Accounting Principles
18  ("GAAP") by Failing to Disclose A Material Related-Party
   Transaction with Encore Capital Group / Propel Tax.**

19  199.  The FASB codified the authoritative guidance about GAAP in its

20  Accounting Standards Codification ("ASC").  ASC 850, concerning "Related Party

21  Disclosures", provides, generally, that information about transactions with related

22  parties must be disclosed in public financial statements, so that those who rely on

23  the statements can evaluate the loans' significance.  (ASC 850-10-10-1).

24  200.  ASC 850-10-50-1 provides that "[f]inancial statements shall include

25  disclosures of material related party transactions, other than compensation

26

27

28  [64] *See* Encore Capital's Proxy Statement at 19, filed with the SEC on Schedule 14A on April 22, 2015 ("Encore Proxy Statement").

arrangements, expense allowances, and other similar items in the ordinary course of business."  The disclosures must include, *inter alia*:

>    a.    The nature of the relationship(s) involved;
>
>    b.    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;
>
>    c.    The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and
>
>    d.    Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

201.    Under the master definitions of ASC, "related parties" are defined as:

>    a. Affiliates of the entity …
>
>    f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests
>
>    g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

202.    As discussed in in ¶ 37 above, Defendant Grinberg is Chairman of the Audit Committee and Compensation Committee, and a member of the Nominating Committee of BofI's Board of Directors.  In this capacity, Defendant Grinberg was able to significantly influence the management and operating policies of BofI. This makes him a "related person" for purposes of Item 404.

203.   During 2014, Defendant Grinberg also served as the Chief Financial Officer of Encore Capital. In this capacity, Defendant Grinberg could significantly influence the management and operating policies of Encore.  This makes Encore Capital a related party to BofI pursuant to the ASC definition of Related Parties above.

204.   The $31.9 million term-loan facility that BofI provided in May 2014 to Propel Tax, which was owned by Encore Capital, accordingly constituted a related-party loan given Defendant Grinberg's executive officer position at Encore Capital and his Audit Committee Chairmanship at BofI.  *See* ¶¶ 37, 196-97 above.

205.   GAAP recognizes that transactions between related parties cannot be presumed to be carried out on an arm's length basis, and therefore may affect the decisions of financial statement users.  BofI's loan to Propel Tax was material[65] in that it was a related party transaction and quantitatively significant.  For example, the loan of $39.1 million was nearly four times the total disclosed related party loans outstanding as of June 30, 2014 ($10.9 million).

206.   Accordingly, BofI was required to disclose this material related party transaction in its 2014 Annual Report on Form 10-K and Interim Reports on Forms 10-Q.  In violation of GAAP, BofI failed to make the disclosures as specified in ASC 850-10-50-1 by providing details on the nature of the relationship, a description of the transaction, the dollar amount of the transaction, and the amount due on the date of each balance sheet presented.  *See* ¶¶ 194, 196-205 above.

## V. <u>BofI Failed To Disclose The Criminal Background Of A Senior Officer and Violations of the FDIA</u>

207.   BofI failed to disclose that an individual who served as BofI's Senior Vice President of Wholesale/Correspondent Lending during part of the Class

---

[65] As defined under ASC250-10-S99.  *See also* SEC Staff Accounting Bulletin No. 99 ("[Q]uantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. . . A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important.").

Period ("SVP 1") is a convicted felon.  BofI also failed to disclose that it is in violation of the FDIA for failing to obtain a required waiver under the act for SVP 1's employment.

208.   Section 19 of the FDIA provides that a person convicted of criminal offenses involving "dishonesty or a breach of trust or money laundering," or who has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense," may not:

> (i)  become, or continue as, an institution-affiliated party with respect to any insured depository institution;
>
> (ii)  own or control, directly or indirectly, any insured depository institution; or
>
> (iii)  otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository institution;

12 U.S.C. § 1829(a)(1)(A).  An insured bank cannot permit any such person to engage in prohibited conduct or continue any relationship described above.  (12 U.S.C. § 1829(a)(1)(B)).

209.   A bank may file an application for the FDIC's consent for the individual to become an officer or director of the bank, or the individual may seek a waiver from the FDIC from complying with Section 19.  Anyone who knowingly violates Section 19 "shall be fined not more than $1,000,000 for each day such prohibition is violated or imprisoned for not more than 5 years, or both." (12 U.S.C. § 1829(b)).

210.   SVP 1 served as the Senior Vice President of Wholesale and Correspondent Lending at BofI during the Class Period.  According to his LinkedIn profile, SVP 1 began working at BofI in October 2010, and before that, at IndyMac Bank (the same failed bank at which Garrabrants worked) as a Senior Vice President.

211.   According to CW 5, who worked at BofI at the same time as SVP 1 and was familiar with him, SVP 1 served as a Vice President of Wholesale and

1  Correspondent Lending from early/mid-2010 through April 2013.  CW 5 explained

2  that "Correspondent Lending" referred to BofI's Foreign Nationals Loan program.

3  SVP 1 was promoted to Senior Vice President in May 2013 and became the head

4  of the Foreign Nationals Loan program.  SVP 1 reported to Swanson.

5        212.   A background search of SVP 1 performed on Lexis-Nexis revealed

6  that SVP 1 has been convicted of numerous crimes, including grand theft,

7  burglary, fraud and forgery involving credit cards, dealing in stolen property, and

8  petit theft in Broward County, Florida in 1990.  SVP 1 was sentenced and served

9  time in a California prison.  He has also filed for Chapter 7 bankruptcy twice (in

10  October 2011 and in June 2000), and has been a debtor in at least four actions

11  involving judgments, and state and federal tax liens against him.

12        213.   CW 5 indicated that SVP 1 was hired by BofI despite his criminal

13  history and background check, which included fingerprints and an FBI background

14  scan.  CW 5 related that CW 5 saw the results of the background check when they

15  were received by BofI and that Garrabrants's executive assistant brought the

16  results to CW 5 and noted that SVP 1 had been in jail for theft.  CW 5 related that

17  the executive assistant said that Garrabrants and Swanson wanted "to sweep it

18  under the table and give him a chance."

19        214.   CW 1, who worked with SVP 1 in BofI's in Multifamily lending

20  group when SVP 1 became head of the group's sales division, also noted that

21  BofI's senior management knew about SVP 1's criminal background and that BofI

22  did not disclose his background to the FDIC.  CW 1 noted that prior to BofI, SVP

23  1 worked at IndyMac while Garrabrants was there.  CW 1 also recalled SVP 1

24  telling CW 1 of his criminal background and his imprisonment in Florida, which,

25  according to CW 1, was "common knowledge at BofI and "not a secret – everyone

26  knew."  CW 1 also recalled SVP 1 telling CW 1 that because of his felony

27  conviction, no other bank aside from BofI would hire him.

28

215.   An article published on November 18, 2015 by *Seeking Alpha* entitled "Undisclosed Executive History May Be Final Blow for BOFI" (the "November 18, 2015 Article") described the background and employment history of an unidentified BofI Senior Vice President matching that of SVP 1.  The November 18, 2015 Article noted that in September 2015, more than two years after his criminal convictions, the employee (SVP 1) filed a motion to vacate the pleas he had entered.  The motion was denied.

216.   SVP 1's motion was likely an attempt to invoke Section 19(a)(1)(B) of the FDIA, which provides an exception to the prohibition of convicted felons like SVP 1 from serving as a bank officer.  Section 19(a)(1)(B) provides that "[o]n motion of the Corporation, the court in which the conviction or the agreement of a person referred to in subparagraph (A) has been entered may grant an exception to the application of paragraph (1) to such person if granting the exception is in the interest of justice."  12 U.S.C. § 1829(a)(1)(B).

217.   The November 18, 2015 Article also noted that despite SVP 1's criminal history and bankruptcies, BofI issued two loans to him for more than $700,000.

## VI.   Other Unlawful Misconduct By Defendants

218.   In his complaint, Erhart provided details of other misconduct at BofI during the Class Period, including:  (i) BofI had deposit concentration risk due to a mere four customers accounting for approximately 25% of total deposits, and nine customers accounted for 40% of total deposits at BofI; (ii) BofI falsely responded to an SEC subpoena issued in December 2014 by indicating it did not have information which the SEC sought regarding an entity named ETIA LLC despite the existence of a loan file at BofI concerning ETIA that was provided to BofI's legal counsel; and (iii) BofI falsely responded to the OCC's request for any correspondence from banking agencies and law enforcement by indicating it had

not received any government or regulatory subpoenas despite the fact that Erhart had seen a BSA spreadsheet identifying many such subpoenas.

## VII. BofI Failed To Disclose Material Information About Pending Government and Regulatory Investigations

219.   During the Class Period, BofI misrepresented and failed to disclose to investors information concerning government and regulatory subpoenas it had received and pending investigations by those agencies.  BofI's filings with the SEC during the Class Period do not contain any mention of subpoenas or government or regulatory investigations of the Company.

220.   On October 14, 2015, during a BofI conference call with analysts and investors to discuss the allegations made by Erhart, Garrabrants assured "[t]here is nothing ongoing" and "there is no continuity to this," and responded to an analyst's question about OCC review as follows:

> BOB RAMSEY: Okay. And so, they've [the OCC] let you know that there is nothing ongoing related to these concerns that he raised, that they are still investigating at this point?
>
> GREG GARRABRANTS: Well, I have to be very careful about stating exactly what the OCC is doing. But the fact is, is that all of these were investigated. There is nothing ongoing. And the OCC comes in, and regularly reviews these things. If any of it were true, we wouldn't have gotten these deals done. You can take as absolute confirmation, by the fact that we got those deals done in the month -- one deal done in the month that these allegations were there, and then the next deal, that there is no continuity to this. We have great regulatory relations. We are under no regulatory orders, no regulatory restrictions on our business, and we continue to have great dialogue with our regulators. And there's no issues [sic] with any of -- the idea that we are not providing information or something like that.

221.   As described in ¶¶ 225-26, these statements and omissions regarding legal proceedings belied the fact that BofI, as it would later admit, was indeed subject to government and regulatory investigation.

222.   Erhart "saw a BSA spreadsheet that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of Treasury."  (Erhart Compl. ¶ 33).  According to Erhart, he sat next to a BofI employee who received and logged subpoenas and heard comments

1   about how many subpoenas BofI had received and how frequently BofI received

2   subpoenas.  (*Id.*).

3        223.   The author of an article published on *Seeking Alpha* on August 28,

4   2015 (the "August 28, 2015 Article") reported that earlier that month, the SEC

5   responded to the author's request for information about BofI pursuant to the

6   Freedom of Information Act ("FOIA") and reportedly invoked a "law

7   enforcement" exemption in refusing to turn over potentially responsive documents,

8   as follows:

> We are withholding records that may be responsive to your request
> under 5 U.S.C. § 552(7), 17 CFR § 200.80(7)(i). This exemption
> protects from disclosure records compiled for law enforcement
> purposes, the release of which could reasonably be expected to
> interfere with enforcement activities. Since Exemption 7 protects the
> records from disclosure, we have not determined if other exemptions
> apply. Therefore, we reserve the right to assert other exemptions when
> Exemption 7 no longer applies.[66]

13        224.   The author noted in the August 28, 2015 Article that the SEC's

14   response in this instance differed from its previous responses that "there are no

15   records responsive to your request" to earlier requests the author had made for the

16   same information.

17        225.   BofI finally confirmed the existence of government and regulatory

18   investigations in supporting documents to a motion it filed in its countersuit

19   against Erhart in this District, *BofI Federal Bank v. Charles Matthew Erhart, et al.*,

20   No. 3:15-cv-02353-BAS-NLS.  In a memorandum in support of BofI's motion to

21   file certain documents under seal (the "BofI Sealing Brief"), BofI revealed that an

22   accompanying declaration by a forensic investigator hired by BofI to examine

23   Erhart's computer for confidential information "contain[s] the file names of BofI

24   documents" that are confidential because, among other reasons provided by BofI,

25   some file names evidence communications with regulators, which are nonpublic

26   and not to be disclosed, per agency rules.  (*Id.*)  Similarly, file names containing

27   

---

28   [66] The Friendly Bear, *The New York Times Has Only Scratched The Surface on BofI Holding. . . ,*" *Seeking Alpha*, Aug. 28, 2015 (the "August 28, 2015 Article").

the term "subpoena" evidence nonpublic agency investigations, which BofI is not permitted to disclose.[67]

226.   The BofI Sealing Brief also indicated that other declarations, including a declaration by BofI's Chief Governance Risk and Compliance Officer John Tolla, that BofI sought to file under seal included purportedly confidential information showing "records identifying the existence (and, in some cases, the subject matter) of investigations by the OCC."  (BofI Sealing Brief at 4-5).  The BofI Sealing Brief contained a chart listing BofI's reasons for seeking to seal the documents, including "Reveals existence and nature of confidential regulator communications (12 C.F.R. § 4.3.7(b)(1)(i)); reveals confidential government subpoenas[.]" (BofI Memo at 6-8).

## VIII.   **Garrabrants Intimidated And Threatened BofI Personnel, And Abused His Position For Personal Gain**

227.   Garrabrants created and presided over a culture of fear and unethical conduct at BofI to perpetuate the fraudulent scheme described in this Complaint. He also used his power to benefit himself financially.

228.   Former BofI employees who interacted with Garrabrants recall attending weekly management meetings in which Garrabrants threatened retaliatory action against anyone who challenged his actions or directives, and in which he uttered obscenities and used other vulgar language to disparage and scorn people whom he believed had done so.

229.   CW 5 recalled attending weekly management meetings at BofI every Friday at noon.  Garrabrants, Micheletti, and every Senior Vice President and higher level employees attended those meetings, for a total of approximately 15 participants.  CW 5 indicated that while the topics discussed at the meetings

---

[67] *See* Memorandum of Points and Authorities In Support of BofI Federal Bank's Ex Parte Motion to File Portions of the Declarations of Michael D. Armstrong, John C. Tolla, and James W. Tomlinson, and the Entirety of Exhibits 2, 3, 4, and 7 Under Seal, at p. 5-6 (Dkt. No. 8-1), filed in *BofI Federal Bank v. Charles Matthew Erhart, et al.*, No. 3:15-cv-02353-BAS-NLS (S.D. Cal.).

varied, on several occasions Garrabrants ranted about an employee leaving the bank and Garrabrants's plans to sue the employee.  CW 5 relayed that Garrabrants reminded those at the meeting that he has more money than they, and that he would stop at nothing to destroy them if they came after him.  On another occasion in which CW 5, Garrabrants, and Ball were in the same room, CW 5 witnessed Garrabrants calling Ball a "f[***]ing idiot" and telling him, "You will do as I say."  CW 5 noted that Garrabrants has intimidated a lot of people at BofI.

230.   CW 5, who left BofI in May 2013, also described an incident in December 2015 in which CW 5 was served a search warrant by local authorities, who searched CW 5's home for allegedly stolen BofI property that CW 5 did not possess.  The local authorities nevertheless took with them all of CW 5's computers and other property belong to CW 5.  CW 5 believed that the search warrant was issued at Garrabrants's behest.  A criminal complaint has since been filed against CW 5 in California Superior Court, San Diego County.

231.   CW 3 had similar recollections of Garrabrants.  CW 3 noted that Garrabrants "is an attorney, very smart guy.  He tried to scare everybody." According to CW 3, BofI employees feared that there would be repercussions if they spoke out about BofI's improper practices.  CW 3 heard Garrabrants say he would destroy people.

232.   CW 8 also attended weekly senior staff meetings with Garrabrants and others and witnessed crude behavior by him.  According to CW 8, if Garrabrants disliked how something was done, he would disrespect the person responsible in a very crude and vile manner.  Garrabrants also belittled Ball on more than one dozen occasions during the weekly meetings and used obscene language to describe him, CW 8 recalled.  One of those occasions occurred after Ball had written up Garrabrants for engaging in unauthorized activity.  CW 8 also indicated there was high employee turnover at BofI.

233.   CW 9 reflected on the negative environment at BofI and said, "It was just a horrible place."  CW 9 related that Garrabrants scares people if they speak negatively about BofI.

234.   CW 10 described BofI as a "sweatshop" where the turnover was high. According to CW 10, Garrabrants's approach was if "you look at me wrong you're out of here."

235.   CW 1 also confirmed there was high turnover at BofI.

236.   According to a former National Account Executive who worked at BofI prior to and during part of the Class Period ("CW 11") and reported to SVP 1, a convicted felon who served as Senior Vice President of Wholesale/ Correspondent Lending (*see* ¶¶ 207-17), there was a fear-based culture at BofI and there was a high rate of employee turnover.  CW 11 described the management style at BofI as "terrible."

237.   A former officer of BofI who left prior to the end of the Class Period ("CW 4") described Garrabrants as someone who does not know limits, stating "he will bankrupt people."  CW 4 further related that Garrabrants and John Tolla were "hyper-aggressive for growth.  They're pushing the boundaries."  CW 4 related that CW 4 attended meetings at which Garrabrants disparaged a former Internal Auditor of BofI who worked at the Company from approximately 2011 until first half of 2013, when the auditor was fired.  CW 4 related that CW 4 learned from other BofI employees that the former Internal Auditor had conducted an audit of deposits and discovered that Garrabrants was depositing third-party checks into Garrabrants's account at BofI, including a check made out to Garrabrants's wife with an apparently forged signature.  CW 4 related that CW 4 learned Garrabrants had completed a deposit slip for that check and submitted it to the deposit manager.  According to CW 4, before the internal auditor was fired, the auditor wrote an audit report with the auditor's findings about Garrabrants's activity but the report was "buried."

238.   Other BofI employees described Garrabrants's illicit conduct using BofI accounts.  Erhart, who had conducted another audit in early 2015 of senior management's personal accounts at BofI, "discovered that CEO Gregory Garrabrants was depositing third-party checks for structured settlement annuity payments into a personal account, including nearly $100,000 in checks made payable to third parties."  (Erhart Compl. ¶ 44).

239.   Erhart documented his findings in a memo to Jonathan Ball dated January 20, 2015.  (*Id.*).  Erhart also confronted Ball about Garrabrants's deposits of third-party checks, to which Ball responded, "Is he still doing that?  He was supposed to stop."  (Erhart Decl. ¶ 45).

240.   Erhart "also learned that the issue of Mr. Garrabrants's depositing of third-party checks had previously been raised to the Audit Committee before he started working at the Bank, and that restrictions were imposed on him."  (Erhart Compl. ¶ 44).  Erhart was concerned Garrabrants may have been evading taxes.  (*Id.*)

241.   Erhart also discovered that Garrabrants was the signatory of a BofI consumer account opened in the name of his brother, Steven Garrabrants, with a balance of approximately $4 million – the largest consumer account at BofI at the time.  (*Id.* ¶ 45).  Erhart noted that $4 million was wired into the account but he could not find any evidence of how Steven Garrabrants came into possession of such a large amount of money.  (*Id.*)  Steven Garrabrants is a former minor league baseball player who signed with the Arizona Diamondbacks in 2003 for $50,000 per year and became a free agent in 2007.[68]  He also has an interest in a Plano, Texas-based manufacturer of baseball, sports flooring, rubber flooring and artificial turf industry named Kodiak Sports, LLC.  As recently as December 2014

---

[68] *See* Steve Garrabrants's profile on Minor League Baseball's website, *available at* http://www.milb.com/player/index.jsp?sid=milb&player_id=451790#/career/R/hitting/2007/ALL.

(shortly before Erhart began his audit of senior management accounts), Steven Garrabrants took out a loan for $116,800.00.[69]  Erhart was concerned that the activity in Steven Garrabrants's account was another indication that Defendant Garrabrants was engaged in tax evasion.  (*Id.*)

242.   CW 5 also witnessed similar suspicious activity by Defendant Garrabrants.  According to CW 5, Garrabrants repeatedly instructed personnel to conduct unethical activities for his benefit.  CW 5 recounted that the head of bank deposit operations at BofI, who reported to CW 5, notified CW 5 that Garrabrants attempted to deposit third-party checks and checks made payable to his wife into his own account at BofI.  Garrabrants's wife, however, was not a joint account holder on the account, according to CW 5.

243.   CW 5 recalled one instance in which Garrabrants attempted to deposit a $100,000 check made payable to his wife into his BofI account.  The head of deposit operations advised Garrabrants that his wife's name needed to be added to the account, but Garrabrants declined.  CW 5 confronted Garrabrants about the $100,000 check and notified him that CW 5 could not process such a transaction unless Garrabrants's wife signed the check.  Garrabrants instructed CW 5 to deposit the check anyway.

244.   According to CW 5, a BofI employee informed CW 5 that Garrabrants proceeded to forge his wife's signature on the $100,000 check and returned the check immediately for deposit.

245.   CW 5 indicated that the head of bank deposit operations informed Jonathan Ball of the incident and that although Ball explained BofI's policy on third-party checks to Garrabrants, Garrabrants ignored the explanation and instructed Ball to deposit such checks.

_____
[69] *See* Document No. 2014-22820, filed with the County Clerk's Office in Grayson County, Texas, attaching a Deed of Trust, dated November 21, 2014, listing Steven Garrabrants as "Borrower," GMH Mortgage Services LLC as "Lender," and a "Note" amount of $116,800.00 owed to the Lender.

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

246.   The Class Period begins on September 4, 2013, when BofI filed an annual report on Form 10-K with the SEC for the fiscal year ending June 30, 2013 (the "2013 Form 10-K").  For the quarter, the Company reported net income of $11.13 million, or $0.78 per diluted share. For fiscal year 2013, the Company reported net income of $40.29 million, or $2.89 per diluted share.

247.   In the 2013 Form 10-K, BofI also reported $2.3 billion in loans held for investment, and ALL of $14.182 million, as of June 30, 2013.  BofI explained that its "allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio," and assured that "[w]e are committed to maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that "management performs an ongoing assessment of the risks inherent in the portfolio."

248.   The weighted average LTV and median LTV across BofI's entire real estate loan portfolio was reportedly 54.68% and 54.01%, respectively, as of June 30, 2013.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $715,309[,000]; 61% —70%: $278,043[,000]; 71% —80%: $56,273[,000]; and greater than 80%: $8,671[,000]."  With respect to multifamily loans in its portfolio, BofI reported "LTV less than or equal to 55%: $331,546[,000]; 56% —65%: $283,323[,000]; 66% —75%: $139,537[,000]; 76%—80%: $6,356[,000] and greater than 80%: $2,756 [,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $15,815[,000]; 51% —60%: $6,586[,000]; 61%—70%: $2,087[,000]; 71%—80%: $953[,000] and greater than 80%: $0."

249.   BofI stated that  "[w]e believe our weighted-average LTV of 54.68%
at origination has resulted and will continue to result in the future, in relatively low
average loan defaults and favorable write-off experience."

250.   With respect to loan underwriting standards, BofI stated:

> We individually underwrite the loans that we originate and all loans
> that we purchase. Our loan underwriting policies and procedures are
> written and adopted by our board of directors and our loan committee.
> Each loan, regardless of how it is originated, must meet underwriting
> criteria set forth in our lending policies and the requirements of
> applicable lending regulations of our federal regulators.
>
> In the underwriting process we consider the borrower's credit score,
> credit history, documented income, existing and new debt obligations,
> the value of the collateral, and other internal and external factors. For
> all multifamily and commercial loans, we rely primarily on the cash
> flow from the underlying property as the expected source of
> repayment, but we also endeavor to obtain personal guarantees from
> all borrowers or substantial principals of the borrower. In evaluating
> multifamily and commercial loans, we review the value and condition
> of the underlying property, as well as the financial condition, credit
> history and qualifications of the borrower. In evaluating the
> borrower's qualifications, we consider primarily the borrower's other
> financial resources, experience in owning or managing similar
> properties and payment history with us or other financial institutions.
> In evaluating the underlying property, we consider primarily the net
> operating income of the property before debt service and depreciation,
> the ratio of net operating income to debt service and the ratio of the
> loan amount to the appraised value.

251.   The 2013 Form 10-K also contained limited details on BofI's off-
balance sheet activities, stating, in relevant part:

> Credit-Related Financial Instruments. The Company is a party to
> credit-related financial instruments with off-balance- sheet risk in the
> normal course of business to meet the financing needs of its
> customers. . . .
>
> The Company's exposure to credit loss is represented by the
> contractual amount of these commitments. The Company follows the
> same credit policies in making commitments as it does for on-
> balance-sheet instruments.

252.   BofI described its off-balance sheet commitments as of June 30, 2013
to consist of "commitments to originate loans with an aggregate outstanding
principal balance of $246.0 million, commitments to sell loans with an aggregate
outstanding principal balance at the time of sale of $106.3 million[.]"  BofI further

1    stated that it has "no commitments to purchase loans, investment securities or any

2    other unused lines of credit."  BofI indicates further down in the 2013 Form 10-K

3    that "[t]he fair value of off-balance sheet items is not considered material."

4         253.   The 2013 Form 10-K also included certifications pursuant to

5    Sections 302 and 906 of SOX by each of defendants Garrabrants and Micheletti.

6    The Section 302 certifications were identical but for Defendants' names and titles

7    listed therein, and provided as follows, in pertinent part:

8         2.    Based on my knowledge, this report does not contain any
     untrue statement of a material fact or omit to state a material fact
9    necessary to make the statements made, in light of the circumstances
     under which such statements were made, not misleading with respect
10   to the period covered by this report.

11        3.    Based on my knowledge, the financial statements, and other
     financial information included in this report, fairly present in all
12   material respects the financial condition, results of operations and
     cash flows of the registrant as of, and for, the period presented in this
13   report.

14                                  * * *

15        5.    The registrant's other certifying officer and I have disclosed,
     based on our most recent evaluation of internal control over financial
16   reporting, to the registrant's auditors and the audit committee of
     registrant's board of directors (or persons performing the equivalent
17   functions):

18        a.    All significant deficiencies and material weaknesses in
     the design or operation of internal control over financial reporting
19   which are reasonably likely to adversely affect the registrant's ability
     to record, process, summarize and report financial information; and
20

21        b.    Any fraud, whether or not material, that involves
     management or other employees who have a significant role in the
22   registrant's internal controls over financial reporting.

23        254.   The Section 906 certifications were also identical but for Defendants'

24   names and titles listed therein and stated, with respect to each Defendant, that "to

25   the best of my knowledge"

26   (a) the [2013 Form 10-K] Report fully complies with the requirements
     of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
27

28   (b) the information contained in the Report fairly presents, in all
     material respects, the financial condition and results of operations of

the Company.

255. The statements in ¶¶ 246-254 concerning BofI's financial results, ALL, LTV across its loan portfolio, loan underwriting standards, off-balance sheet activities, internal controls, and the accuracy and completeness of the 2013 Form 10-K were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (iii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iv) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (v) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

256. On November 5, 2013, BofI filed with the SEC its Form 10-Q for the first fiscal 2014 quarter ending September 30, 2013 (the "Q1 2014 Form 10-Q") in which it reported net income of $12.18 million, or $0.85 per diluted share for the quarter.

257. The Q1 2014 Form 10-Q also reported $2.48 billion in loans in its loan portfolio and ALL of $14.546 million, as of September 30, 2013.  BofI explained that "[t]he Company's goal is to maintain the allowance for loan losses (sometimes referred to as the allowance) at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that "the Company believes that the allowance for loan losses is adequate at September 30, 2013[.]"

258. The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 55% as of September 30, 2013.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%:

$759,165[,000]; 61% – 70%: $359,085[,000]; 71% – 80%: $65,582[,000]; and greater than 80%: $9,978[,000]."  With respect to multifamily loans in its portfolio, BofI reported "LTV less than or equal to 55%: $354,157[,000]; 56% – 65%: $299,615[,000]; 66% – 75%: $139,120[,000]; 76% – 80%: $6,332[,000] and greater than 80%: $1,886[,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $15,717[,000]; 51% – 60%: $6,558[,000]; 61% – 70%: $2,087[,000]; and 71% – 80%: $943[,000]."

259.   The Q1 2014 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (*see* ¶ 251).  BofI described its off-balance commitments as of September 30, 2013 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $115.9 million, and commitments to sell loans with an aggregate outstanding principal balance of $44.6 million."  BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

260.   The Q1 2014 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to Q1 2014 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

261.   The statements in ¶¶ 256-60 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q1 2014 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships

with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

262.   Around the same time on November 5, 2013, BofI issued a press release announcing its "record" financial results for the first quarter of fiscal 2014. BofI reported "[n]et income was a record $12.2 million, an increase of 35.5% over net income of $9.0 million for the quarter ended September 30, 2012."

263.   The statements in ¶ 262 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, that BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

264.   On the same day, November 5, 2013, BofI conducted a Q1 2014 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in the Q1 2014 Form 10-Q.

265.   In addition, Garrabrants stated that "[w]e are pleased with the increase in the credit quality at the bank," noting a decline in non-performing assets as a percentage of total assets year-over-year.

266.   With respect to BofI's operations and risk management, Garrabrants stated, "[w]e continue to make investments in our people, systems, and processes to ensure that we will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for the future."

267.   When an analyst asked about the CFPB's new ability to repay and QM rule, Garrabrants responded as follows, in relevant part, with respect to BofI's loan underwriting standards:

they've solidified our ability to continue to do the prudent originations

that we have, and not allowed other institutions to come in and basically mess up this business by sort of racing to the bottom on credit. Because you can't any more do a -- it is illegal now to do a state[d] -income loan. . . And we never did that. We've always done full documentation loans.

I don't believe in low documentation, and no documentation loans. From my perspective, I want to see everything. If we're making a judgment and a trade off about a particular aspect of something, that's fine. But we can do that with the holistic picture, and have that picture documented.

268.   The statements in ¶¶ 264-67 concerning BofI's financial results, loan credit quality, risk management, and loan underwriting standards, were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (iii) BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate CIP program and by lending to borrowers who failed to provide sufficient identifying information (*see* ¶¶ 114-42); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

269.   On February 5, 2014, BofI filed with the SEC its Form 10-Q for the second quarter ending December 31, 2013 ("Q2 2014 Form 10-Q") in which it reported net income of $13.15 million, or $0.91 per diluted share, for the quarter.

270.   The Q2 2014 Form 10-Q also reported $2.828 billion in loans in its loan portfolio and ALL of $15.2 million, as of December 31, 2013.  BofI reiterated its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and, further, assured that "[it] believes that the allowance for loan losses is adequate at December 31, 2013[.]"

271.   The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 55% as of December 31, 2013.  As for single family

mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $885,370[,000]; 61% – 70%: $434,800[,000]; 71% – 80%: $79,180[,000]; and greater than 80%: $7,992[,000]." With respect to multifamily loans in its portfolio, BofI reported "LTV less than or equal to 55%: $427,304[,000]; 56% – 65%: $263,288[,000]; 66% – 75%: $169,521[,000]; 76% – 80%: $7,421[,000] and greater than 80%: $1,875[,000]." As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $16,038[,000]; 51% – 60%: $6,522[,000]; 61% – 70%: $2,082[,000]; and 71% – 80%: $933[,000]."

272. The Q2 2014 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251). BofI described its off-balance commitments as of December 31, 2013 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $125.3 million, and commitments to sell loans with an aggregate outstanding principal balance of $38.8 million." BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

273. The Q2 2014 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q2 2014 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

274. The statements in ¶¶ 269-73 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q2 2013 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57);

(ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

275.   Around the same time on February 5, 2014, BofI issued a press release announcing its "record" financial results for the second quarter of fiscal 2014.  BofI reported "[n]et income was a record $13.2 million, an increase of 34.7% over net income of $9.8 million for the quarter ended December 31, 2012."

276.   The statements in ¶ 275 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, that BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

277.   On the same day, February 5, 2014, BofI conducted a Q2 2014 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in the Q2 2014 Form 10-Q.

278.   In addition, Garrabrants stated that "[w]e continue to be pleased with the increase in the credit quality at the bank," noting a decline in non-performing assets as a percentage of total assets year-over-year.

279.   Garrabrants also commented on the growth in BofI's C&I loans, explaining that "the vast majority of those loans are loans that have been self originated by the bank, sourced by our team and they are a significant portion of those are lender financed loans that are backed by hard collateral, receivables, real estate or other loans."

280.   In response to a question from an analyst regarding QM, Garrabrants described his understanding of the new ability to pay/QM rule, and again, assured, that "in our case, we never did no documentation loans.  We always collected

1  every piece of documentation that we possibly could including tax returns from the

2  IRS and everything else, so that really didn't change anything that we did."

3      281.  Garrabrants also noted the penalties for not complying with the new

4  rule, and assuring that "the precursor to all of those penalties is that you have to

5  have not calculated the ability to repay, which we always do."

6      282.  The statements in ¶¶ 277-81 concerning BofI's financial results, loan

7  credit quality, C&I loan quality, and BofI's loan underwriting standards, were false

8  and misleading when made because Defendants knew, but failed to disclose:

9  (i)  BofI's ALL failed to account for likely losses on high risk loans BofI

10  underwrote and originated, including loans BofI made pursuant to off-balance

11  sheet activities with Quick Bridge, BofI Properties, and others (*see* ¶¶ 151-57); (ii)

12  BofI engaged in lax lending practices that subject the Company to significant risk

13  of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (iii) BofI

14  originated high risk C&I loans pursuant to its lending relationship with Quick

15  Bridge, OnDeck, and others (*see* ¶¶ 69-108); (iv)  BofI violated federal banking

16  regulations and laws and other laws by failing to maintain an adequate CIP

17  program and by lending to borrowers who failed to provide sufficient identifying

18  information (*see* ¶¶ 114-42); and (v) BofI failed to implement and enforce

19  adequate internal controls (*see* ¶¶ 158-66).

20      283.  On May 6, 2014, BofI filed with the SEC its Form 10-Q for the third

21  quarter ending March 31, 2014 ("Q3 2014 Form 10-Q") in which it reported net

22  income of $14.61 million, or $1.00 per diluted share, for the quarter.

23      284.  The Q3 2014 Form 10-Q also reported $3.154 billion in loans in its

24  loan portfolio and ALL of $15.994 million, as of March 31, 2014.  BofI reiterated

25  its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and,

26  further, assured that "[it] believes that the allowance for loan losses is adequate at

27  March 31, 2014[.]"

28

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

285.   The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 55% as of March 31, 2014.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $1,037,567[000]; 61% – 70%: $527,072[000]; 71% – 80%: $80,862[000]; and greater than 80%: $14,326[000]."  With respect to multifamily mortgages in its loan portfolio, BofI reported:  "LTV less than or equal to 55%: $430,990[,000]; 56% – 65%: $294,687[,000]; 66% – 75%: $164,865[,000]; 76% – 80%: $7,688[,000] and greater than 80%: $1,865[,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $11,867[000]; 51% – 60%: $5,779[000]; 61% – 70%: $1,436[000]; and 71% – 80%: $922[000]."

286.   The Q3 2014 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251).  BofI described its off-balance commitments as of March 31, 2014 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $70.2 million, and commitments to sell loans with an aggregate outstanding principal balance of $33.6 million."  BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

287.   The Q3 2014 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q3 2014 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

288.   The statements in ¶¶ 283-87 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q2 2013 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI's ALL failed

to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

289.   Around the same time on May 6, 2014, BofI issued a press release announcing its "record" financial results for the third quarter of fiscal 2014.  BofI reported "[n]et income was a record $14.6 million, an increase of 40.5% over net income of $10.4 million for the quarter ended March 31, 2013."

290.   The statements in ¶ 289 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, that BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶ 251).

291.   On the same day, May 6, 2014, BofI conducted a Q3 2014 conference call with analysts and investors during which defendant Micheletti reiterated the financial results reported in the Q3 2014 Form 10-Q.

292.   In addition, Garrabrants stated that "[w]e are pleased with the increase in the credit quality at the bank," noting a decline in non-performing assets as a percentage of total assets year-over-year.  Garrabrants remarked that "[w]e remain highly focused on credit quality at the Bank and have not sacrificed credit quality to increase originations nor loosen our underwriting standards[.]"

293.   With respect to BofI's loan losses, Garrabrants stated that "[o]ur current level of loan loss reserve reflects the low-risk and low loan-to-value ratio in the current portfolio."

294.   The statements in ¶¶ 291-93 concerning BofI's financial results, loan credit quality, loan underwriting standards, and loan losses were false and misleading when made because Defendants knew, but failed to disclose: (i)  BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities with Quick Bridge, BofI Properties, and others (*see* ¶¶ 151-57); (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157).

295.   On August 7, 2014, BofI issued a press release announcing its "record" financial results for the fourth quarter and full year ending June 30, 2014. BofI reported "[n]et income was a record $16.0 million, an increase of 43.8% over net income of $11.1 million for the quarter ended June 30, 2013."  With respect to BofI's loan portfolio, Garrabrants noted that "[o]ur loan portfolio originations increased 146% and 118% year-over-year for the fourth quarter and the fiscal year, respectively" and explained that "[w]e achieved our loan growth without reducing our credit standards while improving our net interest margin."

296.   The statements in ¶ 295 concerning BofI's financial results and credit standards were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); and (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157).

297.   On the same day, August 7, 2014, BofI conducted a Q4 and Fiscal 2014 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in BofI's press release issued earlier that day.

298.   During the conference call, Garrabrants stated with respect to BofI's single-family loan origination practices that "we continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products."  Similarly, with respect to BofI's C&I loan portfolio, Garrabrants commented that "we believe that we can continue to grow our portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines."  He indicated that "We are pleased with the increase in the credit quality at the bank," noting a decline in non-performing assets as a percentage of total assets year-over-year.

299.   With respect to BofI's compliance programs, including its BSA/AML program, Garrabrants touted that

> We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance. We believe that we are on the same page with our regulators about their expectations.

> * * *

> We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams.

> * * *

> But we want to make sure we stay ahead of our risk management needs and make sure that certainly we stay out of BSA trouble and things like that.

300.   Micheletti also made statements during that call, in response to an analyst's inquiry:

> DON WORTHINGTON: Okay. Thanks. Then NPAs [non-performing assets], based on the percentage that you disclosed, is a dollar amount around $16.3 million. Is that about right for the quarter?

> ANDY MICHELETTI: It is a little bit bigger than that. It is around $20 million. We run it on a total loan -- gross loans, not on net loans. So that is probably why you are coming up with this small difference.

But in basis point terms, on total loans it is identical to last quarter. So it is 20 bps.

* * *

ANDY MICHELETTI: Let me clarify a number I gave out. I think I said nonperforming were 20 basis points. I meant 57 basis points, not 20 on that. But still down from 60 bps last quarter. 46 in total.

301.  The statements in ¶¶ 298-300 concerning BofI's financial results, single family loan origination standards, C&I loan credit standards, and compliance programs were false and misleading when made because Defendants knew, but failed to disclose:  (i)  BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities with Quick Bridge, BofI Properties, and others (*see* ¶¶ 151-57); (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (iii) BofI originated high risk C&I loans pursuant to lending relationships with Quick Bridge, OnDeck, and others (*see* ¶¶ 69-108); (iv) BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate CIP program and by lending to borrowers who failed to provide sufficient identifying information (*see* ¶¶ 114-42);  and (v) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

302.  On August 28, 2014, BofI filed its Form 10-K for the fiscal year ending June 30, 2014 (the "2014 Form 10-K").  For the quarter, the Company reported net income of $16.01 million, or $1.09 per diluted share.  For fiscal year 2014, the Company reported net income of $55.96 million, or $3.85 per diluted share.

303.  In the 2014 Form 10-K, BofI also reported $3.59 billion in loans held for investment, and ALL of $18.373 million, as of June 30, 2014.  BofI explained that its "allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio," and assured that "[w]e are

committed to maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that "management performs an ongoing assessment of the risks inherent in the portfolio."

304.   The weighted average LTV and median LTV across BofI's entire real estate loan portfolio was reportedly 55.98% and 56.20%, respectively, as of June 30, 2014.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $1,158,319[,000]; 61% —70%: $626,465[,000]; 71% —80%: $103,895[,000]; and greater than 80%: $16,562[,000]."  With respect to multifamily loans in its portfolio, BofI reported "LTV less than or equal to 55%: $470,436[,000]; 56% —65%: $306,419[,000]; 66% —75%: $184,923[,000]; 76%—80%: $10,578[,000] and greater than 80%: $1,854[,000].  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $11,591[,000]; 51% —60%: $5,752[,000]; 61%—70%: $1,431[,000]; 71%—80%: $911[,000] and greater than 80%: $0."  BofI stated that "[w]e believe our weighted-average LTV of 55.98% at origination has resulted and will continue to result in the future, in relatively low average loan defaults and favorable write-off experience."

305.   BofI also described its loan underwriting standards in substantially the same manner as in its 2013 Form 10-K as follows:

> We individually underwrite the loans that we originate and all loans that we purchase. Our loan underwriting policies and procedures are written and adopted by our board of directors and our loan committee. Credit extensions generated by the Bank conform to the spirit and technical requirements of our lending policies and the applicable lending regulations of our federal regulators.
>
> In the underwriting process we consider all relevant factors including the borrower's credit score, credit history, documented income, existing and new debt obligations, the value of the collateral, and other internal and external factors. For all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment, but we also endeavor to obtain personal guarantees from all material owners or partners of the borrower. In evaluating a multifamily or commercial

1
2
3
4
5
6

credit, we consider all relevant factors including the outside financial assets of the material owners or partners, payment history at the Bank or other financial institutions, and the management/ownership experience with similar properties or businesses. In evaluating the borrower's qualifications, we consider primarily the borrower's other financial resources, experience in owning or managing similar properties and payment history with us or other financial institutions. In evaluating the underlying property, we consider primarily the recurring net operating income of the property before debt service and depreciation, the ratio of net operating income to debt service and the ratio of the loan amount to the appraised value.

7
8
9
10

306.   The 2014 Form 10-K's disclosure regarding BofI's off-balance sheet activities was nearly identical to the description included in its 2013 Form 10-K as set forth in ¶ 251.

11
12
13
14
15
16
17

307.   BofI described its off-balance sheet commitments as of June 30, 2014 to consist of "we had commitments to originate loans with an aggregate outstanding principal balance of $174.0 million, commitments to sell loans with an aggregate outstanding principal balance at the time of sale of $54.9 million[.]" BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI indicates further down in the 2014 Form 10-K that "[t]he fair value of off-balance sheet items is not considered material."

18
19
20
21

308.   The 2014 Form 10-K also included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the 2014 Form 10-K that were nearly identical to the certifications included with BofI's 2013 Form 10-K as set forth in ¶¶ 253-54.

22
23
24
25
26
27
28

309.   The statements in ¶¶ 302-308 concerning BofI's financial results, ALL, LTV across its loan portfolio, loan underwriting standards, off-balance sheet activities, internal controls, and the accuracy and completeness of the 2014 Form 10-K were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-

157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (iii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iv) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (v) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

310.   In a September 2014 investor presentation, Micheletti made numerous statements regarding the Company's purported financial condition and prudent practices, including:

 a) "BofI is consistently ranked among the best of the Biggest Thrifts by SNL Financial. . . and is also a top performer among the broader universe among all public banks and thrifts (noting, among other things, BofI's efficiency ratio, non-performing loans/total loans (%),…."

 b) "Single-family – Wholesale Jumbo

  &bull; High-end portfolio lender
   -**'Common Sense' underwriting**

**- Quarter to date average LTV of 59%**"

 c) "Multifamily – Retail/Wholesale

  &bull; High quality originators with average experience of 15+ years

    * * *

  &bull; ***High credit quality***
  &bull; ***Quarter to date average LTV of 62% and DSCR of 1.41%***"

 d) "Investment Summary

   ***

  &bull; ***Robust risk management systems and culture has resulted in lower credit, counterparty and regulatory risks***"

311.   Other investor presentations authored by Micheletti from February 2014, March 2014, May 2014, and February 2015 contain similar statements.

312.   The statements referenced in ¶¶ 310-11 were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (iii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iv) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (v) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

313.   On November 4, 2014, BofI filed with the SEC its Form 10-Q for the first quarter ending September 30, 2014 ("Q1 2015 Form 10-Q") in which it reported net income of $17.84 million, or $1.20 per diluted share for the quarter.

314.   The Q1 2015 Form 10-Q also reported $4.022 billion in loans in its loan portfolio and ALL of $20.495 million, as of September 30, 2014.  BofI reiterated its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and, further, assured that "[it] believes that the allowance for loan losses is adequate at September 30, 2014[.]"

315.   The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 55% as of September 30, 2014.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $1,290,619[,000]; 61% – 70%: $775,927[,000]; 71% – 80%: $132,293[,000]; and greater than 80%: $23,176[,000]."  With respect to multifamily mortgages in its portfolio, BofI reported "LTV less than or equal to 55%: $496,006[,000]; 56% – 65%: $359,799[,000]; 66% – 75%: $227,964[,000]; 76% – 80%: $11,077[,000] and greater than 80%: $2,709[,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $9,230[,000];

51% – 60%: $5,715[,000]; 61% – 70%: $1,425[,000]; and 71% – 80%: $901[,000]."

316.   The Q1 2015 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251). BofI described its off-balance commitments as of September 30, 2014 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $169.6 million, and commitments to sell loans with an aggregate outstanding principal balance of $65.7 million."  BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

317.   The Q1 2015 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q1 2015 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

318.   The statements in ¶¶ 313-17 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q1 2015 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

319.   On the same day, November 4, 2014, BofI issued a press release announcing its "record" financial results for the first quarter ending September 30,

2014.  BofI reported "[n]et income was a record $17.8 million, an increase of 46.5% over net income of $12.2 million for the quarter ended September 30, 2013."

320.   In the release, Garrabrants was quoted as stating, in relevant part, that BofI's "[s]trong loan growth was achieved while maintaining high quality credit standards[.]"

321.   The statements in ¶¶ 319-20 concerning BofI's financial results and credit standards were false and misleading when made because Defendants knew, but failed to disclose that (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); and (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157).

322.   On the same day, November 4, 2014, BofI conducted a Q1 2015 conference call with analysts and investors during which defendant Micheletti reiterated the financial results reported in BofI's Q1 2015 Form 10-Q filed earlier that day.

323.   During the conference call, Garrabrants stated that "[w]e continue to be pleased with the credit quality at the bank," noting a decline in non-performing assets as a percentage of total assets year-over-year.

324.   Garrabrants also touted that "[w]e continue to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination."  He further claimed that "[o]ur strong credit discipline and low loan to value ratio of portfolio had resulted in consistently low credit losses and servicing costs."

325.   Micheletti also made statements during that call, in response to an analyst's inquiry:

ANDY MICHELETTI: . . .  Now that being said, I think it's always a

- 101 -

balance between investing in the future and optimizing short-term earnings. ***And so we've been spending a lot of money on enhancements to our management team, enhancements to our compliance infrastructure***, our data management capabilities, our research teams to continue to make sure that we're staying ahead of our growth from a infrastructure perspective. So you know we've been continually kind of guiding into that 37, 38 efficiency ratio range and that we -- I just unfortunately haven't been able to hit it and we keep on coming up at 35. But we're still investing a lot in our business and we're going to continue to do so. So, I think that it, I wouldn't want to see you kind of start trying to push that efficiency ratio down. But I think the reality of our business model is without all those substantive investments and looking at a lot of the new things that we look at and are continuing, those investments and growth ***I think our business model is really quite amazingly efficient***. And it could run below there but I just wouldn't expect that for a while because we're going to really invest in our future capabilities. So, to make sure that we have the continued growth.

326.   The statements in ¶¶ 322-25 concerning BofI's financial results, loan credit quality, and "strong credit discipline," were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); and (ii) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 42-157).

327.   On January 29, 2015, BofI filed with the SEC its Form 10-Q for the second quarter ending December 31, 2014 ("Q2 2015 Form 10-Q") in which it reported net income of $19.37 million, or $1.27 per diluted share, for the quarter.

328.   The Q2 2015 Form 10-Q also reported $4.372 billion in loans in its loan portfolio and ALL of $23.187 million, as of December 31, 2014.  BofI reiterated its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and, further, assured that "[it] believes that the allowance for loan losses is adequate at December 31, 2014[.]"

329.   The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 54% as of December 31, 2014.  As for single family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%:

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

$1,400,432[,000]; 61% − 70%: $899,598[,000]; 71% − 80%: $174,131[,000]; and greater than 80%: $25,514[,000]."  With respect to multifamily mortgages in its portfolio, BofI reported "LTV less than or equal to 55%: $514,885[,000]; 56% − 65%: $380,633[,000]; 66% − 75%: $255,634[,000]; 76% − 80%: $11,847[,000] and greater than 80%: $862[,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $11,068[,000]; 51% − 60%: $3,889[,000]; 61% − 70%: $1,418[,000]; and 71% − 80%: $0."

330.   The Q2 2015 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251). BofI described its off-balance commitments as of September 30, 2014 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $148.5 million, and commitments to sell loans with an aggregate outstanding principal balance of $53.5 million." BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

331.   The Q2 2015 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q2 2015 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

332.   The statements in ¶¶ 327-31 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q2 2015 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average

LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

333.   On the same day, January 29, 2015, BofI issued a press release announcing its "record" financial results for the second quarter ending December 31, 2014.  BofI reported "[n]et income was a record $19.4 million, an increase of 47.3% over net income of $13.2 million for the quarter ended December 31, 2013."

334.   The statements in ¶ 333 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, that BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

335.   On the same day, January 29, 2015, BofI conducted a Q2 2015 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in BofI's Q2 2015 Form 10-Q filed earlier that day, and had the following exchange with an analyst:

> ANDREW LIESCH: Got you. And then I guess similarly, the provisions increased the few last quarters along with the loan growth. Is that kind of how we should be looking at that as well, just slowly rising as the bank continues to grow?
>
> ANDREW MICHELETTI: *Yes, that's fair.*

336.   During the conference call, Garrabrants again touted that "[o]ur strong credit discipline and low loan-to-value portfolios have resulted in consistently low credit losses and servicing costs."

337.   Garrabrants also commented on BofI's investments in its compliance infrastructure, stating "[w]e have invested significantly in our regulatory and compliance infrastructure, management and personnel to meet heightened regulatory demands and prepare ourselves for our relationship with H&R Block."

1   Further, Garrabrants stated with its BSA compliance program, that "[w]e're

2   investing in a new BSA system, which we think is going to be a lot more -- better

3   at detecting suspicious activity and those sorts of things."

4       338.   The statements in ¶¶ 335-37 concerning BofI's financial results, credit

5   discipline, LTV, and compliance programs were false and misleading when made

6   because Defendants knew, but failed to disclose: (i) BofI's ALL failed to account

7   for likely losses on high risk loans BofI underwrote and originated, including loans

8   BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI

9   engaged in lax lending practices that subject the Company to significant risk of

10   loss and potential regulatory and government actions (*see* ¶¶ 43-157); (iii) BofI

11   violated federal banking regulations and laws and other laws by failing to maintain

12   an adequate CIP program and by lending to borrowers who failed to provide

13   sufficient identifying information (*see* ¶¶ 114-42); and (iv) BofI failed to

14   implement and enforce adequate internal controls (*see* ¶¶ 158-66).

15       339.   On April 30, 2015, BofI filed with the SEC its Form 10-Q for the

16   third quarter ending March 31, 2014 ("Q3 2015 Form 10-Q") in which it reported

17   net income of $21.07 million, or $1.35 per diluted share.

18       340.   The Q3 2015 Form 10-Q also reported $4.711 billion in loans in its

19   loan portfolio and ALL of $25.455 million, as of March 31, 2015.  BofI reiterated

20   its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and,

21   further, assured that "[it] believes that the allowance for loan losses is adequate at

22   March 31, 2015 [.]"

23       341.   The weighted average LTV across BofI's entire real estate loan

24   portfolio was reportedly 56% as of March 31, 2015.  As for single family

25   mortgages in its portfolio, BofI reported "LTV less than or equal to 60%:

26   $1,477,673[,000]; 61% – 70%: $992,540[,000]; 71% – 80%: $192,275[,000]; and

27   greater than 80%: $27,645[,000]."  With respect to multifamily mortgages in its

28   portfolio, BofI reported "LTV less than or equal to 55%: $526,403[,000]; 56% –

65%: $388,781[,000]; 66% – 75%: $266,949[,000]; 76% – 80%: $14,619[,000] and greater than 80%: $859[,000]."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $10,997[,000]; 51% – 60%: $6,863[,000]; 61% – 70%: $3,870[,000]; and 71% – 80%: $0."

342.   The Q3 2015 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251). BofI described its off-balance commitments as of March 31, 2015 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $284.9 million, and commitments to sell loans with an aggregate outstanding principal balance of $61.3 million." BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

343.   The Q3 2015 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q3 2015 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

344.   The statements in ¶¶ 339-42 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, internal controls, and the accuracy and completeness of the Q3 2015 Form 10-Q were false and misleading when made because Defendants knew, but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

345.   On the same day, April 30, 2015, BofI issued a press release announcing its "record" financial results for the third quarter ending March 31, 2015.  BofI reported "[n]et income was a record $21.1 million, an increase of 44.2% over net income of $14.6 million for the quarter ended March 31, 2014."

346.   The statements in ¶ 345 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

347.   On the same day, April 30, 2015, BofI conducted a Q3 2015 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in BofI's Q3 2015 Form 10-Q filed earlier that day.

348.   During the conference call, Garrabrants emphasized BofI's purportedly stringent underwriting standards, stating, in relevant part, as follows:

> We continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes. . . Risk is not hidden in the tail for the portfolio.  Only 8% of the single-family has a loan-to-value ratio greater than 70%, less than 1% greater than 80% and no loans with a loan-to-value ratio of greater than 90%. . .

> We only originate full documentation loans that include borrower personal and business tax returns, bank statements and one full appraisal for multi-family loans and single-family loans under $1 million and two appraisals for all single-family loans above $1 million.

349.   With respect to BofI's C&I loans and lender finance loans, Garrabrants stated that they "are well secured by marketable collateral at much lower leverage ratios than industry averages for similar portfolios."  Moreover, with respect to C&I loans, Garrabrants stated that

> Because we focus on select C&I niches that provide good risk adjusted returns, the average yields in our C&I loans are solidly accretive to our consolidated loan yield. With a healthy loan pipeline and extensive experience across a variety of C&I loan types, we

remain optimistic regarding expansion of our C&I portfolio.

350.   Micheletti also made statements during that call:

ANDY MICHELETTI: . . .  One of the things that happens is it's always funny because on your side of the house people always trying to read the tea leaves and when you've had the kind of run we have, it's always OMG, loan growth it's going to bad, deposit growth is going to be bad.  Can you raise capital? We have this regulatory issue that, it's sort of always bounces around and usually it's wrong.  And it was wrong that we couldn't raise deposits that we wanted. We just did expected that block would get done and so we were sort of preparing for that being very aggressive in reducing rates and we had to catch-up a little bit there. ***And so, this is really more I think fundamental about the fact that we're working on the things that matter to people. We have this inherent advantage from a product perspective where we present what we have to people.*** They really don't talk about branches. They really don't care and they really get the service model and they get the value model and it's just about getting that message out.  So I feel pretty good about where we are there. We don't want our borrowings to go down too much. Most of those borrowings are longer term now and they are part of our effort to decrease our interest rate risk profile. So you have to be thoughtful about where we are always balancing out loan and deposit growth, ***but it's fundamental business transformations that we continually do here to make our business better***.

* * *

EDWARD HEMMELGARN, ANALYST, SHAKER INVESTMENTS, LLC: I just have a few questions.  I know you had an increase in the percentage of your in-house single-family non-performing mortgages. Can you talk about that a little bit, what's causing -- I know you're not having losses, but I mean is it –

GREG GARRABRANTS: Do you want to take that?

ANDY MICHELETTI: Sure. ***When you look at our overall non-performing, they actually were pretty much flat period over period, for that period.*** As we noted last quarter, there were two single-family loans, together which add up to approximately $12 million. Those two single-family loans are the ones that had created a temporary spike up in the non-performing. So, that's primarily what you're seeing.

351.   The statements in ¶¶ 347-50 concerning BofI's financial results, loan underwriting standards, and C&I loan portfolio were false and misleading when made because Defendants knew, but failed to disclose:  (i)  BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities with Quick Bridge, BofI Properties, and others (*see* ¶¶ 151-57); (ii) BofI engaged in lax

lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); and (iii) BofI originated high risk C&I loans pursuant to its lending relationship with Quick Bridge, OnDeck, and others (*see* ¶¶ 69-108).

352.  On July 30, 2015, BofI issued a press release announcing its financial results for the fourth quarter and fiscal year ending June 30, 2015.  For the quarter, the Company reported net income of $24.40 million, or $1.54 per diluted share, compared to net income of $16.0 million, or $1.09 per diluted share for the same period in the prior year.  For fiscal year 2015, the Company reported net income of $82.68 million, or $5.37 per diluted share, compared to net income of $55.96 million, or $3.85 per diluted share, for fiscal year 2014.

353.  The statements in ¶ 352 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose, that BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

354.  On the same day, July 30, 2015, BofI conducted a Q4 and Full Year 2015 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in BofI's press release issued earlier that day.

355.  During the conference call, Garrabrants commented that "[c]urrently, the vast majority of our C&I loan book is sole sourced, originated and agented by us."

356.  With respect to the Company's operations and risk management, Garrabrants commented that

> We are working hard to maintain our culture of continuous improvement, strong risk management, process orientation and disciplined capital allocation. . . Our risk infrastructure is more mature and more capable and we will continue to invest to ensure that we maintain our strong regulatory relationships and ensure that we are

operating the bank in a risk conscious manner.

357.   The statements in ¶¶ 354-56 concerning BofI's financial results, C&I loans, and risk management were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI originated high risk C&I loans pursuant to its lending relationship with Quick Bridge, OnDeck, and others (*see* ¶¶ 69-108); (ii)  BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate CIP program and by lending to borrowers who failed to provide  sufficient identifying information (*see* ¶¶ 114-42); and (iii) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

358.   On August 22, 2015, *The New York Times* published an article concerning BofI's robust growth and unsavory lending practices during Defendant Garrabrants's tenure as CEO.[70]  The article stated, in relevant part:

> As the leader of Bank of Internet USA, based in San Diego, Mr. Garrabrants has been issuing big mortgages to high earners whom other lenders might not necessarily welcome with open arms. But because its financial performance has, in many ways, been spectacular, Bank of Internet has been turning heads — and setting off alarm bells as well. The bank has made loans to people who were later found to have run afoul of the law, and Mr. Garrabrants has had to reassure investors that the bank has good relations with regulators.

> Bank of Internet's loans have increased fivefold, to nearly $5 billion, over the last five years — an almost unheard-of rate of growth for these tepid times in banking. Its losses from bad loans are practically nonexistent, and profits are surging, in part because it charges a much higher interest rate than the bigger banks operating in the same market.

> "I am passionate about what we do here, and I believe in it," Mr. Garrabrants said in one of several telephone interviews in recent weeks. "We are proud of what we are doing here. ***We try to really run a good, ethical shop, and I want people to know that***."

> The bank's stock has risen a staggering 1,600 percent since Mr. Garrabrants came on board in 2007 as chief executive of BofI Holding, the parent of Bank of Internet, with fortunate timing: He left IndyMac, a large lender that collapsed under the weight of its mortgage losses less than a year later.

---

[70] Peter Eavis, *An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*, N.Y. Times, Aug. 22, 2015 (the "August 2015 NY Times article").

* * *

[Some investors] contend that the bank is attracting people who simply can't get cheaper loans — borrowers who may be more risky. Bank of Internet also makes large mortgages to wealthy foreigners, a practice that requires meticulous controls to comply with federal regulations aimed at stopping money laundering. The bank's critics wonder whether its compliance department is up to the task, though Mr. Garrabrants vigorously defended its practices. They also take issue with the bank's funding, contending that the lender is too dependent on customer deposits that could evaporate if turbulence returns to the banking world.

* * *

Mr. Garrabrants, who has also worked at Goldman Sachs and McKinsey & Company, **says the critics are spreading disinformation** — and losing money — as they bet against his firm's soaring stock.

"Here's the problem for them: **They are going into an earnings juggernaut that has none of the things that they're talking about,"** **Mr. Garrabrants said. And he says the bank is as judicious as any other lender in picking its borrowers.** "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.

* * *

Still, Bank of Internet has lent money to some unsavory characters. For example, in 2012 it issued a $5 million mortgage to Purna Chandra Aramalla on a house in Sands Point, an affluent section of Long Island, according to local property records. In 2013, federal law enforcement authorities in New York charged Mr. Aramalla with Medicare and Medicaid fraud. In March, he was sentenced to three years in prison.

In mid-2014, Bank of Internet lent $1.05 million to Frederic Elm for a house in Fort Lauderdale, Fla., property records show. In January, the Securities and Exchange Commission accused Mr. Elm of running a "Ponzi-like" scheme that had raised $17 million since November 2013. Mr. Elm partly settled with the agency in June.

And in 2012, Bank of Internet issued a $1.26 million mortgage to Deepal Wannakuwatte, a Sacramento businessman who received a 20-year prison sentence last year for operating, for more than 10 years, what the F.B.I. called a Ponzi scheme.

* * *

Bank of Internet has lent to people who have failed to pay loans made by other banks. For instance, last year it made a $4.8 million mortgage on a home in Coral Gables, Fla., that belongs to John H. Ruiz, a prominent Miami lawyer. SunTrust, a large regional bank, is currently suing Mr. Ruiz and his wife, asserting that they failed to

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

make payments on a nearly $3 million promissory note.

* * *

Then there are questions about Bank of Internet's marketing of itself as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners. When asked, Mr. Garrabrants said it was "nowhere near the majority." Banks that do this sort of lending can expect extra scrutiny from federal regulatory agencies, which have punished banks for not properly applying bank secrecy and anti-money-laundering laws when vetting their international customers.

In recent months there has been unrest in the division of Bank of Internet that deals with regulatory compliance. Earlier this year, a senior internal auditor, Jonathan Ball, and another employee in the division, Matt Erhart, left the bank. Mr. Ball did not respond to requests for comment. Mr. Erhart's lawyer, Carol L. Gillam, said that she had communicated with regulators, including the Office of the Comptroller of the Currency, the bank's primary regulator. She declined to provide details.

* * *

And, according to Mr. Garrabrants, regulators have inspected Bank of Internet's processes for vetting loans to foreigners — and given the bank positive feedback. "We've had full regulatory review of that process and specific compliments on it," he said, noting that the review took place after the two internal auditors left. "*It is beyond a nonissue*." The Office of the Comptroller of the Currency declined to comment on Bank of Internet or any interactions with the bank.

359. The statements attributable to Garrabrants in the August 2015 NY Times article concerning BofI's ethics, BofI's judiciousness in picking borrowers, BofI critics spreading disinformation, and BofI's foreign nationals program were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (ii) BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate CIP program and by lending to borrowers who failed to provide sufficient identifying information (*see* ¶¶ 114-42); and (iii) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

360.   On August 26, 2015, BofI filed its Form 10-K for the fiscal year ending June 30, 2015 (the "2015 Form 10-K") reiterating the financial results announced in its July 30, 2015 press release.

361.   In the 2015 Form 10-K, BofI also reported $5.00 billion in loans held for investment, and ALL of $28.327 million, as of June 30, 2015.  BofI explained that its "allowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio," and assured that "[w]e are committed to maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that "management performs an ongoing assessment of the risks inherent in the portfolio."

362.   The weighted average LTV and median LTV across BofI's entire real estate loan portfolio was reportedly 56.15% and 56.62%, respectively, as of June 30, 2015.  As for single-family mortgages in its loan portfolio, BofI reported "LTV less than or equal to 60%: $1,606,203[,000]; 61% – 70%: $1,111,742[,000]; 71% – 80%: $239,584[,000]; and greater than 80%: $207[,000]."  With respect to multi-family mortgages in the portfolio, BofI reported "LTV less than or equal to 55%: $533,292[,000]; 56% – 65%: $367,910[,000]; 66% – 75%: $263,766[,000]; 76% – 80%: $15,164[,000] and greater than 80%: $0."  As for commercial real estate loan in its portfolio, BofI reported "LTV less than or equal to 50%: $22,111[,000]; 51% – 60%: $24,975[,000]; 61% – 70%: $12,189[,000]; 71% – 80%: $0 and greater than 80%: $0."  BofI stated that  "[w]e believe our effective weighted-average LTV of 60.39% for loans originated during the fiscal year ended June 30, 2015, has resulted and will continue to result in relatively low average loan defaults and favorable write-off experience."

363.   The 2015 Form 10-K also contained a description of BofI's loan underwriting process and criteria that was identical to the description in the 2014 Form 10-K as described in ¶ 305.

364.   The 2014 Form 10-K's disclosure regarding BofI's off-balance sheet activities was nearly identical to the description included in its 2013 Form 10-K as set forth in ¶ 251.

365.   BofI described its off-balance sheet commitments as of June 30, 2015 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $212.0 million, commitments to sell loans with an aggregate outstanding principal balance at the time of sale of $88.6 million[.]"  BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  BofI indicates further down in the 2014 Form 10-K that "[t]he fair value of off-balance sheet items is not considered material."

366.   The 2015 Form 10-K also included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the 2015 Form 10-K that were nearly identical to the certifications included with BofI's 2013 Form 10-K as set forth in ¶¶ 253-54.

367.   The statements in ¶¶ 360-66 concerning BofI's financial results, ALL, LTV across its loan portfolio, loan underwriting standards, off-balance sheet activities, internal controls, and the accuracy and completeness of the 2015 Form 10-K were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (iii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iv) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (*see* ¶¶ 43-157); and (v) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66).

368.   On August 5, 2015, BofI issued a press release announcing that it had received approval from the OCC to proceed with the definitive purchase and assumption transaction with H&R Block Bank.  In the release, Garrabrants stated that "[o]nce completed and closed, these H&R Block agreements will add to the strength and diversity of our deposit, lending and fee income businesses.  *We believe our nationwide low-cost branchless bank is well aligned with H&R Block's desire to provide their clients with affordable banking products and services.*"

369.   On the same day, BofI conducted a conference call with investors and analysts to discuss the H&R Block transaction.  Garrabrants explained that a program management agreement defined the terms of BofI's ongoing relationship with H&R Block and consisted of five primary components:

First, the Bank will serve as the sole issuer and depository institution for H&R Block's Emerald cards, one of the largest prepaid card programs in the country, with approximately 3 million active cards.

Second, the Bank will act as the sole processing bank for H&R Block's refund transfers.

Third, we will originate all Emerald Advance lines of credit and retain 10% of the Emerald Advance lines of credit that we will originate each year. The Bank will receive an origination fee on all lines of credit and the pro rata economics related to the percentage of the balances retained.

These three products -- the Emerald card, refund transfer, and Emerald Advance -- represent the primary focus and the vast majority of the transactional volume that we will process under the program management agreement.

Fourth, we will be working with H&R Block on a couple of other smaller products, such as the legacy credit card business and some savings accounts.

Fifth, the Bank has obtained certain cross-seller rights for two products -- individual retirement accounts and mortgages.

370.   The statements in ¶¶ 368-69 concerning BofI's agreements with H&R Block and BofI's "branchless business" model being "well aligned" with H&R Block were false and misleading when made because Defendants knew, but failed

to disclose, that BofI created a phantom Nevada branch location to issue and book hundreds of millions of dollars in H&R Block financial products and to take advantage of Nevada usury laws (*see* ¶ 414).

## THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISREPRESENT AND OMIT MATERIAL FACTS

371.   On August 28, 2015, before the market opened, *Seeking Alpha* published an article entitled "The New York Times Has Only Scratched The Surface on BofI Holding…" that, as described in ¶ 142, revealed, among other things, that the SEC's recent response to the author's FOIA request suggested that the agency was investigating BofI and that BofI did business with a mortgage company that advertised loans available to borrowers from Russia, a country appearing on OFAC's sanctions list.[71]   The article also posited that BofI was potentially the subject of a whistleblower lawsuit, that BofI's lending standards and LTV were "gimmicks," and that BofI had overstated its earnings by under-reserving and funding high-risk brokered loans with high-cost deposits.   Following this article, the price of BofI's common stock fell $0.97 per share, or 3.1%, from its closing price of $30.38 on August 27, 2015, to close at $29.41 on August 28, 2015, on elevated trading volume.

372.   On September 1, 2015, BofI issued a press release announcing that it had closed the definitive purchase and assumption transaction with H&R Block Bank.   Under the agreement, BofI purchased from H&R Block Bank certain assets and assumed certain liabilities, including all of the deposit liabilities of H&R Block Bank.   At the time of closing, the Bank received $419 million of cash and assumed an equal amount of deposit liabilities.   It also received a de minimis amount of non-cash assets at zero cost.   In addition, BofI entered into a program management agreement with H&R Block to provide H&R Block-branded financial services products:  Emerald Prepaid MasterCard®, Refund Transfers, Emerald

---

[71] *See Ukraine-/Russia-related Sanctions,* U.S. Treasury website, *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx.

Advance® lines of credit, deposits, credit card and other products through H&R Block's retail and digital channels.  In the release, Garrabrants was quoted as stating "[o]ur multi-year strategic partnership further diversifies our deposit, lending and fee income businesses and provides tremendous opportunities to offer co-branded banking products to Block's 20 million customers."

373.   On September 4, 2015, BofI filed the 2015 Proxy Statement with the SEC seeking shareholder approval for the election of certain directors, an increase in the number of authorized BofI shares of common stock, and the appointment of BDO USA, LLP as BofI's independent public accounting firm, among other items. The 2015 Proxy Statement described the Company's policy and procedures on related party transactions, which includes an evaluation of ***"whether it is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances,"*** as follows:

Related Party Transaction Policy and Procedures

Pursuant to the Company's Related Party Transaction Policy and Procedures, the Company's Board of Directors is responsible for reviewing and approving or ratifying all related party transactions that are subject to such policy. This policy applies to certain transactions involving over $100,000 in any calendar year with related parties, which includes our officers, directors and director nominees, and members of their immediate family. The policy also applies to certain transactions with Company stockholders who own more than 5% of the Company's stock. In determining whether to approve or ratify a related party transaction, the Board of Directors will take into account material facts of the transaction, ***including whether it is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances***, and the extent of the related party's interest in the transaction. The Bank offers an employee loan program available to all directors, officers and employees on a non-discriminatory basis under which each eligible employee may obtain home loans for terms of 9 years to 30 years at interest rates that are below market rates on loans made to persons unaffiliated with the Bank and the Company, provided the loan is supported by more collateral than that normally provided by unaffiliated borrowers.

374.   The 2015 Proxy Statement further stated that BofI made $12.5 million in loans to directors, principal officers and their affiliates and the related party

loans and that these and other related party loans generally are on the same terms then available to unaffiliated persons with comparable creditworthiness and that do not involve abnormal risk of collectibility:

> In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates. ***Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank. Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features***. As discussed above, the Bank offers an employee loan program available to all directors, officers and employees on a non-discriminatory basis under which each eligible employee may obtain home loans for terms of 9 years to 30 years at interest rates that are below market rates on loans made to persons unaffiliated with the Bank and the Company, provided the loan is supported by more collateral than that normally provided by unaffiliated borrowers. Loans to all directors, executive officers and employees who elected to participate in this program totaled approximately $29.1 million at June 30, 2015. All loans to directors, executive officers and employees were performing in accordance with their terms at June 30, 2015. Loans to directors, principal officers, and their affiliates totaled $12.5 million at June 30, 2015. Total principal payments on related party loans were $0.3 million.

375.    The 2015 Proxy Statement also included a "Report of the Audit Committee" signed by Defendants Grinberg, Mosich, and Argalas that recommended that BofI's audited consolidated financial statements be included in the 2015 Form 10-K.  According to the report, "[t]he Audit Committee operates under a written charter adopted by the Board of Directors."  The Audit Committee Charter, available on BofI's website, sets forth the duties and responsibilities of the Audit Committee as follows, in relevant part:[72]

> 1.     Review available policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles and applicable rules and regulations of the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) applicable to Nasdaq-listed

---

[72] *See* Audit Committee Charter of BofI Holding, Inc., *available at* http://www. snl.com/Cache/1001201774.PDF?O=PDF&T=&Y=&D=&FID=1001201774&iid= 4055785.

issuers;

2.     Oversee the Company's accounting and financial reporting process;

* * *

5.     Confirm that the Company's principal executive officer and principal financial officers are satisfying the certification requirements of Sections 302 and 906 of the Sarbanes-Oxley Act; review disclosure made to the Audit Committee by the CEO and CFO about significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a role in the Company's internal control over financial reporting;

* * *

19.    Review the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, and evaluate the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon;

* * *

22.    Review the significant reports to management prepared by the Company's internal auditing department and management's responses;

* * *

25.    Establish procedures for: (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

26.    Review reports prepared by Management concerning all related party transactions for potential conflicts of interest situations on an ongoing basis and approve all such transactions (if such transactions are not approved by another independent body of the Board)

376.   The Report of the Audit Committee in the 2015 Proxy Statement further described the committee's primary responsibilities as follows:

The primary responsibilities of the Audit Committee are to oversee and monitor the integrity of the Company's financial reporting process, financial statements and systems of internal controls; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence and performance; and the performance of the Company's internal audit function.

377.   The statements in ¶¶ 373-76 concerning the Audit Committee's operation and responsibilities and BofI's Related Party Transaction Policy and Procedures were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66); (ii) BofI's Audit Committee and Internal Audit Program were ineffective because of undisclosed conflicts of interest and lack of independence (*see* ¶¶ 167-78); and (iii) BofI issued loans to insiders, including certain Individual Defendants, and their affiliates on more favorable terms than available to comparable unaffiliated parties (*see* ¶¶ 179-206).

378.   On October 13, 2015, as described in ¶ 20, *The New York Times* reported that Erhart had filed a lawsuit against the Company for violating federal laws designed to protect whistle-blowers.  As described in ¶¶ 20 and 218, Erhart alleged widespread misconduct at BofI and by senior BofI officers and directors, including Garrabrants.  On this news, shares of BofI fell $10.72 per share, or 30.2%, from its closing price of $35.50 on October 13, 2015, to close at $24.78 on October 14, 2015, on extremely high trading volume.[73]

379.   On October 14, 2015, BofI conducted a conference call with analysts and investors to discuss media reports concerning the action filed by Erhart.  Garrabrants vehemently denied the allegations in Erhart's Complaint, claiming that "[t]he complaint is riddled with evidence of basic misunderstandings, inaccuracies, out-of-context statements and illogical conclusions."  Garrabrants characterized Erhart as a "junior disgruntled employee" and stated that while Erhart contacted several federal agencies about BofI's alleged wrongdoing, "they have taken no action."  Garrabrants represented, among other things, that ***the Bank has never misstated its financials***"; "***[w]e do not do business with customers on the***

---

[73] On a pre-split adjusted basis, BofI's stock price fell $42.87 per share from its closing price of $142.00 on October 13, 2015, to close at $99.13 on October 14, 2015.

*prohibited OFAC list"*; and *"[t]here are no regulatory issues of any kind that have arisen from Mr. Erhart's contact with the OCC."*

380.   With respect to Erhart's allegations concerning Garrabrants's improper use of his personal accounts, Garrabrants stated *"[t]axes were paid on all the money.  That -- and there's actually a Form 4 with gift -- with a gift that shows some of my stock going out. And you can see my holdings of stock.* And so, having several million in a family trust is not particularly unusual[.]"

381.   Garrabrants also disclosed during the call that BofI's General Counsel Eshel Bar-Adon *"conducted its own review for the audit committee of what happened, and I think that that conclusion is difficult to argue with."* Garrabrants also claimed that *"we have a culture that focuses very strongly on ethics[.]"* Garrabrants further stated that "[w]e did our own investigation of this. *All of that was provided to our external auditors, and the external auditors reviewed it, and they found it to be completely without merit, which it is, completely without merit."*

382.   Finally, with respect to pending investigations, Garrabrants vaguely stated that "[w]e are under no regulatory orders, no regulatory restrictions on our business, and we continue to have great dialogue with our regulators.  *And there's no issues* [sic] *with any of -- the idea that we are not providing information or something like that.*"

383.   The statements in ¶¶ 379-82 concerning the merits and accuracy of Erhart's allegations, regulatory issues, Garrabrants's account, and BofI's internal investigation and review by external auditors were false and misleading when made because Defendants knew, but failed to disclose: (i) BofI's Audit Committee and Internal Audit Program were ineffective because of undisclosed conflicts of interest and lack of independence (*see* ¶¶ 167-78); (ii) BofI had in fact (as further described below in ¶ 385) not completed its internal investigation and its report had not been provided or reviewed by external auditors; (iii) BofI violated federal

banking regulations and laws and other laws by failing to maintain an adequate CIP program and by lending to borrowers who failed to provide sufficient identifying information (*see* ¶¶ 114-42); (iv) Garrabrants engaged in illicit conduct involving deposit accounts at BofI Federal Bank for his personal benefit (*see* ¶¶ 237-45); (v) BofI falsely responded to regulatory and government inquiries (*see* ¶¶ 20, 128-33, 219); (vi) BofI received government subpoenas and was subject to nonpublic agency investigations and investigations by the OCC (*see* ¶¶ 219-26); and (vii) as described immediately below, Garrabrants's Form 4's do not explain the source of funds in his brother's account.

384.   A review of Form 4's filed by or on behalf of Garrabrants for transactions between June 30, 2012 and February 9, 2016 shows that he acquired 500,404 shares of BofI stock during that period, including 362,417 shares acquired through the exercise of stock options and 20,275 shares purchased on the open market.[74]  The Form 4's reviewed further indicate that during the same period, Garrabrants sold 94,856 shares in the open market (on December 31, 2012) at $26.30 per share, for proceeds of approximately $2.494 million, and disposed of 306,709 shares through non-open market transactions.  Accordingly, contrary to Garrabrants's claim, his Form 4's do not explain the source of the $4 million balance allegedly in his brother's bank account over which Garrabrants has authority.  Notably, Garrabrants did not specifically dispute the alleged account balance or his authority over the account during the October 14, 2015 conference call.

385.   On October 22, 2015, BofI conducted its annual stockholders meeting.  During the meeting, Theodore Allrich, Chairman of BofI's Board of Directors, contradicted Garrabrants's statements during the October 14, 2015 earnings conference call regarding the Company's internal investigation of

---

[74] All amounts of BofI shares listed in ¶ 384 are pre-split adjusted.

Erhart's allegations and the purported review and conclusion of its external auditors. Specifically, Allrich stated:

> I would like to clarify certain statements made on our analyst call on October 14, 2015, regarding our external auditors' awareness of the allegations of our former junior internal auditor. Management orally shared with our external auditors a summary of the early conclusions of our internal review of the internal auditor matter, which concluded that the internal auditor was merely a disgruntled employee making a series of baseless allegations. ***Until recently, the written report setting forth the details of our investigation was not discussed with or provided to our External Auditors.*** Subsequently, we have provided a final written report of our internal review to our External Auditors. ***To date, our External Auditors have not evaluated the allegations and the report.*** Our early conclusions, shared with our external auditors, were wholly consistent with the final conclusions in our written report.[75]

386. On October 29, 2015, BofI filed with the SEC its Form 10-Q for the first quarter ending September 30, 2015 ("Q1 2016 Form 10-Q") in which it reported net income of $25.5 million, or $1.60 per diluted share.

387. The Q1 2016 Form 10-Q also reported $5.291 billion in loans in its loan portfolio and ALL of $31.078 million, as of September 30, 2015. BofI reiterated its goal in maintaining ALL, as described in earlier Form 10-Qs filed by BofI, and, further, assured that "[it] believes that the allowance for loan losses is adequate at September 30, 2015."

388. The weighted average LTV across BofI's entire real estate loan portfolio was reportedly 56% as of September 30, 2015. As for single-family mortgages in its portfolio, BofI reported "LTV less than or equal to 60%: $1,713,182[,000]; 61% – 70%: $1,188,556[,000]; 71% – 80%: $255,106[,000]; and greater than 80%: $206[,000]." With respect to multifamily mortgages in its portfolio, BofI reported "LTV less than or equal to 55%: $515,112[,000]; 56% – 65%: $392,341[,000]; 66% – 75%: $265,828[,000]; 76% – 80%: $15,101[,000]

---

[75] *See* Transcript of BofI Holding, Inc. Annual Meeting of Stockholders, Thursday, October 22, 2015, 2:00 pm PT, San Diego, California 92122 on BofI's website, *available at* http://www.snl.com/Cache/1500077112.PDF?O=PDF&T=&Y=&D=&FID=150007 7112&iid=4055785.

and greater than 80%: $0."  As for commercial real estate loans in its portfolio, the Company reported "LTV less than or equal to 50%: $24,453[,000]; 51% – 60%: $22,421[,000]; 61% – 70%: $26,234[,000]; and 71% – 80%: $4,745[,000]."

389.   The Q1 2016 Form 10-Q also contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 251). BofI described its off-balance commitments as of September 30, 2015 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $277.8 million, and commitments to sell loans with an aggregate outstanding principal balance of $82.0 million."  BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit."  BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

390.   In a section entitled "Legal Proceedings," the Q1 2016 stated, in relevant part, that

> . . .from time to time we may be a party to other claims or litigation that arise in the ordinary course of business, such as claims to enforce liens, claims involving the origination and servicing of loans, and other issues related to the business of the Bank. None of such matters are expected to have a material adverse effect on the Company's financial condition, results of operations or business.

391.   The Legal Proceedings section also refers internally to a section entitled "Subsequent Events" in which BofI describes the instant class litigation.

392.   The Q1 2016 Form 10-Q included certifications pursuant to Sections 302 and 906 of SOX by each of Defendants Garrabrants and Micheletti as to the Q1 2016 Form 10-Q that were nearly identical to the certifications described in ¶¶ 253-54.

393.   The statements in ¶¶ 386-92 concerning BofI's financial results, ALL, LTV across its loan portfolio, off-balance sheet activities, legal proceedings and subsequent events, internal controls, and the accuracy and completeness of the Q1 2016 Form 10-Q were false and misleading when made because Defendants knew,

but failed to disclose:  (i) BofI's ALL failed to account for likely losses on high-risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (*see* ¶¶ 69-108); (iii) BofI's average LTV failed to account for undisclosed high-risk loans BofI issued (*see* ¶¶ 43-157); (iv) BofI failed to implement and enforce adequate internal controls (*see* ¶¶ 158-66); and (v) BofI had received government subpoenas and was subject to nonpublic agency investigations and investigations by the OCC (*see* ¶¶ 219-26).

394.   On October 29, 2015, BofI issued a press release announcing its financial results for the first quarter ending September 30, 2015.  BofI reported "[n]et income was a record $25.5 million, an increase of 42.9% over net income of $17.8 million for the quarter ended September 30, 2014."

395.   The statements in ¶ 394 concerning BofI's financial results were false and misleading when made because Defendants knew, but failed to disclose that BofI's ALL failed to account for likely losses on high-risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57).

396.   On the same day, October 29, 2015, BofI conducted a 1Q 2016 conference call with analysts and investors during which Defendant Micheletti reiterated the financial results reported in BofI's press release issued earlier that day.

397.   During the conference call, Garrabrants assured that BofI's "portfolio credit quality is very strong.  Our strong credit discipline and low loan-to-value portfolio have resulted in consistently low-credit losses and servicing costs."  Further, Garrabrants stated that "[w]e continue to maintain our conservative underwriting criteria and have not loosened credit quality to increase loan volume."

398.   Micheletti also made statements during that call, in response to an analyst's inquiry:

> GARY TENNER, ANALYST, D.A. DAVIDSON: Just two quick questions, the gain on sale line, I think this is the one income line that maybe wasn't already asked, [3.7% this quarter versus 1.4%] last quarter. Any correlation there between that line and the mortgage line or it's just kind of timing of sales?
>
> ANDY MICHELETTI: Yes, so gain on sale other is what you're talking?
>
> GARY TENNER: Yes.
>
> ANDY MICHELETTI: Gain on sale, yes, **we originate structured settlements for sale depending on a variety of factors in terms of looking at the business**. The primary increase in that is related to structured settlement sales.

399.   The statements in ¶¶ 396-98 concerning BofI's financial results, credit discipline, LTV, conservative underwriting criteria, and structured settlements were false and misleading when made because Defendants knew, but failed to disclose (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (*see* ¶¶ 43-157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (*see* ¶¶ 151-57); (iii) BofI's average LTV failed to account for all undisclosed high risk loans BofI issued, including to undisclosed lender partners (*see* ¶¶ 43-157); (iv) BofI had received government subpoenas and was subject to nonpublic agency investigations and investigations by the OCC (*see* ¶¶ 219-26).

400.   On October 29, 2015, *Seeking Alpha* published an article entitled "Buyer Beware:  More Odd Behavior from BOFI," which notes differences between certain statements Garrabrants made on the October 14, 2015 conference call and the transcript of the call BofI filed with the SEC next day.[76]

---

[76] Real Talk Investments, *Buyer Beware:  More Odd Behavior From BOFI*, *Seeking Alpha*, Oct. 29, 2015.

401.   Following the news on October 29, 2015, the price of BofI common stock fell $1.91 per share, or approximately 7.6%, from its closing price of $25.18 on October 28, 2015, to close at $23.26 on October 29, 2015, on unusually high trading volume.

402.   On October 30, 2015, as described in ¶¶ 225-26, BofI filed its motion to file certain declarations under seal in its countersuit against Erhart, which confirmed the existence of "nonpublic agency investigations," "investigations by the OCC," and "confidential government subpoenas."  BofI's stock price fell another $3.26 per share, or 14%, from its closing price on October 29, 2015 to close at $20.00 on October 30, 2015, on extremely high trading volume.

403.   On November 4, 2015, *Seeking Alpha* published its article entitled "Buyer Beware:  BOFI Related Party Loans" that, as described in ¶¶ 184-90, provided details of previously undisclosed related party loans BofI made to Defendants Garrabrants, Micheletti, Grinberg, Argalas, and Mosich, and other BofI senior executives , including the sister of BofI's Chief Legal Officer, Bar-Adon, on terms far more favorable than those available to borrowers unaffiliated with BofI.  The article indicates that the related-party loans run afoul of Regulation O and, further, cast serious doubt as to the integrity of internal investigation of Erhart's allegations apparently performed by Grinberg and Bar-Adon.  On November 4, 2015, BofI's stock traded as low as $23.28 per share, or 1.7% lower than its closing price of $23.68 on November 3, 2015.

404.   On November 5, 2015, *Seeking Alpha* published an article noting that BofI's recent filings in its countersuit against Erhart reveals the existence of undisclosed subpoenas and non-public government investigations.[77]

405.   On November 10, 2015, as described in ¶¶ 70-87, details concerning BofI's suspicious lending relationships with OnDeck, Quick Bridge, RCN, and

---

[77] Aurelius, *Recent BOFI Court Filing Confirms Existence of Undisclosed Subpoenas And Nonpublic Government Investigations*, *Seeking Alpha*, Nov. 5, 2015.

BofI Properties were revealed in an article published by *Seeking Alpha*. The article also notes that BofI's list of subsidiaries cannot be located on the SEC's EDGAR system.[78] Following this news, the price of BofI stock fell $0.72 per share, or 2.94%, from its closing price of $24.48 on November 9, 2015 to close at $23.76 on November 10, 2015, on high trading volume.

406.   On November 18, 2015, *Seeking Alpha* published its article that, as described in ¶¶ 215-17, revealed that BofI had employed a felon convicted of grand theft, forgery of a credit card receipt, burglary, and dealing in stolen property, in violation of Section 19 of the FDIA. The article further noted that BofI issued two loans to the individual, even after he filed for bankruptcy. A search for individuals with the same background revealed that the article was referring to an individual who served as BofI's Senior Vice President of Wholesale and Correspondent Lending during the Class Period. Following this news, the price of BofI stock fell $0.93 per share, or 4.47%, from its closing price of $20.82 on November 17, 2015 to close at $19.89 on November 18, 2015, on unusually elevated trading volume.

407.   On November 19, 2015, as described in ¶¶ 91-93, BofI's lending relationship with Center Street, which was known for fix and flip, "no doc" and "no FICO," and "no income verification" loans, was revealed in an article published by *Seeking Alpha*. The article noted that nearly $300 million in in risky single-family lender finance loans BofI made to Center Street SPEs were disguised as "Warehouse and other" loans on BofI's financial statements. Following this news, the price of BofI stock fell $0.49 per share, or 2.4%, from its closing price of $19.89 on November 18, 2015 to close at $19.40 on November 19, 2015.

408.   On November 30, 2015, an article published by *Seeking Alpha* alerted investors to the transcript of BofI's annual stockholders meeting on BofI's website

---

[78] BofI's 2015 Form 10-K, which refers to Exhibit No. 21.1 which cannot be located, states that the "[s]ubsidiaries of the Company consist of Bank of Internet USA (federal charter) and BofI Trust I (Delaware charter)."

and Allrich's clarification that Garrabrants's earlier statements about BofI's internal investigation of Erhart's allegation and the purported review and conclusion of BofI's external auditor were actually false.[79]  Following this news, the price of BofI stock fell $0.42 per share, or 2.06%, from its closing price of $20.41 on the previous trading day, November 27, 2015, to close at $20.03 on November 30, 2015.

409.   On December 8, 2015, *Seeking Alpha* published an article confirming the lending relationship between BofI and Quick Bridge.  The article included an image of a UCC Financing Statement showing BLG as the Debtor and BofI Federal Bank as the Secured Party.  According to the article, the second page of the UCC Financing Statement referred to a "Master Loan and Security Agreement dated February 12, 2014" between BofI Federal Bank, which is identified as the lender and secured party, and WCL Holdings I, LLC as the Borrower.  The article notes that BofI's failure to disclose its relationship with Quick Bridge or WCL may be in violation of applicable accounting standards and that WCL may require consolidation.  On December 8, 2015, BofI's stock fell another $0.15 per share, or approximately 1 %, from its closing price of $19.12 on December 7, 2015 to close at $18.97 on December 8, 2015.

410.   On December 16, 2015, *Seeking Alpha* published an article about the background of BofI's former Vice President of Internal Audit, Jonathan Ball, that raised questions about the veracity of the declaration Ball had filed in support of BofI's motion for preliminary injunction in BofI's countersuit against Erhart.[80] The article noted that for 18 years, Ball led the internal audit department of La

---

[79] Aurelius, *BofI:  Chairman Contradicts CEO's Assertions Regarding External Auditors "Without Merit" Finding*, *Seeking Alpha*, Nov. 30, 2015.

[80] Real Talk Investments, *Former BofI Head Auditor's Career History Raises Questions About His Declaration*, *Seeking Alpha*, Dec. 16, 2015; *see also* Declaration of Jonathan Ball Submitted in Support of BofI Federal Bank's Motion for Preliminary Injunction, filed in *BofI Federal Bank v. Erhart*, No. 3:15-cv-02353-BAS-NLS (S.D. Cal.) (Dkt. No. 22).

Jolla Bank, the largest U.S. bank failure in 2010 due to fraud by the bank's executives who admitted to accepting bribes. La Jolla Bank was reportedly criticized by the government for its weak and inadequate internal controls. The article also questioned Ball's assertions in his declaration that he was unable to recall certain events alleged by Erhart and pointed out other issues that cast doubt as to Ball's credibility.

411. On January 6, 2016, before the market opened, *Seeking Alpha* published an article that, as described in ¶¶ 95-98, exposed BofI's lending relationship with Propel Tax. The article also revealed Defendant Grinberg's ties to Propel Tax through his executive role at Encore Capital, making the $31.9 million loan facility BofI provided Propel Tax a related-party transaction that should have been disclosed. The transaction also compromised the internal investigation of Erhart's allegations by Grinberg and Bar-Adon. In addition, the article noted that BofI made a mortgage loan to Jonathan Ball in March 2012, which likely created a conflict of interest (Plaintiff has since independently confirmed that BofI made a mortgage loan to Ball). On this news, BofI stock opened on January 6, 2016 at $20.04 per share, which was $0.32, or 1.6%, lower than its closing price of $20.36 on January 5, 2016.

412. On January 21, 2016, as described in ¶¶ 101-108, an article published in *Seeking Alpha* revealed BofI's use of BofI Properties, an undisclosed, off-balance sheet SPE managed by Bar-Adon and Constantine, to hide troubled mortgages.[81] The article also noted that Bar-Adon created three additional off-balance sheet SPEs to purchase lottery receivables from Bar-Adon's former employer. Following this news, the price of BofI stock traded as low as $17.24 on January 1, 21, 2016, before closing that day at $17.62, below its closing price of $17.70 on the previous trading day.

---

[81] Aurelius, *SPEs Managed By Bofi Executives Directly Contradict Financial Reporting, Seeking Alpha*, Jan. 21, 2016.

413.   On January 28, 2016, BofI conducted a conference call with analysts and investors to discuss its Q2 2016 financial results.  During the conference call, Garrabrants revealed, for the first time during the Class Period, BofI's use of SPEs in its C&I lending business.  Garrabrants stated, in relevant part:

> The underlying collateral which is residential or commercial real estate properties or non-real estate related loans or receivables is housed in the bankruptcy remote special purpose entity that insures the bank at the collateral segregated from a legal perspective in the unlikely event of a bankruptcy.

414.   On February 3, 2016, an article appearing on *Seeking Alpha* reported that BofI was no longer "branchless," as it had opened its first branch location in Reno, Nevada that, according to the FDIC's website, was supposed to be a "full service" branch, but an in-person inspection by the author indicated otherwise.[82] According to the author, the Nevada branch was located in shared and tightly compacted office space housing dozens of small businesses and BofI's office was approximately 75 square feet in size.  The office was reportedly staffed with only one person who confirmed she worked for BofI but declined to provide any other information.  The article noted that BofI's program management agreement with H&R Block required that BofI establish a Nevada branch where BofI "will issue and book the Financial Products and "take all reasonable actions at the Nevada Branch necessary for [BofI] Bank to export Nevada interest rates (and rely upon Nevada usury rates) on the Emerald Advance and other credit products[.]"  The article concluded that BofI's H&R Block related credit products totaling hundreds of millions of dollars were likely being "booked" through its "phantom" Nevada branch potentially to take advantage of the laws of Nevada, which does not limit interest rates in express written contracts.[83]

---

[82] Aurelius, *Why BOFI Created A Phantom "Full Service Branch" In The Nevada Desert*, *Seeking Alpha*, Feb. 3, 2016.

[83] *See* NRS  99.040(1), which provides, generally, and with respect to contracts:

> When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of

415.  Following this news, the price of BofI stock fell $1.06 per share, or 6.2%, from its closing price of $16.98 on February 2, 2016, to close at $15.92 on February 3, 2016, on elevated trading volume.

## ADDITIONAL SCIENTER ALLEGATIONS

416.  The Individual Defendants, as directors and/or senior officers of BofI during the Class Period, including Defendant Grinberg as Chairman of Audit Committee of BofI's Board of Directors and an "audit committee financial expert" according to SEC rules and regulations, are liable as direct participants in all of the wrongs complained of herein.  (2015 Proxy Statement at 9).  Through their positions of control and authority, as well as their stock ownership, the Individual Defendants were in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of the Form 10-Ks, Form 10-Qs, press releases, and other public statements, as set forth above.

417.  The Individual Defendants also possessed the power and authority to, and did, control the contents of BofI's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

418.  As already detailed herein at ¶¶ 253-54, 260, 273, 287, 308, 317, 331, 343, 366, 392, Defendants Garrabrants and Micheletti signed SOX certifications during the Class Period attesting to their responsibility for and knowledge of disclosure controls and procedures, as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), as well as BofI's internal control over financial reporting.

Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, in the following cases:

(a)    Upon contracts, express or implied, other than book accounts[.]

419.   As already detailed herein at ¶¶ 375-76, Defendants Grinberg, Mosich, and Argalas signed the Report of the Audit Committee included in BofI's 2015 Proxy Statement stating that Defendants operated under the Audit Committee Charter of BofI.

420.   The Individual Defendants knew and/or recklessly disregarded that public statements made by them and by BofI concerning BofI's business, operations, financial results, and prospects were false and misleading when made.

421.   Specifically, the Company's earnings were materially misstated because BofI's ALL failed to account for likely losses from high risk loans BofI originated, including pursuant to undisclosed lending partner relationships. Knowledge of the Company's misstated earnings may rightfully be attributed to BofI and its key officers and directors, including the Individual Defendants, particularly Grinberg, Mosich, and Argalas, who were members of BofI's Audit Committee during the Class Period.  According to BofI's Audit Committee charter by which the Audit Committee purports to operate, each member of the committee "must be able to read and understand fundamental financial statements, including the Company's balance sheet, income statement, and cash flow statement[.]"  As members of the Audit Committee, Defendants Grinberg, Mosich, and Argalas were primarily responsible for overseeing BofI's financial reporting process and system of internal accounting controls of the Company, as well as appointing and overseeing BofI's independent public accountants.

422.   Defendant Garrabrants also participated in Audit Committee meetings and was therefore aware of BofI's misstated earnings and negative findings by the committee and by internal auditors.

423.   With respect to related party loans, Defendants Garrabrants, Micheletti, Grinberg, Mosich, and Argalas had actual knowledge of their related party nature because of each of them and/or their affiliate obtained such a loan

1    from BofI on far more favorable terms than available to borrowers unrelated to

2    BofI.

3         424.   Defendants Garrabrants, Micheletti, Grinberg, Mosich, and Argalas

4    were motivated to engage in the fraud alleged herein because each of them

5    benefited from related-party loans as described above.

6         425.   Defendant Garrabrants was also motivated to engage in the fraud

7    alleged herein because he was eligible to receive, and did receive, cash bonuses

8    during the Class Period pursuant to BofI's "Incentive Cash Bonus Plan."   In fact

9    throughout the Class Period, BofI disclosed in its 2013, 2014 and 2015 Proxy

10   Statements that Garrabrants's salary is significantly below his peer group but with

11   the incentive-based compensation added to his salary his total compensation is in

12   line with his peers.  The Incentive Cash Bonus Plan awarded bonus compensation

13   up to 105% of Garrabrants's base salary if he met five metrics, including

14   "increas[ing] non-GAAP securities adjusted earnings per share," which was

15   weighted between 0% and 20% out of 105%.  (2015 Proxy Statement at 18).  For

16   fiscal 2015, BofI's Compensation Committee determined that a bonus equal to

17   97.5% of Garrabrants's base salary of $375,000 in 2015 was appropriate.  (*Id.*)

18   The Compensation Committee determined that Garrabrants scored the maximum

19   20% for the metric of increasing non-GAAP securities adjusted earnings per share.

20   (*Id.*)  However, with respect to a different metric, that is, "maintain[ing] the Bank's

21   history of good regulatory relations," which was also weighted between 0% and

22   20%, Garrabrants scored only 10%.  (*Id.*)

23        426.   Defendants Garrabrants, Micheletti, Grinberg, Mosich, and Argalas

24   also had the requisite experience and expertise to understand and prepare BofI's

25   financial statements.  According to the 2015 Proxy Statement and BofI's website,

26   Garrabrants has an MBA degree and is a CFA.  Micheletti is a licensed CPA and

27   formerly worked as an auditor at Deloitte & Touche LLP.  Grinberg has an MBA

28   degree and a Bachelor's degree in accounting, is a CPA, and is a former partner at

1    Deloitte & Touche.  Further, as discussed further below, BofI's Board determined

2    Grinberg meets the definitions of "audit committee financial expert" adopted by

3    the SEC and included in NASDAQ's rules for listed companies.  Mosich and

4    Argalas each have an MBA degree.  Accordingly, the Individual Defendants

5    possessed the training and experience to understand that BofI's financial

6    statements were misstated.

7        427.   Additionally, on information and belief and according to allegations

8    interposed by Erhart and plaintiffs in pending shareholder derivative litigation

9    against BofI's Board and chief officers, since at least December 2014 Grinberg,

10   Mosich, and Argalas, as members of the Audit Committee of BofI's Board, were

11   aware of the details of Erhart's complaints of violations of law committed by BofI

12   senior officers, including Garrabrants:  In mid-December 2014, John Tolla revised

13   a draft evaluation of Erhart's job performance that had been prepared by Jonathan

14   Ball.  As a result of those revisions, Tolla downgraded Erhart's performance in

15   retaliation for his whistleblowing activities.  Concerned about the propriety of

16   Tolla's retaliation against Erhart, Ball directly advised the Audit Committee of

17   Tolla's downgrading of Erhart's performance evaluation.  The Audit Committee

18   then ratified and approved Tolla's retaliation against Erhart by failing to instruct

19   Tolla to restore Erhart's performance grade to the level Ball had determined.

20       428.   Further, on information and belief, on March 12, 2015 BofI's Chief

21   Legal Officer Eshel Bar-Adon met with Erhart and informed him that Bar-Adon

22   was acting as General Counsel to the Audit Committee; accordingly, Grinberg,

23   Mosich, and Argalas had actual knowledge of Erhart's whistleblower complaints,

24   and had directed Bar-Adon to meet with Erhart regarding the activities at issue.

25   Moreover, as Chairman of the Audit Committee, Grinberg is the person at BofI to

26   whom all employee complaints regarding suspected unlawful conduct were

27   directed.  Accordingly, Erhart's whistleblower complaints would have been

28

1   directed to Grinberg, who would then have shared them with fellow Audit

2   Committee members Mosich and Argalas, and later the full Board.

3                          **LOSS CAUSATION**

4        429.   Defendants' unlawful conduct alleged herein directly caused the

5   losses incurred by Plaintiff and the Class.  Throughout the Class Period, the price

6   of BofI's common stock was artificially inflated as a direct result of Defendants'

7   materially false and misleading statements and omissions.

8        430.   The true facts became known by investors and the market through a

9   series of partial corrective disclosures, some by third parties and some by

10  Defendants, beginning on or around August 28, 2015.  By making

11  contemporaneous additional misstatements in the form of denials in response to

12  partial disclosures by third parties, or by failing to reveal the falsity of all

13  statements at one time, artificial inflation remained in the price of BofI stock

14  throughout the entirety of the Class Period.

15       431.   As the true facts become known and/or the materialization of the risks

16  that had been concealed by Defendants occurred, the price of BofI common stock

17  declined as the artificial inflation was removed from the market price of the stock,

18  causing substantial damage to Plaintiff and the members of the Class.

19       432.   The declines in the price of BofI common stock and the resulting

20  losses are directly attributable to the disclosure of information and/or

21  materialization of risks that were previously misrepresented or concealed by

22  Defendants.  Had Plaintiff and other members of the Class known of the material

23  adverse information not disclosed by Defendants or been aware of the truth behind

24  their material misstatements, they would not have purchased BofI common stock

25  at artificially inflated prices.

26       433.   From the time that the truth about Defendants' wrongful conduct first

27  emerged until the time the market learned of BofI's true financial condition, the

28  price of BofI common stock declined in a series of material steps from $30.38 per

share (the closing price on August 27, 2015, one trading day immediately preceding August 28, 2015), to $15.92 per share on February 3, 2016, the last day of the Class Period—a total decline of over 47.6%—as the market processed each set of previously undisclosed facts.  Each disclosure and/or materialization of previously concealed risks removed a portion of the artificial inflation from the price of BofI's common stock caused by Defendants' prior material misrepresentations and omissions, and directly caused Plaintiff and the Class to suffer damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

434.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons and entities who purchased or acquired BofI's publicly traded common stock between September 4, 2013 and February 3, 2016, inclusive, as well as purchasers of BofI call options and sellers of BofI put options, (the "Class").  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

435.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, BofI common stock actively traded on NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by BofI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

436.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

437.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

438.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BofI;

- whether the Individual Defendants caused BofI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BofI common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

439.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

1

## **FRAUD-ON-THE-MARKET PRESUMPTION**

2      440.   Plaintiff will rely upon the presumption of reliance established by the

3  fraud-on-the-market doctrine, in that:

4            a.      Defendants made public misrepresentations or failed to disclose

5  material facts during the Class Period;

6                  b.      the misrepresentations and omissions were material;

7            c.      BofI common stock was traded in an efficient market during

8  the Class Period;

9            d.      the Company's shares were liquid and traded with moderate to

10  heavy volume during the Class Period;

11            e.      the Company traded on the NASDAQ, and was covered by

12  multiple analysts;

13            f.      the misrepresentations and omissions alleged would tend to

14  induce a reasonable investor to misjudge the value of the Company's securities;

15  and

16            g.      Plaintiff and members of the Class purchased and/or sold BofI

17  common stock between the time Defendants failed to disclose or misrepresented

18  material facts and the time the true facts were disclosed, without knowledge of the

19  misrepresented or omitted facts.

20      441.   Based upon the foregoing, Plaintiff and the Class are entitled to a

21  presumption of reliance upon the integrity of the market.

22      442.   Alternatively, Plaintiff and the Class are entitled to the presumption of

23  reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of*

24  *Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted

25  material information in their Class Period statements in violation of a duty to

26  disclose such information, as detailed above.

27

28

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1

## ADDITIONAL CONTROL-PERSON ALLEGATIONS

2    443.   As detailed above, each of the Individual Defendants was a

3   "controlling person" of BofI during the Class Period within the meaning of Section

4   20(a) of the Exchange Act.

5    444.   Defendant Garrabrants served throughout the Class Period as

6   President, CEO, and a director of BofI; was intimately involved in the day-to-day

7   management of the Company; and bore responsibility for the truthfulness and

8   accuracy of the Company's financials and other statements.  Among other things,

9   Garrabrants signed SOX certifications included in SEC filings by the Company

10   attesting that, to the best of his knowledge, the reports "fully compl[y] with the

11   requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934"

12   and "the information contained in the Report[s] fairly presents, in all material

13   respects, the financial condition and results of operations of the Company."

14   Garrabrants made numerous other statements on BofI's behalf during the Class

15   Period.  *See* ¶¶ 246-369, *supra*.  Additionally, as detailed throughout this

16   Complaint, Garrabrants directly participated in, knew of, or recklessly disregarded

17   the misconduct giving rise to liability under Section 10(b) of the Exchange Act.

18   *See* ¶¶ 43-245, *supra*.

19    445.   Defendant Micheletti served throughout the Class Period as Executive

20   Vice President and CFO of BofI, was intimately involved in the day-to-day

21   management of the Company, and bore responsibility for the truthfulness and

22   accuracy of the Company's financials and other statements.  Among other things,

23   Micheletti signed SOX certifications included in SEC filings by the Company

24   attesting that, to the best of his knowledge, the reports "fully compl[y] with the

25   requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934"

26   and "the information contained in the Report[s] fairly presents, in all material

27   respects, the financial condition and results of operations of the Company."

28   Micheletti made numerous other statements on BofI's behalf during the Class

Period.  *See* ¶¶ 246-369, *supra*.  Additionally, as detailed throughout this Complaint, Micheletti directly participated in, knew of, or recklessly disregarded the misconduct giving rise to liability under Section 10(b) of the Exchange Act.  *See* ¶¶ 43-245, *supra*.  Further, regardless of whether Micheletti is liable under Section 10(b), he is liable under Section 20(a) as a "controlling person" of BofI, which is a primary violator of the securities laws, as detailed in this Complaint.

446.  Defendant Grinberg served throughout the Class Period as a director of BofI as well as Chairman of the Board's Audit Committee, Chairman of the Board's Compensation Committee, and a member of the Board's Nominating Committee.  He also serves as Chairman of the Audit Committee of the Board of Directors of BofI Federal Bank.  Further, BofI's Board determined Grinberg "meets the definitions of 'audit committee financial expert' adopted by the SEC and included in NASDAQ's rules for listed companies."  (2015 Proxy Statement at 9).  The SEC defines "audit committee financial expert" as "a person who has the following attributes":

(A) An understanding of generally accepted accounting principles and financial statements;

(B) The ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves;

(C) Experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrant's financial statements, or experience actively supervising one or more persons engaged in such activities;

(D) An understanding of internal control over financial reporting; and

(E) An understanding of audit committee functions.

17 C.F.R. § 229.407(d)(5)(ii).

447.  Defendant Mosich served throughout the Class Period as Vice Chairman of BofI's Board and as a member of the Board's Audit Committee.  He

also serves as a member of the Audit Committee, ALCO, Credit, and Operations and Technology Committees of the Board of BofI Federal Bank.

448.   Defendant Argalas served throughout the Class Period as a director of BofI and as a member of the Board's Audit Committee.  He also serves as a member of the Audit Committee and the Internal Assets Review Committee of the Board of BofI Federal Bank.

449.   As noted above, Grinberg, Mosich, and Argalas signed the Report of the Audit Committee included in BofI's 2015 Proxy Statement filed with the SEC on September 4, 2015, which contained false or misleading statements of material fact or falsely or misleadingly omitted to state material facts.  *See* ¶¶ 373-376, *supra*.

450.   As members of BofI's Board and the Audit Committee, Grinberg, Mosich, and Argalas were charged with overseeing the Company's risk exposure. According to the 2015 Proxy Statement, for example:

> The Board of Directors, together with the Audit Committee, the Nominating, and the Compensation Committee as well as four risk committees, which are the Credit, the IAR, the Operations and Technology and the ALCO committees, coordinate with each other to provide enterprise-wide oversight of our management and handling of risk.

(*Id.* at 8.)

451.   Those committees, the 2015 Proxy Statement continued, "report regularly to the Board of Directors on risk-related matters and provide the Board of Directors with insight about our management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational and reputational risks."  (*Id.*)  The Board "is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees."  (*Id.*)

452.   Further, the Audit Committee—on which Grinberg, Mosich, and Argalas served during the Class Period—"primarily oversees those risks that may

1    directly or indirectly impact [BofI's] financial statements, including the areas of

2    financial reporting, internal controls and compliance with public reporting

3    requirements."  (*Id.*)

4        453.    Given their positions as directors and members of the Audit

5    Committee of BofI's Board (including Grinberg's status as an "audit committee

6    financial expert"), Grinberg, Mosich, and Argalas bore responsibility for

7    overseeing risks relating to financial reporting, internal controls, and compliance—

8    all of which were implicated by the misconduct detailed in this Complaint.  These

9    Defendants' responsibilities and activities at BofI thus demonstrate they had the

10   ability to control and influence the Company.

11       454.    That Grinberg, Mosich, and Argalas signed the Report of the Audit

12   Committee included in the Company's 2015 Proxy Statement further demonstrates

13   their ability to control and influence the Company.

## COUNT I

### (Against All Defendants[84] for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

15       455.    Plaintiff repeats and realleges each and every allegation contained
16
17   above as if fully set forth herein.
18
         456.    This Count is asserted against Defendants and is based upon Section
19
20   10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated
21
     thereunder by the SEC.

22       457.    During the Class Period, Defendants engaged in a plan, scheme,

23   conspiracy and course of conduct, pursuant to which they knowingly or recklessly

24   engaged in acts, transactions, practices and courses of business that operated as a

25   fraud and deceit upon Plaintiff and the other members of the Class; made various

26   untrue statements of material facts and omitted to state material facts necessary in

27
28   ───────────────
     [84] *See* FN 6, *supra*.  Plaintiff is not amending its Section 10(b) claims against
     Defendants Micheletti, Grinberg, Mosich and Argalas at this time but is preserving
     them for possible future amendment or appeal.

order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BofI common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire BofI common stock and call options, and to sell BofI put options, at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

458.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for BofI securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about BofI's internal controls and compliance with federal law.

459.   By virtue of their positions at BofI, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with deliberately reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of Defendants were committed willfully or with deliberately reckless disregard for

1   the truth.  In addition, each Defendant knew or deliberately recklessly disregarded

2   that material facts were being misrepresented or omitted as described above.

3       460.   Defendants were personally motivated to make false statements and

4   omit material information necessary to make the statements not misleading in

5   order to personally benefit from the sale of BofI securities from their personal

6   portfolios.

7       461.   Information showing that Defendants acted knowingly or with

8   deliberately reckless disregard for the truth is peculiarly within Defendants'

9   knowledge and control.  As the senior managers and/or directors of BofI, the

10  Individual Defendants had knowledge of the details of BofI's internal affairs.

11      462.   The Individual Defendants are liable both directly and indirectly for

12  the wrongs complained of herein.  Because of their positions of control and

13  authority, the Individual Defendants were able to and did, directly or indirectly,

14  control the content of the statements of BofI.  As officers and/or directors of a

15  publicly held company, the Individual Defendants had a duty to disseminate

16  timely, accurate, and truthful information with respect to BofI's business,

17  operations, future financial condition and future prospects.  As a result of the

18  dissemination of the aforementioned false and misleading reports, releases and

19  public statements, the market price of BofI securities was artificially inflated

20  throughout the Class Period.  In ignorance of the adverse facts concerning BofI's

21  operations and quality control processes which were concealed by Defendants,

22  Plaintiff and the other members of the Class purchased or otherwise acquired BofI

23  common stock or call options at artificially inflated prices, or sold BofI put options

24  at artificially inflated prices, and relied upon the price of the stock, the integrity of

25  the market for the stock and/or upon statements disseminated by Defendants, and

26  were damaged thereby.

27      463.   During the Class Period, BofI common stock was traded on an active

28  and efficient market.  Plaintiff and the other members of the Class, relying on the

materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired BofI shares or call options, or sold BofI put options, at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock or call options, or would not have purchased or otherwise acquired them at the inflated prices that were paid or would not had sold said put options or would not have sold them at the inflated prices they received.  At the time of those transactions by Plaintiff and the Class, the true value of BofI stock was substantially lower than the prices paid by Plaintiff and the other members of the Class for stock or call options, or the prices at which Class members sold put options.  The market price of BofI securities declined sharply upon public disclosure of the facts alleged herein, to the injury of Plaintiff and Class members.

464.   By reason of the conduct alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

465.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities referenced above during the Class Period, upon the disclosures that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

466.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

467.   During the Class Period, the Individual Defendants participated in the operation and management of BofI, and conducted and participated, directly and

1    indirectly, in the conduct of BofI's business affairs.  Because of their senior

2    positions, they knew the adverse non-public information alleged herein about

3    BofI's business and quality control.

4         468.   As officers and/or directors of a publicly owned company, the

5    Individual Defendants had a duty to disseminate accurate and truthful information

6    with respect to BofI's internal controls and to correct promptly any public

7    statements issued by BofI which had become materially false or misleading.

8         469.   Because of their positions of control and authority as senior officers

9    and/or directors, the Individual Defendants were able to, and did, control the

10   contents of the various reports, press releases and public filings BofI disseminated

11   in the marketplace during the Class Period concerning BofI's results of operations

12   and internal controls.  Throughout the Class Period, the Individual Defendants

13   exercised their power and authority to cause BofI to engage in the wrongful acts

14   complained of herein, which caused the market price of BofI securities to be

15   artificially inflated.  The Individual Defendants, therefore, were "controlling

16   persons" of BofI within the meaning of Section 20(a) of the Exchange Act.

17        470.   Each of the Individual Defendants, therefore, acted as a controlling

18   person of BofI.  By reason of their senior management positions and/or being

19   directors of BofI, each of the Individual Defendants had the power to direct the

20   actions of BofI, and exercised the same to cause BofI to engage in the unlawful

21   acts and conduct complained of herein.  Each of the Individual Defendants

22   exercised control over the general operations of BofI and possessed the power to

23   control the specific activities comprising the primary violations about which

24   Plaintiff and the other members of the Class complain.

25        471.   By reason of the above conduct, the Individual Defendants are liable

26   pursuant to Section 20(a) of the Exchange Act for the violations committed by

27   BofI.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.       Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.       Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.       Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.       Awarding such other and further relief as this Court may deem just and proper.

SECOND AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1

## DEMAND FOR TRIAL BY JURY

2      Plaintiff hereby demands a trial by jury on all issues so triable.

3

4      Dated:  November 25, 2016       **LIEFF CABRASER HEIMANN &**
                                        **BERNSTEIN, LLP**
5

6
                                        By:  /s/ *Richard M. Heimann*
7                                                Richard M. Heimann
                                                 *Attorney for Lead Plaintiff Houston*
8                                                *Municipal Employees Pension System*
                                                 *Email:  rheimann@lchb.com*
9
                                        Richard M. Heimann (Cal. Bar No. 063607)
10                                       rheimann@lchb.com
                                        Joy A. Kruse (Cal. Bar No. 142799)
11                                       jakruse@lchb.com
                                        Katherine C. Lubin (Cal. Bar No. 259826)
12                                       kbenson@lchb.com
                                        275 Battery Street, 29th Floor
13                                       San Francisco, CA  94111-3339
                                        Telephone:  (415) 956-1000
14                                       Facsimile:  (415) 956-1008

15                                       Daniel P. Chiplock (admitted *pro hac vice*)
                                        dchiplock@lchb.com
16                                       Michael J. Miarmi (admitted *pro hac vice*)
                                        mmiarmi@lchb.com
17                                       250 Hudson Street, 8th Floor
                                        New York, NY  10013
18                                       Telephone:  (212) 355-9500
                                        Facsimile:  (212) 355-9592
19
                                        Sharon M. Lee (*pro hac vice* application pending)
20                                       slee@lchb.com
                                        2101 Fourth Avenue, Suite 1900
21                                       Seattle, WA  98121-2315
                                        Telephone: (206) 739-9059
22
                                        *Counsel for Lead Plaintiff Houston Municipal*
23                                       *Employees Pension System and Lead Counsel for*
                                        *the Proposed Class*
24

25

26

27

28