UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE:<br><br>BofI HOLDING, INC. SECURITIES LITIGATION. | Case No. 3:15-CV-02324-GPC-KSC<br><br><u>CLASS ACTION</u><br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>**[Dkt. No. 88]** |

Before the Court is a Motion to Dismiss the Second Amended Complaint filed by Defendants BofI Holding, Inc., Gregory Garrabrants, Andrew J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas. Dkt. No. 88-1. The motion has been fully briefed. Lead Plaintiff Houston Municipal Employees Pension System ("Lead Plaintiff" or "HMEPS") filed an opposition response on February 3, 2017, Dkt. No. 94, and Defendants filed a reply on February 17, 2017, Dkt. No. 95-1. Upon review of the moving papers, the applicable law, and for the foregoing reasons the Court hereby **DENIES** in part and **GRANTS** in part Defendants' Motion to Dismiss.

**INTRODUCTION & PROCEDURAL HISTORY**

The facts of this case are familiar to both the Court and the parties and were recited at length in the Court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("CAC"). *See generally* Dkt. No. 64. In that order (the "First Motion to Dismiss Order"), the Court concluded that Lead Plaintiff had stated a viable claim for securities fraud under Section 10(b) of the 1934 Securities Act, Rule 10b-5 promulgated thereunder, and Section 20(a) of the Securities Act — one that met the heightened pleading standard of Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA) — against Defendant BofI Holding, Inc. (BofI) and Defendant Gregory Garrabrants. The Court, however, dismissed Defendants Andrew Micheletti, Paul Grinberg, Nicholas Mosich, and James Argalas from the action, having concluded that Lead Plaintiff failed to plead enough for the Court to find that they acted with the requisite scienter or control to be liable under Section 10(b) or Section 20(a).

Lead Plaintiff filed their Second Amended Class Action Complaint[1] ("SAC") on November 25, 2016. Dkt. No. 79. The SAC, comprised of 147 pages and 471 paragraphs of allegations, is virtually identical to the CAC. *Compare* SAC, Dkt. No. 79 *with* CAC, Dkt. No. 26. It contains just 10 more pages of text and 23 more paragraphs of allegations than the CAC. *Id*. Although the Court granted Lead Plaintiff, in its First Motion to Dismiss Order, leave to amend both their Section 10(b) and Section 20(a) claims against Micheletti, Grinberg, Mosich, and Argalas, the new allegations in the SAC are directed at Section 20(a) liability only. As Lead Plaintiff stated in the SAC: "Plaintiff filed this Second Amended Complaint primarily to make clear it asserts Section 20(a) claims against those Defendants notwithstanding the

---

[1] Defendants never moved to dismiss the original class action complaint, Dkt. No. 1, because it was consolidated with a number of other civil actions before dispositive motions were filed. The Consolidated Class Action Complaint ("CAC"), the subject of the previous and first motion to dismiss, followed the Court's consolidation order.

Court's dismissal of the Section 10(b) claims against them.  Plaintiff also, however, retains Section 10(b) claims against those Defendants in this Complaint to preserve them for appeal or in the event discovery reveals additional information supporting those claims." SAC, Dkt. No. 79 at 12 n.6.  In other words, the SAC contains no new allegations as to Lead Plaintiff's previously dismissed Section 10(b) claims against Micheletti, Mosich, Grinberg, and Argalas, but does contain new allegations as to their Section 20(a) liability.  Accordingly and to the extent that Lead Plaintiff has not provided the Court with new allegations or argument as to the Section 10(b) liability of Micheletti, Mosich, Grinberg and Argalas, the Court stands by its previous ruling. *See* First Motion to Dismiss Order, Dkt. No. 64.

Defendants moved to dismiss the SAC on December 23, 2016.  Dkt. No. 88-1. In it, Defendants primarily argue that Lead Plaintiff has failed to state Section 10(b) claims against the remaining individual defendants — Micheletti, Grinberg, Mosich, and Argalas — and that it has also failed to state Section 20(a) claims against those defendants. *See generally id.*  Yet while the focus of their motion to dismiss — per the Court's December 15, 2016 Order Denying Defendants' Ex Parte Application for An Order Increasing The Page Limits On The Briefing, Dkt. No. 87 — was on Lead Plaintiff's amendments to the complaint, the tenor of the motion to dismiss unmistakably seeks to persuade the Court to revisit the conclusions made in its First Motion to Dismiss Order.  In fact, in its conclusion, Defendants state in no uncertain terms that "the Court [should] grant their motion to dismiss the SAC for failure to meet the heightened pleading requirements of the PSLRA, and in particular to dismiss plaintiff's claims against Defendants Micheletti, Grinberg, Mosich and Argalas, with prejudice."  Dkt. No. 88-1 at 31.

Mindful of the fact that the Second Amended Complaint supersedes the First Amended Complaint, *see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989), the Court has accepted, in part, Defendants' invitation to revisit Lead Plaintiff's Section 10(b) claims.  The SAC, like the CAC,

has identified over a hundred of BofI's statements as false and misleading.  *See, e.g.*, Dkt. No. 79 at ¶¶ 246-370.  While the Court continues to adhere to the view that some of these statements are actionable under the securities laws — and therefore, that Lead Plaintiff has pleaded enough to survive a motion to dismiss — the Court is also convinced that many of them are not.  As such and to the extent that Defendants have challenged certain categories of statements as inadequate to support a securities fraud claim, the Court has rendered a decision below for the purpose of whittling down the actionable fraudulent statements and narrowing the scope of future discovery.  The Court's underlying conclusion, however, has not changed, as it continues to find that many of BofI's statements concerning its loan underwriting standards and internal controls were sufficiently false or misleading when made to survive the motion to dismiss and, specifically, the heightened pleading requirements of the PSLRA and Rule 9(b).

## **FACTUAL BACKROUND**

Founded in 1999, BofI[2] is a federally-chartered Internet bank that operates from its headquarters in San Diego, California.  *See* SAC ¶ 3.  BofI is not your typical bank.  Instead of relying on brick-and-mortar branches to generate business, BofI offers its products through retail distribution channels, such as websites, online advertising, a call center of salespeople, referrals from financial advisory firms, and referrals from affinity groups.  *Id.*  BofI is in the business of providing consumer and business products, including checking, savings, and time-deposit accounts, and services, such as financing for residential and commercial real estate, business, and vehicles.  *Id.* ¶¶ 2-3.  BofI is also in the business of consumer and business lending.  *Id.* ¶ 32.  BofI engages in Single Family Mortgage Secured Lending, Multifamily Mortgage Secured Lending, Commercial Real Estate Secured and Commercial

---

[2] "BofI" will refer to both the holding company and its subsidiary, BofI Federal Bank.  SAC ¶ 2.

Lending, Specialty Financial Factoring, Prepaid Cards, and Auto, RV, and other consumer-related lending. *Id.*

BofI has grown tremendously in recent years. *Id.* ¶ 5. Over the last five years, total deposits increased to $5.2 billion, signaling 235% growth, and net income increased from $20.6 million in fiscal year 2011 to $82.7 million in fiscal year 2015. *Id.* Development of the bank's loan portfolio propelled BofI's growth during these years. *Id.* ¶ 44. From 2011 to 2015, BofI's loan portfolio grew from $1.33 billion to $5 billion, representing 274% in growth. *Id.* By the end of calendar year 2015, BofI had a loan portfolio worth $5.715 billion. *Id.* ¶ 32. From September 4, 2013 to February 3, 2016 (the putative "Class Period"), Lead Plaintiff HMEPS and other class members similarly situated purchased BofI's common stock. *Id.* ¶ 1. During the Class Period, BofI's stock reached a high of $142.54 per share, representing a 1,100% increase over its initial public offering of $11.50 per share in 2005. *Id.* ¶ 6. As of January 22, 2016, HMEPS had 63,032,258 in common stock shares outstanding. *Id.* ¶ 34.

On October 13, 2015, *The New York Times* reported that a formal internal auditor at BofI had filed a federal whistleblower lawsuit ("the *Erhart* Case")[3] alleging that BofI was engaged in widespread misconduct. *Id.* ¶ 20. After the *Erhart* Case was filed, the price of BofI's stock fell by $10.72 per share (or $42.87 per share on a pre-split adjusted basis), or by 30.2%, and closed at $24.78 on October 14, 2015. *Id.* ¶ 21. The total capital loss amounted to $675 million. *Id.* The price of Defendants' stock then continued to decrease through February 3, 2016 (i.e., the last day of the Class Period). *Id.* ¶ 22. Lead Plaintiff now alleges that the decline in the market value of BofI's securities caused Lead Plaintiff, along with the other Plaintiffs, to suffer significant damages. *Id.*

---

[3] *Erhart v. BofI Holding, Inc.*, Case No. 15-cv-2287-BAS-NLS (S.D. Cal).

In addition to BofI, Lead Plaintiff has named five individuals as defendants in this action, all of whom served as BofI executives throughout the Class Period. Gregory Garrabrants is the Chief Executive Officer (CEO), President, and a Director of BofI. *Id.* ¶ 35. He has held the CEO position since 2007 and been President and Director since 2008. *Id.* Andrew J. Micheletti is BofI's Executive Vice President and Chief Financial Officer (CFO), and has held those positions throughout the Class Period. *Id.* ¶ 36. Paul J. Grinberg is a member of BofI's Board of Directors and has been the Chairman of the Board Audit Committee, the Board Compensation Committee, and a member of the Board Nominating Committee for the Class Period. *Id.* ¶ 37. Nicholas A. Mosich has served as the Vice Chairman of BofI's Board of Directors and as a member of the Board Audit Committee throughout the Class Period. *Id.* ¶ 38. James S. Argalas served as a member of the Board of Directors and a member of the Board Audit Committee throughout the Class Period. *Id.* ¶ 39.

### 1. Defendants' Alleged Fraudulent Scheme

The gravamen of Lead Plaintiff's claims is that Defendants materially misrepresented the risk of investing in BofI by engaging in knowing and reckless conduct that rendered the bank a "materially-less safe investment than investors were led to believe." *Id.* ¶ 23. The Defendants, Lead Plaintiff alleges, sold themselves as offering "significant cost savings and operation efficiencies derived from its purported branchless business model, as well as low loan losses." *Id.* ¶ 7. Yet while Defendants touted themselves as a "careful, prudent institution" and emphasized their "conservative loan-underwriting standards," Lead Plaintiff alleges that the bank actually had a "troubled identity that resorted to lax lending practices and other unlawful conduct to fraudulently boost its loan volume and earnings." *Id.* ¶¶ 1, 8.

By way of numerous false and misleading representations, BofI allegedly concealed the actual risk of loss present on its ledger and deceived investors as to its true financial condition. In their more than 140-page complaint, Lead Plaintiff identifies hundreds of statements or omissions that were allegedly false or misleading

when made and offers voluminous contentions why those statements amounted to misrepresentations. The heart of Lead Plaintiff's allegations concerns Defendants' deviations from BofI's loan underwriting standards, inadequate internal control and audit measures, inaccurate financial results and risk figures, undisclosed related-party transactions, and other violations of the federal securities laws.

### 2. Defendants' False and Misleading Statements

Lead Plaintiff has identified four types of misleading statements made by BofI during the Class Period: 1) SEC filings; 2) conference calls about the results in SEC filings; 3) press releases about the results in SEC filings; and 4) earnings calls.[4] *Id.* ¶¶ 47, 246-370. With regards to the SEC filings, Lead Plaintiff has specifically identified Defendants' 2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K as misleading, *id.* ¶¶ 255, 309, & 367, as well as Defendants' 10-Q forms for Quarters 1 through 3 of 2014, Quarters 1 through 3 of 2015, and Quarter 1 of 2016, *id.* ¶¶ 261, 274, 288, 318, 332, 344, 393. Most of the press releases and conference calls that Lead Plaintiff has identified refer specifically to BofI's financial earnings as published in the respective SEC filings.

## LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990). Under Rule 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the

---

[4] While Lead Plaintiff identifies many statements made by BofI throughout the SAC, the Court's analysis focuses on those statements identified by Lead Plaintiff in the section entitled "Materially False and Misleading Statements Issued During the Class Period." *See* ¶¶ 246-370.

3:15-CV-02324-GPC-KSC

. . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (citations omitted).

## DISCUSSION

The SAC's voluminous allegations assert that BofI engaged in widespread wrongdoing during the Class Period. For instance, Lead Plaintiff argues that BofI violated the "Ability to Repay Rule," 12 C.F.R. § 1026, *see* SAC ¶¶ 17-24; that it engaged in illicit lending partnerships that ran afoul of the Office of the Comptroller of the Currency (OCC)'s guidance on payday lending, *see id.* ¶¶ 24-36; that it violated the Bank Secrecy Act, among other laws, by making loans to foreign nationals without proper vetting, *see id.* ¶¶ 40-46; that it violated 12 C.F.R. § 215 by failing to disclose related-party loans made to its senior officers, *see id.* ¶¶ 61-68; and more. Defendants, in turn, spend a fair amount of their briefing explaining why BofI's conduct did not amount to a violation of any of these rules or regulations. *See, e.g.*, Dkt. No. 88-1 at 17 (explaining why the SAC's allegations do not demonstrate a violation of 12 C.F.R. § 1026, the Ability to Repay Rule).

The Court observes, however, that the Section 10(b) inquiry — and by extension the Section 20(a) inquiry — is not tantamount to an investigation into

fiduciary misconduct or internal corporate mismanagement. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by [enacting] s 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *see also Retail Wholesale & Dep't Store Union Local 338 Ret. Fund*, 845 F.3d 1268, 1278 (9th Cir. 2017) (rejecting plaintiff's interpretation of Section 10(b) liability because it would "turn all corporate wrongdoing into securities fraud."); *In re GlenFed, Inc. Sec. Litig*., 11 F.3d 843, 849 (9th Cir. 1993) ("Fiduciary misconduct or internal mismanagement of a corporation is an area traditionally left to state law, not federal securities law."), *vacated and remanded by In re GlenFed Sec. Litig.*, 60 F.3d 591 (9th Cir. 1995) (en banc) (holding that Rule 9(b) does not require inference of scienter).

Rather, the Court, here, is concerned with whether BofI made material misrepresentations or omissions in its public statements — that is, whether it lied. *See* 15 U.S.C. § 78u–4(b)(1) (creating private actions for when defendants make an "untrue statement of a material fact" or "omit[ ] to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading"). As such, the Court's analysis focuses, not on whether any specific violation of law was committed, but whether the Lead Plaintiff has identified public statements that were rendered false or misleading by the facts alleged in the complaint, including those facts suggesting that BofI's banking practices had fun afoul of the law.

With this background in mind, the Court conducts the following analysis and concludes that Lead Plaintiff has pleaded actionable fraudulent or misleading statements as to BofI's loan underwriting practices and as to its internal controls and compliance infrastructure, but has not sufficiently demonstrated that Defendants' statements about its Allowance for Loan Losses (ALL), Net income/diluted price per share, Loan-to-Value Ratio (LTV), or undisclosed lending partnerships are actionable under the securities laws.

9

# I. <u>Violations of Section 10(b) of the Exchange Act</u>

Section 10(b) of the Securities Exchange Act makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors."  15 U.S.C. § 78j(b). Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ."  17 C.F.R. § 240.10b–5(b).  Rule 10b-5 also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5(a), (c).

To state a securities fraud claim under 10(b) of the Act and Rule 10b-5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.[5]  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).  A complaint alleging claims under Section 10(b) and Rule 10b-5 must also satisfy the pleading requirements of both the PSLRA and Rule 9(b).  *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).

Any complaint alleging fraud must comply with Rule 9(b), which requires the complaint to state with particularity the circumstances constituting fraud.  Fed. R. Civ. P. 9(b).  Malice, intent, knowledge, and other conditions of a person's mind may

---

[5] Defendants do not, and have never, challenged the third, fourth, or fifth elements of the prima facie case.  The Court will follow suit and address whether Lead Plaintiff's allegations have met the first and second elements.

3:15-CV-02324-GPC-KSC

be alleged generally. *Id.* To satisfy this heightened pleading requirement, the plaintiff must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (internal citations omitted). In addition, the complaint must indicate "what is false or misleading about a statement, and why it is false" and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1107 (9th Cir. 2003) (internal citations omitted).

Complaints alleging violations of Section 10(b) of the Exchange Act must also comply with the Private Securities Litigation Reform Act, codified at 15 U.S.C. § 78u–4(b)(1). The PSLRA imposes a heightened pleading requirement for securities fraud actions brought under § 10(b) and Rule 10b-5, requiring that falsity and scienter be plead with particularity. *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1200 (2013); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Congress enacted it into law in 1995 to curb abuses of securities fraud litigation. *Amgen*, 133 S. Ct. at 1200. Such abuses included "nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and manipulation by class action lawyers." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007).

Under the PSLRA's heightened pleading instructions, a complaint alleging that a defendant made a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs*, 551 U.S. at 321. In order for an omission to be actionable, the omitted information must have been "necessary . . . to make the statements made,

in light of the circumstances under which they were made, not misleading." *Retail Wholesale*, 845 F.3d at 1278.

Actionable misrepresentations or omissions must also be material to investors. 15 U.S.C. § 78u–4(b)(1)(A)–(B). "The materiality of the misrepresentation or an omission depends upon whether there is 'a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale*, 845 F.3d at 1274 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

## 1. Material Misrepresentations

Determining the sufficiency of material misrepresentations alleged in a securities fraud complaint requires a court to make two inquiries. First, and as stated above, the court must assess "the reason or reasons" why the statements are misleading. 15 U.S.C. § 78u–4(b)(1). Second, and often as a threshold matter, the court must also analyze whether the statement itself could be a misleading statement under Section 10(b).

"[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). In assessing whether a statement is actionable or not, the Ninth Circuit distinguishes between "puffery" and misrepresentations. *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). "'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). "Mere puffery" is "extremely unlikely to induce consumer reliance." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008). Consumer reliance, in turn, is affected "by specific rather than general assertions." *Id.* "Thus, a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable

statement of fact while a general, subjective claim about a product is non-actionable puffery." *Id.* In other words, misleading statements must be "capable of objective verification." *Retail Wholesale*, 845 F.3d at 1275.

"Vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are not capable of objective verification and are not actionable. *See In re Cutera Sec. Litig.*, 610 F.3d at 1111. Statements that are preceded by qualifiers such as "We believe" are similarly not actionable as they cannot be measured as true or false on an objective standard. *See Or. Pub. Empls. Ret. Fund*, 774 F.3d at 606-07. Aspirational statements, that emphasize commitment to certain values or goals, are not capable of objective verification either. *See Retail Wholesale*, 845 F.3d at 1276. Also generally immune from Section 10(b) challenges, are "forward-looking statements." *See* U.S.C. § 78–u5(i)(1)(A) (PSLRA "safe harbor" provision for certain forward-looking statements); *see also In re Cutera Sec. Litig.*, 610 F.3d at 1111. Forward-looking statements, unlike actionable statements, are not "descriptive of historical fact." *S.E.C. v. Todd*, 642 F.3d 1207, 1221 (9th Cir. 2011) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001)).

## A. Loan Underwriting Standards

The allegations set forth in the SAC demonstrate with sufficiently particularity that many of BofI's statements concerning its loan underwriting standards and credit quality were materially false and misleading at the time they were made.

CEO Garrabrants, in a press release and a conference call concerning BofI's Q1 2015 results filed November 4, 2014, made a variety of statements that highlighted BofI's "record" financial results as the result of "strong credit discipline." *See* SAC ¶ 319.

[1] Garrabrants also touted that "[w]e continue to have an unwavering focus on credit quality of the bank *and have not sacrificed credit quality to increase origination.*" He further claimed that "[o]ur strong credit discipline and low loan to value ratio of portfolio had resulted in

consistently low credit losses and servicing costs." *Id.* ¶ 324 (emphasis added).

[2] In the release, Garrabrants was quoted as stating, in relevant part, that BofI's "*[s]trong loan growth was achieved while maintaining high quality credit standards[.]*" *Id.* ¶ 320 (emphasis added).

[3] "For all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment . . . In evaluating a multifamily or commercial credit, we consider all relevant factors including . . . [assets, payment history at BofI, other financial resources, net operating income, debt service, and appraised value]." *Id.* ¶ 305.

[4] "Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators." *Id.* ¶ 250 (made with respect to loan underwriting standards generally).

[5] "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products." *Id.* ¶ 298 (made with regard to single-family loan origination).

After having reviewed these statements, for a second time, the Court is still convinced that they were false or misleading when made. There is ample evidence in the SAC, as was the case with the CAC, that BofI was not adhering to high credit quality standards and that it had, in fact, begun to "sacrifice credit quality to increase origination" and that its "strong loan growth" was not the result of "maintaining high credit quality standards."

In reaching this conclusion, the Court was particularly influenced by the allegations attributed to a handful of confidential witnesses, which — if true — demonstrate that much of BofI's loan growth was due to management's knowing loosening of credit quality standards.

Take the allegations attributed to CW 1, for example. CW 1 was a former Senior Underwriter at BofI's San Diego Headquarters. SAC ¶ 54. According to

CW 1, "beginning in early 2014" him and his group "were being pressured by BofI's Executive Vice President and Chief Credit Officer Thomas Constantine, as well as Leigh Porter, who was in charge of BofI's Multifamily–Income Property Lending group, to underwrite loans that CW 1 was not comfortable signing off on and that did not make economic sense for BofI to issue." *Id.* CW 1 went on to give an example of such a loan.

In mid-2014, CW 1 worked on a loan for a multi-family property in Laguna Beach, California that was to be leveraged at a LTV of 70% to 75%. *Id.* ¶ 55. "According to CW 1, the borrower sought a cash-out refinancing loan of several million dollars but had bad credit and no cash." *Id.* CW 1 then recalled how he "reviewed bank statements provided by the borrower that showed less than a $100 balance in some accounts, including one account that had a negative balance." *Id.* These facts led CW 1 to believe that the borrower "was using the property basically to support a lifestyle the borrower no longer had the money to support" and that her "spending habits outstripped her income." *Id.* ¶¶ 55, 57. CW 1 further noted that BofI had "already issued a highly leveraged refinancing loan for a mixed-use property to the same borrower" and that "since the first cash-out refinancing loan from BofI, the borrower had taken on an additional $80,000 in debt from Mercedes-Benz, which CW 1 believed indicated the borrower had recently purchased a new luxury vehicle." *Id.* ¶¶ 56-57. CW 1 then noted that for these reasons and because "the operating standards of the property showed barely any cash flow" — the primary factor assessed by BofI for multifamily and commercial loans, *see supra* statement [3] — she recommended against financing the property. *Id.*

Notwithstanding his recommendation, however, BofI issued the loan. The SAC recounts how CW 1 expressed her concerns about the approval to the Chief Credit Officer, Thomas Constantine, but that he brushed them aside saying "that the transaction was a good deal for BofI" because, "even if it had to foreclose on the underlying properties," BofI would take control of a valuable property. *See id.* ¶ 58.

15

The SAC further alleges that Constantine's comments were "at odds with the ability-to-repay/QM rule, which does not include a property's foreclosure value among the factors that should be considered in determining a borrower's ability to repay a loan." *Id.* ¶ 59

CW 1, however, was not the only former employee who described BofI's lending practices differently than executive management. CW 2, who worked in the Multifamily–Income Property Lending group and later in the Commercial & Industrial (C&I) Lending Group, worked on a multimillion-dollar C&I loan in mid-2014 for a property located in downtown San Diego. *Id.* ¶ 63. According to CW 2, the property was owned by an individual who had hoped to build a hotel on the property and the borrower was a limited liability company. *Id.* ¶¶ 63-64. CW 2 explained that the property "had been listed for sale for three years at approximately $13 million, which . . . indicated that the property was not worth $13 million." *Id.* ¶ 63. As such, when an appraiser, who was a friend of Chief Credit Officer Constantine, appraised the property at $18 million, CW 2 "refused to recommend the loan." *Id.* CW 2 explained that his refusal to approve the loan was also due, at least in part, to a "suspicious clause" in the borrower's LLC agreement that CW 2 "thought was part of a scam designed for the owner to regain ownership of the property." *See id.*

CW 2 informed Constantine and the BofI loan originator that he would not approve the loan, and he maintained his position even after Constantine "pressured" him to approve it. *Id.* ¶ 65. Nonetheless, however, Garrabrants, eventually approved the loan upon Constantine's recommendation, for between $11 and $13 million dollars with an appraised value of $18 million. *Id.* According to CW 10, a senior underwriter who worked at BofI just prior to the Class Period, it was not unusual for

BofI's executive management to fund loans that other underwriters "declined to sign off on," as was the case for the loan that CW 2 refused to approve.[6] *Id.* ¶ 68.

The allegations attributed to CW 1 and CW 2, at the very least, render "false or misleading" BofI's statements in November 2014 that they "ha[d] not sacrificed credit quality to increase origination" and that the Company's "strong loan growth was achieved while maintaining high quality credit standards." Both statements were made by BofI's CEO Garrabrants, the former during a conference call with analysts and investors, in which Micheletti participated, and the latter in the corresponding press release. Both are affirmative statements about the origins of BofI's "record" financial results. And both represent to the public that the Company had increased its revenue without resorting to "race-to-the-bottom" tactics, and specifically, that BofI had not sacrificed credit quality to issue more loans. The above-mentioned confidential witness allegations, however, and to say nothing of the other allegations in the complaint, render that affirmative message not just misleading, but untrue.

A statement is misleading it if would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). The CW allegations recited above make evident that the reality of BofI's loan underwriting practices, on the ground, in 2014, differed materially from the representations made by BofI in its disclosures made in November 2014. While BofI's management assured investors that its loan originations were the result of anything but deteriorating credit standards, former underwriters at BofI painted a

---

[6] As the Court stated in its previous Motion to Dismiss Order, *see* Dkt. No. 64 at 18 n.5, the fact that CW 10 worked at BofI before the Class Period does not diminish the probative value of his allegations. The Court finds that CW 10's allegations are relevant insofar as they corroborate the allegations of other CWs and tend to indicate that BofI was engaged in a pattern of misconduct that began before the Class Period and extended into it.

picture of a bank that made end-runs around the procedures, controls, and persons tasked with ensuring that the Company adhered to high credit standards.

Former underwriters were "pressured" by BofI's management to approve loans that the underwriters refused to recommend because they did not meet high credit-quality standards. Those employees, in turn, expressed their concerns to upper-level management — including the Executive Vice President/Chief Credit Officer (Constantine), the Chief Legal Officer (Bar-Adon), the Chief Lending Officer (Swanson), and the CEO (Garrabrants) — about loans that were approved in spite of their conclusions. Members of management, however, were not only unreceptive to these reservations, but at times they acted in spite of them. That management then sought approval from corporate executives, such as Garrabrants, for loans that assigned underwriters would not approve, lends even greater support to the notion that BofI's management was circumventing conservative underwriting procedures to increase loan origination. Misrepresentations concerning the origins of BofI's loan growth, moreover, would undoubtedly have been material to potential investors as the development of BofI's loan portfolio was the primary driver of the Company's growth during the Class Period and, thus, a key metric in attracting and retaining investors.

In reaching this conclusion, the Court is not persuaded by Defendants' murmurings questioning the reliability of Lead Plaintiff's confidential witnesses or the particularized nature of their allegations. *See* Dkt. No. 88-1 at 18 n.8. As the Court stated in its First Motion to Dismiss Order, the Court finds that the CWs are described with sufficient detail to meet the standard laid out in *Zucco Partners* and in *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005). *See* First Motion to Dismiss Order. Dkt. No. 64 at 17 (citing *Zucco Partners*, 552 F.3d at 991). What is more, the Court is also confident that the specific CW allegations referenced in this Order are reliable and based upon personal knowledge. *See Zucco*, 552 F.3d at 991. As loan underwriters, CW 1 and CW 2 were in a position to evaluate the credit

quality of BofI's potential borrowers, to identify any indicia of risk apparent in the loans they worked on, and to speak to the "pressure" they felt to issue imprudent loans. They had personal knowledge about the loans referenced in the SAC and they would be in a position to testify to that anecdotal evidence were this case to go to trial. *See Berson*, 527 F.3d at 985 (concluding that CW allegations were sufficiently particularized if it was plausible that they "would know" or "could reasonably deduce" a certain fact about the company). Accordingly, there is no reliability issue at this stage.

Moreover, the Court is also satisfied that the CW allegations recounted above are sufficiently particularized to withstand scrutiny under the PSLRA and Rule 9(b). The SAC captures tremendous details concerning the CWs' experiences at BofI. It includes general statements about how the CWs viewed BofI's underwriting practices and specific examples detailing how the approval of particular loans contradicted management's representations about its underwriting practices. The CWs identified above described when the challenged loans were approved (in mid-2014), who approved them or did not approve them (i.e., the underwriter), what their terms were, and under what circumstances they were approved. Such descriptions are more than sufficient to state the circumstances constituting fraud and provide the "reason or reasons" why BofI's representations that it had not sacrificed loan and credit quality to increase loan origination, made on November 14, 2014, were false or misleading when made.

### B. Internal Controls & Compliance Infrastructure

The Court likewise concludes here, as it did in its First Motion to Dismiss Order, that Lead Plaintiff has identified actionable false and misleading statements made by BofI about the adequacy of its compliance infrastructure and internal controls.

The SAC highlights, for instance, the following statements made by Garrabrants, during a conference call, concerning the state of staffing in BofI's various compliance departments:

> [1] "*We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML compliance*. We believe that we are on the same page with our regulators about their expectations." *Id.* ¶ 299 (referencing quarter results before August 7, 2014) (emphasis added).

> [2] "*We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams.*" *Id.* (statement made August 7, 2014) (emphasis added).

Lead Plaintiff contends that these representations were rendered "false and misleading" by CW allegations indicating that BofI had not adequately staffed its BSA and AML compliance along with other internal control departments. The Court agrees.

At least two of the confidential witnesses described their departments as being insufficiently staffed. CW 3, a former BSA and Third Party Risk Officer who was in charge of the department, stated that BofI's "BSA and Third Party Risk Department Team was "understaffed consisting of only three members" throughout his tenure. *Id.* CW 9, a senior accounting officer who reported to Garrabrants, albeit before the Class Period, similarly stated that his department was "short-staffed and [that] Garrabrants did not allow CW 9 to hire additional personnel." *Id.* ¶ 166.

CW 3, moreover, not only described his department as "understaffed" but also described an interaction between himself and CEO Garrabrants that strongly suggests that Garrabrants, too, knew that CW 3's department was understaffed.

CW 3, the SAC explains, was responsible for "develop[ing] bank staff" and for "remediating regulatory issues" with BSA examinations and internal audits, and reported, for a time, directly to John Tolla, BofI's Chief Governance Risk and Compliance Officer and Senior Vice President of Compliance and Audit. *Id.* ¶ 126.

As such and by virtue of his position and responsibility at the Company, CW 3 was also in the position to attend meetings with senior executives, including CEO Garrabrants. *Id.* ¶ 126. At one such meeting, a couple of weeks after CW 3 joined BofI, CW 3 told management that he "needed a lot more people in the BSA department because of the risk Garrabrants was causing BofI to take on." *Id.* And in response, Garrabrants stated that CW 3's tombstone was going to read "died understaffed." *Id.*

The allegations attributed to these CWs render "false or misleading" BofI's representations about the investment and money it was spending on personnel to run its internal control departments. "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985. The above statements were made by Garrabrants during a conference call about BofI's Q4 earnings on August 7, 2014. *Id.* ¶ 297. Both statements represented to investors that BofI had made "significant investments" in their compliance infrastructure, and specifically that they had hired "new personnel" and "beef[ed] up [thei]r compliance teams" in the preceding quarters. *Id.* The CW allegations, however and which the Court takes as true at this stage of the proceeding, give an impression of a different state of affairs.

The message that BofI sent to investors and analysts about its internal control efforts was the opposite of the message it sent to the individuals in charge of implementing the Company's policies. Through the above statements, BofI communicated to its investors that it valued internal controls so much that it invested heavily in upgrades and new personnel to carry them out. The above allegations, however, give every indication that BofI was not receptive to investing in new personnel, that it was not concerned about the stated need for new personnel, and that it did not hire new personnel even after requests from key employees were made. As CW 3 himself stated, his department was "understaffed," it had been that way for

CW 3's entire tenure at BofI, which extended into the Class Period, and it had remained that way despite pleas made to executive management. The Court moreover concludes that such misrepresentations would have been material to investors because whether BofI had the human capacity to enforce its internal controls would inevitably affect its ability to carry out the compliance systems meant to protect the bank, and its stock, from risk.

The Court further concludes that the level of detail provided by CW 3 is sufficiently particularized to withstand Rule 9(b) and PSLRA scrutiny. CW 3 has provided the Court with the information it needs to deduce that the individual had knowledge of the staffing needs of the BSA and Third Party Risk Department, that he was competent to form an opinion about those needs, and that he would have been in a position to communicate and interact with executive management about those needs. Accordingly, the allegations provided by CW 3, and bolstered by those of CW 8, supply the "reason or reasons" why BofI's August 2014 statements about its compliance efforts were false and misleading when made.

Defendants nonetheless seek to undermine the probative value of these "understaffed" allegations by arguing that they are conclusory and that they otherwise lack a temporal nexus with the allegedly false statements made by BofI on August 7, 2014. Dkt. No. 88-1 at 18-19. The Court disagrees.

Defendants argue that Lead Plaintiff's allegation, contributed to CW 3, that the BSA/AML department was "understaffed" at "three members" is irrelevant because it is not clear how "this number of staff members constituted 'understaffing.'" Dkt. No. 88-1 at 18. Defendant argues that Lead Plaintiff should have, instead, presented facts showing "how other similarly situated banks staff their compliance programs or provide details for why this staffing level actually created the risk plaintiff speculates might exist." *Id.* Defendants' argument, however, ignores the fact that Garrabrants himself corroborated CW 3's "conclusion" when he said that CW 3 would "die

understaffed." Indeed, Garrabrants' reaction to CW 3's assertion confirms that he, too, believed the department to be "understaffed."

Defendants' other means of undermining Lead Plaintiff's "understaffed" allegations involves questioning whether CW 3's narrative coincided with the above-mentioned statements made by Garrabrants on August 7, 2014. Defendants argue that CW 3's allegations lack probative value as to the "false or misleading" nature of Garrabrants' August 2014 statements because Lead Plaintiff does not specify when CW 3 and Garrabrants interacted and because it is "likely" that the meeting took place before the Class Period. The Court grants Defendants that the interaction between CW 3 and Garrabrants likely took place before the Class Period. The SAC described CW 3 as working at BofI "prior to and during the Class Period" and the alleged meeting occurred "a couple of weeks after CW 3 joined BofI."

Yet that Garrabrants' comment "likely" occurred before the Class Period does not strip the allegation of its probative value, as Defendants allege. CW 3 said his department was "understaffed" with only "three employees" throughout his time at BofI, which extended into the Class Period (beginning September 4, 2013). That fact alone demonstrates that the short staffing CW 3 complained of persisted into the Class Period and at most within a year of the above statements. While it is true that Lead Plaintiff has not demonstrated how long the "understaffing" existed, or whether it remained true until August 7, 2014 and the preceding "several quarters," the Court is nonetheless satisfied that the proximity between Garrabrants' "died understaffed" statement, CW 3's employment at BofI, and the August 7, 2014 statements is sufficiently close to warrant the reasonable inference that no changes had been made in the interim and that the BSA department remained understaffed during the quarters that were the subject of Garrabrants' statements.

The PSLRA and Rule 9(b) only require that Lead Plaintiff provide particularized reasons why a statement was false or misleading at the time it was made, not that Lead Plaintiff prove its entire case in the complaint and without the

benefit of reasonable inferences.  In fact, the opposite is true.  *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1264 (4th Cir. 2006) (Even under PSLRA's heightened standards, the court "continues to give all reasonable inferences to plaintiffs").  The allegations attributed to CW 3 and CW 8 have put BofI on notice of the "circumstances constituting fraud, " *see* Rule 9(b), and demonstrate that there is nothing "frivolous" about Lead Plaintiff's claims that BofI's compliance departments were understaffed, *see Amgen*, 133 S. Ct. at 1200 (reiterating that Congress enacted the PSLRA to curb abuses of securities fraud litigation).  Accordingly, the Court is satisfied that the above statements made by Garrabrants are actionable as false and misleading statements at this stage of the litigation.

## 2.  Scienter

Plaintiffs must plead scienter with particularity to survive a motion to dismiss a § 10(b) claim.  Scienter encompasses the intent to deceive, manipulate, and defraud. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  To satisfy the requisite state of mind in the Ninth Circuit, "a complaint must 'allege that the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco*, 552 F.3d at 991 (citation omitted).  Recklessness involves "a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers [of] that [which] is either known to the defendant or is so obvious that the actor must have been aware of it."  *In re NVIDIA*, 768 F.3d at 1053 (internal citations omitted).  Facts showing mere recklessness or a motive to commit fraud and opportunity to do so, provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness.  *In re VeriFone*, 704 F.3d at 701.  Thus, to establish a strong inference of deliberate recklessness, plaintiffs must "state facts that come closer to demonstrating intent, as opposed to mere motive or opportunity."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (abrogated on

other grounds by *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

## A. Holistic Review

As stated above, a complaint brought under the PSLRA is well-plead if the facts give rise to a "strong inference" that the defendants acted with the requisite state of mind. In assessing the sufficiency of allegations under Rule 10(b)(5) a district court must view the allegations holistically, not in isolation. *In re VeriFone*, 704 F.3d at 702-03 (discussing holistic review as required by the Supreme Court in *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011)). That is not to say that the court cannot, if it chooses, "engage in an individualized discussion of the complaint's allegations," but rather that it should not "unduly focus on the weakness of individual allegations to the exclusion of the whole picture." *Id.* At this stage, the court must test for allegations of scienter sufficient to justify the case to proceed against the defendant. *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011).

## B. BofI's Scienter

In order for a Section 10(b) claim to lie against BofI, the Court must find a strong inference of scienter for the corporate defendant. Generally speaking, such an inference must be made by pleading scienter as to the individual executive or director who made the misstatement. *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008).

In assessing the scienter of corporate officers, the Ninth Circuit has often spoken in terms of what is not enough to create a strong inference that a corporate officer acted with scienter. In *South Ferry* the Ninth Circuit tackled the question of whether and when the "core operations inference" — that is, the inference that key company officers have knowledge of facts critical to a business' core operations or important transactions — is sufficient to meet the strict pleading standards of the PSLRA. 542 F.3d at 781. There, the court concluded that an officers' position

within a company was not sufficient, on its own, to create a strong inference of scienter, but that a kind of "core inference plus" would be sufficient. *Id.* at 784-85. By way of example, the *South Ferry* court noted that plaintiffs might be able to meet the PSLRA requirement by relying on the core operations inference and by alleging that specific information had been conveyed to management relating to the fraud. *Id.* at 785. In *Zucco*, the Ninth Circuit made clear that SOX certifications are not sufficient "without more" to satisfy the PSLRA requirements. *Zucco*, 552 F.3d at 1004. Finally, in *In re Rigel Pharm., Inc. Sec. Regulation*, the Ninth Circuit concluded that allegations of "routine corporate objectives," or executive compensation based upon corporate goals, were not sufficient by themselves to create a strong inference of scienter, despite the element of motive involved. *See* 697 F.3d 869, 884 (9th Cir. 2012).

Defendants, in this second motion to dismiss, have not proffered any new legal arguments undermining the Court's previous conclusion that Lead Plaintiff's allegations, when viewed holistically, establish that Defendant Garrabrants — and BofI by extension — made the above statements relating to loan underwriting standards and internal control investment and enforcement with the requisite scienter. *See* First Motion to Dismiss Order, Dkt. No. 64. The Court, therefore, adopts that part of its holding in full. *See id.* at 22-25.

In relevant part, the Court explained in its previous order that the same facts that established the falsity of the above-mentioned statements also sufficed to demonstrate that they were made with knowledge or recklessness of their falsity. *See In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).

> The complaint sets forth a number of facts from which the Court can infer that CEO Gregory Garrabrants knew that BofI was deviating from its stated lending practices and failing to maintain adequate internal and audit controls. For one, Plaintiffs' allegations indicate that Garrabrants was actually complicit in misconduct. Confidential Witness 7, who had once attended a meeting with Garrabrants to discuss negative audit findings, stated that Garrabrants not only brushed his findings "under the rug," CAC

¶ 147, but "cleaned up" audit reports that he disagreed with. *Id.* ¶ 174. Then, according to a former BofI Assistant Vice President/Senior Processor of Income Property Lending Operations, Garrabrants had instructed employees to do no further background checks on foreign nationals if their name did not appear on the Office of Foreign Asset Control (OFAC) list. *Id.* ¶ 134. Confidential witnesses who worked at BofI before the Class Period made similar allegations of Garrabrants' complicity. *See id.* ¶ 133 (stating that Garrabrants had instructed BofI's Executive Vice President and Chief Credit Officer to underwrite loans even though they were missing TINs); *id.* ¶ 173 (stating that Garrabrants interfered with the audit committee's duties). Plaintiffs' allegations also set forth facts indicating that Defendant was aware – or should have been aware – of misconduct occurring at the bank. The Complaint contains allegations of a third party risk officer who stated that Garrabrants had said the officer's tombstone would read "died understaffed," in response to the officer's assertion that they needed more people in the Bank Secrecy Act department. *Id.* ¶ 124. Plaintiffs also alleged that a senior underwriter even went so far as to leave concerns about a multi-million dollar loan directly with Garrabrants' assistant, in order to explain why her boss should not have recommended that Garrabrants approve a specific loan over her objection. *Id.* ¶¶ 61-64.

Viewing these allegations holistically, and in light of the fact that Garrabrants was the CEO of BofI throughout the Class Period, had signed the SOX certifications on the company's quarterly and yearly earnings throughout the Class Period, and made repeated representations that BofI had sound underwriting and audit procedures during the Class Period, the Court finds that Plaintiffs have alleged a strong inference of scienter as to Garrabrants. The opposing inference that Defendants would have the Court adopt — that is, that the confidential witnesses are nothing more than "disgruntled" and "low-level" employees making unsubstantiated statements, *see* ECF No. 41 at 4-5 & ECF No. 37 at 17 — is not as strong as the inference that Garrabrants knowingly misrepresented BofI as having conservative credit guidelines, adequate internal controls, and as being in compliance with regulatory obligations. Accordingly, Plaintiffs have sufficiently plead scienter so as to survive Defendants' motion to dismiss.

*Id.* Accordingly, and in light of no compelling new argument to the contrary, the Court yet again holds that the allegations in the SAC are sufficient to demonstrate

that Garrabrants, and BofI by extension, made, at the very least, the above-mentioned statements regarding BofI's loan origination practices and internal controls with the requisite scienter.

### 3. Non-actionable misrepresentations

#### A. Allowance for Loan Losses

Lead Plaintiff challenges successive Form 10-Ks and Form 10-Qs issued by BofI during the Class Period as containing actionable false and misleading statements about BofI's allowance of loan losses ("ALL").[7] SAC ¶ 247 (Form 10-K 2013), ¶ 257 (Form 10-Q Q1 2014), ¶ 270 (Form 10-Q Q2 2014), ¶ 284 (Form 10-Q Q3 2014), ¶ 303 (Form 10-K 2014), ¶ 314 (Form 10-Q Q1 2015), ¶ 328 (Form 10-Q Q2 2015), ¶ 340 (Form 10-Q Q3 2015), ¶ 361 (Form 10-K 2015), ¶ 387 (Form 10-Q Q1 2016). Lead Plaintiff also challenges a statement made by Garrabrants about the ALL during a Q3 2014 conference call. SAC ¶ 293. Defendants counter that Lead Plaintiff has failed to demonstrate that BofI's ALL was "false or that it was insufficient to cover estimable and probable losses to BofI's portfolio." Dkt. No. 88-1 at 22. The Court agrees, but adds that many of the challenged statements identified by Lead Plaintiff are not actionable to begin with.[8]

The ALL, as Defendants explain and as Lead Plaintiff does not dispute, "is a valuation reserve established and maintained by a bank to cover losses that are probable and estimable in its portfolio." Dkt. No. 88-1 at 21. The Third Circuit described the loan loss reserve as follows in *Shapiro v. UJB Fin. Corp.*:

> statement of condition, or balance sheet, account set up by a bank based on its expectations about future loan losses. As losses occur, they are

---

[7] As Defendants point out, an alternative name for the ALL is Allowance for Loan and Leases Losses (ALLL). The Court further notes that "loan loss reserves" is another synonym for the ALLL. *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280-82 (3d Cir. 1992).

[8] A recently published case, *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, --- F.3d ---, 2017 WL 1753276 (9th Cir. May 5, 2017), does not disturb the Court's conclusion as the Court finds that Lead Plaintiff has failed to demonstrate that BofI's ALL statements were false or misleading when made.

charged against this reserve. That is, the loan account is credited and the reserve account is debited. The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve.

964 F.2d 272, 281 (3d Cir. 1992) (citing American Bankers Assoc., *Banking Terminology* 215 (1989)).  According to the *Shapiro* court, and based on its review of financial authorities, calculating and assessing the adequacy of the loan loss reserve is no straightforward task as there is "no single method for evaluating and setting loan loss reserves, perhaps because no method has proven foolproof."  *See id.* (citing C. Edward McConnell, *Loan Loss Reserve Mgmt. & Unwise Lending Practices, in Bank Credit* 354 (Herbert V. Prochnow ed. 1981)).  And "[n]o matter what method is used, the economic judgments made in setting loan loss reserves can be validated only at some future date."  *See id.* (citing McConnell).

With this background in mind, the Court concludes that the majority of the statements that Lead Plaintiff quotes from the Form 10-Ks and Form 10-Qs are not actionable as misleading because they are not "objectively verifiable."

BofI explained that . . . [1] "[w]e are committed to maintaining the allowance for loan losses at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio . . . "[9]

[2] "[t]he Company's goal is to maintain the allowance for loan losses (sometimes referred to as the allowance) at a level that is considered to be commensurate with estimated probable incurred credit losses in the portfolio" and that [3] "the Company believes that the allowance for loan losses is adequate at September 30, 2013."

---

[9] This statement is repeated verbatim with regards to the 2014 Form 10-K and 2015 Form 10-K. *See* ¶¶ 303, 361.

29

[4] "BofI reiterated its goal in maintaining ALL, as described earlier in Form 10-Qs filed by BofI, and, further, assured that "[it] believes that the allowance for loan losses is adequate at December 31, 2013[.]"[10]

SAC ¶¶ 247, 257, 270, 284, 303, 314, 328, 340, 361, 387. These statements are classic corporate "puffery." Aspirational statements about what BofI is "committed to" and what its "goals" are, are not objectively verifiable. *See Retail Wholesale*, 845 F.3d at 1276 (aspirational statements, that emphasize commitment to certain values or goals, are not capable of objective verification). Statements of opinion, like those prefaced with "We believe," are similarly not actionable. *See Or. Pub. Empls. Ret. Fund*, 774 F.3d at 606-07. Accordingly and because the Court cannot quantify these statements for their truth or falsity, they are not actionable.

Those statements that are "capable of objective verification," however, do not fare any better. Lead Plaintiff argues that each of BofI's stated loan loss reserve calculations[11] were false and misleading when made because:

> (i) BofI engaged in lax lending practices that subject the Company to significant risk of loss and potential regulatory and government actions (see ¶¶ 43-157); (ii) BofI's ALL failed to account for likely losses on high risk loans BofI underwrote and originated, including loans BofI made pursuant to off-balance sheet activities (see ¶¶ 151-57); (iii) BofI's off-balance sheet activities included undisclosed lending partnerships with Quick Bridge, BofI Properties, and others (see ¶¶ 69-108); (iv) BofI's average LTV failed to account for undisclosed high risk loans BofI issued (see ¶¶ 43-157); and (v) BofI failed to implement and enforce adequate internal controls (see ¶¶ 158-66).

SAC ¶ 255. The SAC mistakes quantity for quality. Pointing the Court to hundreds of paragraphs of allegations of fraud generally is not the same as providing the Court

---

[10] This statement is repeated verbatim with regards to the Q3 2014 Form 10-Q, 2015 Q1 Form 10-Q, Q2 2015 Form 10-Q, Q3 2015 Form 10-Q, and Q1 2016 Form 10-Q. *See* ¶¶ 284, 314, 328, 340, 387.

[11] Each of these statements are virtually identical, and differ only with regards to the date and corresponding ALL. *See, e.g.*, ¶ 247 ("In the 2013 Form 10-K, BofI also reported $2.3 billion in loans held for investment, and ALL of $14.182 million, as of June 30, 2013.")

with particularized "reason or reasons" why BofI's loan loss calculations were false or misleading at the time they were made. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("But this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se false* based on the plaintiff's allegations of fraud generally.") (emphasis in original).

This lack of specificity is reason alone to dismiss this category of statements. *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002) ("Although the allegations here are voluminous they do not rise to the level of specificity required under the PSLRA") *overturned on other grounds by Proctor v. Vishay Intertechnology Inc.*, 584 F.3d 1208 (9th Cir. 2009). For even taking as true all of Lead Plaintiff's allegations concerning BofI's "lax lending practices," "off-balance sheet activities," "average LTV," "failure to account for likely loan losses," and "[in]adequate internal controls," and comparing them to the above statements, the Court is still left speculating as to why those facts rendered BofI's loan loss reserve calculations false at the time they were made. For example, at paragraph ¶ 154 of the SAC, Lead Plaintiff recounts BofI's policy on the allowance for loan losses. Lead Plaintiff has not, however, explained how that policy has been violated or how the existence of that policy otherwise renders BofI's loan loss reserve calculations false or misleading.

Similarly, at ¶ 155, Lead Plaintiff asserts that BofI "consistently maintained a low ALL" that was a half to a whole percentage point below the average ALL for comparable financial institutions and that was allegedly attributable to "strong credit discipline." And yet, Lead Plaintiff has failed to explain how merely having a low loan loss reserve is enough to render its loan loss calculation false or misleading. As the Third Circuit explained in *Shapiro*, loan loss reserve calculations are a question of economic judgment and can be calculated and evaluated in a variety of ways. The Court, therefore and absent any ascertainable theory of how BofI specifically

materially misrepresented its ALL calculation, cannot conclude that BofI's loan loss reserve calculation was a falsehood as opposed to an economic judgment that, in hindsight, proved to be unwise or imprudent or negligent.[12]  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) ("In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood."); *see also South Ferry*, 542 F.3d at 784 ("The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading "fraud by hindsight.").

Accordingly, the Court finds that BofI's loan loss reserve calculations, along with its statements about how it calculates that figure,[13] are insufficiently pleaded to withstand scrutiny under Rule 9(b) and the PSLRA.

## B. Net Income and Diluted Shares

Lead Plaintiff asserts that BofI's statements announcing its net income and diluted price per share were also false and misleading when made for the same "reason or reasons" identified above.  *See* SAC ¶ 246 (Form 10-K 2013), ¶ 256 (Form 10-Q Q1 2014), ¶ 269 (Form 10-Q Q2 2014), ¶ 283 (Form 10-Q Q3 2014), ¶ 302 (Form 10-K 2014), ¶ 313 (Form 10-Q Q1 2015), ¶ 327 (Form 10-Q Q2 2015), ¶ 339 (Form 10-Q Q3 2015), ¶ 360 (Form 10-K 2015),  ¶ 386 (Form 10-Q Q1 2016).

---

[12] Indeed, even if Lead Plaintiff could have made such a demonstration, it is doubtful that Lead Plaintiff, given the way they chose to organize the complaint, could have successfully argued that the SAC's allegations gave rise to a strong inference that the allegedly false or misleading ALL statements had been made with the requisite scienter.

[13] *See* SAC ¶¶ 247, 303, 361 ("[A]llowance for loan losses is maintained at a level estimated to provide for probable incurred losses in the loan portfolio," . . . [] "management performs an ongoing assessment of the risks inherent in the portfolio."); *see also id.* ¶ 293 ("[o]ur current level of loan loss reserve reflects the low-risk and low loan-to-value ratio in the current portfolio.").

The Court, however, finds that the "reason or reasons" provided by Lead Plaintiff, which are the same as those identified *supra* Section I.3.A, do not state with sufficient particularity why BofI's stated income and diluted price per share, specifically, were false or misleading when made. *See Metzler*, 540 F.3d at 1070 ("But this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se false* based on the plaintiff's allegations of fraud generally."). By asserting that the "reason or reasons" giving rise to the falsity of these statements span hundreds of paragraphs of factual allegations, Lead Plaintiff left it up to the Court to infer falsity from the SAC's allegations of fraud generally. Lead Plaintiff, however, cannot place that onus upon the Court as it is their responsibility to explain with particularity why the misconduct alleged in the SAC rendered BofI's net income and diluted price per share false at the time they were announced. Accordingly, the Court finds that BofI's statements concerning its income and diluted price per share do not provide an independent basis for securities fraud.

## C. Loan-to-Value Ratio

The last category of financial results that Lead Plaintiff challenges are BofI's loan-to-value or LTV figures. *See* SAC ¶ 248 (Form 10-K 2013), ¶ 258 (Form 10-Q Q1 2014), ¶ 271 (Form 10-Q Q2 2014), ¶ 285 (Form 10-Q Q3 2014), ¶ 304 (Form 10-K 2014), ¶ 315 (Form 10-Q Q1 2015), ¶ 329 (Form 10-Q Q2 2015), ¶ 339 (Form 10-Q Q3 2015), ¶ 362 (Form 10-K 2015), ¶ 388 (Form 10-Q Q1 2016). Defendants argue that Lead Plaintiff has failed to demonstrate that these figures were false or misleading because the SAC's anecdotal allegations concerning loans issued with high LTVs are not enough to render the LTV numbers false or misleading. The Court agrees.

Again, and as an initial matter, a couple of the SAC's statements about BofI's weighted LTV average are not actionable because they are not "capable of objective

verification." Paragraphs 304 and 248 of the SAC include the following allegedly false and misleading statements made by BofI:

> BofI stated that "[w]e believe our weighted-average LTV of [54.68%/55.98$] at origination has resulted and will continue to result in the future, in relatively low average loan defaults and favorable write-off experience."

SAC ¶¶ 248, 304. Yet as explained above, statements of opinion, such as those prefaced with "we believe" are not actionable because subjective and optimistic statements about the Company's future cannot be measured for its truth or falsity. Accordingly, the Court concludes that these statements cannot be false or misleading. *See Or. Pub. Empls. Ret. Fund*, 774 F.3d at 606-07.

That said, the main crux of Lead Plaintiff's LTV argument is that BofI materially misrepresented its loan-to-value averages in the Form 10-Ks and Form 10 Qs issued during the Class Period. The Court turns to this next.

According to Lead Plaintiff, BofI's stated weighted LTV ratios were false and misleading when made because "BofI's average LTV failed to account for undisclosed high risk loans BofI issued. (See ¶¶ 43-157)." *See, e.g.*, SAC ¶¶ 248, 255. Yet as Defendants point out, the SAC does not "show that BofI's disclosed average and median LTV ratios are false, as the average and median easily accounts for the handful of higher LTV loans alleged in the SAC." Dkt. No. 88-1 at 26. For instance, at ¶¶ 55, 64, 187-190, the SAC describes a number of loans that were made with high LTVs, upwards of 70%. But the mere fact that BofI issued some loans with high LTVs is not enough to render the loan-to-value ratio false.

The statements that Lead Plaintiff identifies as false and misleading in BofI's Q1 2014 10-Q disclose that BofI had $139,120,000 in multifamily loans with a LTV between 66%–75%; $6,332,000 in multifamily loans with a LTV of 76%–80%; $1,886,000 in multifamily loans with a LTV greater than 80%; along with $2,087,000 in commercial loans with a LTV between 61%–70%; and $943,000 in commercial loans with a LTV of 71%–80%. *See, e.g.*, SAC ¶ 258. The Court has no reason to

believe, and Lead Plaintiff has offered no such reason demonstrating, that the high LTV loans identified by the SAC are not included within these disclosed figures. Accordingly, the Court has no basis for concluding that the LTV ratios were false or misleading when made, even when considering the LTV calculations in light of the anecdotal allegations in the complaint.

The Court further concludes, and as it stated in greater detail above, that the other "reason or reasons" offered by Lead Plaintiff to explain the LTV ratios' falsity, the same as those stated *supra* Section I.3.A, are likewise insufficiently particularized to withstand review. The SAC's general allegations of fraud are inadequate to demonstrate that BofI's LTV calculations, as reported in their financial disclosures, were false and misleading when made. *See Metzler*, 540 F.3d at 1071 ("But this Circuit has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se false* based on the plaintiff's allegations of fraud generally."). Accordingly, the Court concludes that BofI's statements concerning its LTV ratios do not provide an independent basis for securities fraud.

### D. Lending Partnerships

Another theory of fraud that Lead Plaintiff proffers is that Defendants made "false or misleading statements" about lending partnerships that they did not disclose to investors. The SAC asserts that BofI entered into a number of lending partnerships with companies that made high-risk loans and in so doing "deceptive[ly] transfer[red]" those "high-risk loans off BofI's balance sheet to artificially improve the Company's performance." Defendants, in turn, seek to undermine these allegations by arguing, in part, that Lead Plaintiff has failed to demonstrate that it had any duty to disclose those lending partnerships in its public filings.

The Court reiterates, however, that the Section 10(b) inquiry is not solely concerned with whether any of BofI's alleged lending partnerships amounted to regulatory violations, but whether or not BofI materially misrepresented those

partnerships. *See Santa Fe*, 430 U.S. at 473-74 (holding that "Only conduct involving manipulation or deception is reached by Section 10(b) or Rule 10b-5" and that Section 10(b) does not create a federal cause of action for fiduciary breaches and corporate misconduct not involving manipulation or fraud). With that framework in mind, therefore, the Court must focus, here, on whether any of Defendants' statements about its lending partnerships materially misrepresented the state of those partnerships.[14]

Lead Plaintiff identifies the following statements about BofI's undisclosed lending partnerships, which appear in successive 10-Qs and 10-Ks issued during the Class Period, as false and misleading:

> BofI described its off-balance sheet commitments as of June 30, 2013 to consist of [1] "commitments to originate loans with an aggregate outstanding principal balance of $246.0 million, commitments to sell loans with an aggregate outstanding principal balance at the time of sale of $106.3 million[.]" BofI further stated that it has [2] "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI indicates further down in the 2013 Form 10-K that [3] "[t]he fair value of off-balance sheet items is not considered material.

SAC ¶ 252 (2013 Form 10-K) (brackets added).[15]

As an initial matter, the Court notes that it is dubious whether or not the first and third statements are actionable as a threshold matter. Statements about BofI's

---

[14] To the extent that the SAC could be viewed as asserting an omission theory of fraud based on BofI's undisclosed lending partnerships, the Court finds such a theory to be lacking. "Absent a duty to disclose, an omission does not give rise to a cause of action under § 10(b) and Rule 10b–5." *Retail Wholesale*, 845 F.3d at 1278. Yet as Defendants point out, "Plaintiff identified no affirmative duty requiring BofI to disclose the identity of these entities in its public filings." Dkt. No. 88-1 at 23.

[15] Identical statements appear in the 10-K and 10-Q forms that followed this announcement. *See* ¶ 259 (Q1 2014 Form 10-Q), ¶ 272 (Q2 2014 Form 10-Q), ¶ 286 (Q3 2014 Form 10-Q); ¶¶ 306-07 (2014 Form 10-K), ¶ 316 (Q1 2015 Form 10-Q), ¶ 330 (Q 2 2015 Form 10-Q), ¶ 342 (Q3 2015 Form 10-Q), ¶¶ 363-64 (2015 Form 10-K, mislabeled as 2014 Form 10-K), ¶ 389 (Q1 2016 Form 10-Q). The only material difference is the amount of BofI's off-sheet origination commitments and selling commitments as stated in each form.

"commitments" to take certain actions has the "aspirational" quality that was found insufficient in *Retail Wholesale*, 845 F.3d at 1276. The Court further notes that BofI's "commitment" statements are also problematic because they are forward-looking, as a "commitment" inherently involves a promise to take action in the future. *See Todd*, 642 F.3d at 1221 (forward-looking statements, unlike actionable statements, are not "descriptive of historical fact."). The Court also has its reservations about the third statement's actionability because whether the fair value of an asset is "material" is a fact charged with business judgment about which two reasonable minds could differ. *See In re GlenFed.*, 42 F.3d at 1549 ("In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.").

Yet even if these statements are actionable as misleading, they are still insufficient as a basis for securities fraud because Lead Plaintiff has failed to provide sufficiently coherent and particularized reasons why these statements were rendered "false or misleading" by BofI's lending partnerships. The reasons offered by Lead Plaintiff mirror those offered above, *see supra* Section I.3.A. It is, however, not remotely clear to the Court how BofI's "lax" lending practices, improperly calculated ALL and LTV, or failure to enforce adequate internal controls renders BofI's "commitment to purchase loans, investments securities or any other unused lines of credit" false or misleading.

Moreover and more importantly, Lead Plaintiff has also not explained how BofI's allegedly illicit and nondisclosed lending partnerships render the value of their off-balance sheet commitments, as stated in the statements identified above, false or misleading. Lead Plaintiff's allegations concerning BofI's lending partners, *see* SAC ¶¶ 69-113, focus on whether BofI's undisclosed lending partnerships were inconsistent with BofI's "purported conservative and disciplined lending standards," rather than whether they were specifically inconsistent with the above statements.

For example, Lead Plaintiff asserts that BofI's partnerships with the described entities are problematic because the partners partake in "abusive marketing practices," control failures, and "unsafe and unsound lending." *Id.* ¶ 72. But even if such conclusions were true, the mere existence of a legally questionable relationship does not, on its own, render the above statements false or misleading.

Lead Plaintiff's allegations discuss the value of some of BofI's lending partnerships, but they do not provide enough details for this Court to conclude that the money and business they earned from those partnerships, however fraught they were, materially superseded their disclosed "commitments." According to the SAC, BofI was "primary responsible" for originating $184.08 million in loans for OnDeck, *id.* ¶ 76, had a balance of $11.78 million in BofI-originated loans from its relationship with QuickBridge, *id.* ¶ 83, and it issued a $31.9 million loan to Propel Tax at one point, *id.* ¶ 96. Lead Plaintiff, however, has failed to explain how the value of these loan originations was "material" or otherwise in excess of the loans that BofI planned to originate off-sheet for any given fiscal period.

Accordingly, the Court concludes that BofI's statements about the value and commitments of its off-balance sheet activities are not actionable statements for purposes of Lead Plaintiff's securities fraud suit.[16]

## II. <u>Violations of Section 20(a) of the Exchange Act</u>

Section 20(a) of the Securities Exchange Act codifies derivative liability for those persons who "control" a primary violator of the Securities Exchange Act. 15 U.S.C. § 78t; *see also Hateley v. S.E.C.*, 8 F.3d 653, 656 (9th Cir. 1993) ("As we have stated, Section 20(a) is a means of imposing vicarious liability on controlling persons"). Lead Plaintiff, accordingly and in addition to their Section 10(b) claims,

---

[16] In making this conclusion, the Court does not foreclose the argument that BofI's allegedly undisclosed lending partnerships constitute a "reason or reasons" why BofI's other actionable statements were false and misleading when made.

have alleged that the individual defendants — that is, Garrabrants, Micheletti, Grinberg, Mosich, and Argalas — are vicariously liable as "controlling persons" of BofI based upon BofI's alleged predicate violation of § 10(b) of the Act.[17]  SAC ¶¶ 466-71.

### 1. Nature of Control Person Liability

Congress intended for control person liability under Section 20(a) "to prevent evasion of the law by organizing dummies who will undertake the actual things forbidden.  In other words, § 20(a) was intended to impose liability on controlling persons, such as controlling shareholders and corporate officers, who would not be liable under respondeat superior because they were not the actual employers." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577 (9th Cir. 1990).  As the Eleventh Circuit explained in *Laperriere v. Vesta Ins. Grp., Inc.*:

> In congressional hearings preceding the passage of the Act, Congress referred to correcting the "dangerous and unreliable system of depending upon dummy directors" that lacked any accountability or responsibility. The House of Representatives Report accompanying the Act summarized section 20(a) and clarified that Congress intended to achieve its purpose by making a person who controls a person subject to the act . . . liable *to the same extent* as the person controlled unless the controlling person acted in good faith.

526 F.3d 715, 721 (11th Cir. 2008) (per curiam) (emphasis in original) (internal citations and footnotes omitted).  By holding persons who "were able, directly or indirectly, to exert influence on the policy and decision-making process of others" liable, Congress sought to hold accountable "the [person] who stands behind the scenes and controls the [securities violator] who is in a nominal position of authority."  *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1441 (9th Cir. 1987)

---

[17] The Court previously determined that Lead Plaintiff had adequately stated control person liability as to Garrabrants.  *See* First Motion to Dismiss Order, Dkt. No. 64 at 27.  Because Defendants have failed to present new argument demonstrating why this conclusion should be disturbed, the Court adheres to its previous decision.

(quoting 18 Cong. Rec. 8086, 8095 (1934)) (remarks of Rep. Lea) (additions in original), *reversed on other grounds by Hollinger*, 914 F.2d 1564.

Accordingly, a defendant need not be primarily liable under Section 10(b), or any other security law, in order to be liable under Section 20(a).[18]  *See Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 963 (D. Ariz. 2010).  Rather, and as the Ninth Circuit has articulated, "a defendant employee of a corporation who has violated the securities law will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990 (citations omitted).

The issue of control is a complex and fact-intensive question.  *See, e.g.*, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) ("Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions."); *see also Wool*, 818 F.2d at 1441 ("the issue of control is a complex question of fact requiring a close examination of the particular situation and organization").  And because "the concept of control, in the context of the securities law, is an elusive notion for which no clear-cut rule or standard can be devised, the two-pronged test for establishing control should be

---

[18] The Court, in its First Motion to Dismiss Order, Dkt. No. 64, dismissed the Section 20(a) claims without prejudice against Micheletti, Grinberg, Mosich, and Argalas based on the fact that Lead Plaintiff had failed to allege primary securities violations against them.  Lead Plaintiff had argued in a conclusory fashion that their control person allegations against those defendants were legally sufficient because their Section 10(b) violations against them were sufficient and because they adequately alleged control.  *See* Dkt. No. 40 at 31.  Yet because the Court disagreed with Lead Plaintiff's premise and was not otherwise persuaded by their perfunctory argument as to control, it dismissed the Section 20(a) allegations against Micheletti, Grinberg, Mosich, and Argalas.  The Court notes, however, that it is not bound by that reasoning now that Lead Plaintiff has amended their Section 20(a) claims and fully briefed the legal issues concerning the sufficiency of those claims as they pertain to Micheletti, Grinberg, Mosich, and Argalas.  Defendants' argument to the contrary, therefore, is misplaced and unpersuasive.

construed liberally and flexibly." *Id.*; *see also Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir. 1967) (stating that Section 20(a) is "remedial" in purpose and should be "construed liberally").

### 2. The Prima Facie Case and the Good Faith Defense

Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.[19] To state a prima facie case for Section 20(a) liability, a plaintiff must prove: (1) "a primary violation of federal securities laws" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard*, 228 F.3d at 1065. Because the Court has already determined that Lead Plaintiff has adequately pleaded a primary violation of § 10(b) as to BofI, the current focus is on whether Lead Plaintiff's control person allegations are sufficient to hold Micheletti, Grinberg, Argalas, and Mosich accountable for that primary violation.[20]

To establish the liability of a controlling person, "the plaintiff does not have the burden of establishing that person's scienter distinct from the controlled corporation's scienter." *See Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1398 (9th Cir. 1993). The plaintiff also does not have the burden of demonstrating that the defendant was a culpable participant in the violation. *Howard*, 228 F.3d at 1065; *see also Hollinger*,

---

[19] The definition of "person" under the Act includes a "company." 15 U.S.C. § 78c(a)(9); *Todd*, 642 F.3d at 1223.

[20] The Court observes that it has upheld Lead Plaintiff's § 10(b) securities fraud claim against Defendant Garrabrants as well as the corporate defendant, BofI. The SAC, however, predicates "control person" liability only on the remaining individual Defendants' control over BofI and not over Garrabrants. *See, e.g.*, SAC ¶ 470. Accordingly, the Court will analyze the sufficiency of Lead Plaintiff's control person allegations only as they pertain to BofI.

914 F.2d at 1575 (holding that plaintiff is not required to show "culpable participation" to establish control person liability). Instead, the burden rests on the defendant to plead and prove that "he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation." *Todd*, 642 F.3d at 1223. If, therefore, a defendant can demonstrate both a lack of scienter and an effective lack of participation in the underlying violation, the defendant is entitled to a good faith defense. *Howard*, 228 F.3d at 1066.

The SEC's regulations define "control" as " the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.45; *see also Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) ("The SEC's definition of "control" reflects th[e] remedial purpose" of section 20(a)"); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996) ( "As the definition suggests our inquiry must revolve around the 'management and policies' of the corporation, not around discrete transactions."). Furthermore and in the Ninth Circuit, indicia of control include: "Whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements, which is sufficient to presume control over the transactions giving rise to the alleged securities violation." *Todd*, 42 F.3d at 1223 (internal citations omitted); *see also Howard*, 228 F.3d at 1065.

"Ordinarily," however, "the status or position of an alleged controlling person, by itself is insufficient to presume or warrant a finding of power to control or influence." *Wool*, 818 F.3d at 1441. Yet "although a person's being an officer or director does not create any *presumption* of control. It is a sort of red light." *Arthur*, 994 F.2d at 1397 (9th Cir. 1993) (citing 4 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in Loss & Seligman). "It is," moreover, "not uncommon for control to rest with a group of persons, such as the members of the corporation's management." *Id.*

### 3. Pleading Requirements of Section 20(a) Allegations

Before reaching the merits of Lead Plaintiff's control person allegations, the Court must first address the parties' dispute concerning whether such allegations are measured by the heightened pleading requirements of Rule 9(b) or by the more permissive standard articulated in Rule 8(a). For the following reasons, the Court concludes that Lead Plaintiff's control-person allegations are sufficient if they meet the notice-pleading standard.

Rule 8(a) requires a plaintiff to state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Such a claim must be a plausible on its face. *See Iqbal*, 556 U.S. at 678. That is, the pleading must state enough facts "to raise a reasonable expectation that discovery will reveal evidence" of the misconduct alleged. *Twombly*, 550 U.S. at 545. Rule 9(b), by contrast and as stated above, requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy the Rule 9(b) standard, a plaintiff must identify the "who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about the [fraudulent statement], and why it is false." *Evbeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).

The Ninth Circuit has not yet had occasion to address whether a Section 20(a) claim is or may be subject to the heightened pleading requirements of Rule 9(b). *See, e.g.*, *Apollo*, 690 F. Supp. 2d at 966. As a consequence and in the absence of such a decision, district courts in this circuit have reached opposite conclusions. Some have determined that only the less stringent standard of Rule 8(a) applies. *See, e.g.*, *id.* (holding that Rule 8(a) provides the governing pleading standard for Section 20(a)); *see also In re Washington Mut., Inc. Sec. Deriv. & ERISA Litig.*, 259 F.R.D. 490, 502-04 (W.D. Wash. 2009) (concluding that Rule 8(a) applies to plaintiffs' claims under Section 15 of the Securities Act because "control person liability do[es] not directly touch on circumstances that constitute fraud."); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1201 (C.D. Cal. 2008) (concluding that "the control

element is not a circumstance that constitutes fraud and therefore need not be pled with particularity"). Others have concluded that Rule 9(b) applies to control person allegations. *See, e.g.*, *Shurlin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006) ("Where a plaintiff asserts a section 20(a) claim based on an underlying violation of section 10(b), the pleading requirements for both violations are the same"); *see also In re Ramp Networks, Inc. Sec. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002) (same); *Howard v. Hui*, 2001 WL 1159780, *4 (N.D. Cal. Sept. 24, 2001) (concluding that "Plaintiff's section 20(a) claim is an allegation of fraud.").

This Court, however, is not persuaded that Section 20(a) control person allegations are governed under Rule 9(b).

Rule 9(b) requires a plaintiff alleging fraud to state with particularity the circumstances constituting that fraud. Fed. R. Civ. P. 9(b). Naturally then, and as described above, a plaintiff alleging securities fraud under § 10(b) of the Act must comply with the heightened pleading requirements of Rule 9(b) (as well as the PSLRA requirements). *Tellabs*, 551 U.S. at 319. As the Court concluded in the First Motion to Dismiss Order and as it concludes again today, Lead Plaintiff has pleaded with particularity that BofI made material misrepresentations or omissions with scienter. Lead Plaintiff has, therefore, stated a primary violation of the securities laws and met the first element of a Section 20(a) claim.

Thus and having already concluded that Lead Plaintiff has adequately pled a § 10(b) securities violation against BofI, the question then becomes whether any other individuals can be held vicariously liable for that violation. To that end, the second element of a Section 20(a) claim directs plaintiffs to proffer allegations demonstrating that the defendant exercised actual power or control over the primary violator such that that defendant, too, can be held accountable for the primary violation.

What is necessary, however, to plead the circumstances constituting control does not amount to circumstances constituting fraud. Liability for control-person violations does not depend on the defendant's "culpable participation" in the underlying primary violation. That is to say, plaintiffs need not show that the defendant "affirmatively participated in the alleged fraudulent securities transaction" in order to be liable under Section 20(a). *See Kersh v. Gen. Council of Assemblies of God*, 804 F.2d 546, 549-50 (9th Cir. 1986), *overruled by Hollinger*, 914 F.2d 1564 ("culpable participation" not required to plead Section 20(a) violation). There is also no requirement that the plaintiff plead the scienter of the individual defendant in order to state a Section 20(a) claim. *See Arthur*, 994 F.2d at 1398 ("If the plaintiff had this obligation [to demonstrate scienter], the controlling person provision would hardly make anyone liable who would not be so otherwise"). Rather, the § 20(a) statute premises liability solely on the control relationship, subject to the good faith defense. *Hollinger*, 914 F.2d at 1575 ("Thus, the statute premises liability solely on the control relationship, subject to the good faith defense.").

Whether there is a control relationship between the defendant and the primary violator is a question separate and apart from the issue of fraud. The control inquiry, as defined by the Ninth Circuit, does not require any analysis of the "who, what, where, when, and how" of any discrete instance of fraud or any explanation of what made a statement or action "misleading" or "false." Rather, and contrary to what Defendants suggest, the control analysis requires Courts to inquire into the "realities of business relationships," *Wool*, 818 F.2d at 1441, and the "management and policies" of the corporation, 15 U.S.C. § 78t, and to identify indicia of control in support of vicarious liability, *Paracor Finance*, 96 F.3d at 1162. As such, the focus is not on the transactions giving rise to the alleged securities violation, but whether a court can rightly presume control over those transactions by virtue of the relationship between the defendant and the primary violator. *See id.* The allegations concerning

that relationship, therefore, need not include circumstances constituting fraud and thus need not be plead under Rule 9(b).

Indeed, although the Ninth Circuit has yet to speak on this issue, the Eighth Circuit has similarly concluded, in an uncontroversial manner, that questions of control under Section 20(a) are analyzed under Rule 8(a). *Lustgraaf v. Behrens*, 619 F.3d 867, 875 (8th Cir. 2010). ("Unlike the first prong of our control-person tests, where fraud is at issue, the second and third prongs involve questions of control and are therefore analyzed under our ordinary notice-pleading standard.").

The Court further notes that it is not persuaded by Defendants' citation to *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*, 2017 WL 66281 (N.D. Cal. Jan. 4, 2017) in support of its position that Rule 9(b) applies. The *In re Volkswagen* court relied on *Howard v. Hui*, which had cited to *In re GlenFed Sec. Litig.*, 60 F.3d 591 (9th Cir. 1995), and *Berry v. Valence Tech., Inc.*, 175 F.3d 699 (9th Cir. 1999), for the proposition that Rule 9(b) applied to Section 20(a) pleadings. *In re GlenFed*, however and upon which *Berry* relied, did not hold that Rule 9(b) applies to the control element of a Section 20(a) violation. Accordingly and in light of the fact that subsequent Ninth Circuit cases addressing Section 20(a) pleading standards do not so state that control person allegations are analyzed under Rule 9(b), the Court declines to apply such a heightened pleading standard. *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Fund v. America West Holding Grp.*, 320 F.3d 920, 945-46 (9th Cir. 2003); *see also Apollo*, 690 F. Supp. 2d at 969 (internal citation omitted) (concluding that *In re GlenFed* does not support position that Rule 9(b) applied to control person allegations).

### 4. Control Person Allegations

Defendants argue that the SAC fails to state a Section 20(a) claim against Micheletti and the Audit Committee Defendants. For the following reasons, the Court concludes that Lead Plaintiff's control person allegations are sufficient to state

a claim against Micheletti, Mosich, Argalas and Grinberg and further concludes that this decision would not be disturbed even if Rule 9(b) applied.

## A. Micheletti

A review of the complaint demonstrates that it properly alleges a control relationship between Micheletti and BofI. Micheletti is BofI's Executive Vice President and Chief Financial Officer, and served BofI in these two capacities throughout the Class Period. SAC ¶ 36. The SAC describes how Micheletti attended weekly meetings at BofI every Friday at noon with Garrabrants, the Senior Vice Presidents, and other "higher level employees", *id.* ¶ 229, and also provides details on his "regular" interactions with, and directions made to, a senior accounting officer, *id.* ¶¶ 166, 177. The SAC further states that Micheletti authored and made statements at presentations made to BofI's investors on at least five occasions in September 2014, February 2014, March 2014, May 2014, and February 2015, *id.* ¶¶ 310-11. That he spoke on behalf of BofI at conference calls with analysts and investors on November 5, 2013, February 5, 2014, May 6, 2014, August 7, 2014, November 4, 2014, January 29, 2015, April 30, 2015, July 30, 2015, and October 29, 2015. *Id.* ¶¶ 264, 277, 291, 297, 322, 355, 347, 353, 396. That he "reiterated the financial results" for each quarter during those conference calls. *Id.* And that he signed Sarbanes-Oxley certifications during the Class Period "attesting to their [his and Garrabrants'] responsibility for and knowledge of disclosure controls and procedures . . . as well as BofI's internal control over financial reporting" for at least eleven fiscal quarters. *Id.* ¶¶ 253-54, 260, 273, 287, 308, 317, 331, 342, 366, 392, 418.

These allegations are sufficient to plead a control violation against Micheletti. Lead Plaintiff has demonstrated, and Defendants concede, that Micheletti was involved in the day-to-day affairs of the corporation. As Executive Vice President and CFO, Micheletti was a member of BofI's executive management, a fact that is a "red light" in and of itself. *Arthur*, 994 F.2d at 1397 ("although a person's being an officer or director does not create any *presumption* of control. It is a sort of red light

. . . . [and] [i]t is not uncommon for control to rest with a group of persons, such as the members of the corporation's management."). *Id.* (emphasis in original). He also attended weekly meetings with BofI's CEO, Senior Vice Presidents, and other high-ranking officers and had frequent interactions with lower-level staff, both of which are probative of his day-to-day involvement in the company.

Countless other courts in this circuit have found allegations describing similar executive and managerial responsibility and activities to be sufficient for Section 20(a) liability at the motion to dismiss stage. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (holding that allegation that defendants "by virtue of their executive and managerial positions had the power to control and influence [Cylink], which they exercised" sufficient to state a control claim against the defendants); *see also Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1192 (S.D. Cal. 2009) (holding control person allegations sufficiently pleaded based upon the executives' "positions and their power to control public statements about Novatel" and that defendants had access to confidential information concerning company"); *In re New Century*, 588 F. Supp. 2d 1206, 1233 (C.D. Cal. 2008) (holding that control personal liability was sufficiently pleaded because complaint "alleged that the Officer Defendants controlled the operation of New Century, and that this caused it to violate Section 10(b) and Rule 10(b)(5)"); *In re Metawave Comms. Corp Sec. Litig.*, 298 F. Supp. 2d 1056 (W.D. Wash. 2003) (concluding that plaintiffs had "sufficiently pled that Defendants . . . exercised actual power or control over any primary violators based on their positions as CEO and CFO").

Lead Plaintiff has, moreover, also demonstrated that Micheletti was involved in the preparation and presentation of financial statements, yet another indicator of control. *See Todd*, 42 F.3d at 1223. Micheletti authored and spoke at investor presentations that discussed BofI's underwriting practices, credit quality, investment summaries, and LTV ratios, among other topics. Micheletti also participated in quarterly conference calls with Garrabrants, during which Micheletti "reiterated the

financial results" for the quarter and answered questions posed by investors, and during which Garrabrants made statements about BofI's credit quality standards and its conservative underwriting criteria. Finally, Micheletti was also a signatory to BofI's quarterly SOX certifications which affirmed that the "financials statements, and financial information included in th[e] report," were fairly presented in "all material respects." SAC ¶ 253. That Lead Plaintiff has alleged that Micheletti had actual authority over the preparation and presentation of financial statements made to investors and other analysts is also more than sufficient to plead that he had the requisite control over BofI. *See Todd*, 642 F.3d at 1223 ("Rather, the indicia of "control" include whether the person managed the company on a day-to-day basis and was involved in the formulation of financial statements . . . . *Moreover, actual authority over the preparation and presentation to the public of financial statements is sufficient to demonstrate control*.") (emphasis added).

Furthermore, and contrary to what Defendants allege, Lead Plaintiff's allegations even go so far as to demonstrate that Micheletti had specific control over the statements that the Court has found actionable. The majority of the exemplary statements that the Court found actionable with respect to BofI's loan underwriting standards and regulatory compliance systems, *supra* Section I.1, were made by CEO Garrabrants during conference calls that were led by Garrabrants and Micheletti. Defendants argue that "it defies common sense to allege that Micheletti (who reports to Garrabrants) had the power to 'control' Garrabrants' oral statements during BofI's conference calls." Dkt. No. 95 at 13. The Court disagrees.

The control person inquiry requires courts to inquire into the "realities of business relationships" and to construe the standard "liberally and flexibly" in accordance with that reality. *Wool*, 818 F.2d at 1441. In the instant case, the SAC demonstrates that both Garrabrants and Micheletti were responsible for communicating BofI's financial results, as evidenced by the fact that they led the quarterly conference calls. Together, they delivered a consistent message to investors

about its "record" financial results, its loan underwriting standards, and its internal controls, a message that remained similar throughout the Class Period. It is also important to recognize that Micheletti was not a silent bystander during these conference calls. In fact, Micheletti was the one to reiterate the financial results, as they appeared in BofI's press release or SEC form, for each of the fiscal periods, *see, e.g.*, SAC ¶ 297, and he frequently made statements during those calls in response to analyst inquiries, *see, e.g.*, *id.* ¶ 300. That Micheletti was present and an active participant during the conference calls where Garrabrants made the majority of the actionable false and misleading statements is sufficient to establish that Micheletti exercised control over the allegedly fraudulent statements at issue.

Defendants, instead, would have the Court conclude that Micheletti could not have controlled Garrabrants because Garrabrants was Micheletti's boss. Such an assertion, however, ignores the reality that "control" can rest collectively with the corporation's management, *see Arthur*, 994 F.2d at 1397, and otherwise ignores the reality that Micheletti, like Garrabrants, is a corporate fiduciary who has duties to the Company in addition to Garrabrants. As such, the Court declines to adopt Defendants' unnecessarily narrow view of the relationship between BofI's CEO and CFO.

What is more, the Court is also not persuaded by Defendants' argument that Micheletti could not have exercised the requisite control over the actionable statements because he did not speak, or write them, himself. Such a position belies the purpose of Section 20(a) liability. Indeed, if Micheletti was the one who made the challenged statements, he would not just be liable under Section 20(a) but under Section 10(b), for a primary securities violation. *See Arthur*, 994 F.2d at 1398 (observing that if the plaintiff had the obligation to demonstrate that the controlling person was a "culpable participant" in the alleged fraud, the controlling person provision "would hardly make anyone liable who would not be so otherwise.").

Accordingly, the Court rejects the notion that such a granular level of control is statutorily required to survive a motion to dismiss.

The Court's conclusion is, moreover, consistent with that reached by the Ninth Circuit in *Wool v. Tandem*. The *Wool* court found that a plaintiff had adequately alleged a control relationship between the corporation and its Chief Executive Officer, Chief Operating Officer, and Controller based upon the individual defendants' "direct involvement . . . in the day-to-day affairs of Tandem in general . . . [and] in Tandem's financial statements in particular." 818 F.2d at 1441-42. Similarly, here, Micheletti was involved in the day-to-day affairs of BofI and was an active participant in the presentations that disclosed BofI's financial statements and contained the actionable fraudulent statements. Accordingly and given the key role that Micheletti played during the conference calls, the Court concludes that Lead Plaintiff has pleaded more than enough to establish, at this stage, that Defendant Micheletti's had a control relationship with BofI.

### B. Audit Committee Defendants

Lead Plaintiff argues that Grinberg, Mosich, and Argalas are also liable as control persons by virtue of their membership on the Audit Committee and the fact that they signed allegedly false or misleading reports in BofI's 2015 Proxy Statement. Dkt. No. 94 at 18. While the Court is not convinced that the SAC demonstrates that the Audit Committee defendants signed any actionable false or misleading statement, the Court is nonetheless persuaded that the SAC has stated enough allegations to warrant moving forward with its Section 20(a) allegations against the Audit Committee Defendants.

Crucially, the SAC alleges that the Audit Committee Defendants each held a position on the Board of Directors, a fact that has been deemed one of the "traditional indicia of control" by the Ninth Circuit. *See America West*, 320 F.3d at 945 (explaining that *Paracor Finance* had denied § 20(a) liability because one of "the traditional indicia of control," that is, "having a seat on the board" was not present).

Grinberg served throughout the Class Period as a Director, Chairman of the Board's Audit Committee, Chairman of the Board's Compensation Committee, and a member of the Board's Nominating Committee. *Id.* ¶ 446. Mosich served throughout the Class Period as a Director, Vice Chairman of the Board, and member of the Audit Committee. *Id.* ¶ 447. Argalas served throughout the Class Period as a Director and member of the Audit Committee. *Id.* ¶ 448. The SAC also alleges that all three Audit Committee Defendants owned stock in the company, yet another one of the "traditional indicia of control" repeated by *Paracor Finance* and *America West*. *See America West*, 320 F.3d at 945 ("owning stock in the target company" was one of the "traditional indicia of control.")

The SAC also alleges that the Audit Committee members "were provided with copies of the Company's reports and press releases" at issue and that they had the "opportunity to prevent their issuance or cause them to be corrected." *Id.* ¶ 417. Moreover, the SAC further demonstrates that the Board of Directors also kept tabs on BofI's conference calls, or at the very least that they had the power to listen in on those calls and the opportunity to make corrections to the content of those calls where appropriate. *Id.* ¶ 385 (Director Allrich, at an annual stockholder meeting, "clarified" statements made by Micheletti or Garrabrants during an analyst call on October 14, 2015).

The SAC also describes, in detail, the responsibilities of the Audit Committee members and of the Directors.

As Audit Committee members, Grinberg, Argalas and Mosich were, for instance, primarily responsible for overseeing and monitoring: (1) the integrity of BofI's financial reporting process, financial statements, and systems of internal controls; (2) compliance with legal and regulatory requirements; (3) the independent auditor's qualifications, independence and performance; and (4) the performance of BofI's internal audit function. *Id.* ¶ 376; *see also id.* ¶ 421. They were also in charge of "review[ing] the policies and procedures adopted by the Company to fulfill its

responsibilities regarding the fair and accurate presentation of financial statements in accordance" with the SEC's and other regulations. *Id.* ¶ 375. And they were required to "[c]onfirm that the Company's principal executive officer and principal financial officers [we]re satisfying the certification requirements of . . . [SOX]" and to "review disclosure[s] made to the Audit Committee by the CEO and CFO about significant deficiencies and materials weaknesses in the design or operation of internal control over financial reporting." *Id.*

Furthermore and according to the 2015 Proxy Statement, quoted in the SAC, the Audit Committee "report[s] regularly to the Board of Directors on risk-related matters and provide[s] the Board of Directors with insight about [ ] management of strategic, credit, interest rate, financial reporting, technology, liquidity, compliance, operational and reputational risks." *Id.* ¶ 450. The 2015 Proxy Statement goes on to state that the Board "is actively involved in oversight and review of the Company's risk management efforts either directly or through its standing committees." *Id.*

Defendant argues that these allegations are insufficient to hold the Audit Committee Defendants accountable as control persons. They assert that Lead Plaintiff has failed to demonstrate that "the Audit Committee, composed entirely of non-executive 'outside' directors, was involved in the day-to-day business of BofI" or that they "exercised control over the contents of BofI's financial statements, press releases, or earnings conference calls." Dkt. No. 88-1. They argue that absent some indication that the audit committee members "at a minimum, had the ability to control the violator's alleged fraudulent act," the Section 20(a) allegations must fail. Dkt. No. 95 at 9. It is, therefore, Defendants' position that in order to survive the motion to dismiss Lead Plaintiff needed to allege facts demonstrating that the Audit Committee members had the ability to control BofI "with respect to the few statements the Court previously identified as actionable." *Id.* at 10. Yet because the SAC fails to plead such facts, Defendants contend that Lead Plaintiff's allegations

amount to no more than a "general" assertion of control person liability "by virtue of their positions on the Audit Committee and their duties thereon." *Id.* at 13.

None of these arguments are compelling to the Court. First, the Court observes that it does not agree with Defendants' rigid interpretation of the Ninth Circuit's precedent concerning the § 20(a) prima facie case. Defendants argue that the SAC must fail because it lacks factual allegations indicating that the Audit Committee Defendants were involved in the day-to-day business of BofI and because it fails to demonstrate that the Audit Committee Defendants had the specific ability to control the actionable fraudulent statements identified above.

Defendants' position, however, ignores the oft-repeated fact that "the concept of control" has "no clear-cut rule or standard" and that it "should be construed liberally and flexibly." *Wool*, 818 F.2d at 1441. Defendants would have this Court conclude that involvement in the day-to-day activities of the company is necessary to state a prima facie case. Yet if that were true it would be difficult to hold any outside director accountable for securities fraud, no matter how strong the showing that they were "in some meaningful sense the persons who stood behind the alleged fraud." *Id.* (reiterating that the purpose of § 20(a) liability was to hold accountable "the person who stands behind the scenes and controls the securities violator . . . .") (brackets omitted). Defendants would also have the Court conclude that the prima facie case requires Lead Plaintiff to demonstrate that the Audit Committee Defendants had the specific ability to control the allegedly false and misleading statements that form the basis of the primary violation. But if that were true, then the Court would be inching dangerously close to shifting the burden of "culpable participation" to the plaintiff, where it does not belong. *Todd*, 642 F.3d at 1223 (control person status is about "whether the defendant exercised power or control over the primary violator, and the plaintiff "need not show that the defendant was a culpable participant in the violation.").

Even still, the fact of that matter is that the Ninth Circuit cases addressing the prima facie burden simply do not adhere to the strict list of prerequisites that Defendants propose.

Most recently, in *America West* — which Defendants do not cite — the Ninth Circuit held that the plaintiffs had adequately pleaded control person liability because they had alleged that the corporate defendants had a shareholder relationship with the primary violator, owned 57.4% of stock in the target company, had members on the Board, and had the power to elect the majority of the board and committee members. 320 F.3d at 945-46. Accordingly, the court concluded "Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have established a prima facie showing that TPG and Continental were "controlling persons" . . ." *Id.* at 946. Notably, the *America West* court did not analyze the defendants' day-to-day control or scrutinize the nexus between the defendant's ability to control the primary violator and the actionable misrepresentations.

Then, in *Howard v. Everex*, the defendants argued that the CEO and Chairman of the Board could not be held liable as a controlling person because he had nothing to do with the preparation of the financial statements that misrepresented the company's profitability. *Id.* at 1063. The court, however, disagreed and instead concluded that the defendants "actual authority over the preparation and presentation to the public of the financial statements" alone was "sufficient to make out a prima facie case." *Id.* at 1066 (emphasis added).

As for *Wool v. Tandem*, there, the court focused exclusively on the positions — namely, President/CEO, Senior Vice President/Chief Operating Officer and Vice President/Controller — held by the defendants, their direct involvement in the day-to-day affairs of the corporation and their direct involvement in the corporation's financial statements. *Id.* Those factors alone, the court held, were sufficient to satisfy the second element of control-person liability because they were sufficient indicators of control to warrant a claim for vicarious liability. *See id.*

55

Accordingly and because the *Wool* court did not analyze whether each of the defendants had the power to control the specific misstatements of revenue that were found actionable, but rather the financial statements in general, *see id.*, the Court is not persuaded that *Wool* instead supports Defendants' position. Defendants cite to *Wool v. Tandem* for the proposition that "Although it is not necessary to plead scienter to state a Section 20(a) claim, plaintiff still must plead facts showing that the defendant, at a minimum, had the ability to control the violator's alleged fraudulent act." Dkt. No. 95 (citing 818 F.2d at 1441). Yet as stated above, the *Wool* court's holding was not so narrowly stated and as such, the Court is not convinced that *Wool* offers the support claimed.

The Court is also not persuaded that *Paracor Finance* supports Defendants' interpretation of the prima facie burden. Defendants posit, in a footnote, that "A section 20(a) claim may not proceed against a defendant where it is not alleged that he or she had authority to control the speaker with respect to the purportedly wrongful statement." Dkt. No. 95 at 9. This argument is misplaced. While the *Paracor Finance* court did analyze at length the defendant-CEO's alleged "control" over the underlying securities violations, it did so at summary judgment. Here, however, the Court is not evaluating whether Lead Plaintiff has proven control person liability as a matter of law, but whether Lead Plaintiff has stated a claim sufficient "to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso,* 637 F.3d at 1055 (9th Cir. 2011) (internal citations and omitted). Thus, just because the absence of control over the fraudulent acts at issue is enough to defeat § 20(a) liability at summary judgment does not necessarily mean that a plaintiff must allege such a specific degree of control at the pleading stage. *See Lustgraaf*, 619 F.3d at 876 (panel concluded that authority was "inapplicable" because it "was not a motion-to-dismiss case and its analysis involved facts that are not part of a plaintiff's prima facie burden.").

Furthermore, other courts in this circuit have similarly concluded that it was appropriate to sustain Section 20(a) liability against audit committee defendants at the motion to dismiss stage. As Lead Plaintiff points out, the court in *Apollo* concluded that investors' allegations as to an audit committee defendant's control of the company was sufficient to state a claim for control liability. 690 F. Supp. 2d at 975-77. There, the Court found it sufficient that the defendant sat on the board, owned stock, and that the allegedly false and misleading statements fell within the purview of the audit committee' duties, as alleged by the complaint. *Id.* at 976 ("the allegations of [the defendant's] Audit Committee responsibilities, in conjunction with the broader control allegations, sufficiently allege control person status at this motion to dismiss stage). Similarly, here, Lead Plaintiff has alleged that the Audit Committee Defendants sat on the board, owned BofI stock, and that the allegedly false and misleading statements made about the adequacy of BofI's internal control departments fell within the purview of the Audit Committee's duties.

*Fouad v. Isilon Sys., Inc*. also supports Lead Plaintiff's position. 2008 WL 5412397, *11-12 (W.D. Was. 2008). In that case, the court concluded that membership on the audit committee, responsibility for internal controls, independent auditors, and reviewing financial results, press releases and the Company's code of conduct was sufficient to state control person liability. *Id.* Defendants attempt to distinguish this case by arguing that there, unlike here, "the audit committee 'had control over the very mechanism [*i.e.,* revenue recognition standards] intended to prevent the alleged fraud.'" Dkt. No. 95. The Court, however, is not persuaded by Defendants' misreading of the case.

The *Fouad* court stated that because the audit committee position "relates directly to the subject of Plaintiffs' fraud allegations," the court "*can infer* that [the individual defendants] had control over the very mechanisms intended to prevent the alleged fraud." *Fouad*, 2008 WL 5412397 at *12 (emphasis added). Similarly, here, given that the Audit Committee Defendants "were provided with copies of the

Company's reports and press releases" and were responsible for "the integrity of BofI's financial reporting process, financial statements, and systems of internal controls" and "the performance of BofI's internal audit function," the Court finds it reasonable to infer that the Audit Committee Defendants had the ability to "control the mechanisms" intended to prevent, at the very least, BofI's misrepresentations as to the sufficiency of its compliance infrastructure. *See America West*, 320 F.3d at 946 (plaintiff pleading Section 20(a) is entitled to the evidence viewed in the light most favorable to them). In fact, Defendants' own authority cites to *Fouad* for the exact proposition that Defendants reject. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 1145, 1200 (D. Oregon 2015) ("allegations of membership in a committee whose responsibilities relate directly to the subject of the fraud allegations are sufficient to plead control-person liability.").

In sum, the Court concludes that Lead Plaintiff has sufficiently alleged a control relationship between BofI and the Audit Committee Defendants. *See Wool*, 818 F.2d at 1441 (focus of 20(a) inquiry "should be on how to characterize the relationship between the various alleged controlling persons and the alleged violator of the securities laws."). By virtue of their positions as Directors and their duties as Audit Committee Members, including oversight of the Company's financial reporting and internal controls, the Court finds it reasonable to infer that Grinberg, Mosich, and Argalas had the ability to directly or indirectly control, at the very least, BofI's statements concerning the adequacy of its internal controls and compliance infrastructure, including those statements about BofI's investments in staffing. The statements that the Court has identified as actionable were made during conference calls and press releases that accompanied and explained the financial results over which the Audit Committee members had the power to correct and for which they had the responsibility to manage. As such and in light of the "remedial" purpose of Section 20(a) and the mandate to construe the statute "flexibly and liberally," the Court concludes that Lead Plaintiff has alleged enough against Mosich, Argalas, and

58

Grinberg to survive the motion to dismiss. The burden now passes to Defendants to demonstrate that "they acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

### Defendants' Request for Judicial Notice

Generally, a court cannot consider matters outside of the complaint on a Rule 12(b)(6) motion to dismiss, unless those matters are: (1) authenticated documents that have been incorporated by the complaint or (2) facts subject to judicial notice. *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001). Documents may be incorporated into a complaint when the plaintiff "refers extensively" to the document or when the document forms the basis of the plaintiff's claims. *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Courts may take judicial notice of adjudicative facts that are "not subject to reasonable dispute." Fed. R. Evid. 201(b). Indisputable facts are those that are "generally known" or that "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Id.*

Here, Defendants have requested that the Court take judicial notice of twenty exhibits in connection with Defendants' motion to dismiss the SAC. The exhibits fall into one of four categories: (1) filings with the SEC, Exhibit 1; (2) filings in the *Erhart* Case, Exhibits 8 and 11; (3) public records of federal agencies, Exhibits 3-6, 10-13, 16, 18; and (4) documents allegedly incorporated by reference by the SAC, Exhibits 2, 7, 9, 14, 15, and 17. Dkt. No. 88-1. Lead Plaintiff, in response, opposes Defendants' request as to Exhibits 7, 8, 11, and 15 only, and concedes that the other documents can be properly noticed though "not for the truth of the contents of those documents." Dkt. No. 94-3.

SEC filings are the proper subjects of judicial notice as they are not subject to reasonable dispute. *See Dreiling v. American Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); *see also In re New Century*, 588 F. Supp. 2d at 1219-20 (taking judicial notice of the SEC filings submitted by Defendants). Accordingly, the Court GRANTS defendants' request to take judicial notice of Exhibit 1, but the Court will

not, as Lead Plaintiff requests, consider the document for the truth of the matters asserted therein. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) (granting defendants' request to take judicial notice of SEC filings, but specifying that they will not "where inappropriate" be considered for the truth of the matter asserted."); *see also Curry v. Hansen Medical, Inc.*, 2012 WL 3242447, *3 (N.D. Cal. Aug. 10, 2012) (taking judicial notice of SEC filings, "but not for the truth of the matters asserted therein.")

Because the Court did not rely on the other documents included in Defendants' request and because Defendants' motion does not make clear how those documents advance Defendants' argument, the Court DENIES Defendants' request to take judicial notice of the remaining exhibits. *See In re Washington Mutual, Inc. Sec., Deriv. & ERISA Litig.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009); *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 996 (S.D. Cal. 2005) (denying defendants' request for judicial notice in part because the court did not rely on the document and found them irrelevant in deciding the motion to dismiss).

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss, Dkt. No. 88, be **DENIED** as to the Section 10(b) claims asserted against the corporate defendant BofI, and Defendant Gregory Garrabrants and **GRANTED** as to Defendants Andrew Micheletti, Nicholas Mosich, Paul Grinberg, and James Argalas.

2.     Defendants' Motion to Dismiss be **DENIED** as to the Section 20(a) claims asserted against Garrabrants, Andrew Micheletti, Nicholas Mosich, James Argalas, and Paul Grinberg.

3.     Defendants' Motion to Dismiss be **GRANTED** as to those statements, as identified by this Order, that concern BofI's (1) Net income/diluted price per share; (2) ALL; (3) LTV; and (4) Lending

60

partnerships.  Those statements are not actionable for purposes of this securities fraud suit.

**IT IS SO ORDERED.**

Dated:  May 23, 2017

Hon. Gonzalo P. Curiel
United States District Judge