1    Richard M. Heimann (Cal. Bar No. 063607)
     rheimann@lchb.com
2    Katherine C. Lubin (Cal. Bar No. 259826)
     kbenson@lchb.com
3    LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
4    275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
5    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008
6
     Daniel P. Chiplock (admitted *pro hac vice*)
7    dchiplock@lchb.com
     Michael J. Miarmi (admitted *pro hac vice*)
8    mmiarmi@lchb.com
     LIEFF CABRASER HEIMANN &
9    BERNSTEIN, LLP
     250 Hudson Street, 8th Floor
10   New York, NY  10013-1413
     Telephone:  (212) 355-9500
11   Facsimile:  (212) 355-9592

12
13   *Counsel for Lead Plaintiff Houston Municipal*
     *Employees Pension System and Lead Counsel for*
     *the Proposed Class*
14

15 **UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

16

17                                Case No. 3:15-cv-02324-GPC-KSC

18                                **CLASS ACTION**

     IN RE BofI HOLDING, INC.
19   SECURITIES LITIGATION            **THIRD AMENDED CLASS**
                               **ACTION COMPLAINT FOR**
20                                **VIOLATIONS OF THE**
                               **FEDERAL SECURITIES LAWS**
21

22

23                                **DEMAND FOR JURY TRIAL**

24

25

26

27

28

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

4   I.      NATURE OF THE ACTION...............................................................1

5   II.     JURISDICTION AND VENUE........................................................10

6   III.    PARTIES ..........................................................................................11

7   IV.     DEFENDANTS MADE MATERIALLY FALSE AND
           MISLEADING STATEMENTS RELATING TO BOFI'S INTERNAL
8          CONTROLS, COMPLIANCE INFRASTRUCTURE, AND RISK
           MANAGEMENT .............................................................................13

9          A.      Statements Relating to BofI's Internal Controls, Compliance
10                 Infrastructure, and Risk Management.................................13

11                 1.      BofI's Form 10-Ks......................................................14

12                 2.      BofI's Form 10-Qs......................................................15

13                 3.      BofI's Proxy Statements ............................................16

14                 4.      SOX Certifications......................................................18

15                 5.      BofI's Form 8-Ks........................................................19

16                 6.      BofI's Investor Presentations....................................19

17                 7.      BofI's Earnings Conference Calls ...........................20

18                 8.      Statements Relating to Related Party Loans in BofI's
                           Proxy Statements .......................................................21
19
           B.      BofI's Ineffective Internal Controls...................................22
20
                   1.      BofI's Internal Controls Were "Non-Existent" and Its
21                         Audit Department Inadequately Staffed. ................24

22                 2.      BofI's Audit Committee and Internal Audit Program
                           Were Materially Inadequate And Often Overridden by
23                         Management. ..............................................................26

24                         a.      BofI's Audit Committee Lacks Independence and
                                   Does Not Provide Adequate Oversight. ..........27
25
                           b.      BofI's Violations of the Flood Disaster Protection
                                   Act. ........................................................................31
26
                           c.      BofI Failed to Adequately Disclose Related-Party
27                                 Transactions and Related-Party Loans to Audit
                                   Committee Members. ...........................................32

28

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1

## **TABLE OF CONTENTS**
### **(continued)**

**Page**

3.  BofI Failed To Disclose The Criminal Background Of A Senior Officer and Violations of the FDIA. ............................ 35

4.  Garrabrants Routinely Intimidated BofI Personnel, Including Members of the Audit Department. ......................... 37

5.  BofI Falsely Responded to Regulatory Subpoenas and Requests. .................................................................. 42

C.  Defendants' Misrepresentations About the Company's Internal Controls, Risk Management and Compliance Infrastructure Caused Investors' Losses ................................................ 42

1.  The Erhart Complaint Reveals BofI's Inadequate Internal Controls, Risk Management and Compliance Infrastructure ................................................................ 43

2.  Additional Disclosures Reveal The Falsity of BofI's Misrepresentations About Its Internal Controls, Risk Management and Compliance Infrastructure. ......................... 46

V.  DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS RELATING TO UNDERWRITING STANDARDS AND CREDIT QUALITY ................................... 48

A.  Statements Relating to Underwriting Standards and Credit Quality ............................................................................. 48

B.  BofI Engaged in Unlawful Lending Practices. .................................. 53

1.  BofI Violated the "Ability-to-Repay" Rule. ............................ 53

2.  BofI Maintained a Deficient Customer-Identification Program and Violated Federal Laws and Regulations. ............ 59

a.  BofI's Deficient Customer Identification Program ........ 59

b.  Loans to Foreign Nationals ............................................ 61

c.  Missing or Unverifiable Customer TINs ....................... 63

3.  BofI Engaged in, and Concealed, Illicit Lending Partnerships .................................................................... 64

a.  OnDeck ........................................................................... 64

b.  Quick Bridge .................................................................. 68

c.  Center Street ................................................................... 73

d.  Propel Tax ...................................................................... 75

C.  Defendants' Misrepresentations About BofI's Underwriting Standards And Credit Quality Caused Investors' Losses .................. 76

1

### TABLE OF CONTENTS
(continued)

2

3                                                                    **Page**

4    VI.   DEFENDANTS MADE MATERIALLY FALSE AND
          MISLEADING STATEMENTS RELATING GOVERNMENT AND
5         REGULATORY INVESTIGATIONS .......................................................... 81

6          A.    Statements Regarding Government and Regulatory
                 Investigations .......................................................................... 81
7
           B.    Defendants' Misrepresentations About Government and
8                Regulatory Investigations Caused Investors' Losses. ........... 85

9    VII.  ADDITIONAL SCIENTER ALLEGATIONS ............................................ 87

10   VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS ................................... 89

11   IX.   FRAUD-ON-THE-MARKET PRESUMPTION ......................................... 90

12   X.    ADDITIONAL CONTROL-PERSON ALLEGATIONS ........................... 91

13   COUNT I  (AGAINST BOFI AND GARRABRANTS FOR VIOLATIONS
          OF SECTION 10(B)  OF THE EXCHANGE ACT AND RULE 10B-5
14        PROMULGATED THEREUNDER) ........................................................ 94

15   COUNT II  (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE
          ACT  AGAINST THE INDIVIDUAL DEFENDANTS) ............................. 97

16   PRAYER FOR RELIEF ................................................................................ 98

17   DEMAND FOR TRIAL BY JURY ................................................................ 99

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Lead Plaintiff Houston Municipal Employees Pension System ("Plaintiff" or "HMEPS"), individually and on behalf of all other entities and individuals similarly situated, by its undersigned attorneys, alleges the following against BofI Holding, Inc. ("BofI" or the "Company") and the other defendants identified below (collectively, "Defendants") based on personal knowledge as to itself and its own acts, and information and belief as to all other matters. Plaintiff's allegations are premised on, *inter alia*, the investigation conducted by and through its attorneys, which includes a review of:

- public filings with the United States Securities and Exchange Commission ("SEC") by BofI, as well as other regulatory and government filings concerning BofI or related entities, and information obtained through the Freedom of Information Act ("FOIA");

- wire and press releases, public conference calls, and media and news reports concerning BofI;

- securities analysts' reports and advisories about BofI; and

- pleadings and other documents filed in lawsuits involving BofI, including in *Charles Matthew Erhart v. BofI Holding Inc., et al.*, No. 3:15-cv-2287-BAS-NLS (S.D. Cal.) ("Erhart Action"), *BofI Federal Bank v. Charles Matthew Erhart, et al.*, No. 3:15-cv-2353-BAS-NLS (S.D. Cal.), and *In re BofI Holding, Inc. Derivative Litigation*, No. 3:15-cv-2722-GPC-KSC (S.D. Cal.), as well as related information readily obtainable on the Internet.

Plaintiff's counsel also conducted or caused to be conducted interviews with former BofI employees, who are identified in this Complaint as confidential witnesses ("CWs"). Plaintiff believes further substantial evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This is a securities fraud class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as SEC Rule 10b-5, on behalf of all individuals and entities who purchased or otherwise acquired the publicly traded common stock of BofI between September 4, 2013 and February 3, 2016, inclusive (the "Class Period"), as well as purchasers

of BofI call options and sellers of BofI put options during the Class Period. As detailed in this Complaint, BofI and those who ran it—particularly its CEO and President, Gregory Garrabrants—touted BofI's purportedly effective internal controls, conservative loan-underwriting standards, and compliance with legal and regulatory obligations when, in fact, they were routinely overriding BofI's internal controls (which former employees described as "non-existent"), engaging in substandard lending practices, and secretly flouting banking laws and other directives. When investors ultimately became aware that Defendants were engaging in this behavior, contrary to numerous statements Defendants had made during the Class Period, the price of BofI shares declined significantly, and Plaintiff and other Class members suffered damages.

2.       BofI is the holding company for BofI Federal Bank (the "Bank"),[1] a federal savings association that provides consumer and business banking products through various distribution channels and affinity group partners (such as Costco). BofI offers various types of consumer and business checking, savings and time-deposit accounts, as well as financing for single-family and multi-family residential properties, small-to-medium size businesses in certain sectors, state lottery prize and structured-settlement annuity payments, and consumer auto and recreational vehicles.

3.       Founded in 1999 during the dot-com boom, BofI is not the typical thrift bank with multiple brick-and-mortar branch locations. Rather, BofI operates primarily from its headquarters in San Diego, California and relies on various distribution channels such as banking websites promoting the Company's "Bank of Internet," "NetBank," "Bank X," and other brands, relationships with mortgage brokers, and salespeople, to generate business.

---

[1] References herein to "BofI" include BofI Federal Bank, unless otherwise indicated.

4.     BofI generates fee income from consumer and business products, including fees from loans it originates for sale and transaction fees from processing payments on loans it retains.  BofI's loan portfolio also generates interest income.

5.     In recent years, BofI has consistently reported extraordinary growth and record profitability while other banks faced small and shrinking net interest margins (the difference between what a bank pays depositors and its loan rates) amid low interest rates and a flattening yield curve.[2]  In the five years leading up to December 31, 2015, BofI's total deposits increased nearly 235% to $5.2 billion and its total loan portfolio increased more than 270% to $5.715 billion.  BofI's earnings also increased year-over-year, from $20.6 million for its fiscal year ending June 30, 2011 to $82.7 million for fiscal year ending June 30, 2015, driven primarily by growth in the Company's interest-earning loan portfolio.  As of December 30, 2015, approximately 59% of BofI's loan portfolio consisted of single-family residential secured mortgages and approximately 21% consisted of multi-family real estate secured loans.

6.     BofI's stock price also skyrocketed on the Company's purportedly strong performance.  During the Class Period, it reached a high of $142.54 per share, or more than 1,100% above its initial public offering price of $11.50 per share in 2005.[3]

7.     BofI's success has been attributed to its ability to attract money by offering relatively high deposit rates and then using the money to make mortgage loans, often to wealthy borrowers with blemished or no credit history, at high interest rates.  The Company also prides itself on significant cost savings and operational efficiencies derived from its purported branchless business model, as

---

[2] *See* John Carney, *Fed Stance Squeezes Bank Profits*, The Wall St. J., Sept. 21, 2015.

[3] On or around November 18, 2015, BofI completed a forward 4:1 stock split and the stock began trading on a split-adjusted basis.  BofI's stock price in ¶ 6 is reported on a pre-split basis.  Unless otherwise indicated, all other BofI references in this Complaint to BofI share prices are adjusted for the stock split.

1   well as low loan losses, which the Company has attributed to its adherence to

2   conservative loan-underwriting standards, effective internal controls, and its

3   remarkably low 60% effective weighted average loan-to-value ("LTV")

4   percentage—the ratio of the loan amount to the value of the property securing the

5   loan—across its entire loan portfolio.

6       8.     As detailed in this Complaint, however, Defendants' representations

7   portraying BofI as a careful, prudent institution masked a troubled entity that

8   resorted to high-risk lending practices and disregarding internal controls to

9   fraudulently boost its loan volume and earnings.  In doing so, BofI was subject to

10  substantial regulatory and compliance risk, as well as concealed risk of loss that it

11  masked in part during the Class Period through the use of undisclosed special

12  purpose entities ("SPEs").

13      9.     The allegations of troubling conduct at BofI are informed by first-

14  hand witness accounts by numerous former BofI employees, a number of whom

15  describe senior management (particularly Garrabrants, either directly or through

16  his subordinates) as improperly pressuring or directing (a) audit personnel to alter

17  or bury their reports and findings so as to hide compliance issues from regulators

18  and (b) lending personnel to approve loans that otherwise would or should not

19  have been approved.

20      10.    For starters, on October 13, 2015, *The New York Times* reported that a

21  former internal auditor at BofI, Charles Matthew Erhart, had filed an action against

22  BofI for violating federal laws designed to protect whistleblowers, which alleged

23  widespread misconduct and a stunning deficiency in internal controls at the

24  Company.  Among other things, Erhart's complaint (the "Erhart Complaint")

25  alleged that (i) BofI's Chief Executive Officer (Garrabrants) engaged in "grossly

26  inappropriate" and intimidating contact with audit personnel, combined with

27  similarly improper pressure tactics by other BofI senior officers, in order to

28  interfere with the auditors' independent functions and findings, including by

1  pressuring such personnel not to put their concerns "in writing"; (ii) BofI made

2  substantial loans to foreign nationals and "politically exposed persons," in

3  violation of the Bank Secrecy Act of 1970 ("BSA"); (iii) senior officers (including

4  Chief Performance Officer Jan Durrans) knowingly presented BofI's audit

5  personnel with documents falsely indicating that the Bank's Fiscal 2015 strategic

6  plan had been properly and timely approved by the Bank's Board of Directors; (iv)

7  BofI compliance personnel found Flood Disaster Protection Act of 1973 ("FDPA")

8  issues with 49 out of 51 sample loans reviewed, but BofI purposefully "buried"

9  and hid from the Office of the Comptroller of the Currency ("OCC") the

10  compliance review identifying many of those issues, causing several compliance

11  employees to quit over the "Bank's nonexistent culture of compliance"; (v) BofI's

12  senior officers directed that "bad" Customer Identification Program ("CIP")

13  information from a third-party vendor be withheld from the OCC, and that a

14  "sanitized" list be generated and produced instead, in contravention of proper audit

15  practices; (vi) Garrabrants improperly deposited third-party checks into his

16  personal account; (vii) BofI falsely responded to an SEC subpoena and OCC

17  request for information concerning customer account information; and (viii)

18  Jonathan Ball, BofI's Vice President of Internal Audit and Erhart's supervisor,

19  resigned abruptly on March 5, 2015 after refusing Garrabrants's order "to engage

20  in what Ball reasonably viewed to be unlawful conduct to cover up the Bank's

21  wrongdoing."  Erhart alleged that he "went up the chain of command" in order to

22  "get the Bank into compliance" concerning these and other issues, only to be

23  "repeatedly threatened, harassed and ultimately fired" after revealing wrongdoing

24  at BofI to management as well as the SEC, the OCC, and the U.S. Department of

25  Labor, Occupational Safety and Health Administration.[4]

26

27  _____
[4] BofI has responded aggressively to Erhart's suit, immediately filing a countersuit
of its own against Erhart on October 19, 2015.  *BofI Federal Bank v. Erhart*, No.
28  15-cv-02353-BAS(NLS) (S.D. Cal.) ("*BofI v. Erhart*"), in which the Bank sought
direct and consequential damages and "exemplary and punitive damages," in

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

11.     Other former BofI employees confirm that Garrabrants and other members of senior management routinely overrode the Company's internal controls and interfered with employees' ability to perform their jobs properly. They also report that the Company's audit department was chronically understaffed.  In sum, BofI failed to implement adequate internal controls, and routinely flouted those risk management and compliance procedures it did have, rendering false and misleading the Bank's and Garrabrants's numerous statements during the Class Period that the Company was committed to "strong risk management" and regulatory compliance.

12.     Additional former BofI employees knowledgeable about BofI's loan-origination and underwriting activities and operations have recounted to Plaintiff's counsel that BofI's claims that its lending standards were "conservative" and "disciplined," and that the Bank was focused on "credit quality," were false and misleading when made.  These former employees describe BofI's routine practice of flouting its own underwriting guidelines and originating risky loans in order to pad the Bank's loan origination volume.

13.     BofI's improper lending and other practices violated numerous federal banking regulations and consumer protection laws and subjected the Company to significant risk of regulatory and government action.  For example, the CWs confirm that BofI (i) issued loans to borrowers whose ability to repay was demonstrably doubtful, in violation of the Truth-In-Lending Act ("TILA"); (ii) issued loans to foreign nationals who had criminal or suspicious backgrounds or

---

addition to a broad injunction, and moving repeatedly not only to throw Erhart's case out of court completely, but also to summarily adjudicate his defenses to BofI's countersuit.  These efforts to date have failed in their mission to eliminate Erhart's suit and destroy him financially, although BofI's motion for reconsideration of the Court's order partially denying summary adjudication of Erhart's defenses is still pending.  BofI also aggressively sought to depose Erhart's lawyer, accusing her of acting in concert with shortsellers of BofI and having improper communications with a *New York Times* reporter, but that subpoena was quashed.  *See* Order Granting Mot. To Quash BofI's Subpoena to Testify at a Deposition (Dkt. No. 86) in *BofI v. Erhart*  (filed Mar. 2, 2017).

lacked sufficient identifying information, in violation of the BSA; (iii) issued loans for properties that failed to comply with the FDPA; and (iv) employed a convicted felon as a senior officer without obtaining a waiver required by the Federal Deposit Insurance Act ("FDIA").

14.     In addition, BofI had undisclosed lending partnerships with a number of entities such as On Deck Capital, Inc. ("OnDeck"), Quick Bridge Funding LLC ("Quick Bridge"), Center Street Lending ("Center Street"), and Propel Tax, each of which engaged in predatory lending or other high risk practices, including offering "liar loan" products, which resulted in riskier loans and lower credit quality.

15.     BofI reaped significant benefits from these lending partnerships, including millions of dollars in loan-origination fees and the ability to report growth in its loan originations and overall improved efficiency.  However, the undisclosed lending partnerships with OnDeck and Quick Bridge, in particular, created significant risks of regulatory actions by the OCC or others against BofI arising from BofI's origination of loans pursuant to a "Rent-A-Charter" scheme. The OCC has publicly condemned and sought to eliminate through enforcement actions such schemes involving arrangements between non-bank lenders and national banks, such as BofI, in which the lenders seek to evade state usury laws by partnering with banks (which are not subject to state law interest rate limits) and paying them a fee to "rent" their bank charter to make high interest rate loans.

16.     In addition, the Bank's undisclosed lending partnership with Quick Bridge created significant credit risk borne by BofI.  BofI originated high interest, high risk loans brought to it by Quick Bridge, and then sold or assigned the loans to Quick Bridge or an affiliated entity (collectively, "Quick Bridge").  Because BofI also provided funding to Quick Bridge to buy those types of loans from BofI, and those funds were collateralized by the loans Quick Bridge bought from BofI, BofI ultimately bore the credit risk of the loans defaulting, unbeknownst to

1  investors.  Indeed, BofI's lending partnership with Quick Bridge was tantamount

2  to a Ponzi scheme, because BofI required its lending partners to replace loans

3  collateralizing the funding BofI provided to them if the loans became delinquent.

4  BofI did not properly disclose nor account for the risk that its lending partners

5  would not able to adequately replace such delinquent loans that collateralized

6  funding BofI provided to them.

7  17.  These lending partners' substandard underwriting standards are at

8  odds with BofI's statements touting its own high underwriting standards and loan

9  credit quality throughout the Class Period.  BofI's failures to disclose these

10  relationships and to acknowledge that it was funding loans through partners that

11  utilized substandard underwriting standards additionally render the Bank's

12  statements concerning its underwriting standards and credit quality false and

13  misleading.

14  18.  Finally, throughout the Class Period the Bank refused to acknowledge

15  the presence of nonpublic government investigations of the Company, including

16  investigations by the OCC and SEC, and that the Company had received

17  government-issued subpoenas.  Indeed, Plaintiff recently obtained (*via* FOIA

18  request) from the SEC a document confirming that, contrary to Defendants'

19  express representations to the contrary during the Class Period, BofI was the

20  subject of SEC investigation no later than May 2015.  Furthermore, that

21  investigation (which was formalized by February 2016) expressly did *not* confirm,

22  as Defendants falsely represented in a previous court filing in this matter, that

23  allegations of mismanagement and regulatory violations against BofI were "false."

24  *See* MPA in Support of Defs. Mot. for Judgment on the Pleadings [Dkt. No. 123-1]

25  at 14 n.8.[5]

26  _____

27  [5] In its letter to BofI dated June 28, 2017, which Plaintiff only recently obtained *via* FOIA request, the SEC confirmed that BofI had been the subject of a formal investigation, and expressly stated that "the attempted use of [its] communication"

28  that its investigation was being concluded "as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally,

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

19.     The previously undisclosed material facts were revealed to the market through a series of corrective disclosures beginning on August 28, 2015 and ending on February 3, 2016, each of which caused the price of BofI shares to decline significantly.

20.     Following the revelations in the Erhart Complaint, for instance, the price of BofI common stock declined $10.72 per share, or 30.2%, to close at $24.78 on October 14, 2015, on extremely high trading volume, for a one-day market capitalization loss of more than $675 million.

21.     BofI's stock price continued to plummet through February 3, 2016, the last day of the Class Period, as the market learned additional details about Defendants' prior misrepresentations and omissions.  For example, a series of articles published in late 2015 and early 2016 revealed BofI's substandard underwriting practices, including its relationships with third-party lenders that originated loans for the Bank and subjected the Bank to additional regulatory risk.  Additional reports revealed BofI's disregard for internal controls and risk management procedures, and disclosed conflicts of interest within the Audit Committee and senior management as a result of related party loans.  The market also learned that BofI was misleading it about the existence of regulatory investigations into the Bank's practices.

22.     From the time that the truth about Defendants' wrongful conduct first emerged until the time the market learned of BofI's true financial condition, the

---

*would be clearly inappropriate and improper* since such a communication, at the most, can mean that, as of its date, the staff of the Commission does not regard enforcement action as called for based upon whatever information it then has. Moreover, this conclusion may be based upon various reasons, some of which, such as workload considerations, *are clearly irrelevant to the merits of any subsequent action*." (emphases supplied). This did not stop BofI from improperly, and falsely, representing in its recent motion for judgment on the pleadings in this matter that the SEC's June 28, 2017 decision not to recommend enforcement action proved the "fals[ity]" of allegations of "mismanagement" and "regulatory violations" against it.  *See* Dkt. No. 123-1, at 14, n.8.  Notably, BofI improperly referenced (and mischaracterized) the SEC's June 28, 2017 letter in its motion without actually providing a copy to the Court or to Plaintiff by way of a request for judicial notice, as is required when citing materials beyond the pleadings.

1    price of BofI common stock declined in a series of material steps from $30.38 per

2    share (the closing price on August 27, 2015, one trading day immediately

3    preceding August 28, 2015), to $15.92 per share on February 3, 2016, the last day

4    of the Class Period—*a total decline of over 47.6%*—as the market processed each

5    set of previously undisclosed facts.  Each disclosure and/or materialization of

6    previously concealed risks removed a portion of the artificial inflation from the

7    price of BofI's common stock caused by Defendants' prior material

8    misrepresentations and omissions, and directly caused Plaintiff and the Class to

9    suffer damages.

10       23.    Defendants' misconduct gives rise to (i) claims under Section 10(b) of

11   the Exchange Act against Defendants BofI and Garrabrants, arising from those

12   Defendants' making of false or misleading statements of material fact with

13   scienter, *i.e.*, knowingly or with deliberately reckless disregard for their falsity and

14   (ii) claims for "control person liability" under Section 20(a) of the Exchange Act

15   against Defendants Garrabrants, Micheletti, Grinberg, Mosich, and Argalas

16   (collectively, the "Individual Defendants").  As this Court has already held,

17   consistent with Ninth Circuit precedent, establishing a controlling person's liability

18   under Section 20(a) does *not* require establishing that person's scienter distinct

19   from the controlled corporation's scienter.  Accordingly, because BofI is liable

20   under Section 10(b), each Individual Defendant is liable as a "controlling person"

21   of BofI under Section 20(a) regardless of whether he is also liable under Section

22   10(b).

## II.    **JURISDICTION AND VENUE**

24       24.    This Court has jurisdiction over the subject matter of this action

25   pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act

26   (15 U.S.C. § 78aa).

27       25.    Venue is proper in this District pursuant to Section 27 of the

28   Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as BofI is

1   headquartered in this District and many of the acts and practices complained of in
2   this Complaint occurred in substantial part in this District.

3          26.    In connection with the misconduct alleged in this Complaint,
4   Defendants, directly or indirectly, used the means and instrumentalities of
5   interstate commerce, including the United States mails, interstate telephone
6   communications, and the facilities of the national securities markets.

7   **III.   PARTIES**

8          27.    By order entered on February 1, 2016, this Court appointed HMEPS
9   as Lead Plaintiff (Dkt. No. 23).  As set forth in its certification filed in connection
10  with its motion for appointment as Lead Plaintiff (Dkt. No. 12-3 (Ex. B)), HMEPS
11  purchased BofI common stock during the Class Period and, as a result of
12  Defendants' misconduct alleged in this Complaint, suffered damages in connection
13  with those purchases.

14         28.    Defendant BofI is a Delaware company that maintains its corporate
15  headquarters at 4350 La Jolla Village Drive, Suite 140, San Diego, California
16  92122.  Founded in 1999, BofI is the holding company for BofI Federal Bank, a
17  federally chartered savings association that purportedly operates from its single
18  location in San Diego.  As of December 31, 2015, BofI held $5.2 billion in
19  deposits.

20         29.    BofI also offers various types of consumer and business loans,
21  including: (i) Single Family Mortgage Secured Lending—mortgages secured by
22  first liens on single-family residential properties for consumers and for businesses
23  (*i.e.*, lender-finance loans), as well as consumer home equity loans secured by
24  second liens on single-family mortgages; (ii) Multifamily Mortgage Secured
25  Lending—multi-family residential mortgage loans; and (iii) Commercial Real
26  Estate Secured and Commercial Lending—loans secured by first liens on
27  commercial real estate and commercial and industrial ("C&I") loans based on
28  business cash flow and asset-backed financing.

30.     On or around August 31, 2015, BofI closed a purchase-and-assumption transaction with H&R Block, a federal savings bank, and its parent company, pursuant to which BofI purchased certain assets and assumed certain liabilities, including all of H&R Block's deposit liabilities.  It also received $419 million of cash and assumed an equal amount of deposit liabilities and acquired a small amount of non-cash assets.  Additionally, BofI entered into a program-management agreement with H&R Block under which BofI would provide H&R Block-branded financial services products through H&R Block's retail and digital channels.

31.     BofI's common stock is listed on NASDAQ Global Select Market under the ticker "BOFI" and is a component of the Russell 2000® Index and the S&P SmallCap 600® Index.

32.     Defendant Gregory Garrabrants has served at all relevant times as President, CEO, and a Director of BofI.  He has also served as President, CEO, and a Director of BofI Federal Bank, and a member of its Board's Credit Committee, Asset and Liability Committee ("ALCO"), and Operations and Technology Committee.  Garrabrants is an attorney and member of the State Bar of California; he also has a Master's of Business Administration degree and is a Chartered Financial Analyst ("CFA").

33.     Defendant Andrew J. Micheletti has served at all relevant times as the Company's Executive Vice President and Chief Financial Officer.  He is licensed as a Certified Public Accountant ("CPA") (inactive) in California and has held various licenses issued by the National Association of Securities Dealers.

34.     Garrabrants and Micheletti signed Sarbanes-Oxley Act of 2002 ("SOX") certifications accompanying Forms 10-Q and 10-K that BofI filed with the SEC during the Class Period, and made other false or misleading statements of material fact to investors, including in press releases issued by BofI and during BofI conference calls with analysts and investors.

35.     Defendant Paul J. Grinberg has served at all relevant times as a member of BofI's Board of Directors and as Chairman of the Board's Audit Committee, Chairman of the Board's Compensation Committee, and a member of the Board's Nominating Committee.  He also serves as Chairman of the Audit Committee of the Board of Directors of BofI Federal Bank.  Grinberg is a former partner of Deloitte & Touche LLP and has an MBA degree and a bachelor's degree in accounting.  He is also licensed as a CPA in New York.

36.     Defendant Nicholas A. Mosich has at all relevant times served as Vice Chairman of BofI's Board of Directors and as member of the Board's Audit Committee.  He also serves as a member of the Audit Committee, the ALCO, the Credit, and the Operations and Technology Committees of the Board of Directors of BofI Federal Bank, and holds an MBA.

37.     Defendant James S. Argalas has at all relevant times served as a member of BofI's Board of Directors and as a member of the Board's Audit Committee.  He also serves as a member of the Audit Committee and the Internal Assets Review Committee of the Board of Directors of BofI Federal Bank, and holds an MBA.

## IV.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS RELATING TO BOFI'S INTERNAL CONTROLS, COMPLIANCE INFRASTRUCTURE, AND RISK MANAGEMENT

### A.   Statements Relating to BofI's Internal Controls, Compliance Infrastructure, and Risk Management

38.     Throughout the Class Period, Defendants made numerous false and misleading statements that BofI had adequate internal controls over financial reporting, and was committed to risk management and establishing an adequate compliance infrastructure.  The truth, as described further below, was that BofI violated banking laws and regulations requiring banks to establish and maintain effective internal controls.  Specifically, Defendants' statements were false and misleading when made because Defendants knew, but failed to disclose, that: (i)

BofI's internal controls were deficient (indeed, former employees described them as "non-existent") and its Audit department was inadequately staffed; (ii) BofI's Audit Committee and internal audit program were materially inadequate and the Audit Committee lacked independence; (iii) BofI's Audit Committee members suffered from conflicts of interest by having benefitted from related-party loans from BofI on favorable terms; (iv) BofI failed to disclose the criminal background of a senior officer and violated the FDIA; (v) Garrabrants and other senior officers routinely intimidated BofI personnel, including Audit department members, and interfered with audit functions; and (vi) BofI falsely responded to regulatory subpoenas and requests.

### 1.    BofI's Form 10-Ks

39.    BofI's Form 10-K for the period ending June 30, 2014 ("2014 Form 10-K") contained the following statements:

> Standards for Safety and Soundness. The federal banking regulatory agencies have prescribed, by regulation, guidelines for all insured depository institutions relating to: (i) *internal controls, information systems and internal audit systems*;[6] (ii) loan documentation; (iii) credit underwriting; (iv) interest rate risk exposure; (v) asset growth; (vi) asset quality; (vii) earnings; and (viii) compensation, fees and benefits. *The guidelines set forth safety and soundness standards that the federal banking regulatory agencies use to identify and address problems at FDIC member institutions before capital becomes impaired*. If the OCC determines that the Bank fails to meet any standard prescribed by the guidelines, the OCC may require us to submit to it an acceptable plan to achieve compliance with the standard. OCC regulations establish deadlines for the submission and review of such safety and soundness compliance plans in response to any such determination. We are not aware of any conditions relating to these safety and soundness standards that would require us to submit a plan of compliance to the OCC.
>
> Item 9A. Controls and Procedures.  Evaluation of Disclosure Controls and Procedures. Our management, under supervision and with the participation of the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures, as defined under Exchange Act Rule 13a-15(e). *Based upon this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2014, the disclosure controls and procedures were effective* to ensure that information required to be disclosed in the Company's Exchange Act

---

[6] Unless otherwise specified, all emphases to quoted excerpts herein are supplied.

reports is recorded, processed, summarized and reported within the time periods specified in the Securities Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

Management's Report On Internal Control Over Financial Reporting. **Management is responsible for establishing and maintaining adequate internal control over financial reporting**. Internal control over financial reporting is defined in Rule 13a-15 (1) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of; our principal executive and principal financial officers and effected by the board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions of our assets;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

40.     BofI's Form 10-K for the period ended June 30, 2015 ("2015 Form 10-K") contained these same disclosures.[7]

### 2.     BofI's Form 10-Qs

41.     BofI's Form 10-Q filed September 30, 2013 contained the following statement concerning BofI's internal controls:

ITEM 4. CONTROLS AND PROCEDURES.  The Company's management, with the participation of its Chief Executive Officer and Chief Financial Officer, **conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures**, pursuant to Exchange Act Rule 13a-15(e). **Based**

---

[7] For clarity and brevity, Plaintiff has included examples of false and misleading statements in the body of the Complaint.  A complete list of Defendants' alleged false and misleading statements appears in the accompanying Appendix.

*upon that evaluation, our Chief Executive Officer along with our Chief Financial Officer concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were effective* to ensure that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended September 30, 2013 that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

42.    BofI's Form 10-Qs for the periods ending December 31, 2013, March 31, 2014, September 30, 2014, December 31, 2014, March 21, 2015, September 30, 2015, and December 31, 2015 contained the same statements. *See* App'x at Section I.

### 3.    BofI's Proxy Statements

43.    The Proxy Statements (Form DEF 14A) contained the following statements about BofI's internal controls:

- "The Board's Role in Risk Oversight. . . the Audit Committee primarily oversees those risks that may directly or indirectly impact our financial statements, including the areas of financial reporting, *internal controls* and compliance with public reporting requirements . . ."

- "Report of the Audit Committee . . . The primary responsibilities of the Audit Committee are to oversee and monitor the integrity of the Company's financial reporting process, financial statements and *systems of internal controls*; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence and performance; and the *performance of the Company's internal audit function*."

44.    These statements appeared in BofI's Proxy Statements dated September 9, 2013 ("2013 Proxy Statement"), September 8, 2014 ("2014 Proxy Statement"), and September 4, 2015 ("2015 Proxy Statement").  The Proxy Statements were signed by Garrabrants, and the Report of the Audit Committee

contained therein was signed by Defendants Grinberg, Argalas, and Mosich. *See* App'x at Section I.

45.     The Proxy Statements also included a statement explaining that "[t]he Audit Committee operates under a written charter adopted by the Board of Directors." The Audit Committee Charter, available on BofI's website, sets forth the duties and responsibilities of the Audit Committee as follows, in relevant part:

1.     Review available policies and procedures adopted by the Company to fulfill its responsibilities regarding the fair and accurate presentation of financial statements in accordance with generally accepted accounting principles and applicable rules and regulations of the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) applicable to Nasdaq-listed issuers;

2.     Oversee the Company's accounting and financial reporting process;

* * *

6.     Confirm that the Company's principal executive officer and principal financial officers are satisfying the certification requirements of Sections 302 and 906 of the Sarbanes-Oxley Act; *review disclosure made to the Audit Committee by the CEO and CFO about significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a role in the Company's internal control over financial reporting*;

* * *

19.     Review the Company's annual audited financial statements with management, including a review of major issues regarding accounting and auditing principles and practices, *and evaluate the adequacy and effectiveness of the Company's disclosure controls and procedures and management's reports thereon*;

* * *

22.     Review the significant reports to management prepared by the Company's internal auditing department and management's responses;

* * *

25.     Establish procedures for: (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, *internal accounting controls* or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of *concerns regarding questionable accounting or auditing matters*;

26.    Review reports prepared by Management concerning all related party transactions for potential conflicts of interest situations on an ongoing basis and approve all such transactions (if such transactions are not approved by another independent body of the Board)

### 4.    SOX Certifications

46.    Throughout the Class Period, BofI's filings with the SEC included certifications pursuant to Sections 302 and 906 of SOX by Defendants Garrabrants and Micheletti.  The Section 302 certifications were identical but for Defendants' names and titles listed therein, and provided as follows, in pertinent part:

5.    *The registrant's other certifying officer and I have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a.    *All significant deficiencies and material weaknesses in the design or operation of internal control* over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls* over financial reporting.

47.    The Section 906 certifications were also identical but for Defendants' names and titles listed therein and stated, with respect to each Defendant, that "to the best of my knowledge":

(a) the [Form 10-K] Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(b) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

48.    These SOX certifications were included with the Company's 10-Q and 10-K filings during the Class Period.[8]

---

[8] Specifically, these certifications were filed with BofI's 2013, 2014, and 2015 Form 10-Ks, BofI's Form 10-Q for the Quarterly Period ended September 30, 2013 (filed on November 5, 2013), Form 10-Q For the Quarterly Period ended December 31, 2013 (filed on February 5, 2014), Form 10-Q for the Quarterly Period ended March 31, 2014 (filed on May 6, 2014), Form 10-Q for the Quarterly Period ended September 30, 2014 (filed on November 4, 2014), Form 10-Q for the

### 5.   BofI's Form 8-Ks

49.   BofI's Form 8-Ks during the Class Period contained the following statement about BofI's internal controls.  These statements appeared in BofI's Form 8-Ks dated July 22, 2014 and February 23, 2015:

> (15) Disclosure Controls and Procedures; Internal Controls. ***The Company and the Significant Subsidiaries have established and maintain disclosure controls and procedures*** (as such term is defined in Rule 13a-15 and 15d-15 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and the Significant Subsidiaries is made known to the Company's Chief Executive Officer and its Chief Financial Officer by others within those entities, ***and such disclosure controls and procedures are effective to perform the functions for which they were established***; the Company's auditors and the Audit Committee of the Board of Directors have been advised of: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) ***any fraud, whether or not material, that involves management or other employees of the Company who have a role in the Company's internal controls*** and any fraud that is material or known to the Company that involves persons other than management or employees of the Company who have a role in the Company's internal controls; ***any material weakness or other material significant deficiency in internal controls have been identified for the Company's auditors and disclosed in the Registration Statement and the Prospectus***; and ***since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to any material weakness or significant deficiency***.

### 6.   BofI's Investor Presentations

50.   Throughout the Class Period, Garrabrants and Micheletti gave investor presentations in connection with the release of quarterly and yearly earnings.  In each of those investor presentations, Garrabrants and Micheletti made the following statement about BofI's internal controls and risk management systems:

---

Quarterly Period ended December 31, 2014 (filed on January 29, 2015), Form 10-Q for the Quarterly Period ended March 31, 2015 (filed on April 30, 2015), Form 10-Q for the Quarterly Period ended September 30, 2015 (filed on October 29, 2015), and Form 10-Q for the Quarterly Period ended December 31, 2015 (filed on January 28, 2016).  *See* App'x at Section I.

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

- BofI's "[r]obust risk management systems and culture has resulted in lower credit, counterparty and regulatory risks."[9]

## 7.     BofI's Earnings Conference Calls

51.    Throughout the Class Period, Garrabrants and Micheletti made statements about BofI's internal controls, compliance infrastructure, and risk management during earnings conference calls, including the following:[10]

- "We continue to make investments in our people, systems, and processes to ensure that we will appropriately manage our risk, and remain on sound regulatory footing as we enjoy the continued success of what we believe is the right business banking model for the future."

- "We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA and AML ["Anti-Money Laundering"] compliance. We believe that we are on the same page with our regulators about their expectations[.]"

- "We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams."

- "But we want to make sure we stay ahead of our risk management needs and make sure that certainly we stay out of BSA trouble and things like that."

- "[A]s our regulators always say, we have to make sure that we have the risk management, ahead of growth and those sorts of things and we're very focused on that[.]"

- "[w]e are working hard to maintain our culture of continuous improvement, strong risk management, process orientation and disciplined capital allocation. . . . Our risk infrastructure is more mature and more capable and we will continue to invest to ensure that we maintain our strong regulatory relationships and ensure that we are operating the bank in a risk conscious manner."

- "We have a culture that focuses very strongly on ethics[.]"

52.    The above statements concerning BofI's internal controls, risk management and compliance infrastructure in BofI's SEC filings, investor presentations, and earnings conference calls were false and misleading because

---

[9] This statement appeared in BofI's Investor Presentations dated December 2013, January 2014, February 2014, March 2014, May 2014, July 2014, September 2014, December 2014, February 2015, March 2015, August 2015, September 2015, November 2015, December 2015, and February 2016.  *See* App'x at Section I.

[10] Additional substantially similar statements appear in Appendix at Section I.

Defendants knew, but failed to disclose, that: (i) BofI's internal controls were deficient (indeed, former employees described them as "non-existent") and its Audit department was inadequately staffed; (ii) BofI's Audit Committee and internal audit program were materially inadequate and the Audit Committee lacked independence; (iii) BofI's Audit Committee members suffered from conflicts of interest by having benefitted from related-party loans from BofI on favorable terms; (iv) BofI failed to disclose the criminal background of a senior officer and violated the FDIA (indicating a lack of internal controls); (v) Garrabrants and other senior officers routinely intimidated BofI personnel, including Audit department members, and interfered with audit functions; and (vi) BofI falsely responded to regulatory subpoenas and requests.

### 8. Statements Relating to Related Party Loans in BofI's Proxy Statements

53. BofI's Proxy Statements during the Class Period described the Company's policy and procedures on related party transactions, which includes an evaluation of "whether it is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances." BofI represented:[11]

Related Party Transaction Policy and Procedures

Pursuant to the Company's Related Party Transaction Policy and Procedures, the Company's Board of Directors is responsible for reviewing and approving or ratifying all related party transactions that are subject to such policy. This policy applies to certain transactions involving over $100,000 in any calendar year with related parties, which includes our officers, directors and director nominees, and members of their immediate family. The policy also applies to certain transactions with Company stockholders who own more than 5% of the Company's stock. In determining whether to approve or ratify a related party transaction, the Board of Directors will take into account material facts of the transaction, *including whether it is on terms no less favorable than terms generally available to an unaffiliated third-party under the same or similar circumstances*, and the extent of the related party's interest in the transaction.

[11] This statement appeared in BofI's 2013, 2014 and 2015 Proxy Statements. *See* App'x at Section II.

54.     In the 2015 Proxy Statement in particular, BofI went on to represent that it made $12.5 million in loans to directors, principal officers and their affiliates and described these and other related party loans as follows:

> In the ordinary course of its business and subject to applicable banking regulations, the Bank makes loans to and engages in other banking transactions with its directors, officers and employees and their associates. *Such loans and other banking transactions are generally made on the same terms as those prevailing at the time for comparable transactions with persons of comparable creditworthiness that have no affiliation with the Company or the Bank. Loans are made only to persons affiliated with the Company and the Bank if they do not involve more than the normal risk of collectibility of loans made to non-affiliated persons and if they do not present any other unfavorable features*.

55.     The statements regarding related party loans from the 2013, 2014 and 2015 Proxy Statements, in particular, were false and misleading when made because, as described in Section IV.B.2.c *infra*, Defendants knew, but failed to disclose, that the related-party loans were not made on the same terms as those generally prevailing at the time for comparable transactions with non-affiliated persons, and that related-party loans to members of management and the Audit Committee created conflicts of interest that imperiled the Bank's internal controls.

## B.     BofI's Ineffective Internal Controls

56.     Contrary to Defendants' representations cited above, BofI, including members of senior management, failed to implement and enforce adequate internal controls at the Company, and systematically disregarded whatever internal controls were ostensibly in place.  In doing so, BofI violated the following banking laws and regulations requiring banks to establish and maintain effective internal controls: 12 C.F.R. § 30, Safety and Soundness Standards; 12 C.F.R. § 363, Annual Independent Audits and Reporting Requirements; and Section 13 of the Exchange Act.  Further, Defendants' failure to maintain proper internal controls—as with the other misconduct alleged in this Complaint—undermined their portrayal to investors of BofI as an institution committed to sound business

practices that minimized risk. Defendants' statements concerning the Bank's internal controls and compliance infrastructure during the Class Period, as specified above, were accordingly false and misleading.

57. 12 C.F.R. § 30.2 provides that Section 39 of the FDIA requires the OCC to establish safety and soundness standards. Those standards are set forth in Appendix A to Part 30, and establish certain managerial and operational standards for all insured national banks, including standards for internal controls. Specifically, Appendix A provides, in relevant part, that a bank should have internal controls that are appropriate to the bank's size and the nature, scope, and risk of its activities, and that provide for, among other things, "effective risk assessment" and "compliance with applicable laws and regulations."[12] 12 C.F.R. § 363, Annual Independent Audits and Reporting Requirements, mandates that banks with more than $500 million in total assets must submit an annual report to the OCC and the FDIC that includes a report describing management's role in "establishing and maintaining internal controls," "management's assessment of the effectiveness of the bank's internal control [and] "the bank's compliance with designated laws and regulations . . ." (Internal Control Handbook at 4).

58. Section 13 of the Exchange Act concerning "Periodical and Other Reports," 15 U.S.C. § 78m, requires companies with registered securities develop and maintain a system of internal accounting controls that ensure, among other things, that "[t]ransactions are executed in accordance with management's general or specific authorization." (Internal Control Handbook at 4-5); 15 U.S.C. § 78m(b)(2).

---

[12] *See* Internal Control, Comptroller's Handbook at 3, January 2001 (the "Internal Control Handbook"), *available at* http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/intcntrl.pdf.

1          **1.    BofI's Internal Controls Were "Non-Existent" and Its**
2               **Audit Department Inadequately Staffed.**

3          59.    Several BofI former employees related that BofI's internal controls
were woefully deficient or non-existent.  According to CW 5, a former BofI officer
who worked in the Company's San Diego headquarters and left shortly before the
Class Period ("CW 5"), and who reported directly to Garrabrants, "internal
controls were whatever Greg [Garrabrants] wanted them to be. . . We have internal
controls on paper, but were they ever followed?  No."  CW 5 indicated that
Garrabrants disregarded internal control protocols and was more concerned about
BofI reaching performance targets and that some numbers were changed to reach
performance targets.  CW 5 described BofI's internal controls as the worst CW 5
had ever seen.  CW 5 also indicated that BofI's Compliance department was
staffed with only one person.

          60.    A former BSA and Third Party Risk Officer who worked at BofI's
San Diego headquarters prior to and during part of the Class Period ("CW 3")
described the BSA and Third Party Risk Department Team CW 3 oversaw as
consisting of only three people during CW 3's tenure at BofI.  CW 3 was also
responsible for development of bank staff and remediation of regulatory issues of
BSA examinations and internal audits.  CW 3 reported to John Tolla (BofI's Chief
Governance Risk and Compliance Officer and Senior Vice President, Compliance
and Audit) during CW 3's last four to five months working at BofI.

          61.    CW 3 related that CW 3 attended a meeting a couple of weeks after
CW 3 joined BofI at which 10 to 12 other people were present, including
Garrabrants and other BofI executives.  CW 3 related that during the meeting,
Garrabrants introduced CW 3 and said that CW 3's tombstone is going to read
"[CW 3] died understaffed."  According to CW 3, Garrabrants's comment was in
response to CW 3's assertion that CW 3 needed a lot more people in the BSA
department because of the risk Garrabrants was causing BofI to take on.

62.     A former BofI Lending Compliance Officer who worked in the Company's San Diego headquarters prior to and during part of the Class Period ("CW 7"), and who previously worked as an FDIC auditor and compliance examiner, described BofI's internal controls as "non-existent."

63.     A former BofI Chief Information Security Officer and Bank Security Officer who worked at BofI's San Diego headquarters prior to and during part of the Class Period ("CW 8"), and reported to BofI's Chief Operating Officer/Head of Technology and Information Systems Adrian Van Zyl until early 2014 and then to Jan Durrans, stated that BofI's internal controls "weren't as important as making the money."  CW 8 related that CW 8 attended senior staff meetings with Garrabrants and other BofI employees at the Senior Vice President level or higher and that BofI's executive management made it very clear that their purpose in life was to make money and ensured that all of BofI's numbers "created the right numbers."  According to CW 8, BofI's management was constantly concerned with how BofI's Form 10-K or Form 10-Q appeared and made decisions based on those concerns.

64.     A former BofI senior accounting officer who worked in the Company's San Diego headquarters just prior to the Class Period and who reported to Garrabrants ("CW 9") described Garrabrants as "very heavy handed" in managing certain aspects of CW 9's department, including restructuring the department and reassigning personnel without explanation to CW 9.  CW 9 indicated that CW 9's department was short-staffed and Garrabrants did not allow CW 9 to hire additional personnel.

## 2.   BofI's Audit Committee and Internal Audit Program Were Materially Inadequate And Often Overridden by Management.

65.    Defendants failed to establish, maintain, and operate an effective Audit Committee and audit programs at BofI as required by numerous federal laws and regulations.[13]

66.    The Comptroller's Handbook on Internal and External Audits (the "Audit Handbook"), issued by the OCC, provides important guidance on effective audit functions based on those laws and regulations.[14]  The Audit Handbook (at 5) provides that a bank's board of directors has non-delegable responsibilities for establishing, overseeing, and maintaining audit functions.  With respect to a bank's audit committee, the Audit Handbook notes that 12 C.F.R. § 363 requires national banks with more than $500 million in assets (such as BofI) to have an audit committee consisting entirely of outside directors that are independent of bank management, and that SOX and the Exchange Act impose specific requirements on audit committees aimed at strengthening their independence, effectiveness, and accountability.  With respect to internal auditors, the OCC explains that their primary role is "to independently and objectively review and evaluate bank activities to maintain or improve the efficiency and effectiveness of a bank's risk management, internal controls, and corporate governance."  The OCC emphasizes that internal auditors "must be independent of the activities they audit so that they

---

[13] The following are the relevant regulations establishing minimum requirements for internal and external audit programs:  12 C.F.R. § 9, Fiduciary Activities of National Banks (requiring annual audit for national banks acting as fiduciaries); 12 C.F.R. § 21.21, BSA Compliance (requiring a BSA compliance program); 12 C.F.R. § 30, Safety and Soundness Standards (establishing operational and managerial standards for internal audit systems for insured national banks); 12 C.F.R. § 363 (establishing requirements for independent financial statement audits; board of directors' audit committee structure and responsibilities); 12 C.F.R. §§ 210, 228, 229, and 240 (S.E.C. regulations establishing requirements for, among other things, independent financial statement audits, qualifications, responsibilities, and disclosures of audit committees); and SOX (addressing auditor independence).

[14] *See* Internal and External Audits, Comptroller's Handbook, Apr. 2003, *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/2003AuditHB.pdf.

can carry out their work freely and objectively" and "render impartial and unbiased judgments." (*Id.* at 23). Accordingly, the bank's "chief financial officer, controller, or other similar positions"—including, of course, the CEO—"should generally be excluded from overseeing the internal audit activities[.]" (*Id.* at 14). The OCC's guidance is consistent with the "Interagency Policy Statement On External Auditing Programs of Banks and Savings Associations" on the FDIC's website which provides, in relevant part, that "[b]oth the staff performing an internal audit function and the independent public accountant or other external auditor should have unrestricted access to the board or audit committee without the need for any prior management knowledge or approval."[15]

67.   BofI's Audit Committee, which consists of three members—Defendants Grinberg (Audit Committee Chair), Argalas, and Mosich—failed to oversee and maintain audit functions at BofI. Each member suffered conflicts of interest by having benefitted from undisclosed BofI loans issued to them on terms far more favorable than the terms available to borrowers unaffiliated with BofI. Further, BofI's internal audit function was ineffective because Garrabrants and other senior executives interfered with the Company's internal audit function and BofI's internal audit department was significantly understaffed.

### a.   BofI's Audit Committee Lacks Independence and Does Not Provide Adequate Oversight.

68.   BofI's internal controls and risk management procedures were inadequate as a result of the Audit Committee's lack of independence and Garrabrants's improper meddling in the Committee's activities.

69.   Erhart revealed in a court-filed declaration that in a discussion with Jonathan Ball during his employment at BofI, Ball said to Erhart that the "real

---

[15] *See* FDIC's "Interagency Policy Statement On External Auditing Programs of Banks and Savings Associations," *available at* https://www.fdic.gov/regulations/laws/rules/5000-2400.html#fdicfoot3_3_link.

1    problem is that the Audit Committee is not independent."[16]  (Erhart Decl. ¶ 6).

2    According to Erhart, Ball told him that he would no longer address key issues over

3    the phone during Audit Committee meetings because on at least one occasion,

4    unbeknownst to Ball, Garrabrants listened in on the call and chimed in.  (*Id.*).

5         70.   CW 5 similarly recalled that Garrabrants often interfered with the

6    Audit Committee's duties.  Garrabrants also ignored internal audit personnel's

7    findings and warnings about BofI's policies concerning depositing third party

8    checks.  For example, Erhart, who had conducted another audit in early 2015 of

9    senior management's personal accounts at BofI, "discovered that CEO Gregory

10   Garrabrants was depositing third-party checks for structured settlement annuity

11   payments into a personal account, including nearly $100,000 in checks made

12   payable to third parties."  (Erhart Compl. ¶ 44).

13        71.   Erhart documented his findings in a memorandum to Jonathan Ball

14   dated January 20, 2015.  (*Id.*).  Erhart also confronted Ball about Garrabrants's

15   deposits of third-party checks, to which Ball responded, "Is he still doing that?  He

16   was supposed to stop."  (Erhart Decl. ¶ 45).

17        72.   Erhart "also learned that the issue of Mr. Garrabrants's depositing of

18   third-party checks had previously been raised to the Audit Committee before he

19   started working at the Bank, and that restrictions were imposed on him."  (Erhart

20   Compl. ¶ 44).  Erhart was concerned Garrabrants may have been evading taxes.

21   (*Id.*)

22        73.   CW 7 recounted an instance in which Garrabrants and other senior

23   managers falsified audit reports provided to OCC examiners.  CW 7 related that

24   CW 7 and another auditor worked on an audit of BofI's Fair Lending Program in

25   the fall of 2013 in anticipation of an expected OCC examination, and that in

26

27   [16] *See* Declaration of Charles Matthew Erhart In Support of His Opposition to
     Motion for Preliminary Injunction, ¶ 6 ("Erhart Declaration" or "Erhart Decl.")
28   (Dkt. No. 27-4 (Ex. 5), filed in *BofI vs. Erhart* (Jan. 19, 2016).

1   September/October 2013, when OCC examiners were on-site at BofI's San Diego

2   headquarters, CW 7 and the other auditor gathered loan documents, some of which

3   had problem items, placed them in a folder and then presented them to the

4   examiners.  CW 7 related that CW 7 and the other auditor were immediately

5   "called on the carpet" by BofI executive management members who yelled at them

6   both for providing the loan documents to the OCC without management review.

7   CW 7 indicated that Garrabrants, Brian Swanson, and a mortgage department head

8   "cleaned up" the loan documents and they were then given to the OCC examiners.

9   CW 7 related that CW 7 noticed that the documents had been altered.

10          74.    Erhart relates that he was responsible for reviewing BofI's CIP with

11  respect to Global Cash Card ("GCC"), which, Erhart alleges, was a vendor that

12  provides cash cards that companies can use for various purposes, including paying

13  employees in lieu of traditional paychecks.  (Erhart Compl. ¶ 40).  BofI's business

14  indeed includes a Prepaid Card division that provides card issuing and bank

15  identification number ("BIN") sponsorship services to companies who have

16  developed payroll, general purpose reloadable, incentive and gift card programs

17  serving consumers.  (2015 Form 10-K at 3).

18          75.    During the week of January 26, 2015, Erhart and a co-worker met

19  with BofI's Deputy BSA Officer, Third Parties to discuss GCC CIP reviews for

20  high-risk customers.  (Erhart Compl. ¶ 40).  Erhart and his co-worker then

21  prepared an internal audit memorandum of their findings on or about February 12,

22  2015, during which time the OCC was conducting an on-site examination of BofI

23  and had asked that third party vendors, such as GCC, to rate their customers.  (*Id.* ¶

24  41).  GCC provided BofI with a list of high-risk customers, 30% of whom BofI

25  found presented verification problems.  (*Id.*)

26          76.    The GCC list was presented to John Tolla, who "demanded that a new

27  list be produced" that did not feature any "bad" CIP data.  (*Id.* ¶ 42).  BofI also did

28  not submit the original list to the OCC and, instead, a "new, sanitized list was."

(*Id.*).  BofI proceeded to terminate its relationship with GCC and, according to Erhart, "Tolla repeatedly instructed staff not to inform the OCC about why the relationship was terminated."  (*Id.*)  Erhart alleged on information and belief that Garrabrants was party to the discussion when the "bad" CIP data was discovered.  (*Id.*)

77.     Erhart and a coworker attached the original GCC list as an exhibit to their February 12, 2015 internal audit memorandum that was intended to be presented to BofI's Audit Committee but Tolla and others at BofI prevented that from occurring.  (*Id.* ¶ 43).

78.     In addition, Erhart discovered in early 2015 that John Tolla "had repeatedly changed the findings on numerous reports required under the Bank Secrecy Act's Quality Control ('QC') requirements."  (*Id.* ¶ 35).

79.     CW 9 related that CW 9 had read the Erhart Complaint.  CW 9 related that it was common, in CW 9's experience, to be asked to "fix" items in audit reports.  CW 9 related that Micheletti would "walk in and say 'Here are these four things on the whatever, get it fixed before it goes to, get it fixed' or do whatever. That was very common. . . ."  CW 9 "fixed" what CW 9 felt comfortable doing but left the other items alone.

80.     The deliberate efforts by Garrabrants, Micheletti, and others to manipulate internal reports and other documents, as well as the Audit Committee's inability or unwillingness to prevent or rectify that misconduct, belied Defendants' repeated representations to investors regarding BofI's allegedly conservative business practices and purported focus on establishing adequate internal controls and adequate risk management procedures, in addition to BofI's, Garrabrants's and Micheletti's statements regarding the soundness of the Company's internal controls.  *See supra* Section IV.A.

### b. BofI's Violations of the Flood Disaster Protection Act.

81.     BofI failed to comply with the Flood Disaster Protection Act of 1973 (as defined above, the FDPA) in issuing loans, and then "buried" audit results revealing FDPA violations.

82.     The National Flood Insurance Act of 1968 and the FDPA, as amended, govern the National Flood Insurance Program ("NFIP").[17]  These statutes require the purchase of flood insurance on certain properties and make available federally subsidized flood insurance to owners of improved real estate or mobile homes located in special flood hazard areas in communities that participate in the NFIP.

83.     Erhart discovered in performing an FDPA audit at BofI that a "previous Compliance employee had found issues with 49 of the 51 samples she pulled" and that "another employee previously produced a Compliance Review identifying many issues."  (Erhart Compl. ¶ 37).  Erhart discovered that BofI "had buried and never issued the reviews."  (*Id.*)

84.     After investigating and verifying the negative findings, Erhart presented them to BofI management "who caused most of the negative findings to be excluded from the Audit Report, leaving in only a small fraction of the findings."  (*Id.* ¶ 38).

85.     CW 7 related that CW 7 conducted a complete FDPA audit because, according to CW 7, there had been a lot of issues with FDPA compliance at BofI.  CW 7 related that CW 7 found that almost every loan CW 7 reviewed had a potential non-compliance issue.

86.     CW 7 related that CW 7 wrote a report of the audit but that CW 7's superior, who was BofI's Compliance Manager and First Vice President, refused to release the report to management because of the negative findings.  CW 7 related

---

[17] *See* Flood Disaster Protection, Comptroller's Handbook, May 1999 (the "Flood Handbook"), *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/flood.pdf.

1   that CW 7 and CW 7's superior met with Garrabrants, Bar-Adon, Swanson, and a

2   couple of other BofI employees about the audit findings.  According to CW 7,

3   Garrabrants brushed the findings under the rug and indicated that other examiners

4   had conducted audits and did not find the issues CW 7 had found.  CW 7 related

5   that in response, CW 7 and CW 7's superior indicated to Garrabrants that a real

6   examiner would have found the same issues.

7        87.    CW 7 also estimated the potential fines BofI faced for the FDPA

8   compliance issues to be a couple of hundred thousand dollars, based on $2,000 per

9   fine.  CW 7 indicated that Garrabrants dismissed the audit findings and CW 7 did

10  not hear anything further about them.

11            **c.    BofI Failed to Adequately Disclose Related-Party
              Transactions and Related-Party Loans to Audit
12            Committee Members.**

13       88.    BofI's internal controls were also compromised because BofI's Audit

14  Committee members suffered from undisclosed, debilitating conflicts of interest by

15  having benefitted from undisclosed related-party loans from BofI on terms far

16  more favorable than the terms available to borrowers unaffiliated with BofI.  For

17  example, Defendants Garrabrants, Micheletti, Grinberg, Argalas, and Mosich, as

18  well as other BofI senior executives, obtained related-party loans, including

19  apparent non-Qualified Mortgage ("QM") loans and loans with LTVs higher than

20  BofI's reported average LTV for single family mortgages, from BofI on far better

21  terms than available to persons unaffiliated with BofI, in direct contravention of

22  BofI's express statements otherwise.

23       89.    In its 2015 Proxy Statement, BofI revealed that, as of June 30, 2015, it

24  made $29.1 million in loans, at below market interest rates, to directors, executive

25  officers and employees who elected to participate in the Company's employee loan

26  program, and that $12.5 million of those loans were made to directors, principal

27  officers, and their affiliates.  Total principal payments on related-party loans were

28

$0.3 million, which reflects an average interest rate of approximately only 1% across all loans in the loan program.

90.     As described above, BofI's 2015 Proxy Statement described the terms of those related-party loans as follows, in relevant part:  "Such loans and other banking transactions are ***generally made on the same terms as those prevailing at the time for comparable transactions*** with persons of comparable creditworthiness that have no affiliation with the Company or the Bank."

91.     However, an article published on *Seeking Alpha* on November 4, 2015 entitled "Buyer Beware:  BOFI Related Party Loans" (the "November 4 Article") makes clear that BofI's loans to BofI executives and directors involved far greater risk of collectability and more favorable terms than available to unaffiliated borrowers at the time.[18]

92.     Some of BofI's related-party loans included a "Balloon Rider."  The CFPB's website describes "Balloon Loans" as "a mortgage that requires a larger-than-usual one-time payment at the end of the term," which can make the borrower's payments lower in the years before the balloon payment, but require large payments, possibly in the tens of thousands of dollars, at the end of the loan term.

93.     During the Class Period, BofI's website advertised "Conventional, FHA, VA and Jumbo loan products" available for consumers wishing to purchase or refinance a home, but there was no mention of "Balloon Loan" or "Balloon Rider" as an available product or loan feature.

94.     The following summarizes related-party loans BofI issued to its executive officers and directors as reported in the November 4, 2015 Article, most of which were on terms that were not comparable to BofI's non-related party loans, and many of which had "Balloon Riders":[19]

---

[18] Real Talk Investments, *Buyer Beware:  BOFI Related Party Loans*, Seeking Alpha, Nov. 4, 2015.

[19] The LTVs (i.e., the ratio of loan amount to the value of the property securing the

| BofI Insider | Loan Amount (Year) | Implied LTV | Balloon Rider |
|---|---|---|---|
| Nicholas A. Mosich<br><br>Vice Chairman of Board of Directors and Audit Committee Member | $985,000 (July 11, 2013) | 78% | No |
| Brian Swanson<br><br>Executive Vice President, Chief Lending Officer | $568,000 (January 25, 2011) | 79.8% | Yes |
| Gregory Garrabrants<br><br>President and CEO (as trustee of Apollo Trust-Two) | $1,853,000 (2009); Refinanced for $1,870,000 (September 2010) | (Construction loan; LTV not indicated) | Yes |
| Andrew J. Micheletti<br><br>Chief Financial Officer | $1,547,000 (June 2011) (Cash-out refinance) | (Not applicable) | Yes |
| James S. Argalas<br><br>Director and Audit Committee Member | $1,510,000 (February 22, 2013) | (Not indicated) | Yes |
| Theodore Allrich<br><br>Chairman of Board of Directors | $600,000 (June 18, 2014) | (Construction loan; LTV not indicated) | No |
| Thomas Constantine<br><br>Chief Credit Officer | $648,000 (February 2012) | 84% | No |
| Paul Grinberg<br><br>Director and Audit Committee Member | $2,192,000 (November 2012) | 80% | Yes |
| Rama Bar-Adon<br><br>Sister of BofI's Chief Legal Officer Eshel Bar-Adon[20] | $936,000 (December 2012) | 80% | Yes |

loan) of many of these related party loans were also significantly higher than the weighted average and median LTVs BofI reported in its SEC filings. For example, in its 2015 Form 10-K, BofI reported that as of June 30, 2015, the weighted average LTV for BofI's single-family mortgages was only 57.76% and that the median LTV for the same loans was 58.87%.

[20] According to the November 4, 2015 Article, which contained images of certain

95.     BofI also reportedly made a loan to Jonathan Ball in March 2012 during which time he was Vice President of Internal Audit.[21]

96.     These related-party loans to BofI's Audit Committee imperiled the Committee's independence, and therefore the effectiveness of BofI's audit, risk management, and compliance infrastructure programs and procedures.

### 3.   BofI Failed To Disclose The Criminal Background Of A Senior Officer and Violations of the FDIA.

97.     BofI's lax risk management and internal controls were also evidenced and compromised by BofI's employment of a convicted felon as BofI's Senior Vice President of Wholesale/Correspondent Lending during part of the Class Period ("SVP 1").  BofI failed to disclose that it was in violation of the FDIA for failing to obtain a required waiver under that Act for SVP 1's employment.

98.     Section 19 of the FDIA provides that a person convicted of criminal offenses involving "dishonesty or a breach of trust or money laundering," or who has agreed to enter into a pretrial diversion or similar program in connection with a prosecution for such offense," may not:

(i)  become, or continue as, an institution-affiliated party with respect to any insured depository institution;

(ii)  own or control, directly or indirectly, any insured depository institution; or

(iii)  otherwise participate, directly or indirectly, in the conduct of the affairs of any insured depository institution;

12 U.S.C. § 1829(a)(1)(A).  An insured bank cannot permit any such person to engage in prohibited conduct or continue any relationship described above.  (12

pages of the loan documents, Eshel Bar-Adon is listed as "Borrower" on the Balloon Rider to the loan and apparently signed it; however, on other pages, his name is crossed out and his sister, Rama Bar-Adon, who reportedly is a practicing attorney in Texas and apparently does not live in San Diego, appeared to have signed as the borrower.  The November 4, 2015 Article also included an image of a "Notice of Federal Tax Lien" listing Eshel Bar-Adon as the Taxpayer, which likely had a negative impact on his credit history and may be a reason why the loan was not taken out in his name.

[21] Aurelius, *BofI:  Undisclosed Related Party Dealings Found to Infect Audit Committee*, Seeking Alpha, Jan. 6, 2016.

1   U.S.C. § 1829(a)(1)(B)).

2       99.    Notwithstanding clear statutory requirements to the contrary, SVP 1

3   served as the Senior Vice President of Wholesale and Correspondent Lending at

4   BofI during the Class Period.  According to his LinkedIn profile, SVP 1 began

5   working at BofI in October 2010, and before that, at IndyMac Bank as a Senior

6   Vice President.

7       100.   According to CW 5, who worked at BofI at the same time as SVP 1

8   and was familiar with him, SVP 1 served as a Vice President of Wholesale and

9   Correspondent Lending from early/mid-2010 through April 2013.  CW 5 explained

10  that "Correspondent Lending" referred to BofI's Foreign Nationals Loan program.

11  SVP 1 was promoted to Senior Vice President in May 2013 and became the head

12  of the Foreign Nationals Loan program.  SVP 1 reported to Swanson.

13      101.   A background search of SVP 1 performed on Lexis-Nexis revealed

14  that SVP 1 has been convicted of numerous crimes, including grand theft,

15  burglary, fraud and forgery involving credit cards, dealing in stolen property, and

16  petit theft in Broward County, Florida in 1990.  SVP 1 was sentenced and served

17  time in a California prison.  He has also filed for Chapter 7 bankruptcy twice (in

18  October 2011 and in June 2000), and has been a debtor in at least four actions

19  involving judgments, and state and federal tax liens against him.

20      102.   CW 5 indicated that SVP 1 was hired by BofI despite his criminal

21  history and background check, which included fingerprints and an FBI background

22  scan.  CW 5 related that CW 5 saw the results of the background check when they

23  were received by BofI and that Garrabrants's executive assistant brought the

24  results to CW 5 and noted that SVP 1 had been in jail for theft.  CW 5 related that

25  the executive assistant said that Garrabrants and Swanson wanted "to sweep it

26  under the table and give him a chance."

27      103.   A former BofI Senior Underwriter ("CW 1") who worked at BofI's

28  San Diego headquarters during part of the Class Period, and who worked with SVP

1 in BofI's in Multifamily lending group when SVP 1 became head of the group's
sales division, also noted that BofI's senior management knew about SVP 1's
criminal background and that BofI did not disclose his background to the FDIC.
CW 1 noted that prior to BofI, SVP 1 worked at IndyMac while Garrabrants was
there.  CW 1 also recalled SVP 1 telling CW 1 of his criminal background and his
imprisonment in Florida, which, according to CW 1, was "common knowledge" at
BofI and "not a secret – everyone knew."  CW 1 also recalled SVP 1 telling CW 1
that because of his felony conviction, no other bank aside from BofI would hire
him.

104.   An article published on November 18, 2015 by *Seeking Alpha* entitled
"Undisclosed Executive History May Be Final Blow for BOFI" (the "November
18, 2015 Article") described the background and employment history of an
unidentified BofI Senior Vice President matching that of SVP 1.

105.   The November 18, 2015 Article also noted that despite SVP 1's
criminal history and bankruptcies, BofI issued two loans to him for more than
$700,000.

### 4.   Garrabrants Routinely Intimidated BofI Personnel, Including Members of the Audit Department.

106.   BofI's internal controls, compliance infrastructure and risk
management were also made ineffective by the culture of fear and unethical
conduct at BofI, created by Garrabrants.  He also used his power to benefit himself
financially, including overriding members of the Audit Department.

107.   Former BofI employees who interacted with Garrabrants recall
attending weekly management meetings in which Garrabrants threatened
retaliatory action against anyone who challenged his actions or directives, and in
which he uttered obscenities and used other vulgar language to disparage and scorn
people whom he believed had done so.

108.   CW 5 recalled attending weekly management meetings at BofI every Friday at noon.  Garrabrants, Micheletti, and every Senior Vice President and higher level employees attended those meetings, for a total of approximately 15 participants.  CW 5 indicated that while the topics discussed at the meetings varied, on several occasions Garrabrants ranted about an employee leaving the bank and Garrabrants's plans to sue the employee.  CW 5 relayed that Garrabrants reminded those at the meeting that he has more money than they, ***and that he would stop at nothing to destroy them if they came after him***.  On another occasion in which CW 5, Garrabrants, and Ball were in the same room, CW 5 witnessed Garrabrants calling Ball a "f[***]ing idiot" and telling him, "You will do as I say."  CW 5 noted that Garrabrants has intimidated a lot of people at BofI.

109.   CW 5, who left BofI in May 2013, also described an incident in December 2015 in which CW 5 was served a search warrant by local authorities, who searched CW 5's home for allegedly stolen BofI property that CW 5 did not possess.  The local authorities nevertheless took with them all of CW 5's computers and other property belonging to CW 5.  CW 5 believed that the search warrant was issued at Garrabrants's behest, and was done as retaliation by Garrabrants, who believed CW 5 was responsible for the sharing details of BofI's business, including SVP 1's criminal background (described above), with shortsellers.  A criminal complaint was subsequently filed against CW 5 in California Superior Court, San Diego County—again, inexplicably, more than two years after CW 5 had left the Bank—resulting in CW 5 (who is a parent with minor children) ultimately entering a plea and receiving a suspended sentence rather than continuing a prohibitively expensive legal defense.

110.   CW 3 had similar recollections of Garrabrants.  CW 3 noted that Garrabrants "is an attorney, very smart guy.  He tried to scare everybody."  According to CW 3, BofI employees feared that there would be repercussions if

they spoke out about BofI's improper practices. ***CW 3 heard Garrabrants say he would destroy people.***

111.   CW 8 also attended weekly senior staff meetings with Garrabrants and others and witnessed crude behavior by him.  According to CW 8, if Garrabrants disliked how something was done, he would disrespect the person responsible in a very crude and vile manner.  Garrabrants also belittled Ball on more than one dozen occasions during the weekly meetings and used obscene language to describe him, CW 8 recalled.  One of those occasions occurred after Ball had written up Garrabrants for engaging in unauthorized activity.  CW 8 also indicated there was high employee turnover at BofI.[22]

112.   CW 9 reflected on the negative environment at BofI and said, "It was just a horrible place."  CW 9 related that Garrabrants scares people if they speak negatively about BofI.

113.   A Senior Underwriter who worked in BofI's Multifamily lending group in the Company's San Diego headquarters just prior to the Class Period ("CW 10"), described BofI as a "sweatshop" where the turnover was high.

_____

[22] In his defense of this action, Garrabrants and his counsel have also utilized intimidation tactics directed at Plaintiff's Lead Counsel, its investigator, and certain CWs.  On August 26, 2016, Judge Crawford granted Plaintiff's requested protective order (Dkt. 49) after finding Defense counsel's statements to at least two of the CWs indicating that their names had appeared in the First Amended Complaint were "***very concerning***" because they "***portray[ed] an effort to mislead witnesses, potentially under false pretenses, into cooperating with defendants***." Defendants also attempted to improperly impede Plaintiff's investigation of its claims by sending a letter to Lead Counsel's investigator falsely accusing him of "defaming" BofI and threatening legal action against him.  Garrabrants's and Defense Counsel's tactics clearly intimidated certain CWs.  Prior to the filing of the First Amended Complaint in this matter, CW 8, after confirming what is attributed to him/her herein as completely accurate, expressed apprehension about being discovered by Garrabrants and commented that Garrabrants "***is a very vindictive man . . . if he knows somebody did something to him, you know, he's like, I guess, like Donald Trump, if you hit him, he hits you back hard***[.]"  (Dkt. No. 45-2).  Ironically, after the filing of that Complaint, CW 8 submitted a declaration (Dkt. 42-2) claiming to recant  his/her testimony, strongly suggesting he/she had been "hit" with the very intimidation tactics about which he/she had warned Lead Counsel.  The foregoing is entirely consistent with the culture of fear and intimidation inculcated by senior management at BofI (specifically, Garrabrants) that is described by Erhart and numerous CWs.

According to CW 10, Garrabrants's approach was if **"you look at me wrong you're out of here."**

114. CW 1 also confirmed there was high turnover at BofI.

115. According to a former National Account Executive who worked at BofI prior to and during part of the Class Period ("CW 11") and reported to SVP 1, there was a fear-based culture at BofI and there was a high rate of employee turnover. CW 11 described the management style at BofI as **"terrible."**

116. Other BofI employees described Garrabrants's illicit conduct using BofI accounts, including, as discussed above in Section IV.B.2.a, deposing third party checks into his personal account.

117. Erhart also discovered that Garrabrants was the signatory of a BofI consumer account opened in the name of his brother, Steven Garrabrants, with a balance of approximately $4 million – the largest consumer account at BofI at the time. (*Id.* ¶ 45). Erhart noted that $4 million was wired into the account but he could not find any evidence of how Steven Garrabrants came into possession of such a large amount of money. (*Id.*) Steven Garrabrants is a former minor league baseball player who signed with the Arizona Diamondbacks in 2003 for $50,000 per year and became a free agent in 2007.[23] He also has an interest in a Plano, Texas-based manufacturer of baseball, sports flooring, rubber flooring and artificial turf industry named Kodiak Sports, LLC. As recently as December 2014 (shortly before Erhart began his audit of senior management accounts), Steven Garrabrants took out a loan for $116,800.00.[24] Erhart was concerned that the

---

[23] *See* Steve Garrabrants's profile on Minor League Baseball's website, *available at* http://www.milb.com/player/index.jsp?sid=milb&player_id=451790#/career/R/hitting/2007/ALL.

[24] *See* Document No. 2014-22820, filed with the County Clerk's Office in Grayson County, Texas, attaching a Deed of Trust, dated November 21, 2014, listing Steven Garrabrants as "Borrower," GMH Mortgage Services LLC as "Lender," and a "Note" amount of $116,800.00 owed to the Lender.

1    activity in Steven Garrabrants's account was another indication that Defendant

2    Garrabrants was engaged in tax evasion.  (*Id.*)[25]

3        118.   CW 5 also witnessed similar suspicious activity by Defendant

4    Garrabrants.  According to CW 5, Garrabrants repeatedly instructed personnel to

5    conduct unethical activities for his benefit.  CW 5 recounted that the head of bank

6    deposit operations at BofI, who reported to CW 5, notified CW 5 that Garrabrants

7    attempted to deposit third-party checks and checks made payable to his wife into

8    his own account at BofI.  Garrabrants's wife, however, was not a joint account

9    holder on the account, according to CW 5.

10       119.   CW 5 recalled one instance in which Garrabrants attempted to deposit

11   a $100,000 check made payable to his wife into his BofI account.  The head of

12   deposit operations advised Garrabrants that his wife's name needed to be added to

13   the account, but Garrabrants declined.  CW 5 confronted Garrabrants about the

14   $100,000 check and notified him that CW 5 could not process such a transaction

15   unless Garrabrants's wife signed the check.  Garrabrants instructed CW 5 to

16   deposit the check anyway.

17       120.   According to CW 5, a BofI employee informed CW 5 that

18   Garrabrants proceeded to forge his wife's signature on the $100,000 check and

19   returned the check immediately for deposit.

20

21

22   _____

[25] Contrary to Garrabrants's claims on BofI's October 14, 2015 earnings
conference call that his Form 4's explain the balance in his brother's account, a

23   review of Form 4's filed by or on behalf of Garrabrants for transactions between
June 30, 2012 and February 9, 2016 shows that he acquired 500,404 shares of BofI

24   stock during that period, including 362,417 shares acquired through the exercise of
stock options and 20,275 shares purchased on the open market.  The Form 4's

25   reviewed further indicate that during the same period, Garrabrants sold 94,856
shares in the open market (on December 31, 2012) at $26.30 per share, for

26   proceeds of approximately $2.494 million, and disposed of 306,709 shares through
non-open market transactions.  Accordingly, Garrabrants's Form 4's do not

27   explain the source of the $4 million balance allegedly in his brother's bank account
over which Garrabrants has authority.  Notably, Garrabrants did not specifically

28   dispute the alleged account balance or his authority over the account during the
October 14, 2015 conference call.

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

121.   CW 5 indicated that the head of bank deposit operations informed Jonathan Ball of the incident and that although Ball explained BofI's policy on third-party checks to Garrabrants, Garrabrants ignored the explanation and instructed Ball to deposit such checks.

### 5.   BofI Falsely Responded to Regulatory Subpoenas and Requests.

122.   In his complaint, Erhart provided details of other misconduct at BofI during the Class Period, including:  (i)  BofI falsely responded to an SEC subpoena issued in December 2014 by indicating it did not have information which the SEC sought regarding an entity named ETIA LLC despite the existence of a loan file at BofI concerning ETIA that was provided to BofI's legal counsel; and (ii) BofI falsely responded to the OCC's request for any correspondence from banking agencies and law enforcement by indicating it had not received any government or regulatory subpoenas despite the fact that Erhart had seen a BSA spreadsheet identifying many such subpoenas.  These activities implicated BofI's internal controls, and rendered false Defendants' statements that BofI's internal controls were adequate and that the Company valued risk management and compliance.

### C.   Defendants' Misrepresentations About the Company's Internal Controls, Risk Management and Compliance Infrastructure Caused Investors' Losses

123.   Beginning on October 13, 2015, Defendants' misrepresentations about BofI's internal controls, risk management and compliance infrastructure were revealed to the market, causing the Company's stock price to decline and causing investors', including Lead Plaintiff's, losses.

1.   **The Erhart Complaint Reveals BofI's Inadequate Internal Controls, Risk Management and Compliance Infrastructure.**

124.   On October 13, 2015, a former auditor at BofI filed a whistleblower complaint.[26]  The Erhart Complaint alleged widespread misconduct at BofI and by senior BofI officers and directors, including Garrabrants.

125.   Specifically, the Erhart Complaint revealed the falsity of BofI and Garrabrants's previous statements relating to the adequacy of BofI's internal controls over financial reporting, risk management programs, and compliance infrastructure by detailing systematic disregard for internal control processes and compliance with federal law.  For example, the Erhart Complaint disclosed:

- BofI had a "***nonexistent culture of compliance***" that forced multiple members of the audit department to leave their jobs;

- BofI's Chief Legal Officer Bar-Adon and Vice President of Internal Audit Ball instructed Erhart to remove evidence of BofI's violation of the California Penal Code from audit documents, as well as to mark the entire document Attorney-Client Privileged in order to protect it from discovery in subsequent litigation;

- BofI's Chief Credit Officer told Erhart, Ball and others that he was not responsible for the Bank's financials after they were submitted to Defendant Micheletti, and that he would not vouch for such numbers thereafter;

- BofI failed to make timely payments to employees' 401k accounts without notifying the Internal Revenue Service and the Department of Labor to take corrective action;

- BofI failed to obtain the signatures of the Board of Directors on the Fiscal 2015 Strategic Plan at the May, July, and September 2014 Board meeting, and then BofI's Chief Performance Officer Jan Durrans presented the Audit Department with a document that "copied and pasted" the Board members' signatures onto a document falsely reflecting approval as of July 2014;

- BofI's Senior Vice President of Audit and Compliance John Tolla instructed Erhart not to put audit questions or concerns in writing;

- BofI falsely responded to a subpoena from the SEC requesting information about a specific account by indicating it did not have such information when Erhart had seen a loan file containing information on the account;

---

[26] The *New York Times* also reported that Erhart had filed the lawsuit on the same day, and summarized some of its allegations.

- BofI falsely responded to a request from the OCC for information on bank accounts with no TINs by indicating no such accounts existed, when Erhart had seen a spreadsheet listing accounts without TINs;

- BofI falsely told the OCC that the Bank had not received any correspondence or subpoenas from federal and state banking agencies and law enforcement when Erhart had seen a list of such subpoenas;

- BofI made undisclosed substantial loans to foreign nationals with criminal histories, in violation of the BSA's Anti-Money Laundering Rules;

- SVP Tolla repeatedly changed the findings on several reports required under the BSA's Quality Control requirements;

- BofI hid negative findings in a Flood Disaster Protection Act audit before submitting it to the OCC;

- SVP Tolla instructed a report on third party customers who were involved in BofI's Global Cash Card program  be "sanitized" by removing information suggesting the customers were not real before it was provided to the OCC; and

- SVP Tolla prohibited members of the audit department from using email to avoid creating a paper trial.

126.   On the filing of the Erhart Complaint and disclosure of the audit and internal controls violations described therein, shares of BofI declined $10.72 per share, or 30.2%, from their closing price of $35.50 on October 13, 2015, to close at $24.78 on October 14, 2015, on extremely high trading volume.[27]

127.   On October 14, 2015, during a BofI conference call with analysts and investors to discuss the allegations made by former auditor Erhart, Garrabrants stated the following concerning BofI's and its auditor's investigation of Erhart's allegations:  BofI "***conducted its own review for the audit committee of what happened, and I think that conclusion is difficult to argue with***."  Garrabrants also claimed that "we have a culture that focuses very strongly on ethics[.]"  Garrabrants further stated:  "***We did our own investigation of this.  All that was provided to our external auditors, and the external auditors reviewed it, and they found it to be completely without merit, which it is, completely without merit***."

---

[27] On a pre-split adjusted basis, BofI's stock price declined $42.87 per share from its closing price of $142.00 on October 13, 2015, to close at $99.13 on October 14, 2015.

128.   On the same October 14 call, Garrabrants also assured investors that "[t]here is nothing ongoing" by way of regulatory investigation by the OCC and "there is no continuity to this," in describing BofI's relations with its regulators.

129.   On October 22, 2015, BofI conducted its annual stockholders meeting.  During the meeting, Theodore Allrich, Chairman of BofI's Board of Directors, contradicted statements Garrabrants had made during the October 14, 2015 earnings conference call regarding the Company's internal investigation of Erhart's allegations and the purported review and conclusion of its external auditors.  The Chairman's repudiation of Garrabrants's statements concerning evaluation of Erhart's claims reveals the inadequacy of the Company's internal controls, in particular with respect to the Audit Committee's independence and investigation of Erhart's allegations.  Specifically, Allrich stated:

> I would like to clarify certain statements made on our analyst call on October 14, 2015, regarding our external auditors' awareness of the allegations of our former junior internal auditor. Management orally shared with our external auditors a summary of the early conclusions of our internal review of the internal auditor matter, which concluded that the internal auditor was merely a disgruntled employee making a series of baseless allegations. ***Until recently, the written report setting forth the details of our investigation was not discussed with or provided to our External Auditors.*** Subsequently, we have provided a final written report of our internal review to our External Auditors. ***To date, our External Auditors have not evaluated the allegations and the report.*** Our early conclusions, shared with our external auditors, were wholly consistent with the final conclusions in our written report.[28]

130.   The Chairman's repudiation of Garrabrants' statements concerning evaluation of Erhart's claims further illustrates the inadequacy of the Company's internal controls, in particular with respect to the Audit Committee's independence and investigation of Erhart's allegations.

---

[28] *See* Transcript of BofI Holding, Inc. Annual Meeting of Stockholders, Thursday, October 22, 2015, 2:00 pm PT, San Diego, California 92122 on BofI's website, *available at* http://www.snl.com/Cache/1500077112.PDF?O=PDF&T=&Y=&D=&FID=150007711 2&iid=4055785.

## 2.   Additional Disclosures Reveal The Falsity of BofI's Misrepresentations About Its Internal Controls, Risk Management and Compliance Infrastructure.

131.   On October 29, 2015, *Seeking Alpha* published an article entitled "Buyer Beware:  More Odd Behavior from BOFI," which notes differences between certain statements Garrabrants made on the October 14, 2015 conference call and the transcript of the call BofI filed with the SEC next day.[29]  Most critically, the article notes that while the audio of the October 14 conference call reflects, when discussing whether the OCC is investigating Erhart's allegations, Garrabrants stating "*there is nothing ongoing*" and "*there is no continuity to this*," (*see* ¶ 128) the BofI transcript filed with the SEC does not contain either statement.  As the article explains: "So is the investigation ongoing or not? A reader of the financial statements would likely consider the existence of an OCC investigation (or lack thereof) to be material in light of last week's developments." Following the news on October 29, 2015, the price of BofI common stock declined $1.91 per share, or approximately 7.6%, from its closing price of $25.18 on October 28, 2015, to close at $23.26 on October 29, 2015, on unusually high trading volume.

132.   The October 29, 2015 *Seeking Alpha* article relied on information that the market had failed to previously appreciate and incorporate into the Company's stock price.  While the BofI transcript and the webcast were both available prior to October 29, the market did not appreciate the small but significant differences in the two—including in particular the removal of Garrabrants's statements regarding the presence of a regulatory investigation from the official transcript—until the article compared the discrepancies side-by-side.  The fact that BofI failed to include critical statements concerning whether an investigation by the OCC was

---

[29] Real Talk Investments, *Buyer Beware:  More Odd Behavior From BOFI*, *Seeking Alpha*, Oct. 29, 2015.

1  ongoing additionally implicates the Company's lack of internal controls over

2  financial reporting and risk management.

3      133.   On January 6, 2016, before the market opened, *Seeking Alpha*

4  published an article that exposed BofI's lending relationship with Propel Tax

5  (described further *infra* at Section V.B.3.d).  The article also revealed Defendant

6  Grinberg's ties to Propel Tax through his executive role at Encore Capital, making

7  the $31.9 million loan facility BofI provided Propel Tax a related-party transaction

8  that should have been disclosed.[30]  The transaction also compromised the internal

9  investigation of Erhart's allegations by Grinberg and Bar-Adon.  In addition, the

10  article noted that BofI made a mortgage loan to Jonathan Ball in March 2012,

11  which likely created a conflict of interest (Plaintiff has since independently

12  confirmed that BofI made a mortgage loan to Ball).  On this news, BofI stock

13  opened on January 6, 2016 at $20.04 per share, which was $0.32, or 1.6%, lower

14  than its closing price of $20.36 on January 5, 2016.

15      134.   The January 6, 2016 *Seeking Alpha* article relied on information that

16  the market had failed to previously appreciate and incorporate into the Company's

17  stock price.  Specifically, the article identified the relationships between BofI and

18  Propel Tax, as well as Defendant Grinberg's relationship with Propel Tax, which

19  could have compromised the Audit Committee and Company's investigation of the

20  Erhart Complaint and therefore called into question the adequacy of the

21  Company's internal controls and risk management provisions.

22

23

---

[30] BofI's failure to disclose the related-party loan to Propel also violated: (i) Item 404 of Regulation S-K, 17 C.F.R. § 229.404, which requires public disclosure of certain information concerning "any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest" and (ii) U.S. GAAP.  The FASB's Accounting Standards Codification ("ASC") 850, concerning "Related Party Disclosures," provides, generally, that information about transactions with related parties must be disclosed in public financial statements, so that those who rely on the statements can evaluate the loans' significance.  (ASC 850-10-10-1).

V.   **DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS RELATING TO UNDERWRITING STANDARDS AND CREDIT QUALITY**

A.   **Statements Relating to Underwriting Standards and Credit Quality**

135.   Throughout the Class Period, Defendants represented that BofI had established and complied with demanding underwriting standards and therefore had excellent loan credit quality.  However, as explained in Section V.B, *infra*, the following statements were false and misleading when made because Defendants knew, but failed to disclose, (i) BofI engaged in unsound lending practices that subjected the Company to significant risk of loss and potential regulatory and government actions, (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with third party lenders that originated loans using substandard underwriting practices and that subjected BofI to significant credit risk and risk of potential regulatory or government actions, and (iii) BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate Customer Identification Program ("CIP") as part of the Bank's BSA/AML compliance program and by lending to borrowers who failed to provide sufficient identifying information.

136.   The Class Period begins on September 4, 2013, when BofI filed an annual report on Form 10-K with the SEC for the fiscal year ending June 30, 2013 ("2013 Form 10-K"), in which BofI stated:

- "Our loan underwriting policies and procedures are written and adopted by our board of directors and our loan committee. ***Each loan, regardless of how it is originated, must meet underwriting criteria set forth in our lending policies and the requirements of applicable lending regulations of our federal regulators***";

- "In the underwriting process ***we consider the borrower's credit score, credit history, documented income, existing and new debt obligations, the value of the collateral, and other internal and external factors***. For all multifamily and commercial loans, we rely primarily on the cash flow from the underlying property as the expected source of repayment, but we also endeavor to obtain personal guarantees from all borrowers or substantial principals of the borrower. In evaluating multifamily and commercial loans, we review the value and condition of the underlying property, as well as the

financial condition, credit history and qualifications of the borrower. In evaluating the borrower's qualifications, we consider primarily the borrower's other financial resources, experience in owning or managing similar properties and payment history with us or other financial institutions. In evaluating the underlying property, we consider primarily the net operating income of the property before debt service and depreciation, the ratio of net operating income to debt service and the ratio of the loan amount to the appraised value."

• "Credit-Related Financial Instruments. The Company is a party to credit-related financial instruments with off-balance- sheet risk in the normal course of business to meet the financing needs of its customers. . . . The Company's exposure to credit loss is represented by the contractual amount of these commitments [to extend credit]. *The Company follows the same credit policies in making commitments as it does for on-balance-sheet instruments*."

137.   These statements concerning BofI's underwriting standards appeared in substantially the same form in BofI's 2014 and 2015 Form 10-Ks. *See* App'x at Section II.

138.   On November 5, 2013, BofI conducted a Q1 2014 conference call with analysts and investors, during which Garrabrants represented:

• "We are pleased with the increase in credit quality at the bank";

• "We continue to remain focused on credit quality at the bank, and have not sacrificed credit quality to increase originations"; and

• The new Ability-to-Repay and Qualified Mortgage ("QM") rule adopted by the Consumer Financial Protection Bureau ("CFPB") "solidified our ability to continue to do the prudent originations that we have, and not allowed other institutions to come in and basically mess up this business by sort of racing to the bottom on credit.  Because you can't any more do a -- it is illegal now to do a state[d]-income loan. . . And we never did that. *We've always done full documentation loans*. . . . I don't believe in low documentation, and no documentation loans.  From my perspective, I want to see everything.  If we're making a judgment and a trade off about a particular aspect of something, that's fine. But we can do that with the holistic picture, and have that picture documented."

139.   On February 5, 2014, BofI filed with the SEC its Form 10-Q for the second quarter ending December 31, 2013 ("Q2 2014 Form 10-Q"), which contained a nearly identical description of BofI's off-balance sheet activities as included in its 2013 Form 10-K (¶ 136).  BofI described its off-balance commitments as of December 31, 2013 to consist of "commitments to originate loans with an aggregate outstanding principal balance of $125.3 million, and

commitments to sell loans with an aggregate outstanding principal balance of $38.8 million." BofI further stated that it has "no commitments to purchase loans, investment securities or any other unused lines of credit." BofI stated in the Form 10-Q that "[t]he fair value of off-balance sheet items is not considered material."

140.   On February 5, 2014, BofI conducted a Q2 2014 conference call with analysts and investors.  During the call, Garrabrants repeated several of the same statements regarding credit quality that he had on the November 5, 2013 call, again highlighting the fact that BofI "never" does "no documentation" loans.  *See* App'x at Section II.

141.   Continuing through the remainder of 2014, including on earnings calls held on May 6, 2014, August 7, 2014, and November 4, 2014, BofI, and in particular Garrabrants, made similar statements concerning BofI's underwriting standards and credit quality, including the following:[31]

- "[w]e achieved our loan growth without reducing our credit standards while improving our net interest margin";
- "we continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products";
- "we believe that we can continue to grow our portfolio at similar yields in this coming year as we have in the prior year and maintain our conservative credit guidelines";
- "[w]e continue to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination"; and
- "strong loan growth was achieved while maintaining high credit quality standards."

142.   Throughout 2015, Defendants continued touting the purportedly high quality of BofI's loans and its strong underwriting practices.  On January 29, 2015, BofI held a conference call to discuss its Form 10-Q for the second quarter ending December 31, during which Garrabrants touted BofI's "strong credit discipline."

---

[31] Section II of the Appendix contains a complete list of BofI's false and misleading statements concerning underwriting standards and credit quality.

143.   On April 30, 2015, BofI conducted a Q3 2015 conference call, during which Garrabrants again emphasized BofI's purportedly stringent underwriting standards and again insisted "[w]e only originate full documentation loans[.]"  *See* App'x at Section II.

144.   In investor presentations throughout the Class Period, including in February 2014, March 2014, May 2014, September 2014, and February 2015, Micheletti made numerous statements regarding the Company's purported financial condition and prudent practices, including:

- Representing that for single-family loans, BofI used "'common sense' underwriting"; and

- Representing that for multi-family loans, BofI worked with "[h]igh quality originators with average experience of 15+ years" and had "high credit quality[.]"

145.   Defendants also sought to reassure investors when questions regarding BofI's lending practices arose.  On August 22, 2015, *The New York Times* published an article concerning BofI's robust growth and unsavory lending practices during Defendant Garrabrants's tenure as CEO.[32]  According to the *Times*, Garrabrants stated that "[w]e try to run a good, ethical shop and I want people to know that."  In addition, in response to investor concerns about BofI's potentially risky loan portfolio, in particular loans to foreign nationals, Garrabrants reportedly stated that "the critics are spreading disinformation," and the article continued:

> "Here's the problem for them:  ***They are going into an earnings juggernaut that has none of the things that they're talking about,*** *" Mr. Garrabrants said.  And he says the bank is as judicious as any other lender in picking its borrowers.*  "It's about being thoughtful about what risks you take and watching them and being careful," he said, adding that Bank of Internet's deposits are a reliable source of funding.
>
> * * *
>
> Then there are questions about Bank of Internet's marketing of itself

_____

[32] Peter Eavis, *An Internet Mortgage Provider Reaps the Rewards of Lending Boldly*, N.Y. Times, Aug. 22, 2015 (the "August 2015 *NY Times* article").

as a lender to "foreign nationals." It does not disclose exactly what proportion of its loans are made to foreigners. When asked, Mr. Garrabrants said it was **"nowhere near the majority**."

146. On August 5, 2015, BofI issued a press release announcing that it had received approval from the OCC to proceed with the definitive purchase and assumption transaction with H&R Block Bank. In the release, Garrabrants touted BofI's "branchless" model, stating that:

- "[o]nce completed and closed, these H&R Block agreements will add to the strength and diversity of our deposit, lending and fee income businesses. We believe our nationwide low-cost branchless bank is well aligned with H&R Block's desire to provide their clients with affordable banking products and services."

147. These statements concerning BofI's agreements with H&R Block and BofI's "branchless business" model being "well aligned" with H&R Block were false and misleading when made because Defendants knew, but failed to disclose, that BofI created a phantom Nevada branch location to issue and book hundreds of millions of dollars in H&R Block financial products and to take advantage of Nevada usury law which does not limit interest rates in express written contracts.

148. On October 29, 2015, BofI conducted a Q1 2016 conference call with analysts and investors during which Garrabrants made statements touting the Bank's credit quality. *See* App'x at Section II.

149. The above statements concerning BofI's underwriting standards and credit quality were false and misleading when made because, as described in Section V.B *infra*, Defendants knew, but failed to disclose, that (i) BofI engaged in unsound lending practices that subjected the Company to significant risk of loss and potential regulatory and government actions, (ii) BofI's off-balance sheet activities included undisclosed lending partnerships with third party lenders that originated loans using substandard underwriting practices and that subjected BofI to significant credit risk and risk of potential regulatory or government actions, and (iii) BofI violated federal banking regulations and laws and other laws by failing to maintain an adequate CIP as part of the Bank's BSA/AML compliance program

1  and by lending to borrowers who failed to provide sufficient identifying

2  information.

3       **B.     BofI Engaged in Unlawful Lending Practices.**

4       150.   BofI Federal Bank began as a small consumer-focused, nationwide

5  savings bank operating primarily through the Internet.  Between fiscal 2011 and

6  2015, BofI's total deposits grew 232% (from $1.34 billion to $4.45 billion) and its

7  total loan portfolio grew 274% (from $1.33 billion to $5.0 billion).  The primary

8  driver of BofI's increased earnings during that time was growth of its loan

9  portfolio and increasing net interest margin.

10      151.   BofI is subject to extensive regulation by its principal regulator, the

11  OCC, as well as the FDIC, the Federal Reserve, the SEC, the CFPB, and FINRA.

12  Two major focuses of banking supervision and regulation are the safety and

13  soundness of a bank and its compliance with consumer protection laws.  Bank

14  examiners perform on-site examinations to review the Bank's performance based

15  on its management and financial condition, as well as its compliance with

16  regulations.

17      152.   During the Class Period, BofI engaged in deliberately lax lending

18  practices and issued loans to borrowers with poor credit history whose ability to

19  repay the high-interest loans issued to them was, as Defendants knew, doubtful.

20  These lending practices were inconsistent with BofI's claims, described above, that

21  its lending standards were "conservative" and "disciplined," and that the Bank was

22  focused on "credit quality."

23      153.   Through those and other statements, Defendants knowingly misled

24  investors as to the extent of the true risks entailed in investing in BofI.

25       **1.     BofI Violated the "Ability-to-Repay" Rule.**

26      154.   In January 2013, the CFPB adopted a rule (effective on January 10,

27  2014) amending 12 C.F.R. § 1026, or "Regulation Z" (which implements TILA),

28  to implement sections of the Dodd-Frank Wall Street Reform and Consumer

- 53 -

Protection Act ("Dodd-Frank Act") requiring, among other things, that creditors make a reasonable, good faith determination of a consumer's ability to repay, with limited exclusions, any consumer credit transaction secured by a dwelling. 12 C.F.R. § 1026.43(c).  The rule also establishes certain protections from liability under this requirement for "qualified mortgages" or "QMs."  12 C.F.R. § 1026.43(e).

155.   The ability-to-repay/QM rule requires lenders to make a reasonable, good-faith determination before or when a mortgage loan is issued that the borrower has a reasonable ability to repay the loan, considering such factors as the borrower's  income or assets and employment status (if relied on) against: (i) the mortgage loan payment; (ii) ongoing expenses related to the mortgage loan or the property that secures it, such as property taxes and hazard insurance; (iii) payments on other loans secured by the same property; and (iv) the borrower's other debt obligations.  12 C.F.R. § 1026.43(c)(2).  The rule also requires the lender to verify the borrower's credit history.  12 C.F.R. § 1026.43(c)(3).

156.   The rule contains a presumption that the lender has complied with the rule if it originates a QM.  QMs generally cannot contain certain risky features, such as interest-only payments or balloon payments.[33]  Additionally, points and fees on QMs are limited.

157.   As described below, Defendants routinely disregarded borrowers' ability to repay in making mortgage loans.

158.   Former BofI employees, including loan underwriters, provided detailed accounts of the Company's deliberately lax lending practices.  According to CW 1, who worked primarily on financings for apartment buildings and mixed-use buildings, as well as some commercial properties, beginning in early 2014, CW 1 and CW 1's group were being pressured by BofI's Executive Vice President

---

[33] *See* CFPB's *Basic guide for lenders What is a Qualified Mortgage?*, http://files. consumerfinance.gov/f/201310_cfpb_qm-guide-for-lenders.pdf.

and Chief Credit Officer Thomas Constantine, as well as Leigh Porter, who was in charge of BofI's Multifamily – Income Property Lending group, to underwrite loans that CW 1 was not comfortable signing off on and that did not make economic sense for BofI to issue.

159.   One such loan on which CW 1 worked in mid-2014 involved a multi-family property located in Laguna Beach, California that was highly leveraged, at approximately 70% to 75% LTV.  According to CW 1, the borrower sought a cash-out refinancing loan of several million dollars but had bad credit and no cash. CW 1 reviewed bank statements provided by the borrower that showed less than a $100 balance in some accounts, including one account that had a negative balance. According to CW 1, it was clear that the borrower "was using the property basically to support a lifestyle the borrower no longer had the money to support." CW 1's review of the operating standards of the property showed barely any cash flow.  Despite CW 1's recommendation against financing the property, BofI issued the loan.

160.   Further, BofI already had issued a highly leveraged refinancing loan for a mixed-use property to the same borrower, and soon after BofI made the second loan to that borrower, CW 1 was told by co-workers in BofI's loan-servicing department that the borrower had not yet made the first payment owed on the first loan.

161.   CW 1 worked on the second refinancing loan and noticed on an updated credit report concerning the borrower that since the first cash-out refinancing loan from BofI, the borrower had taken on an additional $80,000 in debt from Mercedes-Benz, which CW 1 believed indicated the borrower had recently purchased a new luxury vehicle.  CW 1 was concerned, regarding those two loans, that the borrower's spending habits outstripped her income.  According

to CW 1, the debt-service coverage ratio was not good with respect to both properties.[34]

162.   CW 1 expressed concerns about the two loans to Constantine. According to CW 1, Constantine's response was that the transaction was a good deal for BofI, even if it had to foreclose on the underlying properties.  Constantine noted to CW 1 that it did not matter to BofI if the first loan defaulted because the underlying property was located in Laguna Beach (one of the most expensive real estate markets in California).

163.   Constantine's comment was at odds with the ability-to-repay/QM rule, which does not include a property's foreclosure value among the factors that should be considered in determining a borrower's ability to repay a loan.

164.   CW 1 described other improper lending practices at BofI, including its use of the same appraiser, Brendan Flynn and his appraisal company, The Flynn Group, to perform appraisals for the vast majority of loans BofI made.  CW 1 noted that Flynn was a friend of Constantine and that even though The Flynn Group was located in Southern California, it performed appraisals for BofI for properties located elsewhere, including in Oregon and Las Vegas.  CW 1 recalled instances in which CW 1 saw an initial appraisal by The Flynn Group that appraised a property for a certain value, and later saw an "updated appraisal" by The Flynn Group with a higher appraisal value of the same property.

165.   CW 1 worked on an average of 10 to 15 loans per month at BofI and, beginning in February 2014, CW 1 was uncomfortable with approximately 10% to 20% of those loans because of the process BofI used to approve loans.  "It started to become very rare that we would deny a loan," according to CW 1.

166.   Another Senior Underwriter who worked in BofI's San Diego headquarters prior to and during part of the Class Period ("CW 2") provided

---

[34] The debt-service coverage ratio is the ratio of cash available for debt servicing to interest, principal, and lease payments.

similar accounts of BofI's lending practices.  CW 2 worked in the same lending group as CW 1 for part of the Class Period, and then, also during the Class Period, transferred to BofI's C&I Lending Group, where CW 2 reported to Constantine. According to CW 2, Constantine and Garrabrants approved deals that CW 2 and other underwriters recommended against doing, including loans CW 2 and other BofI underwriters believed were unlikely to be repaid.

167.   In mid-2014, CW 2 worked on a multimillion dollar C&I loan for a large property located in the 700 block of Broadway Street in downtown San Diego, California.  The property had been listed for sale for three years at approximately $13 million, which, according to CW 2, indicated that the property was not worth $13 million.  The property was owned by an individual who had planned to work with Starwood Hotels to build a hotel on the property, but having not done so, the individual was forced by Starwood to sell the property.

168.   The borrower was a limited liability company ("LLC").  CW 2 noted that the appraiser whom BofI hired for the deal was Brendan Flynn of The Flynn Group, the same appraiser identified by CW 1 as performing the vast majority of appraisals for BofI loans.  CW 2 similarly noted that Flynn was a friend of Constantine and was the only appraiser BofI used for all multifamily property appraisals.  According to CW 2, Flynn called CW 2 stating that the property needed to be appraised for $18 million to satisfy the LTV required for BofI to proceed with the loan.  CW 2 refused to recommend the loan with a property valuation of $18 million, particularly after reviewing the borrower's LLC agreement, which contained a suspicious clause indicating that the property owner was also making a loan to the borrower above the purchase price, that the difference between the loan amount and purchase price would be paid to the owner by the borrower within 24 months, and if the borrower failed to do so, the owner would assume ownership of the property.  CW 2 voiced concerns about the clause,

1    which CW 2 thought was part of a scam designed for the owner to regain

2    ownership of the property, to BofI's Chief Legal Officer, Eshel Bar-Adon.

3        169.   After CW 2 informed Constantine and the BofI loan originator

4    working on the same loan that CW 2 would not approve the loan, CW 2 received a

5    call from the loan originator at approximately 3:00 a.m. the following day asking if

6    CW 2 would approve the loan, to which CW 2 responded "Absolutely not."  CW 2

7    then received a call from Constantine pressuring CW 2 to approve the loan.

8    Again, CW 2 refused.

9        170.   A review of the June 2014 Brendan Flynn appraisal report revealed

10   that the Broadway property was ultimately appraised at $18 million.  According to

11   CW 2, the loan was approved by Garrabrants upon recommendation by

12   Constantine and the loan was funded for between $11 million and $13 million.

13   CW 2 subsequently expressed concerns about the transaction to Constantine,

14   BofI's Executive Vice President and Chief Lending Officer Brian Swanson, and

15   other BofI managers.  CW 2 also left a copy of the loan documents and a list of

16   CW 2's concerns with Garrabrants's assistant, as Garrabrants was in Italy at the

17   time.

18       171.   CW 2 also described another loan BofI issued to a borrower whom

19   CW 2 knew had poor credit and a FICO score in the 400 range.[35]  The interest rate

20   on the $24,000 loan was approximately 20%.  According to CW 2, the loan was

21   signed by an underwriter whom CW 2 knew and who, when confronted about the

22   loan, denied any knowledge that his name was on the loan documents.

23       172.   CW 10 confirmed that BofI executive management funded loans that

24   CW 10 and other BofI underwriters declined to sign off on.

25

26

27   ───────────────────────

     [35] A FICO score is a type of credit score between 300 and 850 that lenders use to
28   assess an applicant's credit risk.  The higher the score, the lower the applicant's
     credit risk.

**2.** **BofI Maintained a Deficient Customer-Identification Program and Violated Federal Laws and Regulations.**

**a.** **BofI's Deficient Customer Identification Program**

173.   BofI routinely opened customer deposit and loan accounts for individuals and entities with suspicious or criminal backgrounds and who failed to provide sufficient identifying information.  Those banking practices violated various federal regulations and laws, including (i) the BSA; (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (also known as the USA Patriot Act) (Pub. L. No. 107-56, 115 Stat. 272) ("Patriot Act"); (iii) regulations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury ("U.S. Treasury"); and (iv) FDIC rules and regulations concerning BSA/AML compliance programs.

174.   The BSA requires banks to maintain appropriate records and file certain reports involving currency transactions and its customer relationships. According to the FDIC's Risk Management Manual of Examination Policies (the "FDIC Manual"), the BSA requires banks to maintain sufficient records to reconstruct customer account transactions and activity, if necessary.[36]

175.   The scope and enforcement of the BSA and AML measures have been expanded by several acts and regulations, including Section 326 of the Patriot Act. The Patriot Act requires banks to implement a written and board-approved CIP into the bank's BSA/AML compliance program, which must also be board-approved.  The purpose of the CIP Program is to allow a bank to form a reasonable belief that it knows the true identity of each customer.[37]

---

[36] *See* Section 8.1 of the FDIC Manual, *available at* https://www.fdic.gov/regulations/safety/manual/.

[37] *See* FDIC Manual; *see also* Federal Financial Institutions Examination Council (the "FFIEC"), *Bank Secrecy Act/Anti-Money Laundering Examination Manual*, Feb. 27, 2015 (the "FFIEC Manual"), *available at* https://www.fdic.gov/regulations/examinations/bsa/FFIEC_CIP.pdf.  According to the FFIEC's website, it "is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of

176.   The CIP must contain account-opening procedures that specify the following identifying information obtained from each customer before opening an account:  (i) name; (ii) date of birth for individuals; (iii) physical address; and (iv) identification number, including a Social Security Number ("SSN"), Tax Identification Number ("TIN"), Individual Tax Identification Number ("ITIN"), or Employer Identification Number ("EIN").  (*Id.* at 8.1-10).

177.   Further, the CIP requires banks to develop procedures to verify the identity of each customer.  Significantly, the CIP "must include procedures for determining whether the customer appears on any list of known or suspected terrorists or terrorist organizations issued by any Federal government agency and designated as such by the Treasury in consultation with the other Federal functional regulators." (*Id.* at 8.1-12).  Banks are contacted by the U.S. Treasury when such a list is issued and are required to compare customer names against the list and follow any accompanying directives.  (FFIEC Manual at 51).

178.   Part 326.8 of the FDIC's Rules and Regulations also requires banks to maintain a system of internal controls that is designed to, among other things, "[e]stablish procedures for screening accounts and transactions for OFAC compliance that include guidelines for responding to identified matches and reporting those to OFAC."

179.   OFAC maintains and publishes a number of sanctions lists, including a list of specially designated nationals ("SDNs") that consists of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific.  (*Id.*)  SDN

---

financial institutions by the Board of Governors of the Federal Reserve System (FRB), the Federal Deposit Insurance Corporation (FDIC), the National Credit Union Administration (NCUA), the Office of the Comptroller of the Currency (OCC), and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions."

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

assets are blocked and U.S. persons are generally prohibited from dealing with them.  (*Id.*)   As alleged in the Erhart Complaint and described in further detail below, BofI made loans to foreign nationals with suspicious or unverifiable backgrounds, including criminals and politically exposed persons and persons who failed to provide sufficient identifying information.  As described above, BofI did not allocate sufficient resources to maintain a robust and effective BSA/AML compliance program to minimize the risk of BofI making such loans.

### b. <u>Loans to Foreign Nationals</u>

180.   BofI made loans to foreign nations with suspicious or unverifiable backgrounds, including criminals and politically exposed persons and persons who failed to provide sufficient identifying information.  According to Erhart, in or around January 2015, he discovered in his audit of BofI's loan originations that "the Bank was making substantial loans to foreign nationals including Politically Exposed Persons ('PEP's') in potential violation of BSA/Know Your Customer rules."  (*Id.* ¶ 34).  Erhart found information showing that "many of the borrowers were criminals, even notorious criminals, and other suspicious persons" and also included "very high level foreign officials from major oil-producing countries and war zones."  (*Id.*)

181.   CW 5 confirmed that BofI did not have sufficient internal controls to comply with anti-money laundering laws and regulations.  CW 5 noted that there were a lot of foreign national loans at BofI, some of which lacked TINs.  According to CW 5, foreign national loans required the borrower to open a bank account at BofI and payments on the loan were processed through a BofI business account.  CW 5 related that CW 5 attended meetings with Garrabrants and other BofI banking personnel where the issue of missing TINs on foreign national loans was discussed.  According to CW 5, Garrabrants issued instructions at the meetings "to do it anyway" and that "it's got to be done."  CW 5 stated that

Constantine pressured CW 5's department to push loans through at Garrabrants's instruction.

182.   CW 1 described a refinancing loan that BofI made in mid-2015 to a borrower that participated in a gambling ring operated by a Salvadoran gang.  The borrower had accumulated gambling debt, which the Salvadoran gang permitted the borrower to pay back by recruiting new gamblers for the gambling ring.  CW 1 recalled conducting a background search on the borrower using online search engines and discovering that the borrower had been convicted of a crime and entered into a plea deal a couple years before applying for a BofI loan.  BofI nevertheless issued the loan to the borrower.

183.   CW 2 recalled underwriting a loan for the purchase of a vacant lot in Pasadena that was partially funded by a Venezuelan family trust.  According to CW 2, the property previously housed a plastics factory that left the property contaminated.  CW 2 indicated that a phase I environmental report about the property recommended obtaining a phase II report to further assess the safety of the property.  Constantine searched for and found an environmental inspection company that concluded no further assessment was necessary, and therefore, a phase II report was not ordered, CW 2 recalled.

184.   According to CW 2, the Venezuelan family trust provided equity to the borrower for the purchase.  CW 2, however, did not receive any documents about the trust other than a financial statement.  CW 2 was not provided with the names of the persons behind the trust or any TIN and, therefore, CW 2 was not able to run an OFAC report to check for matching names on the OFAC list.  CW 2 notified Constantine of those issues and refused to approve the loan.  CW 2 stated that Constantine approved the loan anyway, apparently in violation of OFAC.

185.   A slide presentation by BofI's National Sales Executive in 2014 confirms that BofI issued many loans to foreign nationals and was "flexible" in the

1    types of identifying and credit information it accepted from foreign borrowers.[38]

2    Specifically, the BofI Presentation included the following about loans to Chinese

3    nationals without TINs: "we have lent to a lot of Chinese foreign nationals – we

4    know they don't have to file tax returns and we accept letters of employment

5    translated into English by certified translators."

6          186.   As described in an article published by *Seeking Alpha* on August 28,

7    2015 (the "August 28, 2015 Article"), BofI's willingness to make loans to foreign

8    nationals in violation of OFAC regulations is further demonstrated by doing

9    business with a South Florida mortgage broker, A&D Mortgage LLC, whose

10   website includes the images of the flag of Russia, among other national flags, on a

11   page advertising "Foreign National Loans."[39]   A review of the U.S. Treasury's

12   website reveals that OFAC issued directives in 2014 imposing sanctions on

13   specified persons operating in sectors of the Russian economy and prohibiting U.S.

14   persons from engaging in certain financing transactions in the U.S. with those

15   persons.[40]   The August 28, 2015 Article also noted that BofI's issuance of loans to

16   foreign nationals from Russia is inconsistent with Garrabrants's claim that BofI's

17   foreign national loans consist primarily of loans made to Western Europeans and

18   Canadians.

19                  **c.**   **Missing or Unverifiable Customer TINs**

20         187.   Erhart also discovered that BofI opened and maintained hundreds of

21   accounts without TINs.  According to Erhart, on or about January 15, 2015, the

22   OCC requested that BofI provide information about bank accounts without TINs.

23

24   _____

[38] *See* Maurice Totry, National Sales Executive, *BofI's Comprehensive Overview of Our Wholesale Business*, 2014, *formerly available at*

25   https://www.dropbox.com/s/wpxip6e91rfhqaj/BofIFederal_Presentation-%20MT%20Version%2003%2011%202014.pdf?dl=0.  Plaintiff has retained a

26   copy of the document.

[39] The Friendly Bear, *The New York Times Has Only Scratched The Surface On

27   BofI Holding...*, *Seeking Alpha*, Aug. 28, 2015.

[40] *See Ukraine-/Russia-related Sanctions,* U.S. Treasury website, *available at*

28   https://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx.

"The Bank responded to the OCC that there were no accounts without TIN's." (Erhart Compl. ¶ 32).  BofI's response was knowingly false, Erhart alleged, as he "saw a spreadsheet in the BSA [Bank Secrecy Act] folder disclosing approximately 150-200 accounts where the borrower does not have a TIN." (*Id.*)

188.   Erhart showed his supervisor, Jonathan Ball, on Erhart's work computer the OCC's request as well as the loan spreadsheet Erhart found that contained a column titled "account number." (Erhart Decl. ¶ 32).  According to Erhart's allegations, Erhart counted the number of loans lacking TINs for Ball and Ball appeared surprised. (*Id.*).

### 3.   BofI Engaged in, and Concealed, Illicit Lending Partnerships.

189.   BofI also worked with undisclosed SPEs and lending partners such as OnDeck, Quick Bridge, Center Street, and Propel Tax in making high-risk, high interest rate loans to borrowers with poor credit profiles and/or limited or no ability to repay that were inconsistent with BofI's purported "conservative" and "disciplined" lending standards.  The lending partnerships also created credit risks borne by BofI and risks of regulatory or government actions against BofI which defendants failed to disclose.

### a.   OnDeck

190.   BofI engaged in an undisclosed lending partnership with OnDeck as part of an illicit "Rent-A-Charter" scheme that exposed BofI to significant risks of regulatory or government actions.  BofI worked with OnDeck to expand BofI's C&I Lending business, one of the Company's fastest-growing segments during the Class Period.  OnDeck is a publicly traded company whose common stock is listed on the New York Stock Exchange under the ticker "ONDK."  OnDeck was profiled in a Bloomberg article entitled "*Is OnDeck Capital the Next Generation of Lender or Boiler Room?*" that described OnDeck's business as "essentially payday lending for businesses[]" at a high cost – the average interest rate on OnDeck's

business loans was 54%.[41]  OnDeck worked with independent mortgage brokerage firms that recommended loans to BofI in exchange for lucrative fees.  According to Bloomberg, "OnDeck has teamed up with brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy, according to interviews with the brokers and court records."[42]

191.   In December 2014, in connection with its initial public offering, OnDeck filed a prospectus with the SEC in which it described its partnership with BofI.  OnDeck revealed that pursuant to the lending partnership, BofI issued commercial loans in states and jurisdictions in which OnDeck is not licensed to do so:

> [N]ine states and jurisdictions, namely Alaska, California, Maryland, Nevada, North Dakota, Rhode Island, South Dakota, Vermont, and Washington, D.C., require a license to make certain commercial loans and may not honor a Virginia choice of law. . . . In such states and jurisdictions and in some other circumstances, term loans are made by an issuing bank partner that is not subject to state licensing, primarily BofI Federal Bank (a federally chartered bank), or BofI, and may be sold to us.

> \* \* \*

> BofI establishes its underwriting criteria for the issuing bank partner program in consultation with us.  We recommend term loans to BofI that meet BofI's underwriting criteria, at which point BofI may elect to fund the loan. If BofI decides to fund the loan, BofI retains the economics on the loan for the period that it owns the loan.  BofI earns origination fees from the customers who borrow from it and in addition retains the interest paid during the period BofI holds the loan before sale.  In exchange for recommending loans to BofI, we earn a marketing referral fee based on the loans recommended to, and funded by, BofI.  BofI has the right to hold the loans or sell the loans to us or other purchasers, though it generally sells the loans to us on the business day following its origination of the loan. . . .[43]

192.   BofI's partnership with OnDeck is tantamount to a "Rent-a-Charter" scheme, which the OCC has publicly condemned and sought to eliminate at other

---

[41] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*," Bloomberg, Nov. 13, 2014.

[42] *Id.*

[43] OnDeck Form 424B4 (Prospectus) filed with the SEC on December 17, 2014.

banks through enforcement actions.[44]  The OCC has found "a number of abuses in these relationships.  Of primary concern was the inability of small banks to properly oversee the third parties who were making loans in their names.  Among the abuses: deceptive marketing practices, failure to secure confidential customer files, and unsafe and unsound lending."[45]

193.  The OCC has issued advisory letters that warned against Rent-A-Charter schemes, which applied to BofI.  In OCC Advisory Letter AL 2000-10, for example, the OCC noted that "[s]uch third-party arrangements significantly increase risks to the bank and the OCC's supervisory concerns. . . . Payday lenders entering into such [Rent-a-Charter] arrangements with national banks should not assume that the benefits of a bank charter, particularly with respect to the application of the state and local law, would be available to them."[46]  Further, the OCC Advisory Letter provided guidelines for such arrangements, including:

> If payday lending is done indirectly through a third party, the agreement between the bank and a third party must establish adequate controls over the loan transactions, and should clearly delineate the services to be provided by the third party, including compliance with the bank's underwriting and servicing standards, funding procedures, reporting requirements, compensation, and other terms.[47]

194.  Additionally, in advisory letter AL 2003-3, which is also applicable to BofI, the OCC cautioned against "mak[ing] loans through brokers or obtain[ing] loans through purchase transactions that contain terms or reflect practices that may be characterized as abusive or 'predatory.'"[48]  The OCC's concerns included,

---

[44] Aurelius, *BofI:  Boiler Rooms, Bad Loans, And Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks*, *Seeking Alpha*, Nov. 10, 2015.

[45] OCC website, *Payday Lending*, http://www.occ.treas.gov/topics/consumer-protection/payday-lending/index-payday-lending.html.

[46] *OCC Advisory Letter, AL-2000-10*, Nov. 27, 2000, *available at* http://www.occ.gov/static/news-issuances/memos-advisory-letters/2000/advisory-letter-2000-10.pdf.

[47] *Id.*

[48] *OCC Advisory Letter, AL 2003-3*, Feb. 21, 2003, *available at* http://www.occ.gov/static/news-issuances/memos-advisory-letters/2003/advisory-letter-2003-3.pdf.

among other things, that such loans "present significant legal, reputation, and other risks, in addition to the heightened credit risk assumed in cases where the borrower lacks the ability to repay the loan without resorting to liquidation of the collateral."[49]

195.   As mentioned above in ¶ 190 and reported by Bloomberg, the average interest rate on OnDeck's business loans was 54%.  OnDeck acknowledged in its 2015 Form 10-K that a May 22, 2015 Second Circuit Court decision, *Madden v. Midland Funding,*[50] poses an additional threat to its "Rent-a-Charter" business model.  In *Madden*, the court held that the federal pre-emption of state usury laws does not apply in a case where consumer debt originated by a federally chartered bank is subsequently acquired by a non-bank debt collector.  Although the case is about credit card debt, the holding is broad, and according to legal experts it could also apply to commercial loans.[51]  OnDeck's risk disclosure in pertinent part states:

> Any extension of Second Circuit's decision, either within or without the states in the Second Circuit, could challenge the preemption of state laws setting interest rate limitations for those loans made by our issuing bank partners.

196.   BofI did not disclose its partnership with OnDeck pursuant to which BofI made millions of dollars in high-risk loans.  As OnDeck disclosed in its Form 10-K for the year ending December 31, 2014, loans made in states in which OnDeck was not licensed were "primarily" made by BofI, and, further, such loans by issuing bank partners totaled approximately $184.08 million, or 15.9% of OnDeck's $1.157 billion in total originations in 2014.[52]

---

[49] *Id.*

[50] 786 F.3d 246 (2d Cir. 2015).

[51] *See* http://www.paulhastings.com/publications-items/details/?id=e695e469-2334-6428-811c-ff00004cbded: "However, the broad language of the Appeals Court's holding in the Madden case is not limited to the specific facts of the case and, thus, has potential applicability to commercial as well as consumer loans originated by national banks and federal thrifts relying on federal preemption from state usury laws, (…)"

[52] OnDeck Form 10-K filed with the SEC on March 10, 2015, at p. 16.

197.   Contrary to Garrabrants's assertions about BofI's C&I lending business that, among other things, "[w]e are the sole agent for the vast majority of our C&I loans," "the vast majority of our C&I loan books is sole sourced, originated and agented by us," and "[w]e believe there will be opportunities to work more closely with other institutions to growing our C&I loan portfolio either through club deals on a shared national credit basis," a significant portion of BofI's C&I loan originations during the Class Period were actually pursuant to BofI's partnership with OnDeck as part of a Rent-a-Charter scheme.[53]

### b.   Quick Bridge

198.   BofI also originated C&I loans recommended by Quick Bridge in an undisclosed lending arrangement that was akin to a Ponzi scheme and that created significant credit risks ultimately borne by BofI, as well as risks of regulatory or government actions against BofI.  Quick Bridge is an Irvine, California-based "alternative lending company" that provides short-term loans to small and medium-sized businesses that are unable to obtain traditional loans.  Quick Bridge's website advertises, "Poor Credit? No problem.  We base our financing off of a business's cash flow, rather than a business's credit, because we understand the obstacles that modern business owners face."[54]

199.   According to an article published on *Seeking Alpha* on November 10, 2015, entitled *BofI:  Boiler Rooms, Bad Loans, And Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks* (the "November 10, 2015 Article"), Quick Bridge previously did business as "BlackRock Lending Group" ("BLG"),[55] which "the State of Washington has publicly accused of perpetrating 'an advance fee loan

---

[53] *See* BofI's CEO Greg Garrabrants on Q4 2015 Results - Earnings Call Transcript.

[54] *See* Quick Bridge website, *formerly available at* http://quickbridgefunding.com/. Plaintiff has retained a copy of the document.

[55] BlackRock Lending Group is not related to asset-management firm BlackRock, Inc.

scam' whereby 'consumers are told to wire the funds and the consumers never receive their loans.'"[56]

200.   The relationship between Quick Bridge and BLG is confirmed by (i) Plaintiff's review of more than 200 loan foreclosure lawsuits filed by "BlackRock Lending Group, LLC d/b/a Quick Bridge Funding"; and (ii) an amendment to a UCC Financing Statement initially listing BLG as the debtor and BofI Federal Bank as the secured party, but later amended to change the debtor to Quick Bridge Funding, LLC.[57]

201.   Quick Bridge relied on a network of brokers to recommend loans that "come with ridiculously high interest rates, must be paid daily, and have significant fees and penalties."[58]  Quick Bridge then reportedly passed the loans to BofI for origination, which immediately assigned the loans off-balance sheet to WCL Holdings I, LLC ("WCL"), a wholly-owned subsidiary of BLG (d/b/a Quick Bridge) and an apparent SPE managed by Quick Bridge that was financed by BofI. The loans were then reportedly serviced by Quick Bridge, which also managed collections.[59]

202.   According to the November 10, 2015 Article, "[c]ourt documents reveal that many borrowers appear to have never been capable of meeting the onerous terms of the loans and, in some cases, have defaulted within days of the loans being issued.  As a result, the courts have been flooded with collections

---

[56] Aurelius, *BofI: Boiler Rooms, Bad Loans, And Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks,* Seeking Alpha (Nov. 10, 2015).

[57] *See* UCC Financing Statement, Filing No. 14-7399509037, Document No. 4162438002, filed with the California Secretary of State on February 14, 2014 (showing BlackRock Lending Group as debtor, and BofI Federal Bank as secured party), amended by UCC Financing Statement, Filing No. 14-74267595, Document No. 44681230002, filed with the California Secretary of State on September 3, 2014 (changing BlackRock Lending Group to Quick Bridge Funding LLC as debtor).

[58] *See supra* footnote 56.

[59] Roddy Boyd, *BOFI Federal Savings: Annals of the Bank of Misery, Part I,* Southern Investigative Reporting Foundation, June 28, 2017 (the "June 28, 2017 Article").

actions and/or bankruptcies of small business owners related to loans originated by BOFI."[60]

203.   Plaintiff's review of court filings in 420 foreclosure actions filed by Quick Bridge, BLG, and/or WCL concerning defaulted loans reveals that 229 out of 420 of the loans at issue, or 55%, were originated by BofI, and the total remaining balance owed and demanded on the BofI-originated loans was approximately $11.78 million.  A nearly identical form loan agreement was used in each of the 420 BofI-originated loans Plaintiff reviewed.  In one case involving a loan originated by BofI, the "Business Loan Agreement," dated May 12, 2014, showed BofI Federal Bank as the "Lender," Quick Bridge Funding as the "Servicer," and System Solding (USA) Inc. as the "Borrower," and listed a "Loan Amount" of $150,000, a "Total Repayment Amount" of $198,000, an "Origination Fee" of $3,000, and a payment schedule requiring "$2,357.14 Daily Payment Amount (Weekday)" and "84 Daily Payments."[61]  The loan was modified 10 months later with a "Restructure Agreement," dated March 27, 2015, in which the borrower agreed to make 12 remaining monthly payments of $8,652.39.  Less than two months later, however, on May 15, 2015, the borrower allegedly defaulted on the loan with a remaining unpaid loan balance of $78,723.38.[62]  Many of the borrowers of the aforementioned BofI-originated loans defaulted within weeks of obtaining their loan—the average term of those loans was 167 calendar days and the amount of time before the borrowers defaulted was, on average, 52 days. Significantly, some of the borrowers of the loans BofI originated did not even make their first loan payment due.  A review of all 229 loans revealed that the average annual effective interest rate on these BofI originated loans is 248%,

---

[60] *See supra* footnote 56.

[61] *See* Complaint filed in *Quick Bridge Funding, LLC v. System Solding (USA) Inc., et al.*, Case No. 30-2015-00795980-CU-BC-CJC (Cal. Super. Ct. filed June 29, 2015).

[62] *Id.*

1   which is a marked contrast to the average interest rate which appears to apply on

2   the face of the loan agreement (29%).[63]

3       204.   As demonstrated by the "Loan Assignment Schedule" (with

4   redactions) attached to a filing in a collections action and included in the

5   November 10, 2015 Article, many loans originated by BofI are non-performing

6   and have been assigned to WCL.

7       205.   Constantine and BofI's Assistant General Counsel Seth Bayles

8   approved the assignments of BofI loans to WCL, as demonstrated in a document

9   entitled "Bulk Assignment" signed by Bayles and Constantine on behalf of BofI

10  referenced in the November 10, 2015 Article.

11      206.   A review of Uniform Commercial Code Financing Statements ("UCC

12  Financing Statements") filed by BofI with various states' Secretaries of State

13  shows that BofI has provided secured financing to WCL and BLG.[64]  In addition,

14  on December 8, 2015, *Seeking Alpha* published an article confirming the lending

15  relationship between BofI and Quick Bridge.[65]  The article included an image of a

16  UCC Financing Statement showing BLG as the Debtor and BofI Federal Bank as

17  the Secured Party, and a "Master Loan and Security Agreement dated February 12,

18  2014" between BofI Federal Bank, which is identified as the lender and secured

19  party, and WCL Holdings I, LLC as the Borrower.

20      207.   By lending to WCL (which is controlled by Quick Bridge), whose

21  primary purpose is apparently to purchase BofI loans, BofI was effectively funding

---

[63] The average borrower will assume that the difference between "Total Repayment Amount" and "Loan Amount" represents interest, but the average borrower will not realize the excessively high effective annual interest rate, since it is not disclosed.

[64] *See, e.g.*, UCC Financing Statement, Document No. 41624380002, Filing No. 14-7399509037 with California Secretary of State (Feb. 14, 2014) (showing BLG as debtor and BofI Federal Bank as secured party), amended by Document No. 44681230002, Filing No. 14-74267595 (Sept. 3, 2014), and UCC Financing Statement, Initial Filing No. 2014 0603993, filed with Delaware Secretary of State (Feb. 14, 2014) (showing WCL Holdings I, LLC as debtor, BofI Federal Bank as secured party).

[65] Aurelius, *BofI Confirmed To Finance Undisclosed, Off Balance Sheet SPE To Which It Transfers Bad Loans*, Seeking Alpha (Dec. 8, 2015).

its own loan originations and ultimately bore the credit risk of default on those loans, unbeknownst to investors.  The lending partnership with Quick Bridge involved high interest, high risk loans which Quick Bridge brought to BofI and which BofI originated.  In originating those loans, BofI earned substantial fees.  BofI then sold or assigned the loans to WCL/Quick Bridge.  BofI also provided funding to WCL/Quick Bridge to buy those types of high risk, high interest loans from BofI.  Those loans, therefore, served as collateral for the funding WCL/Quick Bridge obtained from BofI.  Through this circuitous arrangement, BofI ultimately bore the credit risk of default of the high risk, high interest loans it assigned to WCL/Quick Bridge because if the borrowers defaulted, WCL/Quick Bridge would not be able to pay back the funding it had obtained from BofI.  Accordingly, the ultimate risk for the assigned loans rested with BofI.

208.   In BofI's third quarter of 2016 earnings conference call on April 28, 2016, Garrabrants provided additional details about its suspicious C&I third party lending relationships, such as with WCL/Quick Bridge, that indicated that the lending relationships were akin to a Ponzi scheme.  Specifically, Garrabrants stated that "[i]n the event [C&I] loans or receivables and the collateral pool fail to perform as required by the loan documents, we require our borrowers to replace the delinquent loan with a different loan that meets our eligibility criteria[.]"  BofI did not properly disclose nor account for the risk that its lending partners would not be able to adequately replace delinquent loans that collateralized the funding BofI provided to those lending partners.  Instead, defendants touted the purported growth of BofI's C&I loan portfolio and falsely and misleadingly claimed that the loans were "well secured" and "backed by hard collateral, receivables, real estate or other loans" when they were not.  The lending partnership with Quick Bridge also subjected BofI to risks of OCC or other regulatory action as it involved loans originated by BofI pursuant to an illicit "Rent-A-Charter" scheme.  The bankruptcy trustee of the bankrupt estate of Lam Cloud Management, LLC, which

allegedly obtained a loan from Quick Bridge through such a scheme, described the transaction as follows:  "In a blatant and transparent attempt to evade state usury laws, QB engaged in a 'rent a charter scheme' by retaining BofI, a federally chartered bank, to originate the QB Loan."[66]

### c.   Center Street

209.   BofI made single-family lender finance loans to Center Street that were inconsistent with BofI's statements about its conservative underwriting standards and high credit quality loans.  Center Street is a private lender that provides "first lien short-term financing within 24 hours for residential real estate investors purchasing properties at discounted prices through trustee sales, pre-foreclosures, short sales, bank REO's, or just about any other kind of discounted sale."[67]

210.   According to an article published by *Seeking Alpha* on November 19, 2015 (the "November 19, 2015 Article"), Center Street and several of its SPEs were recently sued by the receiver of a California "flip and fix" real estate fund named Capital Cove Bancorp which the SEC alleged was a Ponzi scheme and shut down in June 2015.[68]  The receiver's action reportedly alleges that for several years, "Center Street was 'enabling and assisting' the perpetuation of the Ponzi scheme" by, among other things, lending money to Capital Cove on at least 86 occasions when Center Street knew, or should have known, Capital Cove could not have profited from the properties it purchased given "all of the liens placed against the properties, the cost of refurbishment, the carrying costs for the properties" and other costs.  The action reportedly also alleged that despite defaults on most loans

---

[66] *See* Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 547, 548 AND 550 and for Damages Pursuant to Applicable Law, filed in *In re: Lam Cloud Management, LLC*, Case No. 15-19010 (MBK) (Bankr. D.N.J.) (Doc. No. 50) (Mar. 23, 2017).

[67] *See* Center Street website at http://www.centerstreetlending.com/loan-solutions1.html.

[68] Aurelius, *BofI: Risky Loan To Undisclosed, Off-Balance Sheet SPEs Found Disguised Within Mortgage Warehouse Portfolio*, Seeking Alpha, Nov. 19, 2015.

Center Street had already issued to Capital Cove, Center Street continued to issue new fix and flip loans to Capital Cove's operator, Rashid Khalfani, whom Center Street knew had a criminal record, to assist Khalfani in perpetuating a scheme to attract capital from unsuspecting investors and using proceeds to pay Center Street BofI issued single-family lender finance loans to Center Street.  A review of UCC Financing Statements filed by BofI confirms that BofI provided financing to Center Street through its SPEs.[69]

211.   The November 19, 2015 Article also noted that nearly $300 million in in risky single-family lender finance loans BofI made to Center Street SPEs were disguised as "Warehouse and other" loans on BofI's financial statements.  Those loans appear to be included in BofI's "Warehouse and Other" loans on its financial statements without any attribution to Center Street.  Rather, BofI reports its total loan portfolio composition in amounts and percentages by type of loan at the end of each fiscal year-end.  Under the loan type "Single Family Real Estate Secured," there is a subtype of loans called "Warehouse and Other," which BofI explains in a footnote is comprised of warehouse loans (short terms loans to mortgage bankers

---

[69] *See* UCC Financing Statement, Document No. 42609120002, Filing No. 14-7508068361, filed with the California Secretary of State on April 17, 2014, (showing Center Street Lending Fund IV, LLC as debtor, BofI Federal Bank as secured party); UCC Financing Statement, Document No. 3896360002, Filing No. 13-7370912629, filed with the California Secretary of State on July 22, 2013 (showing Center Street Lending RE I, LLC as debtor, BofI Federal Bank as secured party); UCC Financing Statement, Filing No. 20141513506, filed with the Delaware Secretary of State on April 17, 2014 (showing Center Street Lending Fund IV SPE, LLC as debtor, BofI Federal Bank as secured party); UCC Financing Statement, Filing No. 20133378503, filed with the Delaware Secretary of State on August 29, 2013 (showing Center Street Lending MP III SPE, LLC as debtor, BofI Federal Bank as secured party); UCC Financing Statement, Filing No. 20133378677, filed with the Delaware Secretary of State on August 29, 2013 (showing Center Street Lending MP III, LLC as debtor, BofI Federal Bank as secured party); UCC Financing Statement, Filing No. 20141191949, filed with the Delaware Secretary of State on March 26, 2014 (showing Center Street Lending MP IV SPE, LLC as debtor, and BofI as secured party); UCC Financing Statement, Filing No. 20141191923, filed with the Delaware Secretary of State on March 26, 2014 (showing Center Street Lending MP IV, LLC as debtor, and BofI as secured party); and UCC Financing Statement, Filing No. 20132822568, filed with the Delaware Secretary of State on July 22, 2013 (showing Center Street Lending RE I SPE, LLC as debtor, and BofI as secured party).

to fund loans) and single-family lender finance loans ("loans to businesses secured by first liens on single family mortgage loans from cross selling, retail direct and through third-parties.") (2015 Form 10-K at 2).

### d.   Propel Tax

212.   BofI also failed to disclose its lending relationship with Propel Tax, a lender based in San Antonio, Texas that also does business as "Rio Tax."  On May 12, 2012, Propel Tax was acquired by Encore Capital Group, Inc. ("Encore Capital"), a publicly traded company.  Defendant Paul Grinberg, who is Chairman of the BofI Board's Audit Committee and Compensation Committee, and a member of the Nominating Committee, is also currently Group Executive, International and Corporate Development of Encore Capital.

213.   Propel Tax's business reportedly consists of acquiring delinquent tax liens and then issuing complex, high-interest loans to unsuspecting borrowers to pay down their debt.[70]  Propel Tax's controversial business has recently caught the attention of regulators.  In January 2015, Encore Capital reached a settlement with New York Attorney General Eric Schneiderman over concerns that the company filed thousands of flawed debt collection lawsuits against state residents.[71]  In September 2015, the CFPB brought an enforcement action against Encore Capital for using deceptive tactics to collect delinquent accounts.  The CFPB required Encore Capital to pay $42 million in consumer refunds and a $10 million penalty and to stop collections on debts totaling more than $125 million.[72]

214.   BofI's relationship with Propel Tax and Encore Capital is evidenced by several UCC Financing Statements and a Term Loan Facility of the same date, May 2, 2014, showing "Propel Financial 1, LLC" or "Propel Funding Holdings 1,

---

[70] *See* Aurelius, *BofI: Undisclosed Related Party Dealings Found to Infect Audit Committee*, *Seeking Alpha*, Jan. 6, 2016.

[71] *See* Jessica Silver-Greenberg, *Debt Buyer Faces Fine and Loss of Thousands of Court Judgments*, N.Y. Times, Jan. 8, 2015.

[72] *See* Ann Carrns, *Debt Collectors to Pay $61 Million in Consumer Refunds and Amend Their Practices*, N.Y. Times, Sept. 9, 2015.

LLC" (both of which are subsidiaries of Encore Capital) as the debtor, and "BofI Federal Bank" as the secured party.[73]

215.   The relationship is further evidenced in Encore Capital's Form 10-K for the fiscal year ending December 31, 2014 in which Encore Capital reported that on the same day that the UCC Financing Statements were dated, May 2, 2014, Encore Capital, through affiliates of Propel, entered into a $31.9 million term loan facility to fund the acquisition of a portfolio of tax liens. The term loan facility reportedly had a fixed 5.5% interest rate and matures in October 2016.  Encore Capital further disclosed that at December 31, 2014, the outstanding balance on the term loan facility was $19.2 million.

216.   The term-loan facility constituted a related-party transaction and should have been disclosed by BofI in its financial statements pursuant to Accounting Standards Codification ("ASC") 850 by the Financial Accounting Standards Board ("FASB"), as well as SEC Staff Accounting Bulletin No. 99, but was not (*see* footnote 30 (discussing ASC 850)).

### C.   Defendants' Misrepresentations About BofI's Underwriting Standards And Credit Quality Caused Investors' Losses

217.   Beginning on August 28, 2015, Defendants' misrepresentations about BofI's underwriting standards and credit quality were revealed to the market, causing the Company's stock price to decline and causing investors', including Lead Plaintiff's, losses.

218.   On August 28, 2015, before the market opened, *Seeking Alpha* published an article entitled "The New York Times Has Only Scratched The Surface on BofI Holding…" that, as described in ¶ 186, revealed, among other things, that the SEC's recent response to the author's FOIA request suggested that the agency was investigating BofI and that BofI did business with a mortgage

---

[73] *See* UCC Financing Statement, Filing No. 20141730068, May 2, 2014 (filed with Delaware Secretary of State) (Propel Financial 1, LLC), and UCC Financing Statement, Filing No. 20141730241, May 2, 2014 (filed with Delaware Secretary of State) (Propel Funding Holdings I, LLC).

1    company that advertised loans available to borrowers from Russia, a country
2    appearing on OFAC's sanctions list.[74]  The article also posited that BofI was
3    potentially the subject of a whistleblower lawsuit, that BofI's lending standards
4    and LTV were "gimmicks," and that BofI had overstated its earnings by under-
5    reserving and funding high-risk brokered loans with high-cost deposits.  Following
6    this article, the price of BofI's common stock declined $0.97 per share, or 3.1%,
7    from its closing price of $30.38 on August 27, 2015, to close at $29.41 on August
8    28, 2015, on elevated trading volume.

9        219.   The August 28, 2015 *Seeking Alpha* article relied on information that
10    the market had failed to previously appreciate and incorporate into the Company's
11    stock price.  The author of the article "pored through hundreds of loans that BOFI
12    has written over the past several years," as well as analyzed public records, had
13    "conversations with mortgage brokers," and reviewed other online materials,
14    which led the author to conclude that BofI's foreign national program includes
15    countries such as Russia and the Ukraine that are under U.S. sanctions.  The article
16    further explained why loans to foreign nationals might be risky for BofI:  because
17    such loans are at "high risk of inadvertently running afoul of banking laws" and
18    therefore require "extensive upfront due diligence and ongoing monitoring," which
19    the author believed "BOFI is understaffed to handle."  While information relating
20    to loans to foreign nationals may have been publicly available, the market did not
21    previously appreciate why BofI was ill-equipped to handle loans to individuals
22    from countries subject to U.S. sanctions, and how those loans added additional risk
23    to BofI's loan portfolio.

24        220.   On November 10, 2015, *Seeking Alpha* published an article that, as
25    described in ¶¶ 199-202, 204, detailed BofI's suspicious lending relationships with
26    OnDeck and Quick Bridge.  The article also notes that BofI's list of subsidiaries

27

28    ---
[74] *See Ukraine-/Russia-related Sanctions,* U.S. Treasury website, *available at*
https://www.treasury.gov/resource-center/sanctions/Programs/Pages/ukraine.aspx.

cannot be located on the SEC's EDGAR system.[75]   Following this news, the price of BofI stock fell $0.72 per share, or 2.94%, from its closing price of $24.48 on November 9, 2015 to close at $23.76 on November 10, 2015, on high trading volume.

221.   The November 10, 2015 *Seeking Alpha* article relied on information that the market had failed to previously appreciate and incorporate into the Company's stock price.  The article identified the relationships between BofI and the third-party lenders by studying those lender's own SEC filings, rather than BofI's.  The article also analyzed how the third party lenders' substandard underwriting standards would increase the risk in BofI's loan portfolio.

222.   On November 18, 2015, *Seeking Alpha* published its article that, as described in ¶¶ 104-05, revealed that BofI had employed a felon convicted of grand theft, forgery of a credit card receipt, burglary, and dealing in stolen property, in violation of Section 19 of the FDIA.  The article further noted that BofI issued two loans to the individual, even after he filed for bankruptcy.  A search for individuals with the same background revealed that the article was referring to an individual who served as BofI's Senior Vice President of Wholesale and Correspondent Lending during the Class Period.  Following this news, the price of BofI stock declined $0.93 per share, or 4.47%, from its closing price of $20.82 on November 17, 2015 to close at $19.89 on November 18, 2015, on unusually elevated trading volume.

223.   The November 18, 2015 *Seeking Alpha* article relied on information that the market had failed to previously appreciate and incorporate into the Company's stock price.  The article analyzed loan files to uncover that BofI had employed a felon (without disclosing that fact) and issued two loans to him after he filed for bankruptcy, and then further conducted background checks to reveal

---

[75] BofI's 2015 Form 10-K, which refers to Exhibit No. 21.1 which cannot be located, states that the "[s]ubsidiaries of the Company consist of Bank of Internet USA (federal charter) and BofI Trust I (Delaware charter)."

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

that the individual served as a senior vice president at the company.  The market did not appreciate that this conduct had occurred, or that the individual held a high-level position at the Bank, until the article's investigation revealed this fact.

224.   On November 19, 2015, as described in ¶¶ 210-11, BofI's lending relationship with Center Street, which was known for fix and flip, "no doc" and "no FICO," and "no income verification" loans, was revealed in an article published by *Seeking Alpha*.  The article noted that nearly $300 million in risky single-family lender finance loans BofI made to Center Street SPEs were disguised as "Warehouse and other" loans on BofI's financial statements.  Following this news, the price of BofI stock fell $0.49 per share, or 2.4%, from its closing price of $19.89 on November 18, 2015 to close at $19.40 on November 19, 2015.

225.   The November 19, 2015 *Seeking Alpha* article relied on information that the market had failed to previously appreciate and incorporate into the Company's stock price.  Specifically, the article provided detailed analysis of how BofI's relationship with Center Street was likely to increase the amount of risk in the portfolio.  The market did not previously appreciate how the relationship with Center Street related to the accuracy of BofI's statements concerning its underwriting standards.

226.   On December 8, 2015, *Seeking Alpha* published an article confirming the lending relationship between BofI and Quick Bridge.  The article included an image of a UCC Financing Statement showing BLG as the Debtor and BofI Federal Bank as the Secured Party.  According to the article, the second page of the UCC Financing Statement referred to a "Master Loan and Security Agreement dated February 12, 2014" between BofI Federal Bank, which is identified as the lender and secured party, and WCL Holdings I, LLC as the Borrower.  The article notes that BofI's failure to disclose its relationship with Quick Bridge or WCL may be in violation of applicable accounting standards and that WCL may require consolidation.  On December 8, 2015, BofI's stock fell another $0.15 per share, or

1    approximately 1%, from its closing price of $19.12 on December 7, 2015 to close

2    at $18.97 on December 8, 2015.

3    227.    The December 8, 2015 *Seeking Alpha* article relied on information

4    that the market had failed to previously appreciate and incorporate into the

5    Company's stock price.  Specifically, the article identified the relationships

6    between BofI and Quick Bridge, and explained how BofI's undisclosed

7    relationship with these lenders would affect the risk associated with its loan

8    portfolio and be in violation of accounting standards, thereby revealing to the

9    market the falsity in BofI's, Garrabrants's, and Micheletti's statements touting

10   BofI's credit quality and loan underwriting standards.

11   228.    On February 3, 2016, an article appearing on *Seeking Alpha* reported

12   that BofI was no longer "branchless," as it had opened its first branch location in

13   Reno, Nevada that, according to the FDIC's website, was supposed to be a "full

14   service" branch, but an in-person inspection by the author indicated otherwise.[76]

15   According to the author, the Nevada branch was located in shared and tightly

16   compacted office space housing dozens of small businesses and BofI's office was

17   approximately 75 square feet in size.  The office was reportedly staffed with only

18   one person who confirmed she worked for BofI but declined to provide any other

19   information.  The article noted that BofI's program management agreement with

20   H&R Block required that BofI establish a Nevada branch where BofI "will issue

21   and book the Financial Products and take all reasonable actions at the Nevada

22   Branch necessary for [BofI] Bank to export Nevada interest rates (and rely upon

23   Nevada usury rates) on the Emerald Advance and other credit products[.]"  The

24   article concluded that BofI's H&R Block related credit products totaling hundreds

25   of millions of dollars were likely being "booked" through its "phantom" Nevada

26   branch potentially to take advantage of the laws of Nevada, which does not limit

27

28   [76] Aurelius, *Why BOFI Created A Phantom "Full Service Branch" In The Nevada Desert*, *Seeking Alpha*, Feb. 3, 2016.

1  interest rates in express written contracts.[77]  Following this news, the price of BofI

2  stock declined $1.06 per share, or 6.2%, from its closing price of $16.98 on

3  February 2, 2016, to close at $15.92 on February 3, 2016, on elevated trading

4  volume.

5      229.   The February 3, 2016 *Seeking Alpha* article relied on information that

6  the market had failed to previously appreciate and incorporate into the Company's

7  stock price.  The market did not appreciate that BofI was opening the Nevada

8  "branch" for the purpose of taking advantage of Nevada's usury laws, and was

9  only made aware of BofI's real motives once an individual from *Seeking Alpha*

10  investigated the branch in person and reported the true purpose behind the opening

11  of this "branch."

12 **VI.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING**
13 **STATEMENTS RELATING GOVERNMENT AND REGULATORY INVESTIGATIONS**

14     **A.     Statements Regarding Government and Regulatory Investigations**

15      230.   During the Class Period, BofI misrepresented and failed to disclose to

16  investors information concerning government and regulatory investigations, risk,

17  and subpoenas, including the SEC's investigation which commenced in May 2015

18  and escalated into a formal investigation in February 2016.  In fact, Defendants,

19  specifically Garrabrants, affirmatively misrepresented the status of ongoing

20  investigations into BofI by regulators, falsely claiming that there were none when

21  in fact regulators were investigating BofI.[78]

---

[77] *See* Nevada Revised Statutes ("NRS")  99.040(1), which provides, generally, and with respect to contracts:

> When there is no express contract in writing fixing a different rate of interest, interest must be allowed at a rate equal to the prime rate at the largest bank in Nevada, as ascertained by the Commissioner of Financial Institutions, on January 1 or July 1, as the case may be, immediately preceding the date of the transaction, plus 2 percent, upon all money from the time it becomes due, in the following cases:

> (a)     Upon contracts, express or implied, other than book accounts[.]

[78] Statements regarding government and regulatory investigations appear in Section III of the Appendix.

231.   BofI's filings with the SEC during the Class Period do not contain any mention of subpoenas or government or regulatory investigations of the Company. For example, in the section entitled "Legal Proceedings" in its Q1 2016 Form 10-Q, filed with the SEC on October 29, 2015 (five months after the SEC commenced its investigation) BofI failed to disclose the SEC investigation, or any other investigation of the Company.  Instead, BofI stated vaguely in the Form 10-Q that "from time to time we may be a party to other claims or litigation that arise in the ordinary course of business, such as claims to enforce liens, claims involving the origination and servicing of loans, and other issues related to the business of the Bank" and assured that "[n]one of such matters are expected to have a material adverse effect on the Company's financial condition, results of operations or business."  The only legal proceeding BofI specifically disclosed in the Form 10-Q was the first-filed putative securities class action against Defendants that was consolidated into the instant action.

232.   On August 22, 2015, as discussed at ¶ 145, Garrabrants made statements in an article published by *The New York Times* concerning BofI's relationship with its regulators:

- "We've had full a regulatory review of that process [of vetting loans to foreigners] and specific compliments on it [from regulators]. . . . ***It is beyond a nonissue***."

233.   On October 14, 2015, as discussed at ¶¶ 127-28, during a BofI conference call with analysts and investors to discuss the allegations made by former auditor Erhart, Garrabrants assured "[t]here is nothing ongoing" by way of regulatory investigation by the OCC  and "there is no continuity to this," and responded to an analyst's question about OCC review as follows:

> BOB RAMSEY: Okay. And so, they've [the OCC] let you know that there is nothing ongoing related to these concerns that he raised, that they are still investigating at this point?
>
> GREG GARRABRANTS: Well, I have to be very careful about stating exactly what the OCC is doing. But the fact is, is that all of these were investigated. ***There is nothing ongoing***. And the OCC

comes in, and regularly reviews these things. If any of it were true, we wouldn't have gotten these deals done. You can take as absolute confirmation, by the fact that we got those deals done in the month -- one deal done in the month that these allegations were there, and then the next deal, that *there is no continuity to this. We have great regulatory relations. We are under no regulatory orders, no regulatory restrictions on our business, and we continue to have great dialogue with our regulators.* And there's no issues [sic] with any of -- the idea that we are not providing information or something like that.

234.   On the same call, Garrabrants also represented that "[t]here are *no regulatory issues of any kind* that have arisen from Mr. Erhart's contact with the OCC."

235.   These statements and omissions regarding legal proceedings belied the fact that BofI, as it would later admit, was indeed subject to government and regulatory investigation, including a matter under SEC investigation that began no later than May 2015.

236.   On October 30, 2015, BofI finally confirmed, if only indirectly, the existence of government and regulatory investigations concerning BofI when BofI filed supporting documents to its motion in its countersuit against Erhart in this District, *BofI v. Erhart*.  In a memorandum in support of BofI's motion to file certain documents under seal (the "BofI Sealing Brief"), BofI revealed that an accompanying declaration by a forensic investigator hired by BofI to examine Erhart's computer for confidential information "contain[s] the file names of BofI documents" that are confidential because, among other reasons provided by BofI, some file names evidence communications with regulators, which are nonpublic and not to be disclosed, per agency rules.  (*Id.*)  Similarly, file names containing the term "subpoena" evidence nonpublic agency investigations, which BofI is not permitted to disclose.[79]

---

[79] *See* Memorandum of Points and Authorities In Support of BofI Federal Bank's Ex Parte Motion to File Portions of the Declarations of Michael D. Armstrong, John C. Tolla, and James W. Tomlinson, and the Entirety of Exhibits 2, 3, 4, and 7 Under Seal, at p. 5-6 (Dkt. No. 8-1), filed in *BofI v. Erhart* (filed Oct. 30, 2015).

237.    The BofI Sealing Brief also indicated that other declarations, including a declaration by BofI's Chief Governance Risk and Compliance Officer John Tolla, that BofI sought to file under seal included purportedly confidential information showing "records identifying the existence (and, in some cases, the subject matter) of investigations by the OCC." (BofI Sealing Brief at 4-5). The BofI Sealing Brief contained a chart listing BofI's reasons for seeking to seal the documents, including "Reveals existence and nature of confidential regulator communications (12 C.F.R. § 4.3.7(b)(1)(i)); reveals confidential government subpoenas[.]" (*Id.* at 6-8).

238.    The SEC recently released documents concerning BofI in response to another FOIA request that confirmed the SEC's investigation of matters pertaining to BofI, that the investigation began on May 28, 2015 and became a formal investigation on February 11, 2016, and that the SEC issued at least two subpoenas to BofI on February 22, 2016 and October 19, 2016.[80]

239.    A review of the February 22, 2016 subpoena shows that the SEC's investigation was indeed serious as the subpoena sought a wide range of documents from BofI concerning many of the same or similar subject matters that

---

[80] *See* Letters from the SEC Division of Enforcement to BofI Holding, Inc., in *In the Matter of BofI Holding, Inc. (LA-4548)*, dated February 22, 2016 (attaching subpoena for documents "in connection with the above-referenced formal investigation"), and dated October 19, 2016 (attaching subpoena "issued pursuant to a formal order"); and SEC Division of Enforcement Investigation Summary regarding "Inv. No. LA-04548-A, BofI Holding, Inc." (noting Open Date of 5/28/15). In a June 28, 2017 letter to Bar-Adon, the SEC's Los Angeles Regional Office notified BofI of the conclusion of its investigation and that it did not intend to recommend to the SEC to bring an enforcement action, but warned that the notice was provided under the guidelines of Securities Act Release No. 5310 (the "SEC Release") which states, in relevant part, that "*[t]he attempted use of such a communication as a purported defense in any action that might subsequently be brought against the party, either civilly or criminally, would be clearly inappropriate and improper.*" *See* Letter from Diana K. Tani, Assistant Regional Director of SEC's Los Angeles Regional Office to Eshel Bar-Adon, dated June 28, 2017, *available at* ProbesReporter.com. Defendants nevertheless referred to and relied on the June 28, 2017 letter in support of its motion for judgment on the pleadings in this litigation, without actually submitting a copy of or requesting judicial notice of the letter itself for the Court's own review. *See* Defendants' Memorandum of Points and Authorities In Support of Defendants' Motion for Judgment On The Pleadings (Dkt. No. 123-1) at 14 n.8.

underlie the allegations in this Complaint and the Erhart Complaint, including: "BofI's policies, procedures, and practices for identifying, reviewing and disclosing transactions with related parties"; internal controls over approval and disclosure of related-person transactions"; "internal controls over conflicts of interests"; "All Board of Director, Audit Committee, and Compensation Committee meeting minutes"; "any loan made between BofI and Encore Capital Group, Inc. or Propel Financial Services, LLC"; among other documents.

240.   The October 19, 2016 subpoena sought documents pertaining to loans BofI made to foreign nationals, which are a focus of this Complaint and the Erhart Complaint.[81]

## B.   Defendants' Misrepresentations About Government and Regulatory Investigations Caused Investors' Losses.

241.   Beginning on August 28, 2015, Defendants' misrepresentations about government and regulatory investigations of BofI were revealed to the market, causing the Company's stock price to decline and causing investors', including Lead Plaintiff's, losses.

242.   On August 28, 2015, *Seeking Alpha* published an article by an author who indicated that earlier that month, the SEC responded to the author's FOIA request and reportedly invoked a "law enforcement" exemption in refusing to turn over potentially responsive documents, as follows:

> We are withholding records that may be responsive to your request under 5 U.S.C. § 552(7), 17 CFR § 200.80(7)(i). This exemption protects from disclosure records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities. Since Exemption 7 protects the records from disclosure, we have not determined if other exemptions apply. Therefore, we reserve the right to assert other exemptions when

---

[81] Specifically, the subpoena sought documents concerning:  "the percentage of BofI's single-family residential loans ("SFRs") extended to non-resident aliens (NRAs")"; "BofI's underwriting standards for SFRs to NRAs"; "historical performance of SFRs to NRAs"; "Analysis of risk associated with lending to NRAs"; and "Communications Concerning risks associated with lending to NRAs," including communications with "BofI's internal auditors," "BofI's SEC reporting personnel," "BofI's CFO," BofI's Audit Committee," and "BofI's external auditors[.]"

Exemption 7 no longer applies.[82]

243.   The author noted in the August 28, 2015 Article that the SEC's response in this instance differed from its previous responses that "there are no records responsive to your request" to earlier requests the author had made for the same information.  Following this article, the price of BofI's common stock declined $0.97 per share, or 3.1%, from its closing price of $30.38 on August 27, 2015, to close at $29.41 on August 28, 2015, on elevated trading volume.

244.   The August 28, 2015 *Seeking Alpha* article relied on information that the market had failed to previously appreciate and incorporate into the Company's stock price.  It was only after the author made a FOIA request to the SEC, and then compared that response to previous responses received from the SEC for similar requests, that the market became aware of BofI's false and misleading statements regarding the existence of government and regulatory investigations.

245.   As described above at ¶¶ 124-26, on October 13, 2015, Erhart filed a Complaint in which he alleged he "saw a BSA spreadsheet that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of Treasury."  (Erhart Compl. ¶ 33).  According to Erhart, he sat next to a BofI employee who received and logged subpoenas and heard comments about how many subpoenas BofI had received and how frequently BofI received subpoenas.  (*Id.*).  On the filing of the Erhart Complaint and disclosure about the government and regulatory subpoenas BofI received, the price of BofI's stock declined $10.72 per share, or 30.2%, from its closing price of $35.50 on October 13, 2015, to close at $24.78 on October 14, 2015, on extremely high trading volume.[83]

---

[82] The Friendly Bear, *The New York Times Has Only Scratched The Surface on BofI Holding. . .* ," *Seeking Alpha*, Aug. 28, 2015 (the "August 28, 2015 Article").

[83] On a pre-split adjusted basis, BofI's stock price declined $42.87 per share from its closing price of $142.00 on October 13, 2015, to close at $99.13 on October 14, 2015.

246.   On October 30, 2015, as described in ¶¶ 236-37, BofI filed the BofI Sealing Brief in its countersuit against Erhart, which confirmed the existence of "nonpublic agency investigations," "investigations by the OCC," and "confidential government subpoenas."[84]  BofI's stock price declined another $3.26 per share, or 14%, from its closing price on October 29, 2015 to close at $20.00 on October 30, 2015, on extremely high trading volume.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

247.   Garrabrants, as the Company's CEO, is liable as a direct participant in all of the wrongs complained of herein.  Through his position of control and authority, as well as his stock ownership, Garrabrants was in a position to, and did, control all of the Company's false and misleading statements and omissions, including the contents of the Form 10-Ks, Form 10-Qs, press releases, and other public statements, as set forth above.

248.   Garrabrants also possessed the power and authority to, and did, control the contents of BofI's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Garrabrants was provided with copies of the Company's reports and press releases alleged herein to be materially false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

249.   Garrabrants knew and/or recklessly disregarded that public statements made by him and by BofI concerning BofI's business, operations, financial results, and prospects were false and misleading when made.

250.   As described herein, Garrabrants knew but failed to disclose that the Company did not maintain adequate internal controls, and that the Audit

---

[84] A November 5, 2015 *Seeking Alpha* article highlighted that BofI's filing revealed the existence of undisclosed subpoenas and non-public government investigations. *See* Aurelius, "Recent BOFI Court Filing Confirms Existence of Undisclosed Subpoenas And Nonpublic Government Investigations," *Seeking Alpha*, Nov. 5, 2015.

1    Committee and Board were not performing their functions with respect to internal

2    controls and risk management, as stated in BofI's SEC filings.  Knowledge of the

3    Company's misstated earnings may rightfully be attributed to BofI and its key

4    officers and directors, including Garrabrants, who was the Bank's CEO.

5        251.   Garrabrants was also motivated to engage in the fraud alleged herein

6    because he was eligible to receive, and did receive, cash bonuses during the Class

7    Period pursuant to BofI's "Incentive Cash Bonus Plan."  In fact throughout the

8    Class Period, BofI disclosed in its 2013, 2014 and 2015 Proxy Statements that

9    Garrabrants's salary is significantly below his peer group but with the incentive-

10   based compensation added to his salary his total compensation is in line with his

11   peers.  The Incentive Cash Bonus Plan awarded bonus compensation up to 105%

12   of Garrabrants's base salary if he met five metrics, including "increas[ing] non-

13   GAAP securities adjusted earnings per share," which was weighted between 0%

14   and 20% out of 105%.  (2015 Proxy Statement at 18).  For fiscal 2015, BofI's

15   Compensation Committee determined that a bonus equal to 97.5% of Garrabrants's

16   base salary of $375,000 in 2015 was appropriate.  (*Id.*)  The Compensation

17   Committee determined that Garrabrants scored the maximum 20% for the metric

18   of increasing non-GAAP securities adjusted earnings per share.  (*Id.*)  However,

19   with respect to a different metric, that is, "maintain[ing] the Bank's history of good

20   regulatory relations," which was also weighted between 0% and 20%, Garrabrants

21   scored only 10%.  (*Id.*)

22       252.   Defendant Garrabrants also participated in Audit Committee meetings

23   and was therefore aware of BofI's misstatements concerning its internal controls

24   and negative findings by the committee and by internal auditors.

25       253.   Defendant Garrabrants also had the requisite experience and expertise

26   to understand and prepare BofI's financial statements.  According to the 2015

27   Proxy Statement and BofI's website, Garrabrants has an MBA degree and is a

28

THIRD AM. CLASS ACTION COMPLAINT
CASE NO. 3:15-CV-02324-GPC-KSC

1    CFA.  Accordingly, Garrabrants possessed the training and experience to

2    understand that BofI's financial statements were misstated.

3    **VIII.  <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>**

4          254.   Plaintiff brings this action as a class action pursuant to Federal Rule

5    of Civil Procedure 23(a) and (b)(3) on behalf a Class of all persons and entities

6    who purchased or acquired BofI's publicly traded common stock between

7    September 4, 2013 and February 3, 2016, inclusive, as well as purchasers of BofI

8    call options and sellers of BofI put options, (the "Class").  Excluded from the Class

9    are Defendants herein, the officers and directors of the Company, at all relevant

10   times, members of their immediate families and their legal representatives, heirs,

11   successors or assigns, and any entity in which Defendants have or had a

12   controlling interest.

13         255.   The members of the Class are so numerous that joinder of all

14   members is impracticable.  Throughout the Class Period, BofI common stock

15   actively traded on NASDAQ.  While the exact number of Class members is

16   unknown to Plaintiff at this time and can be ascertained only through appropriate

17   discovery, Plaintiff believes that there are hundreds or thousands of members in

18   the proposed Class.  Record owners and other members of the Class may be

19   identified from records maintained by BofI or its transfer agent and may be

20   notified of the pendency of this action by mail, using the form of notice similar to

21   that customarily used in securities class actions.

22         256.   Plaintiff's claims are typical of the claims of the members of the

23   Class, as all members of the Class are similarly affected by Defendants' wrongful

24   conduct in violation of federal law that is complained of herein.

25         257.   Plaintiff will fairly and adequately protect the interests of the

26   members of the Class and has retained counsel competent and experienced in class

27   and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with

28   those of the Class.

258.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of BofI;

- whether the Individual Defendants caused BofI to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of BofI common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

259.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.   FRAUD-ON-THE-MARKET PRESUMPTION

260.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine, in that:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   the misrepresentations and omissions were material;

c.   BofI common stock was traded in an efficient market during the Class Period;

- 90 -

d.      the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e.      the Company traded on the NASDAQ, and was covered by multiple analysts;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g.      Plaintiff and members of the Class purchased and/or sold BofI common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

261.   Based upon the foregoing, Plaintiff and the Class are entitled to a presumption of reliance upon the integrity of the market.

262.   Alternatively, Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.   ADDITIONAL CONTROL-PERSON ALLEGATIONS

263.   As detailed above, each of the Individual Defendants was a "controlling person" of BofI during the Class Period within the meaning of Section 20(a) of the Exchange Act.

264.   Defendant Garrabrants served throughout the Class Period as President, CEO, and a director of BofI; was intimately involved in the day-to-day management of the Company; and bore responsibility for the truthfulness and accuracy of the Company's financials and other statements.  Among other things, Garrabrants signed SOX certifications included in SEC filings by the Company attesting that, to the best of his knowledge, the reports "fully compl[y] with the

1   requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934"

2   and "the information contained in the Report[s] fairly presents, in all material

3   respects, the financial condition and results of operations of the Company." *See* ¶¶

4   46-49, *supra*. Garrabrants made numerous other statements on BofI's behalf

5   during the Class Period. *See* Sections IV.A, V.A, VI.A, *supra*. Additionally, as

6   detailed throughout this Complaint, Garrabrants directly participated in, knew of,

7   or recklessly disregarded the misconduct giving rise to liability under Section

8   10(b) of the Exchange Act.

9        265.   Defendant Micheletti served throughout the Class Period as Executive

10  Vice President and CFO of BofI, was intimately involved in the day-to-day

11  management of the Company, and bore responsibility for the truthfulness and

12  accuracy of the Company's financials and other statements. Among other things,

13  Micheletti signed SOX certifications included in SEC filings by the Company

14  attesting that, to the best of his knowledge, the reports "fully compl[y] with the

15  requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934"

16  and "the information contained in the Report[s] fairly presents, in all material

17  respects, the financial condition and results of operations of the Company." *See* ¶¶

18  46-49, *supra*. Micheletti made numerous other statements on BofI's behalf during

19  the Class Period. *See* Sections IV.A, V.A, VI.A, *supra*. Micheletti accordingly is

20  liable under Section 20(a) as a "controlling person" of BofI, which is a primary

21  violator of the securities laws, as detailed in this Complaint.

22       266.   Defendant Grinberg served throughout the Class Period as a director

23  of BofI as well as Chairman of the Board's Audit Committee, Chairman of the

24  Board's Compensation Committee, and a member of the Board's Nominating

25  Committee. He also serves as Chairman of the Audit Committee of the Board of

26  Directors of BofI Federal Bank. Further, BofI's Board determined Grinberg

27  "meets the definitions of 'audit committee financial expert' adopted by the SEC

28

1    and included in NASDAQ's rules for listed companies." (2015 Proxy Statement at

2    9).

3         267.   Defendant Mosich served throughout the Class Period as Vice

4    Chairman of BofI's Board and as a member of the Board's Audit Committee.  He

5    also serves as a member of the Audit Committee, ALCO, Credit, and Operations

6    and Technology Committees of the Board of BofI Federal Bank.

7         268.   Defendant Argalas served throughout the Class Period as a director of

8    BofI and as a member of the Board's Audit Committee.  He also serves as a

9    member of the Audit Committee and the Internal Assets Review Committee of the

10   Board of BofI Federal Bank.

11        269.   As described above, Grinberg, Mosich, and Argalas signed the Report

12   of the Audit Committee included in BofI's 2013, 2014, and 2015 Proxy

13   Statements, which contained false or misleading statements of material fact.  *See*

14   ¶¶ 43-45, *supra*.

15        270.   As members of BofI's Board and the Audit Committee, Grinberg,

16   Mosich, and Argalas were charged with overseeing the Company's risk exposure.

17        271.   Those committees, the Proxy Statements continued, "report regularly

18   to the Board of Directors on risk-related matters and provide the Board of

19   Directors with insight about our management of strategic, credit, interest rate,

20   financial reporting, technology, liquidity, compliance, operational and reputational

21   risks." (*Id.*)  The Board "is actively involved in oversight and review of the

22   Company's risk management efforts either directly or through its standing

23   committees." (*Id.*)  Further, the Audit Committee—on which Grinberg, Mosich,

24   and Argalas served during the Class Period—"primarily oversees those risks that

25   may directly or indirectly impact [BofI's] financial statements, including the areas

26   of financial reporting, internal controls and compliance with public reporting

27   requirements." (*Id.*)

28

272.   Given their positions as directors and members of the Audit Committee of BofI's Board (including Grinberg's status as an "audit committee financial expert"), Grinberg, Mosich, and Argalas bore responsibility for overseeing risks relating to financial reporting, internal controls, and compliance—all of which were implicated by the misconduct detailed in this Complaint.  These Defendants' responsibilities and activities at BofI thus demonstrate they had the ability to control and influence the Company.

## COUNT I

### (Against BofI and Garrabrants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)

273.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

274.   This Count is asserted against BofI and Garrabrants (collectively, "Defendants," for purposes of this Count) and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

275.   During the Class Period, BofI and Garrabrants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BofI common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise

1    acquire BofI common stock and call options, and to sell BofI put options, at

2    artificially inflated prices.  In furtherance of this unlawful scheme, plan and course

3    of conduct, BofI and Garrabrants, and each of them, took the actions set forth

4    herein.

5         276.  Pursuant to the above plan, scheme, conspiracy and course of

6    conduct, BofI and Garrabrants participated directly or indirectly in the preparation

7    and/or issuance of the quarterly and annual reports, SEC filings, press releases and

8    other statements and documents described above, including statements made to

9    securities analysts and the media that were designed to influence the market for

10   BofI securities.  Such reports, filings, releases and statements were materially false

11   and misleading in that they failed to disclose material adverse information and

12   misrepresented the truth about BofI's internal controls and compliance with federal

13   law.

14        277.  By virtue of his position at BofI, Garrabrants had actual knowledge of

15   the materially false and misleading statements and material omissions alleged

16   herein and intended thereby to deceive Plaintiff and the other members of the

17   Class, or, in the alternative, acted with deliberately reckless disregard for the truth

18   in that he failed or refused to ascertain and disclose such facts as would reveal the

19   materially false and misleading nature of the statements made, although such facts

20   were readily available to Garrabrants.  Said acts and omissions of Defendants were

21   committed willfully or with deliberately reckless disregard for the truth.  In

22   addition, each Defendant knew or deliberately recklessly disregarded that material

23   facts were being misrepresented or omitted as described above.

24        278.  Garrabrants was personally motivated to make false statements and

25   omit material information necessary to make the statements not misleading in

26   order to personally benefit from the sale of BofI securities from his personal

27   portfolio.

28

279.   Information showing that Defendants acted knowingly or with deliberately reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As a senior manager of BofI, Garrabrants had knowledge of the details of BofI's internal affairs.

280.   Garrabrants is liable both directly and indirectly for the wrongs complained of herein.  Because of his position of control and authority, Garrabrants was able to and did, directly or indirectly, control the content of the statements of BofI.  As an officer of a publicly held company, Garrabrants had a duty to disseminate timely, accurate, and truthful information with respect to BofI's business, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of BofI securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning BofI's operations and quality control processes which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired BofI common stock or call options at artificially inflated prices, or sold BofI put options at artificially inflated prices, and relied upon the price of the stock, the integrity of the market for the stock and/or upon statements disseminated by Defendants, and were damaged thereby.

281.   During the Class Period, BofI common stock was traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired BofI shares or call options, or sold BofI put options, at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said stock or call options, or would not have purchased or otherwise acquired them at the inflated prices that were paid or would

1    not had sold said put options or would not have sold them at the inflated prices

2    they received.  At the time of those transactions by Plaintiff and the Class, the true

3    value of BofI stock was substantially lower than the prices paid by Plaintiff and the

4    other members of the Class for stock or call options, or the prices at which Class

5    members sold put options.  The market price of BofI securities declined sharply

6    upon public disclosure of the facts alleged herein, to the injury of Plaintiff and

7    Class members.

8          282.   By reason of the conduct alleged herein, BofI and Garrabrants

9    violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

10    thereunder.

11          283.   As a direct and proximate result of Defendants' wrongful conduct,

12    Plaintiff and the other members of the Class suffered damages in connection with

13    their respective purchases, acquisitions and sales of the Company's securities

14    referenced above during the Class Period, upon the disclosures that the Company

15    had been disseminating misrepresented financial statements to the investing public.

16    **<u>COUNT II</u>**

17    **<u>(Violations of Section 20(a) of the Exchange Act</u>**
**<u>Against the Individual Defendants)</u>**
18

19          284.   Plaintiff repeats and realleges each and every allegation contained in

    the foregoing paragraphs as if fully set forth herein.
20

21          285.   During the Class Period, the Individual Defendants participated in the

22    operation and management of BofI, and conducted and participated, directly and

23    indirectly, in the conduct of BofI's business affairs.  Because of their senior

24    positions, they knew the adverse non-public information alleged herein about

    BofI's business and quality control.
25

26          286.   As officers and/or directors of a publicly owned company, the

27    Individual Defendants had a duty to disseminate accurate and truthful information

28

1   with respect to BofI's internal controls and to correct promptly any public

2   statements issued by BofI which had become materially false or misleading.

3        287.   Because of their positions of control and authority as senior officers

4   and/or directors, the Individual Defendants were able to, and did, control the

5   contents of the various reports, press releases and public filings BofI disseminated

6   in the marketplace during the Class Period concerning BofI's results of operations

7   and internal controls.  Throughout the Class Period, the Individual Defendants

8   exercised their power and authority to cause BofI to engage in the wrongful acts

9   complained of herein, which caused the market price of BofI securities to be

10  artificially inflated.  The Individual Defendants, therefore, were "controlling

11  persons" of BofI within the meaning of Section 20(a) of the Exchange Act.

12       288.   Each of the Individual Defendants, therefore, acted as a controlling

13  person of BofI.  By reason of their senior management positions and/or being

14  directors of BofI, each of the Individual Defendants had the power to direct the

15  actions of BofI, and exercised the same to cause BofI to engage in the unlawful

16  acts and conduct complained of herein.  Each of the Individual Defendants

17  exercised control over the general operations of BofI and possessed the power to

18  control the specific activities comprising the primary violations about which

19  Plaintiff and the other members of the Class complain.

20       289.   By reason of the above conduct, the Individual Defendants are liable

21  pursuant to Section 20(a) of the Exchange Act for the violations committed by

22  BofI.

23  **PRAYER FOR RELIEF**

24       **WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

25       A.   Determining that the instant action may be maintained as a class

26  action under Rule 23 of the Federal Rules of Civil Procedure, and certifying

27  Plaintiff as the Class representative;

28       B.   Requiring Defendants to pay damages sustained by Plaintiff and the

Class by reason of the acts and transactions alleged herein;

      C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

      D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  December 22, 2017     **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

By: /s/   *Richard M. Heimann*
      Richard M. Heimann
      *Attorney for Lead Plaintiff Houston*
      *Municipal Employees Pension System*
      *Email:  rheimann@lchb.com*

Richard M. Heimann (Cal. Bar No. 063607)
rheimann@lchb.com
Katherine C. Lubin (Cal. Bar No. 259826)
kbenson@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Daniel P. Chiplock (admitted *pro hac vice*)
dchiplock@lchb.com
Michael J. Miarmi (admitted *pro hac vice*)
mmiarmi@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Counsel for Lead Plaintiff Houston Municipal Employees Pension System and Lead Counsel for the Proposed Class*

1484159.1