UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE BofI HOLDING, INC. SECURITIES LITIGATION | Case No.: 3:15-cv-02324-GPC-KSC **ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE** **[ECF No. 144]** |

Before the Court is a motion to dismiss the Third Amended Class Action Complaint (the "TAC") filed by Defendants BofI Holding, Inc. ("BofI"), Gregory Garrabrants, Andrew J. Micheletti, Paul J. Grinberg, Nicholas A. Mosich, and James S. Argalas. (ECF No. 144.) The motion is fully briefed. For the reasons explained below, Lead Plaintiff has failed to allege with particularity essential elements of its securities fraud claims. The Court therefore GRANTS the motion to dismiss with prejudice.

## I.    Background

In this consolidated putative securities fraud class action, purchasers of BofI's[1] stock assert claims against BofI and several corporate officers for violations of Sections

---

[1] "BofI is the holding company for BofI Federal Bank, a federally chartered savings association that purportedly operates from its single location in San Diego." (TAC, ECF No. 136 at ¶ 28.) In this ruling, "BofI" will refer to both the holding company and its subsidiary BofI Federal Bank.

10(b) and 20(a) of the Securities Exchange Act of 1934. On February 1, 2016, the Court appointed Houston Municipal Employees Pension System as the Lead Plaintiff (ECF No. 23), and on April 11, 2016, Lead Plaintiff filed a First Amended Complaint (the "FAC") (ECF No. 26). Defendants filed a motion to dismiss the FAC on the grounds that the FAC (1) failed to identify false or misleading statements and (2) did not plead sufficient facts giving rise to a strong inference of scienter. (ECF No. 37.) The Court granted in part and denied in part. (ECF No. 64.) The Court noted that many of the misrepresentations alleged in the FAC fell "short of the PSLRA's [Private Securities Litigation Reform Act] heightened standards," but because a securities plaintiff "need only plead a single materially false misrepresentation to survive a motion to dismiss," the Court's conclusion that the FAC alleged at least some material misrepresentations meant that the Court did not need to "dwell on those aspects of the Complaint" that did not meet the PSLRA's standards. (*Id.* at 15.) The Court found, however, that the FAC's allegations were insufficient to create a "strong inference of scienter on the parts of Defendants Micheletti, Grinberg, Mosich, and Argalas," and dismissed the claims against those defendants without prejudice. (*Id.* at 25–27.)

On November 25, 2016, Lead Plaintiff filed a Second Amended Complaint (the "SAC"). (ECF No. 79.) Defendants again moved to dismiss. (ECF No. 88.) Again, the Court granted in part and denied in part. (ECF No. 113.) The Court first addressed Defendants' reassertion that Lead Plaintiff's pleadings failed to identify any material misrepresentations. Noting that the SAC—like the FAC—was excessive in length, the Court found it helpful to delineate which of the alleged misrepresentations were actionable, and which were not. The Court explained that the SAC alleged "actionable fraudulent or misleading statements as to BofI's loan underwriting practices and as to its internal controls and compliance infrastructure, but [did] not sufficiently demonstrate[] that Defendants' statements about its Allowance for Loan Losses (ALL), Net income/diluted price per share, Loan-to-Value Ratio (LTV), or undisclosed lending partnerships are actionable under the securities laws." (*Id.* at 9.) Noting that the SAC

added no new allegations of scienter on the parts of Micheletti, Grinberg, Mosich, and Argalas, the Court again granted the motion to dismiss the Section 10(b) claims against them. (*Id.* at 3.) The Court nonetheless found the new "control person" allegations sufficient to state plausible Section 20(a) claims against all Defendants. (*Id.* at 58.)

On September 29, 2017, Defendants filed a motion for judgment on the pleadings in which they argued Lead Plaintiff had not pled with sufficient particularity that a disclosure of the falsity of Defendants' misrepresentations caused Lead Plaintiff loss. (ECF No. 123.) The Court agreed and granted the motion. (ECF No. 134.) The Court explained that the corrective disclosures identified in the SAC—a complaint filed in federal court against BofI and a series of articles posted on the website *Seeking Alpha*— either were irrelevant to the alleged misrepresentation or did not actually reveal any fraud to the market. Because that was the first time Defendants argued that Lead Plaintiff failed to plead loss causation adequately, the Court granted Lead Plaintiff leave to amend. (*Id.* at 21.)

On December 22, 2017, Lead Plaintiff filed the now-operative TAC. (ECF No. 136.) As Lead Plaintiff explains in its memorandum in opposition to the instant motion, the TAC is intended to be responsive not only to the Court's judgment on the pleadings ruling, but also to the Court's earlier ruling on Defendants' motion to dismiss the SAC. (*See* ECF No. 148 at 1–2 n.2.) Defendants filed the instant motion to dismiss on January 19, 2018. (ECF No. 144.) Defendants argue that the new alleged misrepresentations in the TAC are not actionable and that the TAC again fails to plead loss causation adequately. Defendants also argue that because Section 20(a) claims require a violation of the securities laws, the TAC's failure to state a claim of violation of Section 10(b) requires dismissal of Lead Plaintiff's Section 20(a) claims. (*Id.* at 25.)

## II. Legal Standard

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

A claim of fraud must comply with Rule 9(b), which requires the complaint to state with particularity the circumstances constituting fraud.  *See* Fed. R. Civ. P. 9(b). Satisfaction of this heightened standard requires delineating "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986)).  The complaint must also indicate "what is false or misleading about a statement, and why it is false," and "be specific enough to give defendants notice of the particular misconduct that they can defend against the charge and not just deny that they have done nothing wrong." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).  In the Ninth Circuit, Rule 9(b)'s heightened pleading standard applies to all element of a securities fraud claim, including loss causation.  *Or. Pub. Empls. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

## III.    Discussion

The elements of Lead Plaintiff's Section 10(b) claims, which assert a violation of Rule 10b-5 (*see* TAC ¶ 274), are (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  In addition to Rule 9(b)'s application to such claims, the Private

Securities Litigation Reform Act ("PSLRA") imposes heightened pleading requirements for the elements of falsity and scienter. With respect to each alleged misrepresentation, the PSLRA mandates that the complaint "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statements is misleading,' 15 U.S.C. § 78u-4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007). "Absent a duty to disclose, an omission does not give rise to a cause of action under § 10(b) and Rule 10b-5. . . . An actionable omissions claim arises only when disclosure is 'necessary . . . to make the statements made, in light of the circumstances under which they were made, not misleading.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (quoting 17 C.F.R. § 240.10b-5(b)).

As discussed in Lead Plaintiff's memorandum in opposition, the TAC retains the misrepresentations deemed actionable by the Court in its earlier ruling, but it also adds new instances of alleged material misrepresentations. The TAC groups the alleged misrepresentations into three categories: (1) statements regarding BofI's internal controls, compliance infrastructure, and risk management; (2) statements regarding BofI's underwriting standards and credit quality requirements; and (3) statements regarding regulatory investigations. (ECF No. 148 at 2.) In the analysis that follows, the Court describes the misrepresentations alleged,[2] and then assesses whether the corresponding alleged corrective disclosures satisfy Rule 9(b)'s heightened pleading standard. With respect to the first two categories—statements regarding internal controls and

---

[2] In its prior ruling, the Court cautioned Lead Plaintiff that the excessive length of its pleadings was contrary to Federal Rule of Civil Procedure 8. (ECF No. 134 at 21.) It appears that Lead Plaintiff has chosen not to heed the Court's warning. Like its earlier iterations, the TAC spans more than one hundred pages and includes numerous allegations of misrepresentations that are patently non-actionable under Ninth Circuit case law. The line between exhaustiveness and excessiveness may be thin, but the TAC clearly falls on the latter side of that divide. Nonetheless, the Court has made an exhaustive review of the TAC and its attached chart organizing Lead Plaintiff's allegations.

underwriting standards—the Court concludes that the allegations of loss causation are inadequate to satisfy Rule 9(b).  As for the third category—statements and omissions regarding regulatory investigations—the Court concludes that (1) the alleged statements and omissions are not actionable and (2) the allegations of loss causation are inadequate to satisfy Rule 9(b).

Before engaging in this analysis, however, the Court finds it helpful to review its previous discussion of the definition of "corrective disclosure" in this context.

## A. Definition of "Corrective Disclosure"

To establish the element of loss causation, a plaintiff "must plausibly allege that the defendant's fraud was *revealed* to the market and *caused* the resulting losses." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (internal quotation marks omitted).  "The misrepresentation need not be the sole reason for the decline in value of the securities, but it must be a substantial cause." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks omitted).  "This inquiry requires no more than the familiar test for proximate cause"; the ultimate issue "is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018) (quoting *Lloyd v. CBV Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).  As stated above, however, loss causation must be pleaded with particularity under Rule 9(b).  *Apollo Grp.*, 774 F.3d at 605.

To prove loss causation, Lead Plaintiff points to what it asserts are "corrective disclosures" of BofI's misrepresentations and notes that a drop in BofI's stock price occurred soon after.  A corrective disclosure must be relevant to the alleged misrepresentation at issue; it must "relate back to the misrepresentation and not to some other negative information about the company." *Bonanno v. Cellular Biomedicine Grp., Inc.*, No. 15-cv-01795-WHO, 2016 WL 4585753, at *3 (N.D. Cal. Sept. 2, 2016) (internal quotation marks omitted).  In other words, a corrective disclosure "is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market." *In*

re *REMEC Inc. Secs. Litig.*, 702 F. Supp. 2d 1202, 1266–67 (S.D. Cal. 2010) (quoting *Teamsters Local 617 Pension & Funds v. Apollo Grp, Inc.*, 633 F. Supp. 2d 763, 818 (D. Ariz. 2009)).

While a corrective disclosure need not be "an outright admission of fraud to survive a motion to dismiss," the disclosure of "a mere 'risk' or 'potential' for fraud . . . is insufficient to establish loss causation." *Loos*, 762 F.3d at 888–89 (citing *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008)). It also need not be a singular event: a series of disclosures, when "viewed in tandem," may be adequate if "[t]he combined force of the[] statements . . . suggest that the market was alerted to" the relevant misrepresentations. *Metzler*, 540 F.3d at 1063 n.6, 1064 n.8. When a series of partial disclosures are alleged, the Court asks whether a full disclosure of the defendant's misrepresentation has been made by "view[ing each] together with the totality of the other alleged partial disclosures." *Lloyd*, 811 F.3d at 1210 (quoting *Pub. Empls. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014)).

As the term suggests, a corrective disclosure normally must reveal some piece of previously undisclosed information showing the falsity of the misrepresentation. *See In re Novatel Wireless Secs. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011) ("It stands to reason then that [a] disclosure that does not reveal anything new to the market is, by definition, not corrective." (internal quotation marks omitted)); *In re Maxim Integrated Prods., Inc. Secs. Litig.*, 639 F. Supp. 2d 1038, 1048 (N.D. Cal. 2009) ("[A] disclosure that does not reveal anything new to the market is, by definition, not corrective." (internal quotation marks omitted)). If the alleged disclosure is duplicative of public information, the market will already have incorporated that information into the stock price; thus, the repeated discussion of the same information normally will not cause any later stock price decrease. *See Bonnano*, 2016 WL 4585753, at *5 (aggregation of publicly-available information "cannot constitute new information because an efficient market would easily digest all public information without the need for [the aggregation] to regurgitate it first" (internal quotation mark omitted)). Repeated discussion of already public information

7

*may* serve as a corrective disclosure, however, when it brings to light an implication of which the market was not aware because understanding that implication required some technical or scientific expertise. *See Gilead Scis.*, 536 F.3d at 1053–54. For example, a discussion of public information may be adequate to serve as loss causation if it interprets "complex economic data understandable only through expert analysis [that was not previously] readily digestible by the marketplace." *Amedisys*, 769 F.3d at 323. By bringing to light an implication of these generally non-digestible data, such an "interpretive corrective disclosure" reveals to the public for the first time information that impacts the value of the stock.

Ultimately, "there is no requirement that the corrective disclosure take a particular form or be of a particular quality . . . . It is the exposure of the fraudulent representation that is the critical component of loss causation." *In re Bristol Myers Squibb Co. Secs. Litig.*, 586 F. Supp. 2d 148, 164 (S.D.N.Y. 2008) (internal quotation marks omitted). In essence, the question is: after the disclosures identified by Plaintiff were made, did the market become aware of the falsity of Defendants' misrepresentations to the extent that it devalued BofI's stock? "If yes, Plaintiff has pled with particularity how Defendants' misrepresentations caused Plaintiff harm; if no, Plaintiff's allegations do not meet the pleading requirements." (ECF No. 134 at 8.)

### B. Analysis

For the reasons explained below, the *Erhart* Complaint served, at most, only as a partial corrective disclosure of the relevant fraud alleged in the TAC. Moreover, the *Seeking Alpha* articles discussed in the TAC cannot serve as even partial corrective disclosures because they relied on publicly available information, and offered no analysis not generally available to the rest of the market. In response to the Court's previous ruling, the TAC adds allegations for each article stating, conclusively, that the market did not appreciate the implications of the publicly available information relied upon by that article. But those conclusory allegations are not sufficient to meet Rule 9(b)'s pleading standard because they do not suggest any plausible reason *why* market participants would

not have understood the implications of the information in front of them.  Finally, the motion to seal filed by BofI in a different case raised, at most, speculation that the Defendants' statements about government investigations were false.

Considering all of the alleged corrective disclosures together, the Court concludes that the TAC does not identify with particularity a corrective disclosure of the misrepresentations alleged.

### i. Internal Controls, Compliance Infrastructure, and Risk Management

The TAC alleges that BofI and its corporate officers made numerous misrepresentations about the adequacy and effectiveness of BofI's internal controls, compliance infrastructure, and risk management.  These alleged misrepresentations were made in Form 10-Ks (TAC ¶ 39), Form 10-Qs (*id.* ¶ 41), proxy statements (*id.* ¶¶ 43, 45), Sarbanes-Oxley certifications (*id.* ¶¶ 46–47), Form 8-Ks (*id.* ¶ 49), and during investor presentations (*id.* ¶ 50) and earnings conference calls (*id.* ¶ 51).  The alleged misrepresentations in this area asserted that BofI's Audit Committee was governed by policies that ensured sound and effective internal controls and that management was responsible for maintaining such effective internal controls.  (*Id.* ¶¶ 39, 43, 45, 49.)  They also asserted that BofI officers had found the bank's internal controls and disclosure policies to be effective, and they had reviewed bank policies for deficiencies.  (*Id.* ¶¶ 41, 46.)  Lead Plaintiff also points to statements allegedly made by Garrabrants and Micheletti suggesting that BofI had robust risk management systems and had even recently made significant investments in its compliance staff, including adopting new systems and hiring new staff.  (*Id.* ¶¶ 50, 51.)  Finally, Lead Plaintiff points to BofI's policy regarding related-party lending, which asserted that such loans were generally made on the same terms as similarly situated borrowers who were not affiliated with BofI.  (*Id.* ¶¶ 53–54.)  According to the TAC, these statements were false because, in reality, BofI had essentially no internal controls.  For example, the TAC cites statements by confidential witnesses who worked at BofI and indicate that management consistently

overrode the actions and concerns of internal auditors, altered reports, approved loans to related parties that were significantly more generous than those offered to non-affiliated borrowers, and falsely responded to regulatory subpoenas and requests.  (*Id.* ¶¶ 56–122.)

With respect to the disclosure of the falsity of these misrepresentations, the TAC points to two sources: (1) a complaint filed in federal court and (2) several articles published on the website *Seeking Alpha*.  The Court addresses these alleged corrective disclosures in turn.

Charles Matthew Erhart, a former BofI internal auditor, filed a complaint against BofI in federal court on October 13, 2015.  *Erhart v. BofI Holding, Inc.*, No. 3:15-cv-02287-BAS-NLS (S.D. Cal.), ECF No. 1 (the "*Erhart* Complaint").  As recounted in the TAC, the *Erhart* Complaint makes numerous accusations that BofI officials engaged in serious misconduct during Erhart's tenure at the company.  (*See* TAC ¶ 124.)  In its previous ruling, the Court described the allegations set forth in the *Erhart* Complaint:

> The *Erhart* Complaint alleges that BofI officers did the following while Erhart served as an internal auditor at BofI: instructed him to remove or shield from discovery any discussion of unlawful conduct that Erhart had noted in an audit report; falsified BofI's financial statements; failed to make timely contributions to BofI's employees' 401k accounts without notifying the Internal Revenue Service or Department of Labor; submitted to the auditing office a strategic plan with forged signatures of the Board of Directors; maintained a too-concentrated deposit source; instructed Erhart never to put evidence of illegal conduct in writing; falsely responded to an SEC subpoena requesting information about a specific account by indicating that BofI had no information about that account; falsely responded to a request by the Office of the Comptroller of the Currency (the "OCC") for information on bank accounts with no tax identification number by stating that BofI had no such accounts; falsely told the OCC that the bank had not received any correspondence or subpoenas from federal and state banking agencies and law enforcement; made undisclosed substantial loans to foreign nationals with serious criminal histories in violation of the Bank Secrecy Act's Anti-Money Laundering Rules; altered auditing reports required by the Bank Secrecy Act's Quality Control requirements; materially miscalculated the bank's allowance for loan and lease losses; created such a "nonexistent culture of compliance" that multiple members of the auditing offices left their jobs; removed negative findings in a Flood Disaster Protection Act

audit before submitting it to the OCC; "sanitized" a report later submitted to the OCC describing third party customers who were involved in BofI's Global Cash Card program by removing information suggesting that the customers were fake; and prevented members of the audit department from using email to communicate so as to prevent the creation of a "paper trail." The complaint also alleges that BofI's largest consumer account was listed under Garrabrants's brother's name, and that Plaintiff suspected that the money in that account came from Garrabrants's rather than Garrabrants's brother. Finally, the complaint alleges that Erhart's manager, John Ball, abruptly resigned on March 5, 2015, "after refusing an order from CEO Garrabrants to engage in what Ball reasonably viewed to be unlawful conduct to cover up the Bank's wrongdoing," and that after Ball resigned, an officer instructed the auditing department not to inform the OCC of Ball's resignation.

(ECF No. 134 at 9–10 (footnote and citations omitted).)[3]  In its previous ruling, the Court concluded that the *Erhart* Complaint's allegations were not relevant to the actionable misrepresentations regarding internal controls and compliance infrastructure because they did not demonstrate that "the compliance office was understaffed or had not been 'beefed up' during the relevant period." (*Id.* at 10–11.)  Because the *Erhart* allegations were irrelevant, the Court found it did not need to address "the parties' dispute over whether allegations asserted in a whistleblower complaint may serve as a partial disclosure in the first place." (*Id.* at 11 n.3.)  The TAC, however, asserts new allegations of misrepresentations that make the *Erhart* Complaint potentially relevant.  For example, Erhart's allegations that BofI officers prevented internal auditors from discussing illegal conduct in writing and altered audit reports are arguably relevant to Garrabrants and Micheletti's assertion that they confirmed the effectiveness of the Audit Committee's controls and procedures.[4]

---

[3] As the Court noted in its previous ruling, Erhart has since filed a First Amended Complaint.  *See Erhart*, No. 3:15-cv-02287-BAS-NLS, ECF No. 32.  The relevant allegations in the First Amended Complaint do not differ materially from the original.

[4] This is not to say, however, that the new alleged misrepresentations are actionable.  Because the Court concludes that the *Erhart* Complaint and *Seeking Alpha* articles discussed in the TAC cannot serve as a

### a. The *Erhart* Complaint as a Corrective Disclosure

The potential relevance of the *Erhart* Complaint tees up the question this Court avoided in its prior ruling: whether the allegations in the *Erhart* Complaint can serve as a corrective disclosure. The Court concludes that, on their own, Erhart's allegations cannot serve as a corrective disclosure. Rather, allegations in a complaint are analogous to an announcement of internal or regulatory investigations into misconduct, which have been held insufficient, on their own, to serve as corrective disclosures. For example, in *Loos*, the Ninth Circuit held that that a company's announcement that it was initiating an internal review of its accounting practices was insufficient to serve as a corrective disclosure. 762 F.3d at 890. The court explained that an investigation raises merely a "risk" or "potential" of fraud, rather than a disclosure of fraud. *Id.* at 888–89. "While the disclosure of an investigation is certainly an ominous event, it simply puts investors on notice of a *potential* future disclosure of fraudulent conduct." *Id.* at 890. As a result, the court concluded, "any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred. This type of speculation cannot[, on its own,] form the basis of a viable loss causation theory." *Id.*

Similarly, in *Meyer v. Greene*, the Eleventh Circuit held that the SEC's announcement that it was initiating an inquiry into a company's real estate valuation practices did not, on its own, amount to a corrective disclosure. 710 F.3d 1189 (11th Cir. 2013). As the court explained, while an "investigation can be seen to portend an added *risk* of future corrective action[, t]hat does not mean that the investigations, in and of themselves, reveal to the market that a company's previous statements were false or fraudulent." *Id.* at 1201.

Just like the investigations discussed above, the *Erhart* Complaint offered at most

_____

corrective disclosure, the Court need not decide whether these new allegations of misrepresentations are actionable.

unconfirmed accusations of fraud. To be sure, if the accusations were confirmed to be true through a later disclosure, loss causation would have been established. *See Loos*, 762 F.3d at 890 n.3 ("We do not mean to suggest that the announcement of an investigation can never form the basis of a viable loss causation theory. Like the Eleventh Circuit, we merely hold that the announcement of an investigation, 'standing alone and without any subsequent disclosure of actual wrongdoing, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'" (quoting *Meyer*, 710 F.3d at 1201). Indeed, that is essentially the facts of *Lloyd*. There, the defendant asserted in SEC filings that it did not have serious doubts about its largest borrower's ability to repay debts, despite the defendant's knowing that the borrower was on the brink of declaring bankruptcy. *Lloyd*, 811 F.3d at 1203–04. Soon after, the defendant disclosed that it had recently received a subpoena from the SEC. *Id.* at 1204. Analysts began surmising that these issues related to the defendant's largest borrower. *Id.* at 1204–05. A month later, the defendant announced that the borrower would not be able to pay its debts. *Id.* at 1205. The Ninth Circuit explained that the defendant's announcement about receiving the subpoena was only a *partial* corrective disclosure, which was not completed until the defendant later confirmed the analysts' fears by announcing that the borrower would default on its loans. *Id.* at 1210. The same applies to the *Erhart* Complaint: while it raised a risk—perhaps even a serious one—that Defendants had committed fraud, the TAC must identify a subsequent confirmation of that fraud to plead loss causation under Rule 9(b).

The Ninth Circuit's recent decision in *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), also supports this view. There, the defendants had "consistently stated that the reviews generated on Yelp's website were 'firsthand' and 'authentic' information from contributors about local business." *Id.* at 1222. After these comments were made, the FTC disclosed that it had received "more than 2,000 complaints from businesses claiming that Yelp had manipulated reviews of their services" by removing and promoting reviews based on a business's relationship with Yelp. *Id.* The Ninth Circuit held that the

13

disclosure of the FTC complaints could not serve as a corrective disclosure because they were only accusations. *Id.* at 1225. According to the court, controlling precedent made clear that "the element of loss causation cannot be adequately made out merely by resting on a number of customer complaints and asserting that where there is smoke, there must be fire." *Id.* The same applies to allegations in Erhart's lawsuit: they draw the market's attention to smoke, but without more, they do not reveal any fire.

Following the reasoning of *Loos*, *Lloyd*, and *Curry*, the Court concludes that the allegations in the *Erhart* Complaint were, at most, a "partial" corrective disclosure of Defendants' misrepresentations about BofI's internal controls. They cannot on their own establish loss causation under the heightened pleading standards of Rule 9(b). If, as in *Lloyd*, a later disclosure occurred that confirmed the risk identified by Erhart's complaint, the totality of those disclosures would be sufficiently corrective to establish loss causation. But for the reasons explained in the next section, the TAC's remaining allegations of corrective disclosures relating to BofI's internal controls (*Seeking Alpha* articles) cannot be considered even another partial corrective disclosure. As a result, in contrast to *Lloyd*, the TAC fails to allege that a later disclosure confirmed any of the allegations asserted in the *Erhart* Complaint.

### b.  *Seeking Alpha* Articles

The TAC points to two *Seeking Alpha* articles and asserts that they disclosed the falsity of the alleged misrepresentations relating to BofI's internal controls. Lead Plaintiff points first to an article written by an author known as "Real Talk Investments" published on October 29, 2015. (TAC ¶ 131; *see* Real Talk Investments, *Buyer Beware: More Odd Behavior From BOFI*, Seeking Alpha (Oct. 29, 2015), https://seekingalpha.com/article/3620436-buyer-beware-odd-behavior-bofi.[5]) As the Court explained in its previous ruling, this article notes "significant" differences between

---

[5] The Court takes judicial notice of the *Seeking Alpha* articles referenced in the TAC. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

a transcript of a conference call BofI sent to the SEC and transcripts of the same call prepared by third parties. The differences noted in this article related to whether the OCC was conducting an investigation into BofI; the largest deposit account at BofI; and why BofI switched external auditors "some years ago." (ECF No. 134 at 17–18.) But as the Court explained in its previous ruling, this article did not disclose any new information to the public because the differing transcripts were already publicly available. According to the TAC, "[w]hile the BofI transcript and the webcast were both available prior to October 29, the market did not appreciate the small but significant differences in the two . . . until the article compared the discrepancies side-by-side." (TAC ¶ 132.) The TAC fails to identify any reason *why* the market did not appreciate the significance of the difference in the transcript versions, and Lead Plaintiff offers no such explanation in its briefing. As this Court explained in its previous ruling, Lead Plaintiff's failure to offer a plausible reason why the market would not have understood the implications of already public information dooms Lead Plaintiff's use of this article as a corrective disclosure. "Plaintiff does not suggest that, for example, the information discussed in [this article] constitute[d] 'complex economic data understandable only through expert analysis.'" (ECF No. 134 at 15 (quoting *Amedisys*, 769 F.3d at 323, and citing *In re Herbalife, Ltd. Secs. Litig.*, No. CV 14-2850 DSF (JCGx), 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015) (granting motion to dismiss because the complaint "provides no basis to conclude that Pershing's conclusions required expert analysis or that the underlying information was not available to the public"), and *In re Blue Earth, Inc. Secs. Class Action Litig.*, No. CV 14-08263-DSF (JEMx), 2015 WL 12001274, at *2 (C.D. Cal. Nov. 3, 2015).)

In its opposition memorandum, Lead Plaintiff contends that the Court was wrong to reject the *Seeking Alpha* articles as corrective disclosures in its previous ruling because "[n]umerous courts in this Circuit . . . have held that analyst reports using publicly available information can indeed constitute corrective disclosures." (ECF No. 148 at 5.) The cases Lead Plaintiff cites, however, are not useful in this analysis because they fail to apply Rule 9(b)'s heightened pleading standard to the allegations of corrective disclosure.

*See Gilead*, 536 F.3d 1049 (predating the Ninth Circuit's holding in *Apollo Group* that Rule 9(b) applied to allegations of loss causation and corrective disclosures); *In re Banc of Cal. Secs. Litig.*, No. SACV 17-00118 AG (DFMx), 2017 WL 3972456, *9 (C.D. Cal. Sept. 6, 2017) ("[T]he Court finds it inappropriate to apply a heightened pleading standard for loss causation."); *Garcia v. Hetong Guo*, No. CV-15-1862-MWF-MRWx, 2016 WL 102213, at *9–11 (C.D. Cal. Jan. 7, 2016) (omitting any discussion of the implications of the heightened pleading standard); *In re Questcor Secs. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *21 (C.D. Cal. Oct. 1, 2013) (predating *Apollo Group*).  As discussed at length in the Court's prior ruling, one of the consequences of applying Rule 9(b) to allegations of a corrective disclosure based on publicly available information is that the pleading must offer a plausible reason *why* the market would not have understood the implications of that information offered by the article's author.  (*See* ECF No. 14–17.)

Next, the TAC cites a January 6, 2016, article written by an author known as "Aurelius."  (*See* ECF No. 123-8.)  As discussed in the Court's previous ruling, this article "states that BofI's audit committee had been 'infected by related party loans to members of the committee,'" "notes that multiple public documents indicate that Grinberg served as a 'key executive' in a third party [Propel Tax] that received financing from BofI while Grinberg was serving as BofI's Audit Chairman," "criticizes BofI for not disclosing these deals," "explains how Grinberg's dual roles in BofI and [Propel Tax] creates a conflict of interest," and "suggests that the failure to disclose this information indicates defects in BofI's 'internal audit function.'"  (ECF No. 134 at 19.)  As with the previous article, this article was written based on public information.  (ECF No. 123-8 at 19 ("All information for this article was derived from publicly available information.").)  Yet the TAC, again, fails to indicate why the market would not have understood the implications of this information.  Rather, the TAC repeats the conclusions of the article.  (TAC ¶ 134 ("[T]he article identified the relationships between BofI and Propel Tax, as well as Defendant Grinberg's relationship with Propel Tax, which could have

compromised the Audit Committee and Company's investigation of the Erhart Complaint and therefore called into question the adequacy of the Company's internal controls and risk management provisions.").)  This is not an explanation of why the market would not have understood the implications of the public information, but rather an explanation of the implications themselves.  The TAC does not suggest why other market participants could not have done the same analysis and reached the same conclusion.  Without more, this article did not reveal anything that demonstrated the falsity of the alleged misrepresentations listed above or confirm for the first time any of the allegations in *Erhart* Complaint.

In sum, the allegations in the *Erhart* Complaint offered, at most, only partial corrective disclosures of the falsity of the alleged misrepresentations discussed above. Because the two *Seeking Alpha* articles cited by the TAC discussed publicly available information, they did not confirm for the first time any of Erhart's allegations.  The TAC's allegations of loss causation regarding misrepresentations about BofI's internal controls are insufficient to meet the heightened pleading standards of Rule 9(b).

### ii.  Underwriting Standards and Credit Quality Requirements

In the second category of allegations, Lead Plaintiff asserts that Defendants made several misrepresentations regarding BofI's underwriting standards and credit quality. The TAC identifies statements by Defendants that every BofI loan must meet the underwriting criteria set forth in BofI's lending policies and applicable regulations and that BofI considered many aspects of a borrower's credit (TAC ¶ 136); that off-balance-sheet loans must meet the same credit policies as on-balance-sheet loans (*id.*); that BofI creates only "full documentation loans" (*id.* ¶ 138); that BofI had no commitments to purchase loans, investment securities, or any other unused lines of credit (*id.* ¶ 139); that BofI did not reduce its "conservative" credit standards while achieving significant portfolio growth (*id.* ¶ 141); and that its partnership with H&R Block would add "strength and diversity" to its "deposit, lending and fee income businesses" and aligned well with BofI's branchless structure (*id.* ¶ 146).  According to the TAC, these statements

17

were false because BofI engaged in "unsound lending practices," its off-balance sheet activities "included undisclosed lending partnerships" subjecting BofI to significant credit and regulatory risk, and BofI violated banking regulations by failing to maintain an adequate Customer Identification Program ("CIP"). (*Id.* ¶¶ 149–216.)

According to the TAC, the falsity of these misrepresentations were revealed to the market by way of *Seeking Alpha* articles. First, it cites an article published on August 28, 2015 by the author "The Friendly Bear," entitled "The New York Times Has Only Scratched the Surface on BofI Holding . . ." (ECF No. 123-4.) As discussed in the Court's previous ruling, this article states in relevant part "that BofI's preferred loan clients are 'home flippers and other speculators – a behavior that resulted in the failure of its "predecessors" Indymac and Thornburg (i.e., allowing borrower to borrow against existing properties, regardless of current lien status, in order to buy additional investment properties),' and that BofI was '[m]aking loans to individuals who are "unsavory" in nature and hardly appear credit-worthy for multi-million dollar loans.'" (ECF No. 134 at 12.) The article also "suggests that BofI is lending to individuals who cannot get a loan at their regular bank institution, and that county records demonstrate that BofI's on-balance sheet loans 'are sourced through mortgage brokers.'" (*Id.*) The article concludes that BofI's five-percent-interest loans are "by definition, economically irrational" and that "BofI must be lending to individuals 'with heaps of existing debt, tax liens, gambling debt, an inability to put more cash at closing, or a history of bankruptcy/foreclosure.'" (*Id.*) The article also describes "that the SEC's recent response to the author's FOIA request suggested that the agency was investigating BofI and that BofI did business with a mortgage company that advertised loans available to borrowers form Russia, a country appearing on OFAC's sanctions list." (TAC ¶ 218.)

The TAC impliedly concedes that all the information relied upon by the author of the August 28, 2015 article was publicly available, but again asserts that the article "relied on information the market had failed to previously appreciate and incorporate into the Company's stock price." (*Id.* ¶ 219.) This time, the TAC suggests a reason that the

market might not have understood the implications of this information. It states that the author was only able to reach its conclusions because the author "pored through hundreds of loans that BofI has written over the past several years," and held "conversations with mortgage brokers." (*Id.*) But that is not a plausible reason why the market would not have understood the implications of this publicly available information. The TAC offers no reason to believe that the majority of other actors in the market would not have been able to also "pore over" the information or hold conversations with mortgage brokers. "Under an efficient market theory, it is not necessary for any specific individual to track down every piece of information on every stock. One presumes that all public information is incorporated into the market price no matter how far flung it may be." *Bonanno*, 2016 WL 4585753, at *5; *see also Miller v. PCM, Inc.*, No. LACV 17-3364-VAP (KSx), ECF No. 42 (C.D. Cal. Jan. 3, 2018) (rejecting plaintiff's argument that a *Seeking Alpha* article was a corrective disclosure because "much of the information it relayed to the public would be burdensome for the average investor to access"). In other words, the presumption of market efficiency that the TAC relies upon to demonstrate reliance assumes that actors in the market have already "pored over" all publicly available information and drawn all reasonable inferences from that information: "[a]n efficient market for good news is [also] an efficient market for bad news." *In re Merck & Co., Inc. Secs. Litig.*, 432 F.3d 261, 271 (3d Cir. 2005). What is important in this analysis is not that it took the author a lot of time to aggregate the data, but rather that the author was able to engage in some analysis that was not available to other market participants. The TAC offers no plausible reason to believe that was the case here.

Next, the TAC cites an article published November 10, 2015, by Aurelius entitled "BofI: Boiler Rooms, Bad Loans, and Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks." (ECF No. 123-5.) As discussed in the Court's previous ruling, this article states: "while 'the soundness of BofI's mortgage lending practices have [recently] been questioned, . . . [t]his writing attempts to shed light on an equally important piece of the mosaic. Sourced entirely from publicly available records, this article exposes how a

network of boiler rooms, bad loans, and off-balance sheet maneuvers appears to have boosted BofI's reported operating results while adding greatly to it[s] risk profile." (ECF No. 134 at 12–13.) The article discusses "how BofI had 'aggressively expanded' into commercial and industrial ("C&I") businesses, but notes that BofI 'offers only limited disclosures' as to its activities, especially its C&I loans." (*Id.* at 13.) It also states "that despite BofI's perceived success, '[a] search of public records . . . reveals that the courts has been flooded with collections and/or bankruptcy cases involving loans that BofI has originated.'" (*Id.*) It explains "this contradiction by stating that 'it appears' that lending partners such as OnDeck purchase loans originated by BofI," and also discusses "BofI's relationships with Quick Bridge, and the 'potential existence' of off-balance-sheet SPEs [Special Purpose Entities]." (*Id.*) "The article also indicates that BofI has partnered with 'Rehab Cash Now,' which advertises loans with no minimum credit score," and "notes that BofI has also engaged in structured settlement loans, citing recent public court documents, which [Aurelius] notes 'hardly appears sustainable.'" (*Id.*)

The TAC offers no reason why the market would not have drawn the same conclusions from the publicly available information relied upon in the November 10, 2015 article. Rather, it states only that the article "identified the relationships between BofI and the third-party lenders by studying those lender's own SEC filings, rather than BofI's," and "also analyzed how the third party lenders' substandard underwriting standards would increase the risk in BofI loan portfolio." (TAC ¶ 221.) Again, this allegation merely repeats the conclusions reached in the article; it does not suggest why other market participants would not, or could not, have reached those conclusions otherwise. Because the TAC does not identify any such reason (and Lead Plaintiff fails to offer any such reason in its briefing), the November 10 article cannot serve as a corrective disclosure.

Next, the TAC points to an article published on November 18, 2015, by Real Talk Investments entitled "Undisclosed Executive History May Be Final Blow for BofI." Seeking Alpha (Nov. 18, 2015), https://seekingalpha.com/article/3695396-undisclosed-

executive-history-may-final-blow-bofi.  The article "revealed that BofI had employed a felon convicted of grand theft, forgery of a credit card receipt, burglary, and dealing in stolen property, in violation of Section 19 of the FDIA," and "that BofI issued two loans to the individual even after he filed for bankruptcy."  (TAC ¶ 222.)  According to the author, the article was "based upon information reasonably available to the author and obtained from public sources that the author believes are reliable."  (ECF No. 144-3.)  Again, however, the TAC fails to identify (and Lead Plaintiff does not explain in its briefing) why the market would not have drawn this same conclusion based on the same information, other than stating that the author "analyzed loan files" and "conducted background checks" in writing the article.  (TAC ¶ 223.)  There is no reason to believe that any other market actor could not have done the same thing.  As Defendants argue, the article engages in no formal analysis; rather, it "merely compar[es] [the employee's decades old and publicly available] mugshot picture to his LinkedIn pictures, [and] compar[es] DOB data from his mugshot with DOB records from public sources that point to an exact match."  (ECF No. 144-1 at 20.)  In fact, the article "disclaim[ed] any expertise in forensic handwriting analysis, and claims no expertise in photographic or facial analysis."  (*Id.* (citation omitted).)  As discussed above, the Court must assume that market actors engaged in similar analysis at the time the information became publicly available, unless Lead Plaintiff offers a reason to presume otherwise.  Lead Plaintiff's failure to do so requires that the Court conclude this article was not a corrective disclosure.

Next, the TAC cites an article published on November 19, 2015, by Aurelius entitled "BofI: Risky Loans to Undisclosed, Off-Balance Sheet SPEs Found Disguised Within Mortgage Warehouse Portfolio."  (*See* ECF No. 123-6.)  According to the TAC, this article "revealed" to the market BofI's lending relationship with Center Street, "which was known for fix and flip, 'no doc' and 'no FICO,' and 'no income verification loans,'" and "noted that nearly $300 million in risky single-family lender finance loans BofI made to Center Street SPEs were disguised as 'Warehouse and other' loans on

BofI's financial statements." (TAC ¶ 224.) According to the article, the author reached this conclusion by reviewing "UCC statements obtained from California's public database." (ECF No. 123-6 at 5.) Contrary to the TAC's assertion, the fact that the UCC statements were available to the public demonstrates that the author did not "reveal" to the market the fact of BofI's relationship with Center Street. The TAC does not identify (and Lead Plaintiff does not explain in its briefing) any special analysis conducted by the author of the article. Instead, the TAC asserts in conclusory fashion that the article "provided detailed analysis of how BofI's relationship with Center Street was likely to increase the amount of risk in the portfolio." (TAC ¶ 225.) This is not enough to meet the particularity requirements of Rule 9(b).

The TAC next cites another Aurelius article published on December 8, 2015, entitled "BofI Confirmed to Finance Undisclosed, Off Balance Sheet SPE to which it Transfers Bad Loans." (ECF No. 123-7.) The article "included an image of a UCC Financing Statement showing BLG as the Debtor and BofI" as the secured party. (TAC ¶ 226.) It also described how the UCC Financing Statement referred to a "Master Loan and Security Agreement dated February 12, 2014" between BofI and borrower WCL Holdings I, LLC. (*Id.*) "The article notes that BofI's failure to disclose its relationship with Quick Bridge or WCL may be in violation of applicable accounting standards and that WCL may require consolidation." (*Id.*) "All information for th[e] article was derived from publicly available information." (ECF No. 123-7 at 7.) As with the articles above, the TAC does not identify (and Lead Plaintiff does not include in its briefing) why the market would not have been reasonably able to draw the same conclusions from the same information prior to the article's publication. (*See* TAC ¶ 227 (repeating conclusions of the article, but not suggesting what analysis was done to reach these conclusions).) As Defendants argue, nothing in this article "suggests that the market needed, much less that the [author] was qualified to offer, any legal or accounting judgment about BofI's relationship with Quick Bridge and WCL" to reach the author's conclusions. (ECF No. 144-1 at 21.)

Finally, the TAC points to an article published by Aurelius on February 3, 2016, entitled "Why BofI Created a Phantom 'Full Service Branch' in the Nevada Desert." Seeking Alpha (Feb. 3, 2016), https://seekingalpha.com/article/3859626-bofi-created-phantom-full-service-branch-nevada-desert. This article reported that BofI was no longer "branchless" because it had opened, according to the FDIC, a "full service" branch in Nevada. (TAC ¶ 228.) The author had visited the branch and discovered that it was "located in shared and tightly compacted office space housing dozens of small businesses and BofI's office was approximately 75 square feet," and that only one person worked in the branch. (*Id.*) The article concluded that, under BofI's program management agreement with H&R Block, the Nevada branch was "booking" hundreds of millions of dollars as a way to take advantage of Nevada's lax interest-rate laws. (*Id.*) Again, the TAC does not provide (and Lead Plaintiff does not argue in its briefing) why the market would not have reached this conclusion based on the same information other than conclusively asserting "[t]he market did not appreciate that BofI was opening the Nevada 'branch' for purposes of taking advantage of Nevada's usury laws, and was only made aware of BofI's real motives once an individual from *Seeking Alpha* investigated the branch in person and reported the true purpose behind the opening of this 'branch.'" (*Id.* ¶ 229.) There is no reason to believe, for example, that market participants could not have visited the Nevada branch prior to Aurelius's visit and reached the exact same conclusion. As a result, the TAC fails to allege with particularity that this article was a corrective disclosure.

In sum, none of the *Seeking Alpha* articles cited in the TAC served as corrective disclosures of the alleged misrepresentations relating to BofI's underwriting standards and credit quality requirements.

### iii. Regulatory Investigations

Last, the TAC offers allegations that Defendants made materially false and misleading statements relating to government and regulatory investigations. The TAC alleges that none of BofI's SEC filings mentioned any government or regulatory

investigation. (TAC ¶ 231.) In particular, the TAC alleges that Defendants failed to disclose an SEC investigation into BofI that was commenced in May 2015. (*Id.* ¶¶ 230–31.) On October 29, 2015, Defendants stated in a Form 10-Q that "from time to time we may be a party to other claims or litigation that arise in the ordinary course of business, such as claims to enforce liens, claims involving the origination and servicing of loans, and other issues related to the business of the Bank," but that "[n]one of such matters are expected to have a material adverse effect on the Company's financial condition, results of operations or business." (*Id.* ¶ 231.) In a *New York Times* article published on August 22, 2015, Garrabrants stated that regulatory concerns over BofI's loans to foreigners were "beyond a nonissue." (*Id.* ¶ 232.) During an earnings call on October 14, 2015, Garrabrants responded to a question regarding the OCC's response to Erhart's accusations of BofI by saying that "[t]here is nothing ongoing" with respect to an OCC investigation, "there is no continuity to this," that "[w]e have great regulatory relations," "[we] are under no regulatory orders, no regulatory restrictions on our business, and we continue to have a great dialogue with our regulators," and "[t]here are no regulatory issues of any kind that have arisen from Mr. Erhart's contact with the OCC." (*Id.* ¶¶ 233–34.)

According to the TAC, these statements were false because the SEC began an investigation into BofI in May of 2015. (*Id.* ¶ 235.) The TAC also alleges that these statements were false in light of Erhart's allegations that when he worked at BofI there were "many [ongoing] subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of Treasury." (*Id.* ¶ 245.) The TAC also alleges that these statements were false or misleading because on October 30, 2015, BofI filed a motion to seal certain filings in litigation against Erhart. Those filings included documents relating to "nonpublic agency investigations," "investigations by the OCC," "confidential government subpoenas," and "records identifying the existence (and, in some cases, the subject matter) of investigations by the OCC." (*Id.* ¶¶ 236–37, 246.) BofI's motion contained a "declaration by a forensic investigator hired by BofI to

examine Erhart's computer for confidential information," who found documents containing file names evidencing "communications with regulators," and subpoenas. (*Id.* ¶ 236; *see BofI Fed. Bank v. Erhart*, No. 3:15-cv-02353-BAS-NLS, ECF No. 8-1 (S.D. Cal.).) A chart accompanying the motion indicated that some of the documents would reveal the "existence and nature of confidential regulator communications." (*Id.* ¶ 237.) The TAC also cites an SEC FOIA response that indicated that it had initiated an investigation into BofI on May 28, 2015, and had issued subpoenas after the Class Period on February 22, 2016, and October 19, 2016. (*Id.* ¶¶ 238–39.)

### a. Misrepresentations

The Court first considers whether these identified statements are actionable under the heightened pleading standards of Rule 9(b) and the PSLRA. The Court concludes that they are not.

"[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). In this context, a misleading statement is distinguished from "puffery," which "concerns expressions of opinion, as opposed to knowingly false statements of fact." *Apollo Grp.*, 774 F.3d at 606. Such "mildly optimistic, subjective assessment hardly amounts to a securities violation." *Id.* (quoting *In re Cutera Secs. Litig.*, 610 F.3d 1103, 111 (9th Cir. 2010)). Rather, in this context, a material misrepresentation is one that is "capable of objective verification." *Id.*

Lead Plaintiff has not identified any duty held by Defendants to disclose the existence of an SEC investigation into BofI. Rather, it argues that the failure to disclose the existence of an SEC investigation rendered the statements listed above false or misleading. The Court disagrees. First, BofI's statements in its SEC filings that it did not "expect" that litigation against it would "have a material adverse effect on the Company's financial condition, results of operations or business" is prototypical opinion-based puffery. *See id.* (rejecting as puffery the statement "[w]e *believe* that our track record for enrollment and revenue growth is attributable to . . .")). The truthfulness of that

statement would not have changed in any respect if BofI had also stated that the SEC was investigating BofI's conduct.

Second, Garrabrants statements in the *New York Times* that regulatory inquiries were "beyond a nonissue," and his statement during the conference call that there were no "regulatory issues," are simply too vague to be false or misleading. Neither statement clarified what the definition of an "issue" might be. A reasonable investor hearing these words would have interpreted those statements to mean not that regulators had no interest in BofI's conduct, but rather that regulatory interest in BofI was not, for example, a "big deal." There is no way to objectively verify the truthfulness of these statements because whether regulatory interest into BofI was an "issue" depends on the subjective understanding of the meaning of the term "issue."

Next, the TAC does not indicate any reason to believe that Garrabrants's conference call statements in response to a question about an OCC investigation was false in light of the fact that there was an ongoing SEC investigation at the time. According to the TAC, Garrabrants was asked by an analyst whether the OCC "let [Garrabrants] know that there is nothing ongoing related to these concerns that [Erhart] raised, that they are still investigating at this point?" (TAC ¶ 233.) Garrabrants answered that he had to be "careful" about what "the OCC is doing," but that "there is nothing ongoing," "there is no continuity to this," and that BofI had "great regulatory relations," was under no "regulatory orders" or "regulatory restrictions on our business," and that BofI had "great dialogue with our regulators." (*Id.*) The fact that an SEC investigation might have been ongoing at this time does not render false the statements that there was nothing ongoing, or there was no "continuity," with respect to the OCC. The SEC and OCC are separate regulatory bodies. As for the statements regarding "regulatory orders" or "restrictions," the TAC does not allege that the SEC's investigation at the time of the conference call included any "orders" or "restrictions." And the remaining statements—that BofI had "great regulatory relations" and enjoyed a "great dialogue" with regulators—are too vague to hold any objective meaning. *Cutera*, 610 F.3d at 1111

(rejecting as too vague the statement that "we believe our employee relations are good").

In sum, the TAC does not allege that Defendants made any actionable misrepresentations regarding regulatory investigations into BofI. But even if these statements were actionable, Lead Plaintiff's claims fail because—for the reasons explained immediately below—the corresponding allegations of loss causation do not satisfy Rule 9(b)'s requirements.

### b. Loss Causation/Corrective Disclosures

The TAC points to three events as corrective disclosures of the falsity of the statements. First, the TAC cites The Friendly Bear's article, discussed above, published on *Seeking Alpha* on August 28, 2015. (*Id.* ¶ 242.) The author noted in that article that in responding to a recent FOIA request submitted by the author, the SEC invoked FOIA's law enforcement exemption protecting "records compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement activities." (*Id.*) This response was different from the SEC's responses to the author's previous FOIA requests, which had stated that the SEC possessed no records responsive to the author's inquiry. (*Id.* ¶ 243.) Second, the TAC points to the *Erhart* Complaint, which in relevant part alleged that during Erhart's time at BofI he "saw a BSA spreadsheet that identified many subpoenas, including from law enforcement agencies, grand juries, and even from the U.S. Department of Treasury," and that BofI received many subpoenas. (*Id.* ¶ 245.) Third, the TAC cites BofI's filing of the motion to seal, discussed above. (*Id.* ¶ 246.)

The listed corrective disclosures are insufficient to show loss causation. The Friendly Bear's article cannot serve as a corrective disclosure of the falsity of any of the statements above for two reasons. First, as with the other *Seeking Alpha* articles, the information discussed was publicly available. Lead Plaintiff offers no reason to believe that other market participants could not have also requested information from the SEC about any investigations into BofI and received the same response. Nor did the article's author engage in any specialized analysis. Any other market participant could have made

the same inference based on the SEC's response.  Second, even if the article revealed new information to the market, it did not *disclose* the SEC investigation referenced in the TAC.  Instead, it merely showed that the SEC was considering an investigation into BofI. Because The Friendly Bear's article did not identify the contents of any SEC investigation, the SEC's response suggested at most a risk that Garrabrants's statement that there were no regulatory "issues" resulting from Erhart's contacts with the OCC was false.  As discussed above, the disclosure of the possibility of a statement's falsity cannot itself serve as a corrective disclosure.  *Loos*, 762 F.3d at 888–89.

Even considering The Friendly Bear's article in conjunction with the other two alleged disclosures, no actual corrective disclosure occurred.  The *Erhart* Complaint's assertion that BofI "frequently" received regulatory subpoenas did not disclose the existence of the SEC investigation at issue here.  Similarly, the motion to seal filed by BofI in its action against Erhart suggested, at most, that regulators had issued subpoenas to BofI at *some point*.  The motion did not indicate whether the documents sought to be sealed were relevant to Erhart's interactions with the OCC.  BofI's assertion in the motion to seal—that subpoenas had been issued to BofI at some point while Erhart worked there—therefore did not disclose, or confirm, the falsity of any of the statements listed above.  *See Metzler*, 540 F.3d at 1064 (holding a disappointing earnings announcement was not sufficiently tied to specific wrongdoing to produce the inference that the market "realized" the fraud once the earnings announcement was released).

In sum, the TAC's allegations of loss causation with respect to alleged misrepresentations about regulatory investigations do not meet Rule 9(b)'s pleading standard.

## IV.    Section 20(a) Claims

Lead Plaintiff makes clear that its Section 20(a) claims are derivative of its Section 10(b) claims.  (ECF No. 148 at 21.)  Because the Court concludes that the TAC fails to state a claim for a violation of Section 10(b), the Section 20(a) claims also fail.  *See Curry*, 875 F.3d at 1228.

## V. Conclusion

In sum, the Court concludes that the TAC's allegations are insufficient to meet the applicable heightened pleading standards. Because the TAC fails to state a plausible claim for a violation of the securities laws, it also fails to state a violation of Section 20(a).

This was Lead Plaintiff's third iteration of its complaint, and it appears that any further amendment would not survive another motion to dismiss. The Court concludes that another opportunity to amend is not warranted. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("The fact that Zucco failed to correct these deficiencies in its Second Amended Complaint is a strong indication that the plaintiffs have no additional facts to plead." (internal quotation marks omitted)). As a result, the Court GRANTS Defendants' motion to dismiss and DISMISSES Lead Plaintiff's claims against Defendants with prejudice.

**IT IS SO ORDERED.**

Dated: March 21, 2018

Hon. Gonzalo P. Curiel
United States District Judge